**LABATON SUCHAROW LLP**
Carol C. Villegas *(pro hac vice)*
Jake Bissell-Linsk *(pro hac vice)*
Guillaume Buell *(pro hac vice)*
Lisa Strejlau *(pro hac vice)*
Danielle Izzo *(pro hac vice)*
140 Broadway
New York, NY  10005
Telephone:  212 907 0700
Fax:  212 818 0477
cvillegas@labaton.com
jbissell-linsk@labaton.com
gbuell@labaton.com
lstrejlau@labaton.com
dizzo@labaton.com

*Counsel for Lead Plaintiff Oakland County Voluntary*
*Employees' Beneficiary Association, and*
*Oakland County Employees' Retirement System*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| THOMAS LAMONTAGNE, Individually and on Behalf of All Others Similarly Situated, | Case No.: 3:23-CV-00869-AMO <br> <u>CLASS ACTION</u> |
| Plaintiff, | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| TESLA, INC. and ELON R. MUSK, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

**TABLE OF CONTENTS**

<u>Page</u>

I.    SUMMARY OF THE ACTION ......................................................................... 2

II.   JURISDICTION AND VENUE ........................................................................ 12

III.  PARTIES ......................................................................................................... 12

IV.   EXPOSITION OF SUBSTANTIVE ALLEGATIONS .................................. 14

    A.    Background ........................................................................................... 14

        1.    Tesla Touts Self-Driving Cars as the Core of Its Business ........................... 14

        2.    Tesla's Autonomy Doublespeak and Relevant Real Definitions .................. 16

        3.    Tesla's Supposedly Lucrative Robotaxi Business ......................................... 22

    B.    Defendants Misleadingly Touted Tesla's Autonomous Driving Technology .......... 24

    C.    Tesla's Autonomous Driving Technology Was Plagued with Safety Issues ............ 51

        1.    Tesla Dangerously Encouraged Inattentiveness ........................................... 51

        2.    Accidents, Research, and Investigations Verify Tesla's Safety Issues .......... 54

    D.    Tesla Was Nowhere Near Release of Level 4-5 Autonomous Driving Systems ....... 62

        1.    Disclosures to Regulators ............................................................................. 62

        2.    Confidential Witnesses .................................................................................. 66

        3.    Expert Analysis of Challenges Tesla Faced ................................................. 72

            a.    Challenges with Establishing Suitable Functionality for Level 4-5 Functionality and Autonomous Robotaxis ................................. 73

            b.    Tesla's Challenge in Achieving This Functionality Was Heightened by The Company's Decisions ......................................... 79

            c.    Challenges with Establishing Sufficient Dependability and Safety for Level 4-5 Autonomy ...................................................... 81

    E.    Tesla Faces Legal Action and Investigations Related to Its Autonomous Driving Technology .......................................................... 84

V.    SUBSTANTIVE ALLEGATIONS BY ELEMENT ...................................... 86

    A.    Defendants' False and Misleading Statements and Omissions ................................. 86

1.              1.      False and Misleading Statements Made in 2019 ............................ 86

2.      False and Misleading Statements Made in 2020 ............................ 93

3.      False and Misleading Statements Made in 2021 .......................... 100

4.      False and Misleading Statements Made in 2022 .......................... 102

5.      Actionable Omissions in Violation of Disclosure Obligations ................... 105

B.      Revelations of Truthful Information — The Truth Begins to Emerge, While Defendants Continue to Mislead the Market ....................................... 106

1.      August 16, 2021: (First Partial Disclosure) .................................. 106

2.      November 2, 2021: (Second Partial Disclosure) .......................... 109

3.      January 26, 2022: (Third Partial Disclosure) .............................. 110

4.      June 3, 2022: (Fourth Partial Disclosure) ................................... 111

5.      February 16, 2023: (Fifth Disclosure) ........................................ 114

C.      Defendants Acted with Scienter ........................................................ 117

1.      Knowledge and Deliberate Recklessness ................................... 117

2.      Motive and Opportunity .............................................................. 124

D.      LOSS CAUSATION AND ECONOMIC LOSS ................................... 129

E.      RELIANCE ........................................................................................ 130

F.      NO SAFE HARBOR ......................................................................... 131

VI.    CLASS ACTION ALLEGATIONS ............................................................... 133

VII.   COUNTS ........................................................................................................ 135

A.      COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Defendants Tesla and Musk ............................. 135

B.      COUNT II: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)/(c) Promulgated Thereunder Against Defendants Tesla and Musk .................. 136

C.      COUNT III: Violation of Section 20(a) of the Exchange Act Against Defendant Musk ............................................................................................. 137

VIII.  PRAYER FOR RELIEF .................................................................................. 138

IX.    JURY TRIAL DEMANDED ........................................................................... 139

ii

Lead Plaintiff Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA") and Oakland County Employees' Retirement System ("Oakland County ERS") (together "Oakland County," "Lead Plaintiff," or "Plaintiff"), brings this action against Defendants Tesla, Inc. ("Tesla" or the "Company") and Tesla's CEO, Elon R. Musk ("Musk").

Lead Plaintiff alleges the following based upon personal knowledge as to Lead Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys.  This included, among other things, review and analysis of: (i) U.S. Securities and Exchange Commission ("SEC") filings by Tesla; (ii) Company press releases and conference call transcripts; (iii) information posted on the Company's website; (iv) analyst reports and media reports about the Company and the industry; (v) online resources and articles regarding the Company; (vi) public court dockets and filings; (vii) insiders' trades of Tesla stock; (viii) public communications by Defendant Musk (*i.e.*, "tweets") to the website Twitter, now known as X ("Twitter"); (ix) publicly available interviews involving Defendant Musk; (x) interviews with former Tesla Employees; (xi) consultation with experts in automobile automation technologies, automobile regulation, and damages; (xii) documents released through freedom of information laws; and (xiii) other publicly available information.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

This securities class action is brought individually by Lead Plaintiff and on behalf of a class of persons and entities that purchased Tesla common stock between February 19, 2019, and February 16, 2023, inclusive (the "Class Period"), and who were damaged thereby (the "Class").  *See* ¶¶460-61 (full class definition and exclusions).

The claims herein arise under (1) Section 10(b) (15 U.S.C. §78j(b)) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) (together "§10(b)"); and (2) Section 20(a) (15 U.S.C. §78t(a)) of the Exchange Act.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

## I.    SUMMARY OF THE ACTION

1.    Throughout the Class Period, Defendants touted the value of investing in Tesla with incessant assurances that it already had technology that enabled cars to safely drive themselves and that it was on the cusp of releasing "full self-driving," which Defendant Musk claimed would generate billions in software and car sales, and revenue from a fleet of autonomous "robotaxis." These were unequivocal lies: Tesla cars cannot safely drive themselves, and Tesla was never close to releasing true autonomous driving systems. While Tesla's stock price was artificially inflated and artificially maintained by this fraud, Defendant Musk sold over $39 billion in stock. As the truth came to light, including through an eventual recall of every single car equipped with Tesla's "full self-driving" software, investors suffered massive losses.

2.    There are international standards classifying different degrees of autonomous driving set by the Society for Automotive Engineers ("SAE"). Levels 1-2 refer to features like adaptive cruise control; Level 3 refers to a car that can drive itself, but which may signal the human driver to intervene; and Levels 4-5 refer to cars that can drive themselves without human intervention.

3.    However, in public statements, Tesla avoids this terminology to describe its technology. Instead, Tesla uses an Orwellian doublespeak vocabulary to describe its autonomous driving technology. Like nearly all car manufacturers Tesla offers a suite of advanced driver assistance systems ("ADAS"), one example of which is adaptive cruise control, and confusingly calls these systems "autopilot." It sells an upgrade called "enhanced autopilot," which adds several features, including "navigate on autopilot," which Tesla describes as "highway autonomy," implying this feature enables cars to drive themselves autonomously on highways. Tesla sells a further upgrade called "full self-driving" ("FSD"), which provides additional ADAS features, *e.g.*, reacting to traffic lights. Tesla claims the FSD upgrade will eventually provide "[a]utomatic driving on city streets."

4.    The Class Period begins on February 19, 2019, when Defendant Musk participated in an interview hosted by high-profile investor ARK Invest. Defendant Musk stated that Tesla would have "feature complete full self driving this year" and emphasized these remarks, by stating "***I'm certain of that. That is not a question mark***." He also stated: "we would think it's safe for somebody to essentially fall asleep and wake up the destination probably towards the end of next year."

5.      Shortly thereafter, on April 22, 2019, Tesla hosted its first "Autonomy Investor Day" event.  During that event, Defendant Musk made the following statements: (1) "[N]ext year, **for sure**, we'll have over one million robotaxis on the road;" (2) "By the middle of next year, we'll have over 1 million Tesla cars on the road with full Self-Driving hardware, feature complete at a reliability level that we would consider that no one needs to pay attention.  Meaning you could **go to sleep** in your [car];" and (3) [A]utopilot is about **twice as safe** as a normal driver on average."

6.      These statements clearly were referring to Tesla reaching Level 4-5 autonomy.  The notion that you could "go to sleep" while your car drives itself, necessarily means the car is capable of safely driving without any human intervention.  Similarly, the release of "robotaxis" necessarily would require Level 4-5 automation, because lesser degrees of automation would require a human driver to drive the car, and Defendant Musk's other statements that day—describing the forthcoming robotaxi business—depicted a scenario where a Tesla owner's car simply goes to work as a robotaxi, generating profit for the owner when the owner is not using the car.  The reference to autopilot being "twice as safe" as a normal human driver, is independently significant, but also relevant to the depictions of the forthcoming autonomy, because such systems would not be permitted by regulators unless the technology was safe.  Altogether, these statements not only conveyed that Tesla would promptly release Level 4-5 autonomy, but also conveyed that the condition of Tesla's technology at that time was such that Defendant Musk could honestly make these assurances.

7.      These statements, and others like them throughout the Class Period, were incredibly significant to investors, because — as Defendants constantly asserted — the release of this technology would enable incredible profits for Tesla.  It would do this in at least three ways.  First, it would create tremendous demand for Tesla's vehicles, both because of the potential for customers to earn revenue through enlisting their car as a robotaxi when not in use, and simply due to the usefulness of the technology.  Second, it would enable Tesla to recognize a tremendous amount of revenue through its sales of the FSD software upgrade, which it sold for anywhere between $5,000 and $15,000 throughout the Class Period, and which would essentially have 100% profit margins.  Third, Tesla would earn billions by operating its own robotaxis and by taking a fee on all revenue generated by consumers putting their own cars to work as robotaxis.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

8.      The potential value of Level 4-5 autonomy was so great that Defendants have often described it as the most important aspect of Tesla's business.  For example, Defendant Musk told the market that: <u>self-driving is **"essential"** and **"really the difference between Tesla being worth a lot of money or worth basically zero"**</u> (6/14/2022).  Throughout the Class Period, Defendant Musk made many similar statements.  *E.g.*, the "timeline to full self-driving" is one of two things "outside investor[s]" should "really focus on" (6/11/2019); "I'm extremely confident that Tesla will have level five next year, extremely confident, 100%" (12/5/2020); "Full Self-Driving will become the most important source of profitability for Tesla" (1/26/2022); autonomy is "basically our entire expense structure" (4/22/2019); "investors are giving us significant credit for achieving self-driving, given that Tesla's valuation/production is very high compared to other automakers" (9/11/2021); "full self-driving can be sold at essentially 100% gross margin" (1/25/2023); FSD will be "the biggest asset value increase of anything in history" (1/25/2023); and "the value of the company is primarily on the basis of autonomy," and "that's really, I think, the main driver of our value" (6/15/2023).

9.      Throughout the Class Period, Defendants continued to regularly convey that Tesla was on the cusp of releasing Level 4-5 autonomy.  *E.g.*, "in 2020, we expect to have 1 million robo taxis on the road" (4/24/19); "we expect to be feature complete with autonomy by the end of this year" (6/11/2019); "the point at which we're able to upload the software enabling a Tesla to become a robotaxi, expect to have that from a functionality standpoint by the end of next year" (10/23/2019); "I feel extremely confident that it will be possible to do a drive from your home to your office most of the time with no interventions by the end of the year" (4/29/2020); "I'm very confident about Full Self-Driving functionality being complete by the end of this year . . . because I'm literally driving it" (7/22/2020); "the Tesla approach is a general solution.  The latest build is capable of zero intervention drives" (10/8/2020); "I think we'll be pretty close to having enough nines that you're going to have no one in the car by the end of this year" (10/19/2022).

10.      Similarly, Defendants continued to regularly claim that Tesla's cars could drive more safely than humans.  *E.g.*, while discussing safety "it's definitely way better than human" (7/22/2020); "Tesla Full Self-Driving will work at a safety level well above that of the average driver this year, of that I am confident" (1/1/2021); "Active Autopilot (car is driving itself) cuts crashes in half again"

(4/17/2021); "So actually being better than a human, I think, is relatively straightforward, frankly" (1/26/2022); while discussing FSD "it is very clearly safer than not deploying it. Yeah." (9/30/2022); "the safety that we're seeing when the car is in FSD mode is actually significantly greater than the safety we're seeing when it is not" (10/19/2022).

11.    In reality, Tesla's cars were riddled with safety issues and the Company was nowhere near releasing Level 4-5 autonomy.

12.    As an initial matter, Defendants admit that, even today, the car cannot safely drive itself, and requires "active driver supervision" for safe operation. For example, in a letter to two U.S. Senators, on March 4, 2022, Tesla explained that its so-called "self-driving" systems "require the constant monitoring and attention of the driver."

13.    In addition to misleading investors, Tesla's exceptionally misleading messaging regarding its system's capabilities also introduced additional safety issues by creating confusion among Tesla drivers. Tesla created a sense that any language regarding the need for monitoring of the vehicles while using autonomous driving features, was pro forma legal boilerplate and that the car could in fact safely drive itself. Defendants encouraged this perception — and therefore dangerous misuse — in a number of ways.

14.    Tesla's primary way of conveying the need for driver supervision was a "nag screen" on the car's computer screen that displayed occasionally if a driver was not holding the wheel. However, Defendant Musk made statements indicating the need to touch the wheel was "[j]ust a precautionary measure" (4/7/2019), that users should be able to disable this "wheel nag" (12/31/2022), that users do not really need to "hold the wheel" as long as they occasionally apply a "slight" force on it (6/13/2018), and that within the year 2022, "the car will be able to take you from your home to your work, to your friend's house, to the grocery store *without you touching the wheel*" (10/19/22). Tesla also noted in filings that drivers were "*ultimately* responsible" for the car's driving — which sounded more like a legal conclusion than a literal description of the system's safety.

15.    Tesla also sowed confusion as to this point with videos and interviews promoting the Company's autonomous driving technology. For example, a 2016 promotional video showed a Tesla supposedly driving itself in various environments and displayed the text: "The person in the driver's

seat is **only there for legal reasons**.  He is not doing anything.  The car is driving itself." (emphasis added).  In *Bloomberg TV* interview from within a Tesla car, Defendant Musk held his hands off the wheel and exclaimed: "See?  It's on full Autopilot right now.  No hands, no feet, nothing."

16.    Indeed, Tesla has faced multiple forms of legal action concerning its misleading depictions of the Company's technology.  The California DMV filed a complaint, documenting several instances of Defendant Tesla overstating the capabilities of its technology, concluding Tesla had misled consumers that the car was truly autonomous.  In Germany, Tesla has been barred from marketing its system using terms such as "autopilot inclusive" due to the possibility of misleading consumers, and the German Federal Motor Transport Authority has demanded Tesla cease using the term "autopilot," to "prevent misunderstanding and incorrect customer[] expectations."

17.    Following an investigation into a fatal crash, the U.S. National Transportation Safety Board ("NTSB") concluded that a "probable cause" of the crash was "the car driver's inattention due to over reliance on vehicle automation, which resulted in the car driver's lack of reaction to the presence of the truck."  The NTSB issued recommendations to Tesla and other manufacturers concerning the risk of misuse of autonomous driving systems.  Well after the proscribed time to respond, the NTSB chairman noted that the other manufacturers responded but Tesla "ignored us." On September 19, 2021, the NTSB chair called Tesla's use of the term full self-driving "misleading and irresponsible" and stated that it had "clearly misled numerous people to misuse and abuse [the] technology."  About a month later, the NTSB chairman reiterated her "deep[] concern" with Tesla's inaction in implanting NTSB's recommendations.

18.    Research has shown that there is a serious risk of autonomous driving technology increasing driving risks as users rely on that system and become less attentive.  One such article in the journal *Accident Analysis & Prevention* found drivers using Tesla's autopilot showed "a lower visual attention to the forward road" and a "shift in attention," which "led to a sharp increase in long off-road glances that are atypical in manual driving."  Another article presented at the *Proceedings of the Human Factors and Ergonomics Society Annual Meeting* concluded that, upon engaging autopilot, users looked away from the road 18% more often and were 32% more likely to not hold the steering wheel.  Another article in the journal *Frontiers in Psychology*, based on 101 in-depth

interviews of Tesla users, concluded that "that drivers became complacent over time with autopilot engaged, failing to monitor, and engaging in safety critical behaviors" and that "[d]rivers adapt to automation over time, engaging in potentially dangerous behaviors."

19.    The safety deficiencies in Tesla's autonomous driving technology are most dramatically demonstrated by the crashes involving usage of Tesla's self-driving systems.  To date there have been hundreds of such crashes and dozens of fatalities.  In a recent news article, former National Highway Traffic Safety Administration ("NHTSA") senior safety advisor Missy Cummings commented that "Tesla is having more severe — and fatal — crashes than people in a normal data set."  For example:

- On March 23, 2018, a Tesla operating on autopilot drove itself off the road and into a piece of roadside equipment.  The crash killed the driver and engulfed the car in flames.  The NTSB investigation of the crash concluded autopilot was the probable cause of the crash.

- On November 24, 2022, a Tesla vehicle operating with the "full self-driving" system engaged, suddenly stopped in a tunnel, causing an 8-car pileup, which injured nine people, including a 2-year-old.  The driver explained the sudden stop was due to the full self-driving system malfunctioning.

- On December 29, 2019, a Tesla with autopilot engaged slammed into the rear of a parked fire truck in the passing lane of a highway, killing one of the car's two passengers.

- On July 24, 2022, a Tesla driver using autopilot struck the rear of a motorcycle, throwing the motorcycle driver to the ground and killing him instantly.

20.    Recently leaked internal Tesla documents — described as the "Tesla Files" in a series of articles by the German publication *Handelsblatt* — show that Tesla recorded thousands of reports of complications involving its autonomous driving technology.  For example, one leaked table reportedly shows 3,000 entries corresponding to such issues, with at least 2,400 complaints about unintended acceleration, 1,500 complaints about break function, and over 1,000 crashes.

21.    Other research has shown that Tesla's technology has a number of demonstrable safety deficiencies.  For example, researchers have shown that the car is liable to: (1) run down a child in a school crosswalk; (2) ignore 'Do Not Enter' and 'Road Closed' signs; (3) overtake stopped school buses; (4) speed in school zones; (5) hit a child in a stroller; (6) run over children crossing the road; (7) swerve into oncoming traffic; (7) ignore road signs warning it to slow down for sharp bends, causing it to cross over the yellow line; and (9) drive on the wrong side of the road.

22.    Tesla does not publish comprehensive data on all crashes involving the Company's technology — but instead publishes more limited data on crashes involving airbag deployment. This data is obviously incomplete, as just a fraction of crashes involve airbag deployment. For example, fatally striking a pedestrian would not be counted unless an airbag was deployed, even though 17.2% of crashes involve pedestrians. Tesla further cherry picks its published data by only counting crashes where the autonomous driving software was engaged immediately before impact, ignoring crashes where the user attempted to intervene by manually steering or breaking, thereby disabling the software.

23.    Absurdly, Tesla compares the limited subset of crashes it reports to national data recording all police-reported crashes, and concludes its "full self-driving" enabled cars are safer than humans. This apples-to-oranges comparison is plainly meaningless based on the deficiencies in Tesla's publicly available data. It is also likely deeply biased by factors such as the decreased likelihood of using autonomous driving technology in more dangerous driving conditions (like severe weather) and the demographics of Tesla's customers, who are less likely to be very old or very young than the average driver.

24.    However, the biggest problem with Tesla's published safety data — as a basis to compare to human drivers — is that it fails to capture the countless instances where human intervention prevented the "self-driving" car from actually crashing.

25.    Tesla does not publish the rate of "disengagements" (also called "interventions") for its autonomous driving technology, and the best available data comes from a "crowd sourced" database with over 100,000 logged miles. That data shows disengagements approximately every 16 miles — which compares **_horribly_** to officially reported data from Tesla's competitors: Waymo reports one intervention per 17,060 miles, which is more than **<u>1,000 times better</u>** than Tesla, and Cruise reports one intervention per 92,902, miles which is over **<u>5,800 times better than Tesla</u>**. Qualitative accounts of intervention rates are often even worse — for example — in one academic article a Tesla user reported "four or five disengagements per mile" for Tesla's FSD software and another user described it as performing like a "5-year-old learning to drive." Indeed, in a recent (August 25, 2023) live stream of Defendant Musk attempting to showcase FSD software, he was

1  forced to intervene after only twenty minutes, as his car lurched into an intersection in an attempt to

2  run a red light.

3     26.    Remarkably, even after the Class Period, Defendant Musk implicitly admitted his

4  Class Period statements that Tesla cars could self-drive at safer-than-human levels were misleading.

5  On July 19, 2023, Defendant Musk stated that "we'll be better than human **by the end of this year**."

6  While his statement was presented as a positive statement, it admitted that **at that time—in July**

7  **2023**, and therefore at all prior times—the system was **not yet** safer than humans.

8     27.    Defendants' representations throughout the Class Period that Tesla was on the cusp of

9  releasing Level 4-5 automation were equally misleading.  First, ongoing safety issues—which would

10  need to be resolved before regulators would permit this degree of automation—demonstrate Tesla's

11  system was nowhere near safe enough to warrant assertions that Level 4-5 automation would

12  promptly be released.  Additionally, a review of the incredible challenges Tesla faced (and still faces)

13  in developing more advanced autonomy, combined with the magnitude of Defendants' deadline

14  misses, further demonstrates that the Class Period statements were misleading.  For example, Musk's

15  start-of-the-Class Period statement that Tesla would "for sure" have a million robotaxis on the road

16  by 2020 is now over three-and-a-half **years** late, and yet Tesla is still nowhere near releasing that

17  Level 4-5 autonomy.

18     28.    Perhaps the most compelling evidence that Tesla's representations concerning the

19  release of Level 4-5 autonomy were false, is its own admissions.  California imposes regulations on

20  those testing autonomous driving.  In documents released through freedom of information requests,

21  Tesla admitted to the California DMV that its FSD software was not even attempting to reach Level

22  3+ autonomy.  First, on November 20, 2020, Tesla told the DMV that its (then limited release) FSD

23  software "**continues to firmly root the vehicle in SAE Level 2 capability**" — meaning it had ADAS

24  features, but not "self-driving."  Due to the regulations arguably covering the attempted development

25  of higher degrees of autonomy, on December 7, 2020, the DMV asked about "Tesla's intended

26  functionality for the **final release**" for the FSD software.  On December 14, 2020, Tesla responded:

27  "**we expect the functionality to remain largely unchanged in a future, full release to the**

28  **customerfleet**" and "**we do not expect** significant enhancements in [object and event detection and

9

response] or other changes to the feature that would shift the responsibility for the entire [dynamic driving task] to the system."

29.    In another document released through freedom of information requests, on March 9, 2021, the California DMV's Autonomous Vehicle Chief wrote a memo to file about a meeting with several senior Tesla employees. In that memo, the DMV employee recounted asking about "Elon's messaging about L5 capability by the end of the year" and explained that CJ Moore (Tesla's Director of Autopilot Software at the time) stated that Defendant Musk's statement "does not match engineering reality." The memo recounts Tesla's recognition that it would need to reach 1-2 million miles per driver interaction before it could release Level 3+ automation, and the memo concludes: "Tesla couldn't say if the rate of improvement would make it to L5 by end of calendar year."

30.    The previously referenced intervention data shows that Tesla is *still* at roughly 16 miles per intervention, meaning the system would need to become about **62,000 times** better before Tesla could consider releasing Level 3+ automation—despite assuring investors it would do so by the end of 2020.

31.    Accounts from Confidential Witnesses ("CWs") further demonstrate that Tesla's technology was unsafe and that Tesla was nowhere near ready to release Level 4-5 automation during the Class Period. Information provided by CW-1 demonstrates that in late 2021, Tesla was still struggling with one of the most basic and fundamental aspects of its technology. Its neural network-based system is built on correctly recognizing road conditions (*i.e.*, perception) and then determining how the vehicle should act. This perception function was so weak in 2019 that the system's attempts to "autopopulate" annotations (*i.e.*, labels) frequently contained errors—in CW-1's experience, there were errors about 30-40% of the time in late 2021. CW-1 also recounted how most employees turned down the opportunity to drive with the autopilot feature because they did not want to be "test dummies." Multiple CWs (CW-1, CW-2, and CW-3) recounted known problems with Tesla's autonomous driving software throughout the Class Period. CW-3 in particular details that Defendant Musk was regularly updated on the status of the technology and its regressions. CW-4 was involved in a crash caused by the autopilot feature in October 2020. While CW-4's account is just one of

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

1    hundreds of autopilot related crashes, it highlights that the system's deficiencies could cause crashes,

2    even where a driver was actively engaged and attempting to avert the crash.

3        32.    The truth concerning Defendants' misrepresentations made its way into the market

4    through a series of revelations, each partially revealing the fraud.  For example, on August 16, 2021,

5    the NHTSA revealed that it was investigating Tesla due to reoccurring incidents, in which Teslas

6    using autopilot crashed into parked fire trucks, police cars, and other emergency vehicles.  The

7    disclosures concerning this investigation provided investors with some insight into the true condition

8    of Tesla's safety systems and the prospect of releasing Level 4-5 autonomy by the end of 2020, but

9    certainly did not apprise of investors of the entire fraud — especially in-light of Defendants'

10   continued misrepresentations.  The final alleged revelation of the fraud occurred on February 16,

11   2023, when it was revealed that Tesla would **recall** all 362,000+ vehicles equipped with its FSD

12   software because the system did not adequately adhere to traffic safety laws and could (and did) cause

13   crashes and deaths.

14       33.    During the Class Period, and while Tesla's stock price was artificially inflated by this

15   fraud, Defendant Musk sold an astronomical quantity of Tesla stock.  Altogether, he received roughly

16   $39.4 billion in proceeds from these sales — an amount equal to roughly the GDP of Vermont — and

17   received roughly $11.5 billion more than he would have by selling the day after the final truthful

18   revelation was absorbed into Tesla's stock price.  Defendant Musk's sales were highly unusual; he

19   sold approximately 24.4% of his shares, often sold near Class Period highs, sold roughly 239% more

20   shares during the Class Period (for 6,534% greater profit) than his sales in the same time period before

21   the Class Period, and has since not sold any shares.

22       34.    This Action seeks to recover for the significant losses suffered by Lead Plaintiff and

23   members of the Class due to Defendants' false and misleading statements and omissions during the

24   Class Period, and the resulting decline in the price of Tesla stock upon revelations of the truth.

25

26                              [continued on following page]

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

## II.   JURISDICTION AND VENUE

35.     The claims asserted herein arise under (1) Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) (together "§ 10(b)"); and (2) Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

36.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

37.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged federal securities violations have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false or misleading information, occurred in substantial part in this Judicial District.  Defendant Tesla was headquartered within this Judicial District for much of the Class Period.  Many of the misrepresentations and omissions were made in this Judicial District, for example, Defendants made misrepresentations and omissions during Tesla's 2019 Autonomy Investor Day event on April 22, 2019, from Tesla's then-headquarters in this Judicial District.

38.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate communications, and the facilities of a national securities exchange.

## III.   PARTIES

39.     Lead Plaintiff Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA") provides healthcare benefits for retired employees of Oakland County and their spouses and eligible dependents.  As set forth in the certifications submitted with its motion for appointment of Lead Plaintiff (*see* ECF No. 14-2), incorporated by reference herein, Oakland County VEBA purchased Tesla stock during the Class Period.

40.     Lead Plaintiff Oakland County Employees' Retirement System ("Oakland County ERS") provides pension benefits to retired employees of the Oakland County retirement system, and their designated beneficiaries.  As set forth in the certification submitted with its motion for appointment of Lead Plaintiff (*see* ECF No. 14-2), incorporated by reference herein, Oakland County ERS purchased Tesla stock during the Class Period.

41.    Defendant Tesla, Inc. ("Tesla") is incorporated under the laws of Delaware and has its principal executive offices in Austin, Texas.   The Company's principal executive offices were previously located at 3500 Deer Creek Road, Palo Alto, California 94304, until December 2021. Tesla's common stock trades on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the ticker symbol "TSLA."   References herein to "Tesla's stock," "Tesla's common stock," "Tesla Stock," or "Tesla common stock," refer to those shares that trade under the ticker symbol "TSLA."

42.    During the Class Period, Tesla conducted two stock splits — a 5-to-1 split on August 31, 2020 and a 3-to-1 split on August 25, 2022 — and, unless otherwise stated, all references to Tesla's stock price and quantities have been adjusted to refer to the adjusted figures.   This means that references to Tesla's stock price prior to August 31, 2020, are stated herein as one-fifteenth the actual price at that time, and references to Tesla's stock price between August 31, 2020 and August 25, 2022 are stated herein as one-third the actual price at that time, unless stated otherwise.   References to quantities of Tesla stock prior to August 31, 2020, are stated herein as fifteen times the actual quantity at that time, and references to Tesla's stock quantities between August 31, 2020 and August 25, 2022 are stated herein as three times the actual quantity at that time, unless stated otherwise

43.    Defendant Elon R. Musk ("Musk") has served as Tesla's CEO at all relevant times. Tesla states: "As the co-founder and CEO of Tesla, Elon leads all product design, engineering and global manufacturing of the company's electric vehicles, battery products and solar energy products." Musk was also Tesla's largest shareholder throughout the Class Period.

44.    As discussed herein, throughout the Class Period, Defendant Musk was intimately involved in the development of Tesla's supposed autonomy features, was the primary spokesperson for Tesla in investor facing events where he discussed these features, and routinely discussed these features in other public forums, such as on his Twitter account and in interviews.   As Tesla's CEO, Musk possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to investors and securities analysts.

IV.     **EXPOSITION OF SUBSTANTIVE ALLEGATIONS**

A.     **Background**

1.     **Tesla Touts Self-Driving Cars as the Core of Its Business**

45.     Tesla initially rose to prominence as a cutting-edge electric vehicle manufacturer. Prior to the start of the Class Period, at year end 2018, Tesla was manufacturing and selling three electric vehicles: the Model S sedan, the Model X SUV, and the Model 3 sedan.  The Company also had businesses selling energy storage devices and solar energy generation systems.

46.     In 2018, Tesla earned about $19.9 billion (about 93% of total revenue) from its electric vehicles business and about $1.6 billion (about 7% of total revenue) from its energy storage and generation business.  While Tesla ended 2018 with $4 billion in gross profit — as discussed herein — it forecast (during the 2019 Autonomy Investor Day event) that it planned to focus on growing its production capabilities and ramping up its release of additional supposed full self-driving technology and launching its robotaxi business.

47.     Tesla's approach to developing autonomous driving technology involves using cameras installed within the cars to, purportedly, identify roads, street markings, signs, and other objects.  Tesla had previously used LIDAR, an advanced sensor to detect distances, but it had abandoned the use of LIDAR around the start of the Class Period.  Tesla also abandoned the use of radar to detect distances in 2021.  Tesla also does not use "high definition maps," as many other developers of autonomous driving technology do, and instead relies entirely on the camera data that its cars collect.  The purported logic of this approach, according to Defendant Musk, is to emulate the way human drivers maneuver roads, entirely based on what the system can see.

48.     As explained in greater detail herein, Tesla's system relies upon collecting real-world driving data sent to it by its cars on the road, and "labeling" that data in various ways.  The labeled data is then provided to train a "neural network," which — at a very basic level — looks for correlations in that data to develop predictive models as to how to interpret the world and respond. Thus, the system theoretically improves as more training data is provided to it, in the form of labeled information.  Throughout the Class Period Tesla relied on both human labelers to annotate the information captured by the cameras on its vehicles and certain "auto labeling" techniques.  Tesla

1  also relied on feeding data to its system from simulations of actual driving activity, though it generally

2  claims this is primarily a tool for improving performance around unusual situations, where real-world

3  data is sparse.

4  49.    Tesla vehicles have computers built into their cars that rely on the models trained by

5  Tesla's neural networks that process data as the cars are driving.  Tesla is able to send "over-the-air"

6  updates to its existing cars, wherein those cars download newly trained models.  These "over-the-air"

7  updates also enable Tesla to provide new functionality to existing cars once that functionality is

8  developed by Tesla.

9  50.    Throughout the Class Period, Tesla charged various different amounts for its

10  autonomous driving technology.  Its cars come with certain "autopilot" features without additional

11  cost, but users can upgrade that service — a product often referred to by Tesla as "full self-driving"

12  or FSD — either at the time of purchase, as a lump sum payment, or on a subscription basis.  For

13  example, in September 2022, Tesla increased the price to buy its FSD upgrade from $12,000 to

14  $15,000, after several previous price increases.

15  51.    Defendants have repeatedly trumpeted autonomous driving technology as the

16  centerpiece of Tesla's business, as shown in the following examples.

17  52.    On April 22, 2019, during Tesla's 2019 Autonomy Investor Day event, Defendant

18  Musk responded to a question asking, "how much Tesla is spending on autopilot or autonomous

19  technology," by stating: "**It's basically our entire expense structure**."  In other words, Musk was

20  stating that the entirety budget of the Company — all of its operations — were in some sense geared

21  toward its autonomous driving technology.

22  53.    At Tesla's Annual Meeting on June 11, 2019, Defendant Musk stated: "**If I were an**

23  **outside investor, I would really focus on 2 things: what is the timeline to full self-driving**, and

24  what is your plan to scale battery production and get the cost per kilowatt hour lower?  Those are –

25  it's basically battery cells and full self-driving."

26

27

28

Amended Complaint for Violations of the Federal Securities Laws
Case No. 3:23-CV-00869-AMO

54.    On September 11, 2021, Defendant Musk tweeted:[1] **"[I]nvestors are giving us significant credit for achieving self-driving**, given that Tesla's valuation/production is very high compared to other automakers."

55.    On January 26, 2022, during Tesla's 4Q21 earnings call, Defendant Musk stated that he believed: "**Full Self-Driving will become the most important source of profitability for Tesla**."

56.    On June 14, 2022, Defendant Musk stated in an interview with a group called "Tesla Owners Silicon Valley," which was broadcast on YouTube, that "the overwhelming focus is on solving self-driving, that's essential, and that's really **the difference between Tesla being worth a lot of money and worth basically zero**."

57.    On January 25, 2023, during Tesla's 4Q22 earnings call, Defendant Musk spoke about the increased revenue Tesla could expect from selling its "full self-driving" upgrade package and stated: "[T]here's millions of cars where **full self-driving can be sold at essentially 100% gross margin**.  And the value of it grows as the autonomous capability grows.  And then when it becomes fully autonomous, that is a value increase in the fleet.  **That might be the biggest asset value increase of anything in history.**"

58.    Most recently, on June 16, 2023, while speaking at a conference, Defendant Musk stated: "Really the value of the company is primarily on the basis of autonomy," and "[t]hat's really, I think, the main driver of our value."

59.    Altogether, autonomous driving technology was unequivocally pitched by Defendants as the critical aspect of Tesla's business, the most important factor in driving its valuation, the focus of its entire expense structure, and the expected source of unprecedented value increases in the near future.

### 2.    Tesla's Autonomy Doublespeak and Relevant Real Definitions

60.    Defendants largely use a convoluted mix of terminology to describe Tesla's autonomous driving technology,[2] eschewing the internationally recognized standard terminology.

---

[1] Throughout the Class Period Defendant Musk had between about 24 million and 127 million Twitter followers, meaning his tweets were widely viewed.

[2] Within this complaint the term "autonomous driving technology" is used as the broadest term to describe technologies that automate any or all portions of driving.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

This Orwellian doublespeak is used by Tesla and Defendant Musk to falsely promote their technology as more capable than it actually is.  Before discussing the terminology that Defendants use, it is helpful to clarify the terminology recognized in international standards.

61.     The Society for Automotive Engineers ("SAE") has established five levels of vehicle autonomy.  Levels 1-2 refer to systems where a human is always driving the vehicle, but technology can assist in certain aspects of its operation.  Level 3 refers to systems where a human can sometimes hand over control of driving tasks but must always be ready to take over and "intervene."  Level 4 and Level 5 both refer to systems where the human is not responsible for driving the car while systems are engaged, with the primary difference being that Level 4 provides this functionality in limited conditions (either within a restricted geographical location or in specific conditions, *e.g.*, not during rain), whereas Level 5 systems are capable of true self-driving in all conditions.  The following graphic was produced by SAE International to explain the differences in these levels of automation:

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17



18    62.    Instead of using the SAE terminology, Defendants routinely use the term "full self-

19  driving" or "FSD" to describe Tesla's technology.

20    63.    By the start of the Class Period, Tesla included a software package in its vehicles called

21  "Autopilot," which it depicted as providing substantial self-driving capabilities.  For example, its

22  2018 Annual Report, published February 19, 2019, stated: "We have expertise in developing self-

23  driving systems, and currently offer in our vehicles an advanced driver assist system that we refer to

24  as Autopilot[.] . . . Our Autopilot systems relieve our drivers of the most tedious and potentially

25  dangerous aspects of road travel."  Throughout the Class Period, Defendants made numerous

26  statements further conflating "Autopilot" with self-driving.  For example, in Tesla's July 20, 2022

27  presentation for its 2Q22 earnings call, Tesla stated the autopilot system provided "highway

28  autonomy," suggesting it was a Level 4 system, but merely restricted to highway use.  And on

18

numerous occasions Defendants compared the safety of autopilot to human drivers — a comparison that heavily implies autopilot is capable of self-driving in a way that enables such an apples-to-apples comparison.  For example, during Tesla's 2019 Autonomy Investor Day event, Defendant Musk stated: "[A]utopilot is about twice as safe as a normal driver on average."

64.    Throughout the Class Period, Tesla also sold a software upgrade called "Full Self-Driving" or "FSD," which purportedly enhanced the self-driving capabilities of the car.  The name of this software upgrade itself was exceptionally confusing — a consumer who knows their car comes with "autopilot" and then pays for an upgrade to "full self-driving" would, or certainly could, easily believe the car was capable of true self-driving (*i.e.*, Level 4-5 automation).  Additionally, Tesla routinely made grandiose claims that suggested that the car was capable of driving itself.  For example, on April 13, 2019, Defendant Musk tweeted promoting Tesla's 2019 Autonomy Investor Day event, stating: "Tesla will free investors from the tyranny of having to drive their own car."

65.    While Tesla's SEC filings throughout the Class Period stated that drivers were still technically responsible for driving, Defendants downplayed this disclosure as a mere legal technicality.  For example, Tesla's SEC filings state: "Although, at present, the driver is ***ultimately*** responsible for controlling the vehicle, our system provides safety and convenience functionality that allows our customers to rely on it much like the system that airplane pilots use when conditions permit."  (emphasis added).

66.    This disclosure, and those like it, were particularly vague because — if taken at face value — it was demonstrably nonsensical.  For example, during the Class Period Tesla offered a feature called "Smart Summon" as part of its FSD software upgrade, which permitted users to direct the car to drive itself to them across very short distances.  This product, while a galaxy away from fulsome Level 4 or Level 5 autonomy, is literally intended to be used without a driver in the car, rendering Tesla's assertion that the "driver" is responsible for controlling the vehicle nonsensical.  That Tesla releases some features that plainly are intended to be used without a driver in the car, renders their disclosure that the driver is "ultimately responsible" extremely confusing.  Drivers would be readily led to believe that this language is either meaningless, mere legal boilerplate, or subject to undefined exceptions.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

67.     In theory, Tesla's software requires drivers to occasionally touch the steering wheel in order to avoid a visual "nag screen" display reminding them to do so.  However, Defendant Musk presented this as a mere technicality — not a reflection of the car's actual capabilities.  For example, (1) on April 7, 2019, Defendant Musk tweeted that this was "[j]ust a precautionary measure;" (2) on December 31, 2022 Defendant Musk tweeted that he "[a]greed" users should be able to turn off the nag screen; (3) on June 13, 2018, Defendant Musk tweeted the system does not really require the user to "'hold the wheel,'" as long as they occasionally put a "'slight up or downward force'" on it; (4) on October 19, 2022, during the 3Q22 earnings call, Defendant Musk said that regardless of whether the car had received "regulatory approval," by the end of that year, "the car will be able to take you from your home to your work, to your friend's house, to the grocery store ***without you touching the wheel***." (emphasis added).

68.     Defendant Musk has also fostered the belief that driver's need not actually pay attention to the vehicle while it's autonomous driving technology is engaged.  For example, on December 17, 2020, he tweeted: "Tesla AI/Autopilot engineering is awesome!  There's some great AI out there, but can it self-drive while playing Cyberpunk … ?"  Cyberpunk is a highly immersive computer game — not a phone game — and this tweet gave the impression that the car was sufficiently safe that one could safely play a game on a laptop while the Tesla drove itself.

69.     Defendants have added to this confusion with numerous videos and TV appearances. For example, a 2016 promotional video showed a Tesla driving itself through intersections, stop signs, highway on-ramps, and off-ramps, while a driver sat with their hands on their lap.  The video included the text: "The person in the driver's seat is **only there for legal reasons**.  He is not doing anything. The car is driving itself."  (emphasis added).  Notably, it has recently come to light, based on testimony by a senior Tesla employee (Ashok Elluswamy) that the video was staged.  As *Reuters* reported on January 18, 2023, "[t]o create the video, Tesla used 3D mapping on a predetermined route," "[d]rivers intervened to take control in test runs," and "[w]hen trying to show the Model X could park itself with no driver, a test car crashed into a fence in Tesla's parking lot."  On January 19, 2023, *Bloomberg* reported that Defendant Musk was directly involved in that staged video, including by personally writing the text quoted above — "[t]he car is driving itself[,]" emailing that

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

it was fine to "hardcode" some of the drive, *i.e.*, giving explicit permission to fake the self driving technology," and emailing that "needs to feel like one continuous take," which clearly demonstrates he knew it was heavily edited.

70.    Defendant Musk has appeared in multiple TV interviews operating a Tesla without his hands on the wheel.  For example, during an October 10, 2014, *Bloomberg TV* interview, Musk is seen operating a Tesla without holding the wheel, and then states: "See?  It's on full Autopilot right now.  No hands, no feet, nothing."  The image below shows Defendant Musk during that interview.



71.    Indeed, it has been widely reported that it is relatively easy to bypass Tesla's detection of driver engagement, including with the purchase of a product called an "Autopilot Buddy," which attaches to the steering wheel.  The ease at which the control system can be bypassed further suggests to users that the system is merely a technical or legal requirement, not a necessity reflecting the car's true capabilities.

72.    Regulators have repeatedly warned Tesla about the dangers of its use of misleading terminology to describe the capabilities of its cars as "self-driving."

73.    For example, on July 28, 2022, the California DMV filed complaints against Tesla alleging it had misleadingly represented to consumers that its cars were autonomous.  The DMV complaint was based on the "Autopilot" and "Full Self-Driving Capability" labels, as well as

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

numerous other statements made by Tesla in the promotion of its technology. For example, the complaint identified language on Tesla's website claiming, "[t]he system is designed to be able to conduct short and long-distance trips with no action required by the person in the driver's seat." It also identified the following statement on Tesla's website as contributing to the misleading impression that Tesla's vehicles were autonomous:

> From Home - All you will need to do is get in and tell your car where to go. If you don't say anything, your car will look at your calendar and take you there as the assumed destination. Your Tesla will figure out the optimal route, navigating urban streets, complex intersections and freeways. To your Destination - When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.

74.    Similarly, on July 16, 2020, the publication *Car and Driver* reported that a German court ruled that Tesla had been misleadingly using phrases referring to "'Autopilot inclusive'" and "'full potential for autonomous driving'" in its marketing. The article noted Tesla's tendency to "liberally apply phrases such as 'full autonomy' and 'self-driving' to the driver-assist systems in its vehicles." *Reuters* reported on July 14, 2020, that the German court determined "such claims amounted to misleading business practices, adding that the average buyer might be given the impression that the car could drive without human intervention." In 2016, the German Federal Motor Transport Authority (KBA) wrote Tesla a letter stating: "In order to prevent misunderstanding and incorrect customers' expectations, we demand that the misleading term Autopilot is no longer used in advertising the system."

### 3.    Tesla's Supposedly Lucrative Robotaxi Business

75.    Throughout the Class Period, Defendant Musk's assertions that it would run a network of "robotaxis" was heralded by Musk as a tremendous source of value for the Company. The concept of robotaxis was for Tesla to enable drivers to use a phone application to enable third parties to summon their car and drive them to a destination — mimicking other car services like Uber, except that the car would be able to perform this work without a driver, enabling the owner to receive passive income while they were not personally using the car. Defendant Musk further explained that Tesla would supplement the "fleet" of robotaxis with its own cars to ensure there were sufficient Tesla robotaxis to meet demand.

76.     To release the robotaxi product, Tesla would need to achieve true "self-driving" capabilities, because without such capabilities the car would not be able to drive to customers to pick them up.  The assertions, discussed herein, of a forthcoming robotaxi fleet are therefore necessarily also assertions of forthcoming Level 4-5 autonomy.  Indeed, Tesla itself has equated robotaxis with Level 4-5 autonomy — for example, Defendant Musk tweeted on October 11, 2019 directly equating "robotaxis" with "FSD without supervision."

77.     The robotaxi fleet would generate value for Tesla in at least three ways: (1) the Company would take a cut of the profit from all robotaxi trips; (2) Tesla would operate its own Company-owned robotaxi fleet; and (3) the prospect of customers generating passive income through the robotaxi system would massively increase the demand for Tesla's vehicles and the "full self-driving" software upgrade.  Tesla repeatedly claimed that robotaxis would unlock tremendous value for Tesla.  For example:

78.     During Tesla's 2019 Autonomy Investor Day, on April 22, 2019, Defendant Musk stated: "I just think between now and when the robo taxis are fully deployed throughout the world, the sensible thing for us is to maximize rates and drive the company to cash flow neutral.  Once the robo taxi fleet is active, ***I would expect to be extremely cash flow positive***."

79.     On October 11, 2019, Defendant Musk claimed that robotaxis would essentially make owning a Tesla nearly free (a prospect that would be sure to massively increase demand for its vehicles) — tweeting: "***[Y]ou'll be able to earn far more than monthly lease***/loan cost by allowing others to use it.  Managing a small fleet of robotaxis will be a career for many & much better than driving a single car."

80.     On January 26, 2022, during Tesla's 4Q21 earnings call, after claiming that full self-driving would become the most important source of profit for Tesla, Defendant Musk stated: "I mean actually, if you run the numbers on robotaxis, it's kind of nutty.  **It's nutty good from a financial standpoint**."  During that same call, Musk stated: "I think basically everything pales in comparison to the value of robotaxi or full self-driving."  He also stated: "People just do not understand how profound a change this is.  It's not like some little feature.  It's like the most profound software

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

upgrade maybe in history.  Millions of cars suddenly have, what, 4 or 5x utility overnight.  I don't actually know how to quantify that financially except that it's some big number."

81.    Investors also placed significant weight on the value of Tesla's robotaxi business.  For example, ARK Invest, a high-profile investment firm led by Cathie Woods and actively followed by the media and retail investors, released a statement to its website on January 31, 2020, titled: "Tesla's Potential Trajectory During the Next Five Years."  In that statement, ARK Invest stated that its "Bull Case," one of the scenarios that it aggregated into its overall valuation, incorporated a view that Tesla would earn $351 billion per year from its robotaxi business in 2024, roughly 37.11% more than revenue estimated from car sales in the same scenario.  That figure contributed in the aggregate to its overall expected target for Tesla of $7,000 per share (in non-split adjusted prices or $466.66 per share in split adjusted prices).  While these projections are astronomical compared to Tesla's prices of $650 per share (in non-split adjusted prices or $43.37 in split adjusted figures), they highlight the tremendous weight that many investors placed on the robotaxi business.

**B.    Defendants Misleadingly Touted Tesla's Autonomous Driving Technology**

82.    Throughout the Class Period, Defendants continually represented that Tesla was on the cusp of releasing safe and functional Level 4-5 self-driving technology and claimed that Tesla already had technology such that its cars could drive themselves at a greater safety level than humans.

83.    On February 19, 2019, Defendant Musk participated in a podcast interview and claimed Tesla would be "feature complete — full self-driving — this year," adding that people could safely sleep in their car as it drives to the destination, and asserting: "I'm certain of that.  That is not a question mark."

84.    *Business Insider* reported on the interview, in a February 19, 2019, article titled, "Elon Musk doubled down on a bold claim he made about how quickly Tesla vehicles will be able to drive themselves," noting that "his use of the word 'certain' was striking."  That same day, *Wired* wrote: "Elon Musk Promises a Really Truly Self-Driving Tesla in 2020."  An article in *Motor Trend*, published soon thereafter, on February 21, 2019, reported: "Elon Says Teslas Will Fully Drive Themselves This Year."

85.     On April 13, 2019, Defendant Musk posted to Twitter, promoting Tesla's upcoming "2019 Autonomy Investor Day" event: "On April 22, Autonomy Investor Day, Tesla will free investors from the tyranny of having to drive their own car."  This tweet was clearly aimed at priming the public to believe Tesla would be announcing major developments in its "self-driving" technology at that event, which Defendants followed through on, with a variety of false and misleading statements.

86.     The 2019 Autonomy Investor Day was hosted from Tesla's (then) headquarters in Palo Alto and livestreamed over the internet.  The event began with a video ostensibly showing off Tesla's supposed self-driving technology and included presentations by Tesla executives regarding the Company's related hardware and software capabilities.  It also included a presentation and question-and-answer session with Defendant Musk, where he extolled Tesla's competitive advantages in the vehicle automation space.[3]

87.     During the event, Defendant Musk boldly declared that "[b]y the middle of next year, **we'll have** over 1 million Tesla cars on the road with full Self-Driving hardware, feature complete at a reliability level that we would consider that no one needs to pay attention.  Meaning you could go to sleep in your [car]."  Musk also stated: "[I]f you fast-forward a year, maybe a year, maybe a year and three months, but next year, **for sure**, we'll have over one million robo taxis on the road."  Musk emphasized these statements by telling investors that Tesla could turn their existing cars on the road into robotaxis with a wireless software update — "The fleet wakes up with an over-the-[air] update. That's all it takes." — and then reiterated the supposed immense value this would create — "You say

---

[3] Presentations directed to investors and analysts (*e.g.*, earnings calls, "investor day" events, and analyst conferences) are often accompanied by cautionary language intended to satisfy the requirements of the PSLRA Safe Harbor for forward-looking statements (*see* ¶¶455-59).  Under that statute, statements by a company representative may, in certain situations, qualify for the Safe Harbor protections, if among other things, the statement is (a) accompanied by a cautionary statement identifying "the particular oral statement [as] a forward-looking statement" and stating that "actual results might differ materially from those projected," and (b) "accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ . . . is contained in a written document," the statement "identifies the document" containing those factors, and the "information contained in that written document" is an adequate cautionary statement under the statute.  15 U.S.C § 78u–5(c)(2).  Notably, the 2019 Autonomy Investor Day event included no such cautionary language, as was the case for many of Defendants' remarks during the Class Period.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

what is the net present value of the robo taxi?  Probably on the order of a couple of hundred thousand dollars.  So buying a Model 3 is a good deal."

88.     This statement is remarkable in its directness.  The first sentence included no hedging or wavering.  It assured investors that by the middle of 2020 "we'll have" over 1 million cars with "feature complete" full self-driving that is sufficiently reliable that drivers need not pay attention and could literally go to sleep while their car drives them to their destination.  The second sentence equivocated only as to whether this would occur in April 2020 (one year) or July 2020 (one year and three months), but stated Tesla would "**for sure**" have over a million "robo taxis" on the road by the end of 2020.  And the remaining sentences emphasized the importance of this development and downplayed the difficulty — noting that "all it takes" for Tesla to complete this is pushing a software update out.

89.     During the 2019 Autonomy Investor Day event, Defendant Musk further emphasized just how close Tesla supposedly was to activating a robotaxi fleet by claiming the Company was "actually adjusting tire design and really optimizing the car for a hyper efficient robo taxi," and then added: "You can say like probably 2 years from now, we're making a car that has no steering wheels or pedals.  And if we need to accelerate that time, we can always just delete parts.  Easy."  Musk also boasted that the "really fundamental message that consumers should be taking today is that it's financially insane to buy anything other than a Tesla."

90.     During this same event, Defendant Musk made equally profound statements about the current safety levels of Tesla's autonomous driving technologies.  Musk asserted: "[W]hat we see right now is that autopilot is about twice as safe as a normal driver on average."  Musk went on to state that Tesla expected that number to "increase quite a bit over time" and then contextualized his assertions by stating that "consumers will want to outlaw people driving their own cars" because of how much safer self-driving technology will be compared to humans.

91.     Thus, in addition to his assertions that during 2020 Tesla would have full self-driving cars that would be reliable enough that the human inside could sleep while being driven around, and a million robotaxis on the road, Defendant Musk also contended that the technology was *already,* on April 22, 2019, at a point that it was **twice** as safe as human drivers on average.

92.    The 2019 Autonomy Investor Day also highlighted the importance of full self-driving to Tesla's business plans.  Defendant Musk explained that Tesla planned to be "cash flow neutral" (*i.e.*, not profitable) as it focused on maximizing production, but that "[o]nce the robo taxi fleet is active, [he] would expect to be extremely cash flow positive."

93.    News outlets and analyst reports commenting on the 2019 Autonomy Investor Day event focused on Defendant Musk's assertions concerning the forthcoming self-driving cars, robotaxi fleet, and safety.

94.    For example, in a Cannacord Genuity analyst report published on April 22, 2019 and titled, "Tesla unveils Autonomous Strategy with mind-blowing Level 5 capabilities within a year," analyst Jed Dorsheimer reiterated his Buy rating on Tesla and his $391 per share price target for the Company and commented on the "Tesla 'Robotaxi' fleet, a planned autonomous ride-share network that would roll-out next year."  Dorsheimer concluded: "We continue to see Tesla as the clear leader in EVs, and if anything remotely close to the timeline for Level 5 capabilities that the company has laid out occurs, the formidable lead that the company has in autonomy will result in meaningful market share gains."

95.    The investor publication, *TheStreet*, published an article on April 22, 2019 with the headline, "Elon Musk Promises 'Over a Million' Tesla Robotaxis by the End of 2020," which stated that "[t]he Tesla CEO told investors that Tesla would have a fleet of autonomous robotaxis by the end of next year" and reiterated Musk's confidence that Tesla's automation technology would render its cars "fully usable with no hands on the steering wheel" by the end of 2020.

96.    The investor publication, *SeekingAlpha*, also published an article about the event on April 22, 2019, focusing on Defendant Musk's statements about robotaxis, and reciting that Defendant Musk's assertion: "We will have more than 1M robotaxis on the road."

97.    *SmartCitiesDive*, an online publication focused on the transportation industry, published an article on April 23, 2019, titled, "Tesla promises 'robotaxi' network by 2020," which stated that the "pledge to have a fleet of robotaxis on U.S. streets next year [was] a bold statement," reiterated Tesla's purported technological advantages, and noted how Defendant Musk had "emphasized the safety" of the technology.

98.     After the 2019 Autonomy Investor Day event, news outlets reported that Defendant Musk had sent an internal email to all Tesla employees, with the subject line: "Great day for Tesla!" The email reportedly stated: "The Autonomy Day was extremely well-received.  Feedback has been incredible.  [Smiling emoji here.]  Awesome result of extremely intense effort by the Autopilot Team! [two clapping emoji]."

99.     Just two days after the 2019 Autonomy Investor Day event, during the earnings call for Tesla's 1Q19 results, on April 24, 2019, after market close, Defendant Musk reiterated that "in 2020, we expect to have 1 million robo taxis on the road."  Defendant Musk also reiterated that this would be enabled by simple "over the [air]" updates to the vehicles' software.  He also explained that owning a Tesla with the FSD upgrade would enable customers to earn "somewhere between $10,000 and $30,000 a year" by putting their car into the Tesla ride hailing network when they were not personally using it.

100.     During this earnings call, Defendant Musk also boasted about Tesla's full self-driving systems and robotaxi business.  For example, he stated: "We believe we'll have the most profitable autonomous taxi on the market."  He also stated: "I'm very excited about the future for other products, especially for full self-driving, which will fundamentally transform transport as we know it."  Musk's misrepresentations and omissions artificially inflated and/or artificially maintained the price of Tesla stock during a quarter when Tesla reported a wider-than-expected loss and 31% lower delivery numbers than 4Q18.

101.     Analysts reacted favorably to Defendant Musk's enthusiastic statements during the earnings call about Tesla's autonomous driving technology.  For example, an April 25, 2019 Morgan Stanley analyst report states:

> Tesla is trying to showcase its technological advantages while the gap to peers is still extremely wide. Based on our experiences with the company's autopilot technology this past Monday, we believe Tesla has at least comparable full self driving technology at between 1/100th and 1/200th the cost of many peers demonstrating exquisite, Lidar-encrusted robot taxis. To be clear, we estimate Tesla's vision based sensor and computer hardware solution costs around $1k/car vs. other L5 autonomous prototypes with $100k to $200k of hardware cost per unit or more.

102.     On June 11, 2019, Defendant Musk spoke at Tesla's annual meeting.  Despite the myriad safety issues with Tesla's autonomous driving technology, discussed in the following Section,

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

1  Defendant Musk assured investors that Tesla's top priority was safety, claiming: "safety . . . is

2  paramount for us . . . like the absolute primary thing is to maximize the safety of the car," before

3  adding "it's really hard to have a serious injury in a Tesla," and "[i]t's like -- literally it's absurdly

4  safe."

5          103.    During the annual meeting Defendant Musk also touted Tesla's supposed competitive

6  advantages in developing full self-driving.  He claimed that Tesla's computer is "literally 20x faster

7  than the NVIDIA system it replaces," though after similar claims at Tesla's 2019 Autonomy Investor

8  Day, NVIDIA had pointed out that this comparison misquoted specs on the relevant NVIDIA chip

9  and compared Tesla's new chip with an older NVIDIA chip, not with NVIDIA's newest chip.

10          104.    Defendant Musk also reassured investors of the timeline for its release of full self-

11  driving technology during the annual meeting.  He explained that Tesla expected to release a car that

12  was "feature complete with autonomy" by the end of the year, and while he noted that this release

13  will still require supervision, he said it would be able to drive from "your garage to your parking

14  space at work without intervention."  He stated that by the end of 2020 "you'll be able to have the car

15  be autonomous without supervision."  Curiously, he noted that "sometime thereafter" Tesla would be

16  able to "convince the regulators that autonomy is safe enough" for the car to go around with nobody

17  inside.  This last statement was a confusing representation because it was unclear how Musk believed

18  he would have regulatory blessing to permit autonomous driving "without supervision" before

19  convincing regulators the car could drive itself without people inside.

20          105.    Defendant Musk also made several statements about the value of their autonomous

21  driving technology, claiming the "really fundamental message that consumers should be taking today

22  is that it's financially insane to buy anything other than a Tesla."  He also advised, that "outside

23  investor[s]" should focus on "what is the timeline to full self-driving" as one of two critical questions

24  when thinking about investing in Tesla.

25          106.    Analysts again repeated Defendant Musk's enthusiasm for Tesla's FSD technology.

26  For example, on June 11, 2019, Morgan Stanley issued a report on Tesla titled, "Can Tesla Borrow a

27  Page from Detroit on Capital and Talent Retention?," in which it stated: "We currently value Tesla

28  Autonomy at $8.5bn or $45/share on a DCF model. While not disclosed by the company, we estimate

29

that out of Tesla's nearly 50k employees, at least 5k employees are involved directly in developing hardware and software architecture for its AV and EV tech." The report continued, "Musk described Tesla's autonomous tech spend: 'It's basically our entire expense structure.'"

107. The technology-focused publication *CNET* reiterated Defendant Musk's statements about FSD in an article dated June 11, 2019, titled, "Tesla's 2019 shareholder meeting recap: Business up front, submarine cars out back." The article noted the shareholder meeting "was basically a retread of what we've been hearing from Elon over the last year: full self-driving will be "'feature complete'" by the end of 2019, buying an internal combustion vehicle without the ability to drive autonomously is like buying a horse and a flip phone in 2019, the Supercharger V3 rollout is starting to happen at scale and more."

108. During Tesla's 2Q 2019 earnings call on July 24, 2019, another quarter during which Tesla's results missed sales, EPS, revenue, and gross margin consensus estimates, Defendant Musk again made statements conveying that full self-driving technology would soon be released.

109. Tesla sold the "FSD" software upgrade, which promised customers access to true full self-driving capabilities once those features were released. Tesla could therefore only recognize the full revenue from these software upgrade sales upon releasing the full self-driving feature. Against this backdrop, Defendant Musk stated that, when considering Tesla's financial prospects for the year, one needed to "factor in the full self-driving option," which he said was "in play for the year," which indicated that Tesla expected to release full self-driving capabilities in 2019. He further explained: "We just need to get the features done, make sure they're great, roll them out and recognize revenue."

110. During the earnings call, an analyst noted how Defendant Musk had "mentioned the importance of full self-driving for gross margin," and asked Musk if he expected "to be able to offer the full-self driving suite that you plan to offer in the U.S.?" Musk responded affirmatively: "Yes. We expect to be able to offer full self-driving actually everywhere except EU because there's just some committee rules that were put in place years ago that needs to be changed. It's up -- from a technical standpoint, it's very doable, but we just need to work through the regulatory committees to get the regulatory approvals and rules changed." While this statement didn't itself convey any particular timeline for the release of full self-driving, it implied that it was imminent — as Musk

confirmed regulations in the US would not be an obstacle and compared that to Europe, where he believed some rules needed to be changed before they could release self-driving technology.

111.    Analysts again repeated Defendant Musk's enthusiasm for Tesla's FSD technology. For example, on July 24, 2019, Morgan Stanley issued a report on the Company's 2Q19 call titled, "5 Key Thoughts Following the Analyst Call," in which Adam Jonas pointed out the following:

> 25% auto gross margin target dependent upon FSD uptake. For many years, Tesla management have targeted an auto gross margin of over 25% in a steady-state. We don't recall Tesla management so clearly stating that such margins would be dependent upon the update of software upgrades that carry extremely high margins (including upgrades for cars already in the fleet) before this evening.

112.    Similarly, on July 25, 2019, Jefferies published an analyst report titled, "Q2 Challenging but Still Encouraging," in which analyst Philippe Houchois stated that he "[c]ontinue[s] to see value in Tesla's technology lead (power train and AV development)" as part of Jefferies' "Investment Thesis."  Likewise, also on July 25, 2019, Oppenheimer published an analyst report titled, "Strong Volumes; But Margin Pressure Surprises to Downside," wherein analyst Colin Rusch heralded "TSLA's position as a leader in electric vehicle and to a lesser extent advanced drive assistance system (ADAS) functionality which is disrupting the transportation market" as a reason Oppenheimer maintained its "Outperform" rating for Tesla.

113.    Defendant Musk continued to claim Tesla would release "***feature-complete Full Self-Driving***" that year, during Tesla's 3Q19 earnings call on October 23, 2019.  In separate statements during that call, Defendant Musk again stated that Tesla would release software enabling the car to drive itself by the end of 2019, that by the end of 2020 it would not require supervision, and thereafter would receive regulatory approvals.  He added that "flipping of the switch from a car that is . . . not robotaxi to robotaxi, I think will probably be the biggest step-change increase in asset value in history by far."  In other words, that the imminent release of technology enabling robotaxi's would massively increase the value of Tesla's cars, and presumably, cause a correspondingly massive increase in demand for their vehicles.

114.    As during the previous quarter, analysts repeated Defendant Musk's enthusiasm for Tesla's FSD technology.  For example, in an October 24, 2019 analyst report published by Bernstein, stated: "Directionally, we also see further upside to long-term auto gross margins, given the potential

of the higher margin Model Y and increased take rates / functionality for Full Self-Driving." Sacconaghi expanded upon this statement further, writing: "While most investors have focused on the incremental margin opportunity that this deferred revenue presents over time, we'd argue that the real opportunity for Tesla is for it to increase the attach rate and / or the functionality of Full Self Driving - with the potential to permanently improve the gross margin profile of the Model 3."

115.    News reports also underscored and repeated Defendant Musk's enthusiasm for Tesla's FSD technology during the 3Q19 earnings call.  For example, on October 24, 2019, technology-focused online magazine *Futurism* posted an article by Kristin Houser, titled "Tesla: Autopilot Is Nearly 9 Times Safer Than The Average Driver."  The article recited "good news" in Tesla's 3Q19 update, focusing on the supposed safety of Tesla's self-driving technology, stating: "According to Tesla, cars with Autopilot engaged were involved in one accident for every 4.34 million miles driven during the quarter.  The average for human drivers in the United States is one accident for every half million miles — making Autopilot nine times less likely, according to the Elon Musk-led automaker, to be involved in an accident."

116.    During the earnings call for Tesla's 4Q19 results, on January 29, 2020, after market close, Defendant Musk continued to claim Tesla was "pretty close" to releasing "feature-complete" full self-driving, even though they had not launched it by the close of 2019, as they claimed they would.  Musk added that Tesla vehicles "might be feature-complete in a few months."  Defending the failure to meet the previously stated release by the end of 2019, Musk stated: "[W]hat isn't obvious regarding Autopilot and Full Self-Driving is just how much work has been going into improving the foundational elements of autonomy[,]" and that Tesla was "making great progress."  Musk also touted the Company's improvement in "labeling," — essentially preparing data for use in the machine learning system Tesla relied upon for autonomous driving development — which he claimed was "like a 3 order of magnitude improvement," over their prior technique.

117.    Once again, Defendant Musk reiterated the importance of autonomy during Tesla's 4Q19 earnings call, claiming "high margin" would have a "profound effect on [Tesla's] financials," and that high margin would come "from autonomy" in the form of people buying the FSD upgrade. He concluded that thought by claiming: "[A]s we are close to Full Self-Driving, that's just going to

become more and more compelling.  So that's -- from a financial standpoint, that's the real mind-blowing situation, is high volume, high margin because of autonomy."

118.    Given the strong 4Q19 results, analysts including Credit Suisse and Cowen  raised their 2020 EPS estimates on Tesla, with Cowen noting in a January 30, 2020 report: "We are raising our estimates on a pull forward of the Model Y launch and FSD revenue recognition."

119.    In a January 31, 2020 report, Morgan Stanley analyst Adam Jonas noted that in the nearly nine years they had been covering Tesla's stock, they had "not observed the tone of investor commentary as optimistic on the future and confident in the company's ability to grow into a dominant player in the global light vehicle market while creating value that puts it firmly in the discussion with the world's largest mega-cap tech firms."

120.    When Tesla held its 1Q20 earnings call on April 29, 2020, Defendant Musk stated he was "extremely confident" that Tesla's autonomous driving technology would drive customers "from your home to your office most of the time with no interventions by the end of [2020]."  He elaborated that "we can almost do this already" with the "alpha builds," referring to the not-yet-publicly released version of the software.  Musk also explained that Tesla's vast data collection from those using its existing autopilot system provided Tesla with advantages in developing fully self-driving vehicles. Musk also noted: "So -- and yes, we really need to be thinking about what is the transportation of the future, not the transportation of the past.  If this was 1920, do you want to be investing in steam engines or internal combustion engines?  Obviously, not steam engines."

121.    Analysts shared Defendant Musk's enthusiasm for Tesla's FSD technology following the 1Q20 earnings call.  For example, Bernstein published a report on April 29, 2020, titled "*Tesla Q1 20 Debrief: Looks Great.  How's Demand?*," in which analyst A.M. (Toni) Sacconaghi, Jr. wrote: "We see several structural forces positively impacting GMs, including . . . higher full-self-driving adoption and revenue recognition, which could be aided by a new FSD subscription offering late this year."

122.    News reports also echoed Musk's enthusiasm for Tesla's FSD technology following the 1Q20 earnings call.  For example, on May 1, 2020, Bridie Schmidt published an article, titled "'A lot of exciting news': Elon Musk reveals how far ahead of the game Tesla is now," in *The Driven*, an

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

Australian news outlet focused on electric vehicles, and wrote: "A number of significant tidbits of information came forth from Tesla's first quarter earnings report for 2020, which added together have confirmed just how far Tesla is ahead of the electric vehicle game." Schmidt continued noting that Tesla's recently released FSD feature gives the Company "more valuable and voluminous information about autonomous driving as drivers effectively label objects for Tesla as they drive," and concluded: "No wonder car makers are worried."

123. Defendant Musk posted a tweet on June 8, 2020, claiming that the "prime directive" of Tesla's autopilot system is "don't crash," indicating that safety was the Company's top priority. The same tweet claimed that the sensor suite on Tesla vehicles enabled them to be "superhuman," which — especially in the context of a tweet about safety — was yet another assurance that the Tesla system was able to drive itself at levels safer than humans. Musk also claimed that future software upgrades would "increasingly show the potential" of Telsa's technology.

124. Tesla held its 2Q20 earnings call on July 22, 2020, and Defendant Musk once again claimed its autonomous driving technology was safer than human drivers. He began by boasting about new changes to Tesla's neural network training, which he insisted would lead to improved self-driving performance — "[T]he car will seem to have just like a giant improvement. We'll probably roll it out later this year. But we'll be able to do traffic lights, stop, turns, troughs, everything pretty much" — and then claimed there will be a "long march of 9s," referring to the notion of improving from 99.9%+ reliability to a degree of reliability with many more nines, *e.g.*, 99.99999% reliability. He concluded that, while it would be "real work" to continue that march of 9's, the system was already "definitely way better than human[s]."

125. In the same earnings call, Defendant Musk claimed that the system was "profoundly better than people realized. Yes, really profoundly better. It's like amazing." Musk then explained that the technology is "almost getting to the point where [he] could go from [his] house to work with no interventions, despite going through construction and widely varying situations." He then stated that "this is why I'm very confident about Full Self-Driving functionality being complete by the end of this year. It's because I'm literally driving it."

126.    That last sentence is particularly interesting because Defendant Musk was expressly stating that his basis for asserting that Tesla would "complete" full self-driving functionality by the end of 2020 was, at least in significant part, due to his experience using Tesla's autonomous driving technology to commute from his house to Tesla's headquarters with no intervention.  However, as described in Section IV(D)(2), Defendant Musk's experience was not representative of the system's general capabilities, because he provided feedback to his engineering teams based on his drives, who in turn made changes to the system to improve its performance along his commutes.  Additionally, special efforts were made to collect data by having Tesla's in-house cars drive the routes Musk frequented so that the car could learn the routes, further rendering his experience on those routes mostly irrelevant to Tesla's general capabilities on other routes.

127.    This issue is enhanced by the nature of Tesla's neural network-based approach to developing its autonomous driving technology.  A neural network develops in performance by being provided training data.  A system that has been fed training data for a specific route, and then further improved based on Defendant Musk's specific feedback for that route, would be expected to perform much better on that route than elsewhere.  Thus, Musk's trips would have disproportionately good performance.  Yet, Musk presented those trips as evidence to investors of Tesla's forthcoming general self-driving capabilities and made predictions that he knew were based on this inapplicable data.

128.    Reiterating similar past remarks, Defendant Musk again claimed that full self-driving was "just overwhelmingly the most important thing," for Tesla, and that upgrading the fleet to full self-driving would be "the biggest asset value increase in history."  He also mused about what people would do in their cars once full self-driving was enabled, commenting that they would "watch movies, play games, and do work," and that Tesla was already putting "games and stuff" in the car, subtly indicating that it might already be at a point where drivers need not pay attention while in their cars.

129.    Analysts reacted favorably to Tesla's 2Q20 results.  For example, a July 22, 2020 report from Morgan Stanley analyst Adam Jonas noted:

> **Time to embrace the software/services model.** At $300bn, we believe investors are thinking a lot bigger about what Tesla can be and they're looking at how Amazon and Apple re-rated when they rolled out AWS and Apple Services. We are highly focused on how the opportunity for Tesla to move the model away from units x price... and towards ARPU x monthly user… a revenue model that can drive high margin recurring

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

revenue and stickiness to the platform. In fact, we believe such a migration may be a necessary base case to justify entry to the stock at current levels.

130.    Similarly, Piper Sandler published a report on July 22, 2020, titled, "TSLA Reits. Deliveries Goal & Posts Q2 Profit Despite COVID; Upping PT to $2400," in which analyst Alexander Potter wrote: "We still think TSLA deserves 'must own' status following today's call."  Potter continued: "With market share inflecting and self-driving roll-outs on the horizon, we can't envision selling TSLA now[,]" and concluded, "[n]othing in this quarter changed our longer-term expectations for margins and market share, both of which should continue trending higher in coming quarters/years."

131.    Tesla hosted its annual meeting on September 22, 2020, known as "Battery Day." During that meeting Defendant Musk asserted that "Tesla cars are the safest cars ever designed," and that "active safety" software enhanced the safety of its cars.  He also provided an update on Tesla's approach to developing autonomous driving technology, explaining that the Company has gone from labeling individual images to video segments, which he said meant the "sophistication of the neural nets in the car and the overall logic in the car has improved dramatically."

132.    However, Defendant Musk also explained the reason for this change.  He said that "a couple of years ago," Tesla was "kind of stuck in a local maximum," meaning it was "improving, but like the improvements kind of started tailing off and just not getting where they needed to be . . . so we had to do a fundamental rewrite of the entire Autopilot software stack and all of the labeling software as well."

133.    Analysts responded positively to Defendant Musk's comments regarding Tesla's FSD technology during Battery Day.  For example, on September 22, 2020, Piper Sandler analyst Alexander Potter published a note, titled, "Tesla's Battery Day: A Quick Summary of Key Points," and noted that "the event did a good job of summarizing the reasons why Tesla's advantage is insurmountable[]" and, among its "[n]on-battery data points," highlighted that "[a]n ambitious self-driving beta will be released in ~1 month; it's 'clearly going to work.'"

134.    Along similar lines, regarding the safety of Tesla's FSD technology, Cowen published a note on September 23, 2020, titled, "Battery Day Focuses on 50%+ Cost Reduction Road Map and

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

Vertical Integration," in which analyst Jeffrey Osborne highlighted one of the "Key Takeaways from Battery Day" was Defendant Musk noting:

> [T]he autopilot features continue to improve and mentioned it is nearly 10x safer than normal driver-in vehicles currently, as its Autopilot is averaging 0.3 collisions per 1mn miles vs 2.1 collisions per 1mn miles for normal driver-in vehicles. As such, Tesla plans to release a 'private beta version' of its new and improved Autopilot in roughly a month.

135.    During the Battery Day event Defendant Musk again emphasized the value of autonomy for Tesla, stating: "So I think the value of Tesla is going to be like total -- just on the vehicle side, total vehicles produced, times the value of autonomy. That's a way to think about the future value of Tesla."

136.    On October 8, 2020, Defendant Musk tweeted that its robotaxi competitor, Waymo, was impressive, but is "highly specialized," referring to the fact that Waymo is limited to specific driving conditions in specific geographies. He then stated that "Tesla's approach is a general solution" and that the latest build would be released in "a few weeks" and is "capable of zero intervention drives." News articles recounted this tweet, with technology publication *Benzinga*, in an October 8, 2020 article interpreting the tweet to suggest that "[w]hile full self-driving from Tesla is years late, it seems the time is finally getting closer," and noting that once released the software could generate "billions or even trillions in revenue for Tesla."

137.    On October 21, 2020, during Tesla's 3Q20 earnings call, Defendant Musk reiterated that Tesla was utilizing a "generalized neural net-based approach," which did not need high definition maps or cellphone connectivity, and would work even in places a Tesla vehicle has never driven before, and that even in such conditions, "the car should still be able to drive just like a person," and then concluded: "That is the system that we are developing and aiming to release this year."

138.    During that same earnings call, Defendant Musk described the potential value of the robotaxi network, stating that Tesla owners would have the option to put their car on the Tesla robotaxi network full time, or part of the time, and that "if you're an Uber or Lyft driver, you could be managing a fleet of 10 cars," likening this to "a shepherd tending the flock type of thing," which he said would provide "way more leverage." Musk then explained that Tesla was "focused on just

having an autonomous network that has sort of elements of Uber, Lyft and Airbnb," rejecting the idea of a non-autonomous car-sharing product as an interim product.

139.    During the 3Q20 earnings call, Defendant Musk also doubled down on Tesla's rejection of LIDAR — to provide more accurate distance measurements in addition to a regular camera — saying he wouldn't use the technology even if it were free.  Shortly thereafter he explained that his advice to others developing autonomous driving systems would be: "[I]f you care about autonomy, you need to focus on vision because the entire road system is based on passive optical.  So you have to solve passive optical . . . And once you solve passive optical, you've solved self-driving, so why bother with anything else?"

140.    Finally, near the end of the earnings call, Defendant Musk pontificated about the importance of autonomous driving, claiming that "it's very material," and that over the long term "all transport will go autonomous . . . So it will be pretty significant."

141.    Investor publication, *Seeking Alpha*, published an article on October 21, 2020, commenting on the 3Q20 earnings call, titled, "Tesla talks up self-driving capabilities, robotaxi and production ramp."  The article recited several of Musk's assertions about the capabilities of its "full self-driving" system and the robotaxi business.

142.    Automotive industry stalwart, *Car and Driver*, published an article on October 21, 2020, titled, "Elon Musk Foresees Self-Driving Being Released to Public by End of 2020," in which Roberto Baldwin reacted to the 3Q20 earnings call.  Baldwin wrote:

> Today during a third-quarter financial call, Tesla CEO Elon Musk said that the closed self-driving software beta it launched last night would expand to more drivers by early next week. The company would then step it up and the CEO said, "We have, hopefully, a wide release by the end of this year."
>
> * * *
>
> According to Musk, once fully operational the FSD feature in Autopilot will be able to navigate in areas without cell reception, stored maps, or even on roads that have never been driven by a Tesla. Tesla's Autopilot system uses data from its cars driving on a road to help it determine how to set the driver-assistance system to drive on said road.
>
> Analysts reacted favorably to Tesla's earnings which were largely in-line with analyst consensus estimates, and called out the rollout of FSD Beta.  For example, in an October 22, 2020 analyst report from Morgan Stanley titled, "Strong 3Q: The Momentum Continues; Will the Legacy OEMs Catch Tesla?" Adam Jonas wrote: **The**

**next narrative change to watch out for? Software/service revenue.** Investors may not be giving full credit (or any credit) to the value of the solar/stationary storage business. At the same time, the roll-out of the FSD beta just last night can provide the company with insights it can share over time with investors on recurring/software related service revenue. Over time, we look for the company to increase disclosure over such items including (potentially) how much of total revenue comes from recurring software and service revenue, how much is related to autonomy and other services (telematics, insurance, etc). It is our understanding that, at some stage, software revenue (which is being tracked closely internally at the company) may have to be disclosed due to materiality. We believe investors who own Tesla are most excited about this opportunity which, frankly, continues to occupy a relatively minute portion of the discussion on investor/analyst conference calls at this stage.

143.    Along similar lines, in an October 22, 2020 analyst report from Deutsche Bank, titled, "Strong execution supports growth trajectory," Emmanuel Rosner wrote:

As it pertains to gross margin, we similarly tweak up our estimates based on stronger cost performance, the expected roll-out of FSD features before year-end, and continued higher-than-expected regulatory credits. Elon Musk indicated that the Beta FSD features would scale to a larger audience gradually in the coming months and should be widely rolled out by year-end (we assume US only). We now incorporate $100m into our forecast for the recognition of FSD features in 4Q.

144.    Likewise, in an October 22, 2020 analyst report from Oppenheimer, titled, "TSLA: Making Disruption Commonplace," Colin Rusch wrote:

With TSLA beginning its full self-driving (FSD) rollout and announcing increased capex due to higher levels of in-sourcing, the company is delivering on promises made several years ago on innovating how vehicles are made and driven. We believe the focus on process technology and self-learning systems has the potential to help the company extend its current cost advantage vs. peers from a hardware perspective while lowering the expense per vehicle mile traveled (VMT). We are encouraged by improving manufacturing margins and factory throughput, which gives us comfort in raising out-year GM estimates and PT.

145.    On January 1, 2021, Defendant Musk tweeted that Tesla's "Full Self-Driving will work at a safety level well above that of the average driver this year, of that I am confident." While literally about a future iteration of the software Tesla would supposedly release later that year, Defendant Musk's assertion that the system would be "well above" the average driver, strongly conveyed that the current system was already better than humans.

146.    During Tesla's 4Q20 earnings call on January 27, 2021, Defendant Musk boasted: "[W]e've made massive progress on Full Self-Driving." He also offered thoughts on how one would "justify the value of the company being where it is," and explained that by "back-of-the-envelope math," if Tesla sells $50-60 billion of vehicles, and those vehicles "become Full Self-Driving and can

be used in robotaxis," they will increase in utility by about 5x, but even if they only increase in utility by 2x, "that would be a doubling again of the revenue of the company, which is almost entirely gross margin[,]" which would be "like having $50 billion of incremental profit," which works out to a valuation of $1 trillion, based on a 20x price to equity ratio. He then added: "[A]nd the company is still in high-growth mode." He concluded this point by stating: "So I think there is a way to sort of like justify the valuation of the company where it is using just the cars and nothing else, the cars with FSD. And I suspect at least a number of investors are taking that approach."

147.   In response to a question, during the 4Q20 earnings call, asking Defendant Musk why he was confident Tesla "will achieve Level 5 autonomy in 2021?," Defendant Musk responded that he was "confident based on [his] understanding of the technical road map and the progress that we're making between each beta iteration."

148.   Analysts, at the time, commented on Tesla's 4Q20 miss on auto gross margin, but highlighted Tesla's "continued robust narrative," which analysts, including Credit Suisse, noted would "maintain strength for the stock." In a January 27, 2021 report from Cowen, titled, "MODEL S/X REFRESH AND PLAID ROLLING OUT; FSD STILL IN FOCUS, PT TO $545," Jeffrey Osborne wrote:

> Mr. Musk expressed his confidence in Tesla's ability to achiev[e] L5 autonomy [by] the end of this year after seeing rapid improvements and continued progress with each iteration of the software. While there are no plans in place to license the software to 3rd parties and other OEMs, management does plan to look into licensing the product to other OEMs once Tesla can prove they are capable of delivering full self-driving capabilities. Note that the company has already engaged in preliminary discussions about licensing their autopilot to OEMs and seemed optimistic about initial demand.

149.   When reporting on Tesla's 4Q20 results, *CNET* wrote: "Elon Musk says Tesla's Full Self-Driving tech will have Level 5 autonomy by the end of 2021." The article recounted how Defendant Musk's promise to achieve Level 5 was a "[t]all order," but credited Tesla's neural network technology, writing: "The key to getting to that magic Level 5 point involves transferring Tesla's neural network to use surround-view camera footage and then automating the processing of that footage."

150.   In a January 28, 2021 report from Credit Suisse, titled, "Robust growth narrative outweighs weak gross margin datapoint," Dan Levy reported: "We believe Tesla's ongoing data

aggregation supports continued refinement of its 'autopilot'/driver-assist features…likely a competitive advantage over others" and stated that Musk's comments about potentially licensing the autonomous driving technology "bring the potential for these revenue streams a bit more to the forefront…and reminding us of the potential for recurring/software revenue streams for Tesla."

151.    In a January 28, 2021 report from Deutsche Bank, titled, "Noisy quarter, but pivotal year ahead," Emmanuel Rosner wrote:

> We would use any post-earnings TSLA weakness to accumulate shares, based on solid underlying 4Q20 operational performance, and ahead of what should be a great year for the company, with material acceleration in deliveries, new plants and geographies, new products and segments, and large upside optionality from FSD.
>
> ***
>
> [W]e view this year as a pivotal one for the company, with material revenue acceleration benefitting from ramping up capacity and product lines across the globe, and large potential margin benefit from roll out of FSD and broader adoption across the globe.
>
> ***
>
> **FSD upside**
>
> Tesla continues to make progress improving its full self-driving (FSD) beta software which will enable city pilot in N. America once it is feature complete. Management did not provide an exact timeline for broad deployment but commented its current chipset would be enough to achieve the end goal and neural net transition to video (8 camera surround view, synchronized frame rate) has enhanced performance by an order of magnitude.
>
> Looking ahead, management is open to licensing its FSD software to other automakers and actually has engaged in preliminary discussions. Importantly, Tesla plans to launch an FSD subscription service in the coming months which we think could increase the adoption rate materially, given how expensive the FSD option is now ($10k). Both these paths lead us to believe there could be meaningful upside to margin contribution as these incremental sales would essentially flow through at >90% gross margin. In relation, Tesla plans to improve the functionality of FSD in Europe and China which should improve take rates in those regions (China take rate is in low single digits).
>
> Longer term, Elon Musk reiterated its view that all Tesla vehicles could eventually become fully driverless and serve as robo-taxis, and implied that Tesla could double the price of vehicles with robo-taxi functionality, considerably boosting further its gross margin profile, given only additional software content.

152.    On April 26, 2021, Tesla hosted its 1Q21 earnings call.  During the call, Defendant Musk discussed the challenges with developing autonomous driving systems that can handle responding to unusual edge cases, such as encountering a "truck carrying a truck."  Despite

41

recognizing the inherent difficulties of handling all such situations, Defendant Musk pointed to Tesla's ability to collect data from its fleet of cars on the road, touted its vision-based system, explained that Tesla had eliminated its use of radar, and claimed he was "highly confident that we will get this done."

153.    During the same earnings call, Defendant Musk also pontificated that "although like right now, people think of Tesla as . . . a car company or as an energy company.  I think long term, people will think of Tesla as much as an AI robotics company as . . . we are developing one of the strongest hardware and software AI teams in the world."  He also reiterated that autonomous driving would "achieve an extremely high level of safety far in excess of the average person.  So that's what we're doing."

154.    During the earnings call, Defendant Musk also recognized that Tesla's autopilot technology had been implicated in a recent high-profile crash but downplayed this by saying that the particular incident was not Tesla's fault and that the journalists who suggested otherwise should be "ashamed of themselves."  This notably did not disclose the fact that Tesla's autopilot was plagued by safety issues and instead insinuated that reporting of Tesla's safety issues was untrue and shameful.

155.    In an April 27, 2021 report from Credit Suisse, titled, "Gross margin the highlight in a lumpy beat, underscores volume oppty [sic] ahead" Dan Levy wrote:

**FSD – Tesla continues to plan roll-out, but set appropriate expectations:** Tesla noted it is working on V9 of FSD (full self-drive) City Streets beta, which will soon become more widely available in the US. Interestingly, Tesla also highlighted it plans FSD to go to a vision-only system, with radar becoming unnecessary earlier than expected (Elon Musk had previously tweeted that Tesla would embrace an all-vision system, with no radar)…further cementing Tesla as unique vs. others in the push to autonomous driving functionality, as Tesla is pursuing a vision-only system while others are embracing multiple sensors (vision + radar + LiDAR) to achieve redundancy. More broadly, we believe Tesla's ongoing data aggregation supports continued refinement of its 'autopilot'/driver-assist features…likely a competitive advantage over others. Yet with some having cited concern over Tesla's release of features that aren't fully validated, and with some questions on regulatory approval (i.e. Tesla still not approved to release features in Europe), we believe it is important to set appropriate expectations on wider FSD releases.

156.    Simultaneously advancing narratives that Tesla had self-driving technology and that that technology was safe, Defendant Musk tweeted on April 27, 2021: "[P]assive Autopilot (car

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

1    intervenes only when crash probability is high) cuts crashes in half.  Active Autopilot (car is driving
2    itself) cuts crashes in half again," adding "[a]utopilot is unequivocally safer."

3    157.    On May 28, 2021, the publication *Electrek* released an article describing statements
4    made to the publication by Defendant Musk concerning Tesla's decision to remove radar from its
5    vehicles.  Defendant Musk told *Electrek*: "The probability of safety will be higher with pure vision
6    than vision+radar, not lower. Vision has become so good that radar actually reduces signal/noise."  In
7    other words, Defendant Musk claimed that the decision to remove radar was actually intended to
8    improve safety.  However, documents released through freedom of information requests show that
9    the decision was actually motivated by economic conditions — not a belief that removing radar
10    promoted safety.  On June 30, 2021, Tesla sent a letter to NHTSA concerning the removal of radar,
11    and stated: "[O]ne of the many impacts of the COVID-19 pandemic on the automotive industry has
12    been the global shortage of semiconductors, which is a necessary radar component," and that while
13    Tesla had planned to eventually remove radar, they accelerated their plans "to manage the shortage."
14    This correspondence makes clear that Tesla's decision to make the shift at that time was motivated
15    by economic considerations, not safety considerations.

16    158.    During Tesla's July 26, 2021, 2Q21 earnings call, Defendant Musk explained that
17    Tesla had launched a subscription service for its FSD software package the prior month, enabling
18    customers to pay a reoccurring fee for the upgrade, rather than buying it outright.  He also stated:
19    "Obviously, we need to have the full-self driving build widely available for it really to take off at a
20    high rate and make a lot of progress there," but concluded that he believed "FSD subscription will be
21    a significant factor probably next year," thereby conveying that full self-driving capabilities would
22    be available before that time.

23    159.    Later in the same earnings call, Defendant Musk claimed that Tesla was "making great
24    progress on full self-driving," that he was "highly confident that the cars will be capable of full self-
25    driving" and "confident that they will be able to drive themselves with the safety level substantially
26    greater than that of the average cars."

27    160.    Following this earnings call, later in the evening on July 26, 2021, an analyst on the
28    investor website Seeking Alpha wrote an article explaining that "TSLA has yet another reason to

43

justify its lofty price. The company has unveiled a full self driving (FSD) subscription. This is a step in the right direction."  The article projected that subscription revenue for the FSD product could easily surpass Tesla's revenue from car sales.

161.   On September 11, 2021, Defendant Musk posted a peculiar tweet, stating: "investors are giving us significant credit for achieving self-driving, given that Tesla's valuation/production is very high compared to other automakers."  This very clearly acknowledged that Tesla's valuation was supported by investors' — mistaken — belief that Tesla has "achieved self-driving," while simultaneously conveying that Tesla had, in fact, achieved full self-driving.

162.   On January 26, 2022, during Tesla's 4Q21 earnings call, Defendant Musk made several claims that, especially together, Tesla had developed a full self-driving software that was safer than humans, including: (1) "It's not just a question of like do you get to full self-driving but really kind of like the March of Nines of reliability, is it 99.999% reliable or 99.999999% reliable;" (2) "[F]rankly, being safer than a human is a low standard, not a high standard"; and (3) "So actually being better than a human, I think, is relatively straightforward, frankly, how it'd be 1,000% better or 10,000% better."  Together, these statements clearly portrayed Tesla as having already achieved safer-than-human self-driving, and indicated that it was now working to make the technology many times safer than humans.

163.   In the same earnings call, Defendant Musk exclaimed that, "So over time, we think Full Self-Driving will become the most important source of profitability for Tesla. I mean actually, if you run the numbers on robotaxis, it's kind of nutty. It's nutty good from a financial standpoint."  He then added that he was "completely confident at this point that [full self-driving] will be achieved," and specifically stated "my personal guess is that we'll achieve Full Self-Driving this year, yes, with data safety level significantly greater than at present."

164.   Later in the same earnings call, Defendant Musk was asked about the growth rate for Tesla's cars production, and responded entirely in terms of the increase in demand that would supposedly be generated by full self-driving.  He began by stating: "it's apparent from the questions that the gravity of full self-driving is not fully appreciated," before explaining that the full self-driving car, with robotaxi implantation would have 5x more utilization, which would make it feel 5x cheaper,

in addition to the value of freeing up the owner to "be engaged in productivity or amusement instead of having to onerously drive through traffic." He concluded, on this basis, that: "if the cost of our cars do not change at all, we would still sell as many as we could possibly make."

165.  Analysts confirmed that results were generally in line with, or in some cases a slight beat to, consensus estimates, but noted, among other things that Musk was focused heavily on commentary surrounding FSD. For example, analysts highlighted that:

- Piper Sandler, "Cash Everywhere in Q4; Choppy Macro & Supply Bottlenecks Provide Entry Point," 1/26/22: "Commentary was characteristically bullish re: full self-driving (FSD) software;"

- Jefferies, "New Records in Q4; Twists in the Guidance," 1/26/22: "bullish comments on FSD;"

- Deutsche Bank, "Clear EV leader, even as delays new models," 1/27/22: "Tesla also seems to be pushing out the timing of Model 2, while focusing heavily on delivering a feature complete version of FSD after several delays;"

- RBC Capital Markets, "Key thoughts post 4Q21 earnings," 1/26/22: "robotaxis would be more important because it would be cheaper than owning."

166.  News outlets also repeated Musk's commentary with respect to Tesla's FSD technology during the 1Q22 earnings call. For example, on January 26, 2022, the *Washington Post* published an article by Faiz Siddiqui, titled "Elon Musk says Tesla will not produce a new vehicle model in 2022, renews prediction on Full-Self Driving," which reported:

Tesla will instead turn its attention to improving its production and what it sees as a groundbreaking bet in the form of software dubbed Full Self-Driving, which aims to perform everyday driving tasks with an attentive driver behind the wheel.

***

But Musk's comments signaled another key area of focus: Tesla's Full Self-Driving software suite. On the call, Musk renewed a prediction that Tesla would achieve Full Self-Driving, making vehicles autonomous. Tesla currently offers a feature suite of the same name for $12,000; it allows some to access a software beta that enables its driver assistance feature on city streets.

Tesla said nearly 60,000 vehicles in the United States are now equipped with the Full Self-Driving Beta. Musk said in 2019 that there would be 1 million robotaxis capable of driving themselves in 2020, in the form of Tesla vehicles. That prediction did not come true. And regulators and safety experts have increasingly turned their attention to Tesla driver-assistance features, named Autopilot and Full Self-Driving over concerns about whether they overstate their capabilities or lull operators into a false sense of security. (Tesla instructs drivers that they are to pay attention at all times and keep their hands on the wheel while the software is active.)

That didn't stop Musk on Wednesday from issuing yet another bold prediction about the software's capabilities. "My personal guess is that we'll achieve Full Self-Driving this year," he said. "I would be shocked if we do not achieve Full Self-Driving safer than a human this year. I would be shocked." Musk aired frustration over a sense that "the gravity of Full Self-Driving" was not being fully appreciated. "It's not like some little feature," he said. "It's like the most profound software upgrade maybe in history."

167.    Similarly, on January 26, 2022, the *Associated Press* published an article by Tom Krisher titled, "Tesla posts record profit, won't produce new models in 2022," which reported:

The company said that its "Full Self-Driving" software is now being tested on public roads by owners in nearly 60,000 vehicles in the U.S. It was only about 2,000 in the third quarter. The software, which costs $12,000 and cannot yet drive itself, should accelerate Tesla's profitability, the company said.

168.    On April 20, 2022, during Tesla's 1Q22 earnings call, Defendant Musk teased a new product, which he called a "dedicated robotaxi," which would be manufactured in Tesla's Texas factory and would be "highly optimized for autonomy, meaning it would not have [a] steering wheel or pedals," as well as other "optimizations," that are "quite exciting." The discussion of this new "powerful product," signaled to investors that Tesla was finally nearing in on the long-promised release of robotaxi capabilities.

169.    Analysts picked up on Musk's enthusiasm for the dedicated robotaxis and also noted that Musk reiterated Level 4 driving by end-of-year 2022. For example, in an April 21, 2022 analyst report from Wells Fargo titled, "TSLA: Giga-Quarter, but Challenges Still Ahead," Colin M. Langan reported: "Musk also is sticking with Level 4 self-driving by year-end";" and in an April 21, 2022 report from Cowen & Co. titled, "Strong Execution Shows Record GM; Inflation and Berlin/Austin Ramp Lie Ahead," Jeffery Osborne reported: "Tesla is working on developing an autonomous robo-taxi without a steering wheel or pedals. . . . The target for a robotaxi ride is a cost less than a "subsidized" subway ticket."

170.    During Tesla's 2Q22 earnings call on July 20, 2022, Defendant Musk stated that Tesla had "deployed" its "FSD Beta" product to over 100,000 owners, and "[t]hey're very happy with the capability of the system and we'll continue to improve it every week." He added that it was on track for release to all North America customers by the end of 2022.

171.    Analysts continued to report on Musk's commentary and announced timelines regarding Tesla's FSD Beta.  For example, in a July 20, 2022 Cowen & Co. report titled, "Many Moving Pieces to Digest; Berlin/Texas Ramp Key to 2H22," Jeffrey Osborne repeated Musk's claims that Tesla had "[d]eployed FSD beta with city streets driving capability to over 100,000 owners with over 35 million miles driven with FSD beta to lead the industry. FSD beta is on track to be released for all North American customers before the end of the year. The Company's AI Day on September 30 will display progress."  Similarly, in a July 21, 2022 report from Wells Fargo titled, "TSLA: Pricing & Production Should Push 2H Higher," Colin M. Langan reported: "Musk also is sticking with Level 4 self-driving by year-end. The company will provide more information at an AI Day in a few months."

172.    News outlets also responded positively to Defendant Musk's statements during the 2Q22 earnings call.  For example, the *Associated Press* published an article on April 20, 2022 by Tom Krisher, titled "Tesla 1Q earnings 7 times more than year ago on strong sales," and noted, "Tesla also says it expects "'Full Self-Driving'" beta test software to be released to all U.S. customers who purchased the feature by the end of the year. Musk said about 100,000 owners are testing the system now, on public roads."  Similarly, *CNBC* published a report on April 20, 2022 by Lora Kolodny, titled "Tesla reports $18.76 billion in revenue and record margins in Q1," which reported that "[Musk] encouraged people to join Tesla's FSD Beta program, which requires Tesla owners to buy or subscribe to Tesla's FSD premium driver assistance package first, then achieve a high driver safety score."

173.    During the September 30, 2022 "Tesla Autonomy Investor Day," Defendant Musk asserted that Tesla's FSD software improved safety, recognizing that even if it was not perfect, "what matters [] is, is that it is very clearly safer than not deploying it."  By comparing the notion of whether or not full self-driving is deployed, this statement amounted to another assertion that the car is safer driving itself than with a human driver.  At the investor day event, Musk claimed that: "The FSD beta software is quite capable of driving the car."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

174.     Truist Securities published a report of Tesla's 2022 Autonomy Investor Day in an October 2, 2022 report, titled, "AI Day 2022 supports of AI-oriented thesis on TSLA and overwhelms a Q3 delivery shortfall," in which analyst William Stein reported:

> The company provided updates to ADAS/autonomy (FSD), AIaaS (Dojo), and humanoid AI robotics (Optimus). The updates lead us to increase our estimation of likelihood of commercial success for all 3 efforts.
>
> ***
>
> **ADAS / Autonomous driving tech (FSD)**. From a technical perspective, TSLA showed some impressive advancements in the hardware infrastructure, the training datasets, and the types of models used to build up FSD features.  From a commercial perspective, TSLA noted that in the last year, the number of users has grown from only 2,000 to 160,000.  Further, the company plans to deliver a significant upgrade to FSD in about one month's time, and it believes FSD could be delivered worldwide by the end of this year (though regulatory hurdles would prevent this).

175.     Wells Fargo provided coverage of the event in a report dated October 3, 2022 titled, "TSLA: The Bot Showing First Signs of Life at Second AI Day," in which Colin M. Langan wrote:

> **Autpilot Deliveries Exponential Y/Y Growth:** Aside from the Bot reveal, the event discussed its latest developments in Autopilot and the Dojo supercomputer, which will be used for AI (neural net) training. The Autopilot technology has now been delivered to 160K (only 2K a year ago) customers and has increased its testing/training by 40-60%. The team has continued to make technical improvements on its AI engine over time (e.g. interaction search lowered to ~100us/action vs. 1-5ms/action prior). Additionally, the software has transitioned to using language models rather than manual labeling to speed up decision-making and making split-second decisions. In our view, TSLA's approach will further its position in L2+ autonomous driving; however, we remain skeptical about achieving L4 full autonomy without a larger sensor suite including LiDAR, particularly in the near term. Interestingly, when asked about risk tolerance and safety thresholds for FSD, Elon compared FSD's safety performance compared to human performed driving, which we discussed in our prior conversation with Dr. Egil Juliussen.

176.     On the 3Q22 Earnings Call, held on October 19, 2022, Defendant Musk made additional bold statements about the capabilities and safety of Tesla's "self-driving" technology.  He claimed that the safety "when the car is in FSD mode [or "full self-driving mode"] is actually significantly greater than the safety we're seeing when it's not."  In other words, that Tesla vehicles are safer driving itself than being driven by a human.

177.     During the same earnings call, Defendant Musk again recounted how good the self-driving feature supposedly was with reference to his own experience, recounting a recent drive where he "never touched any of the controls."  He also referenced the so called "march of nines," saying "I

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

1    think we'll be pretty close to having enough nines that you're going to have no one in the car by the

2    end of this year." Then he stated: "I think we'll also have an update next year to be able to show to

3    regulators that the car is safer, much safer than the average human."

4    178.    Analysts reiterated Defendant Musk's timelines for FSD following the same earnings

5    call. For example, in an October 20, 2022 report by Wells Fargo, titled, "TSLA: Disappoints on

6    Pricing & Keeps Tough Porduction Target," Colin M. Langan wrote:

7    **Still Targeting FSD by Year End, But Will It Be L4/L5 Full Autonomy**? Elon still
     expects to release full self-driving (FSD) software by the end of this year. However,
8    his tone was less assertive when we questioned him on regulatory approvals and
     TSLA's ability to achieve true L4 or L5 self-driving. As far as functionality, he
9    anticipates the vehicle will be able to do short trips to the grocery store or to work
     without having to touch the steering wheel. However, he said the system would not be
10   ready to have no one behind the wheel by year-end. He said eventually TSLA would
     have enough data to show regulators that the technology is safer than a human driver,
11   but not by year-end.

12   179.    In an October 20, 2022 report from Cowen & Co titled, "Mixed 3Q22 with Strong

13   Finish to 2022 Expected; Auto GM Weighing on Shares," Jeffrey Osborne reported much the same:

14   **As of the end of 3Q, ~160k Tesla drivers in North America had access to the FSD
     beta**. Tesla expects to release the FSD software by the end of the year. While the
15   application will not have regulatory approval by then, the software will enable a
     vehicle to take you from place to place without touching the steering wheel. The
16   technology is not quite ready to completely eliminate the driver from the equation, but
     the company is nearly certain they will be able to have driverless cars by the end of
17   next year. According to the data collected by the company, driving safety metrics are
     much improved in FSD mode relative to human operation.

18   180.    News outlets also repeated Defendant Musk's FSD timelines. For example,

19   technology-focused *CNET* published an article on October 19, 2022, titled, "Elon Musk Says Tesla

20   Full Self-Driving Beta Will Be Open to All Buyers This Year," and wrote:

21   Right now, if you purchase Tesla's Full Self-Driving beta software, you might not be
22   able to use it. The automaker has rolled this tech out to an ever-growing number of
     Tesla drivers, but it appears the OEM is nearing the point where it's comfortable
23   allowing every driver to gain access to its capabilities.

24   As part of Tesla's webcast discussing Q3 2022 financials, CEO Elon Musk said that
     Full Self-Driving's beta release should be rolled out to every person who ordered it by
25   the end of the year, as the software continues to be refined and improved.

26   181.    Likewise, the *Associated Press* published an article on October 19, 2022, titled, "Tesla

27   3Q profit more than doubles from a year ago to $3.29B," in which reporter Tom Krisher wrote, "Musk

28

said Tesla's 'Full Self Driving' feature won't be ready to be used without humans behind the wheel this year. But it will be ready next year 'without question whatsoever in my mind.'"

182. On January 25, 2023, Tesla held its 4Q22 earnings call, and Defendant Musk again touted the success of the "FSD" software it had released. Defendant Musk stated that Tesla had released the software to 400,000 customers, that it was a "huge milestone for autonomy," and that it was the "only way any consumer can actually test the latest AI-powered autonomy." Defendant Musk also boasted, yet again, of the value of full self-driving. He claimed, "every time we sell a car, it has the ability, just from uploading software, to have full self-driving enabled," which he said provided "tremendous upside potential," concluding "that means that there's millions of cars where full self-driving can be sold at essentially 100% gross margin."

183. Analysts again readily reported Defendant Musk's statements on FSD. For example, in a January 26, 2023 report from Oppenheimer, titled, "TSLA: Better-than-feared Results and Commentary," Colin Rusch wrote:

> **FSD unlock.** *Automotive sales included $324M of FSD revenue recognition, with an additional $1B expected to be recognized over time. Cumulative non-highway FSD miles of over 90M in under 2 years demonstrates TSLA's fleet advantage to autonomy development, with more than 400K customers participating in FSD Beta, substantially all of the customers who have purchased FSD, which we expect will help accelerate learning cycles.*

184. In a January 26, 2023 report from Truist Securities, titled, "Disappointing near-term unit & asp data revealed but the long-term units/AI story is compelling; Buy," William Stein reported: "Aside from the car platforms, the company's FSD (Full Self-driving) Beta program is now released to nearly all 400k customers in the US and Canada that purchased FSD. TSLA recognized $324m of FSD revs in Q4 and highlighted it has $1B in deferred revenue that it will rev-rec over time."

185. In a January 26, 2023 report by Canaccord Genuity, titled, "The Sky Is Not Falling," George Gianarikas reported: "Tesla's forward upgradeable units combined with full self-driving (FSD) software should not only provide some margin cushion, but also afford the company an enviable long-term razor/razorblade model. We reiterate our BUY rating and maintain our PT of ~$275, which is based on applying ~25 multiple (unchanged) to our Adj. 2025E EPS of $11.12."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

C.      **Tesla's Autonomous Driving Technology Was Plagued with Safety Issues**

1.      **Tesla Dangerously Encouraged Inattentiveness**

186.    While often misrepresenting the capabilities of its technology, including by asserting that its autonomous driving technology is safer than humans, Tesla ultimately conceded that the system is currently, and was throughout the Class Period, unsafe for use without human supervision.

187.    For example, Tesla's website admits that: "The currently enabled Autopilot, Enhanced Autopilot and Full Self-Driving features require active driver supervision."  In a March 4, 2022 letter to two U.S. Senators, Tesla's senior director, public policy and business development Rohan Patel stated that Tesla's autopilot and FSD systems "require the constant monitoring and attention of the driver," and explained that the system was not capable of performing all "Dynamic Driving Tasks."

188.    Even recently, after the Class Period, Defendant Musk reiterated that the "self-driving" technology was, contrary to his prior assertions, not safer than humans.  During Tesla's 2Q23 earnings call on July 19, 2023, Defendant Musk stated: "I think we'll be better than human by the end of this year."  In other words, the "self-driving" technology was not yet actually better than humans, but Defendant Musk thought it would be later this year.  These recent remarks echoed Defendants' statements during Tesla's January 26, 2022 4Q21 earnings call, stating: "Yes, I would be shocked if we do not achieve full self-driving safer than a human this year.  I would be shocked." *See* ¶¶386-89.

189.    Despite this, Tesla's decision to market its technology — both to investors and consumers — as "full self-driving" along with Defendant Musk's reoccurring assurances the technology was safer than human drivers — introduced a substantial risk that drivers would trust the system to work as advertised and drive itself.  Numerous sources have warned of the risk that Tesla's marketing of autonomous driving technology, especially "full self-driving," poses substantial safety risks.

190.    Most notably, the federal National Transportation Safety Board ("NTSB"), which conducts investigations into transportation accidents and issues safety recommendations, had sharply criticized Tesla for its dangerous marketing.

191.    The NTSB investigated a deadly crash that occurred involving a Tesla Model S operating with autopilot enabled, wherein a car was driving significantly over the speed limit and crashed into the trailer of a semi-truck.  As an NTSB representative explained: "Tesla allowed the driver to use the system outside of the environment for which it was designed, and the system gave far more leeway to the driver to divert his attention to something other than driving . . . The result was a collision that, frankly, should have never happened."  The NTSB's final formal report on this incident stated:

> The National Transportation Safety Board determines that the probable cause of the Williston, Florida, crash was the truck driver's failure to yield the right of way to the car, combined with the car driver's inattention due to overreliance on vehicle automation, which resulted in the car driver's lack of reaction to the presence of the truck. Contributing to the car driver's overreliance on the vehicle automation was its operational design, which permitted his prolonged disengagement from the driving task and his use of the automation in ways inconsistent with guidance and warnings from the manufacturer.

192.    As a result of this investigation, the NTSB issued recommendations that automakers adopt systems to limit the use of autonomous driving technology and develop systems to effectively monitor engagement while such systems are deployed.

193.    In 2020, the NTSB Chairman publicly explained that the five other automakers named in the NTSB's prior report responded to the advice within the 90-day window proscribed by the Board, but that "[o]ne manufacturer ignored us. And that manufacturer is Tesla."  The Chairman added that it's been "881 days since these recommendations were sent to Tesla, and we've heard nothing."  Then, on September 19, 2021, as Tesla was touting a rollout of the limited public release of its FSD software, the NTSB chair called Tesla's use of the term full self-driving "misleading and irresponsible," and stated that people pay more attention to marketing than warnings in car manuals, and that Tesla has "clearly misled numerous people to misuse and abuse technology."  About a month later, on October 25, 2021, the NTSB's Chairman wrote a letter directly to Defendant Musk stating she was "deeply concerned" with Tesla's inaction in implementing NTSB's recommendations, and noted additional crashes that were similarly caused by use of autopilot in unsafe ways.

194.    Additionally, NHTSA's Acting Administrator from September 2017 to August 2019, Heidi King, was quoted by Consumer Reports in an article published on November 11, 2021, as

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

1    saying: "Exaggerated public claims continue to create safety risks, increase driver confusion about

2    vehicle features, and support hype and over-investment in features that might not be road-ready for

3    decades—if ever."

4         195.    Academic research have also shown that there is major concern with the relationship

5    between autopilot and inattentive driving.

6         196.    For example, an article in the journal *Accident Analysis & Prevention* published on

7    October 2021 found that drivers with autopilot engaged looked away from the road more often and

8    for longer periods.  Specifically, that article found that:

> "Changes in glance duration and pattern suggest a lower visual attention to the forward road when AP was engaged compared to after the disengagement to manual driving. Most of the off-road glances were presumably non-driving related, as they were directed downwards and to the center stack region. The shift in attention under AP led to a sharp increase in long off-road glances that are atypical in manual driving."

12        197.    Another article published in October, 2021 presented at the *Proceedings of the Human*

13   *Factors and Ergonomics Society Annual Meeting* analyzed data from Tesla users engaging autopilot

14   and found that upon activating autopilot people looked away from the road 18% more often, and were

15   32% more likely to not hold the steering wheel, and found that this decrease was "not gradual

16   overtime but occurred immediately after engaging AP."  The authors concluded that: "These

17   behaviors were maintained throughout the drive with AP until drivers approached AP

18   disengagement."

19        198.    An article published in the prestigious peer-reviewed journal *Frontiers in Psychology*

20   in February 2023 analyzed 101 in-depth semi-structured interviews of users of Tesla's FSD software

21   conducted by the article's authors.  The article's conclusion was as follows:

> It was found that drivers became complacent over time with Autopilot engaged, failing to monitor the system, and engaging in safety critical behaviors, such as handsfree driving, enabled by weights placed on the steering wheel, mind wandering, or sleeping behind the wheel. Drivers' movement of eyes, hands, and feet became more relaxed with experience with Autopilot engaged. FSD Beta required constant supervision as unfinished technology, which increased driver stress and mental and physical workload as drivers had to be constantly prepared for unsafe system behavior (doing the wrong thing at the worst time). The hands-on wheel check was not considered as being necessarily effective in driver monitoring and guaranteeing safe use. Drivers adapt to automation over time, engaging in potentially dangerous behaviors. Some behavior seems to be a knowing violation of intended use (e.g., weighting the steering wheel), and other behavior reflects a misunderstanding or lack of experience (e.g.,

using Autopilot on roads not designed for). As unfinished Beta technology, FSD Beta can introduce new forms of stress and can be inherently unsafe.

199.    Research published in October 2022 by the *Insurance Institute for Highway Safety* found that 42% of Tesla users surveyed were comfortable letting the driving automation system drive the vehicle without watching the road.  Additionally, that 39% of Tesla users surveyed will look away from the road for more than a few seconds while autopilot is enabled, 36% will keep their hands off the wheel for longer periods of time, 18% will use a laptop or tablet while driving, 20% will watch videos, and 34% will send text messages.

### 2.    Accidents, Research, and Investigations Verify Tesla's Safety Issues

200.    There is no comprehensive account of all accidents caused by Tesla's autonomous driving technology, in part because Tesla's own reporting of accidents is biased and limited.  Tesla publishes data which it claims proves the safety of its technology.  However, this data is severely incomplete.

201.    As an initial matter, Tesla only counts crashes that resulted in an airbag or active restraint deployment.  This grossly understates the total number of crashes involving Tesla vehicles because only a fraction of crashes involve airbag deployment.  For example, a Tesla utilizing autopilot or the FSD software could kill a pedestrian, and this would not be recorded in Tesla's statistics unless the airbags deployed — even though NHTSA data shows that 17.2% of all traffic accident fatalities since 2017 were pedestrians.

202.    Another major deficiency in Tesla's data is that it only records accidents involving autopilot — if autopilot was engaged within the five seconds before a collision. The data therefore fails to account for the presumably, extremely common, scenario of autopilot placing a driver in a situation leading to a crash, where the driver unsuccessfully attempts to avoid the collision.  Given the nature of Tesla's autonomous driving technology, it is entirely possible (but unknown) that situations of that sort comprise the vast majority of autopilot related accidents.

203.    Tesla's data is also likely subject to significant biases leading to data that overstates the relative safety of Tesla's technology.  Individuals may be far more likely to use autonomous driving technology in comparatively safe driving conditions, rendering statistics based on the number

of "miles driven" meaningless without additional context about driving conditions.  Additionally, there may be significant demographic differences between Tesla drivers who use autopilot and other drivers.  The product is ostensibly a safety feature, and it may simply be the case that those interested in buying a safety feature are themselves safer drivers.  Similarly, age is a meaningful predictor of driving safety. Tesla drivers may be more likely to be middle aged, and thus statistically safer drivers.  As a final example, comparisons to crash rates in general may be misleading because most Tesla's are newer cars, and newer cars typically get in fewer crashes.

204.    On June 10, 2023, the *Washington Post* published an article with the subtitle: "17 fatalities, 736 crashes: The Shocking Toll of Tesla's Autopilot," which claimed that "Tesla's driver-assistance system, known as Autopilot, has been involved in far more crashes than previously reported."  The article explained that recent data analysis or NHTSA data indicates that there have been "far more" crashes associated with Tesla's autonomous driving technology than previously reported, though it noted that even now, it is not known if the available data captures all crashes involving Tesla's autonomous driving technology.  Upon reviewing the data, former NHTSA Senior Safety Advisor, Missy Cummings, commented that "Tesla is having more severe — and fatal — crashes than people in a normal data set."  The article also explained that "Tesla's 'Full Self-Driving' and Autopilot systems have been involved in far more incidents than driver-assistance systems from all other manufacturers combined."

205.    While there is not a comprehensive list of every crash caused by Tesla's autonomous driving technology, a review of just some examples of the crashes that have occurred with this technology engaged highlights the severity of the safety issues.

(a)    On March 23, 2018, a Tesla Model X operating on autopilot drove into a paved area dividing the main travel lanes and crashed into a piece of roadside traffic equipment at 71 miles per hour.  The car was ripped apart due to the crash, and the battery pack within the Tesla was breached causing the car to engulf in flames.  The driver died as a result of the accident.  An investigation by the NTSB concluded that "The probable cause of the Mountain View, California, crash was the Tesla Autopilot system steering the sport utility vehicle into a highway gore area due to system limitations, and the driver's lack of response due to distraction likely from a cell phone

game application and overreliance on the Autopilot partial driving automation system." The NTSB also noted that autopilot had been engaged for nineteen minutes prior to the crash, and that the driver's hands were not detected on the steering wheel in the period immediately preceding the crash.

(b)    On December 22, 2022, the *Guardian* reported that a Tesla operating in "full self-driving" mode caused an eight-vehicle crash. The police report stated that "the vehicle was traveling at 55mph when it shifted lane but braked abruptly, slowing the car to about 20mph. That led to another vehicle hitting the Tesla and a chain reaction of crashes."

(c)    On August 17, 2021, the *New York Times* reported that a Tesla Model S operating on autopilot drove past the end of road, ran a stop sign and flashing red light traffic signal,and crashed into a parked Chevrolet Tahoe — killing a 22-year-old college student. The driver of the Tesla Model S reportedly put his trust in the autopilot when he went to pick up his dropped phone.

(d)    On May 15, 2021, a Tesla operating on autopilot mode reportedly collided with a parked police car in Arlington, Washington. According to news reports, "the deputy had his overhead emergency lights activated at the time and was partially blocking the roadway to protect [a separate] collision scene."

(e)    On December 29, 2019, Derrick Monet was driving a 2019 Tesla Model 3 with his wife Jenna Monet as a passenger. The Tesla Model 3 had autopilot engaged when the vehicle slammed into the rear of a parked fire truck in the passing lane of a highway in Indiana. Mrs. Monet died as a result of the crash.

(f)    On August 12, 2020, a couple was killed in Saratoga, California after their Tesla veered of a highway while autopilot was engaged, reaching speeds of up to 114 mph on the off ramp.

(g)    On March 1, 2019, a 50-year-old Tesla driver crashed into the side of a tractor-trailer truck moments after turning on autopilot, as documented by the NTSB. The driver was killed in the crash.

(h)    On August 28, 2021, a Tesla in autopilot mode crashed into a stopped police cruiser with its emergency flashing lights on. The right front of the Tesla Model 3 crashed into the

1    left side of the police car, which was stopped in order to assist the driver of a broken-down Mercedes.

2    The Mercedes was also hit in the collision.

3              (i)    On July 24, 2022, a motorcyclist near Draper, Utah was killed when a Tesla

4    driver using autopilot slammed into the rear of his motorcycle, throwing the motorcycle driver to the

5    ground and killing him instantly.

6              (j)    On May 5, 2021, 35-year-old Steven Hendrickson was killed when his Tesla

7    Model 3 struck an overturned semi-truck on a freeway in Fontana, California.  Another man was

8    seriously injured when the Tesla hit him as he was helping the semi-truck driver.  According to the

9    *Los Angeles Times*, "Hendrickson was a member of the Southern California chapter of a Tesla club

10   who posted numerous photos and videos on social media of his white Tesla Model 3.  One video on

11   his Instagram account showed him riding in the driver's seat of the Tesla without his hands on the

12   wheel or foot on the pedal as the Tesla navigated traffic."

13   206.   Numerous crashes resulting from Tesla's autonomous driving technology have been

14   the subject of government investigation.  For example, as noted above, the NTSB found that Tesla's

15   autopilot was a "probable cause" of a deadly March 23, 2018 crash in which a Tesla drove itself into

16   a piece of roadside traffic equipment.  On August 22, 2019, the NTSB issued findings related to a

17   2018 freeway crash involving Tesla's autopilot feature, concluding: "The probable cause of the

18   Culver City, California, rear-end crash was the Tesla driver's lack of response to the stationary fire

19   truck in his travel lane, due to inattention and overreliance on the vehicle's advanced driver assistance

20   system."

21   207.   Beyond an astounding series of crashes, research have shown that Tesla's systems are

22   simply technologically deficient in substantial and dangerous ways.  For example, the Dawn

23   Foundation ran a series of tests, which showed many common scenarios in which Tesla's autonomous

24   driving technology simply failed to act appropriately.  Their website includes videos documenting the

25   safety defects.[4]

26

27   ───────────────────
     [4] The Dawn Project, Critical Safety Issues Revealed By The Dawn Project's Testing Of Tesla Full
28   Self-Driving (last visited: September 5, 2023) available at https://dawnproject.com/critical-safety-
     issues-revealed-by-the-dawn-projects-testing-of-tesla-full-self-driving

208.    During 2022, The Dawn Project conducted a series of safety tests in Goleta and Santa Barbara, California to test whether Tesla's Full Self-Driving Software was safe for use on public roads. The tests revealed critical safety defects in the software, and showed that Tesla's Full Self-Driving software will:

- Run down a child in a school crosswalk;
- Ignore 'Do Not Enter' and 'Road Closed' signs;
- Overtake stopped school buses;
- Speed in school zones;
- Hit a child in a stroller;
- Run over children crossing the road;
- Swerve into oncoming traffic;
- Ignore road signs warning it to slow down for sharp bends, causing it to cross over the yellow line; and
- Drive on the wrong side of the road.

209.    For example, the Dawn Project showed that Teslas running the FSD software will "drive around stopped school buses with their stop sign arm extended and lights flashing, and it fails to obey school zone speed limits."  A frame of their video documenting this behavior is shown below:



210.    Ignoring school bus safety signs is just one of thousands of examples of driving errors by Tesla's autonomous driving technology documented by the Dawn Project.  While a human may also commit this error, it is not the normal behavior of human drivers to simply ignore driving safety requirements like this; if the car's programming is such that in a reproducible manner it simply fails to abide by this safe and obvious driving requirement, it is misleading to claim the car drives safer

1    than humans. Tragically, this safety issue is far from hypothetical, as it was reported on April 8, 2023,

2    that a Tesla crashed into a student that exited a school bus, which had all its safety indicators on, and

3    that NHTSA is investigating the crash, as it was suspected that the autonomous driving feature was

4    engaged.

5    211.    Another way of thinking about the dangers of Tesla's autonomous driving technology

6    is the number of disengagements (*i.e.*, human interventions) needed while vehicles operate.  Even if

7    humans supervising the vehicle are able to successfully intervene to avoid dangerous situations, the

8    fact that the intervention was necessary, demonstrates that the vehicle was not, in fact, able to safely

9    drive itself at a level greater than humans, as Defendant Musk frequently claimed it could.  Tesla has

10    refused to publish its disengagement data.  California requires all parties testing autonomous driving

11    car systems to report all the times users intervened or disengaged the system.  Remarkably, while

12    Tesla's competitors such as Waymo and Cruise report their numbers, Tesla does not, because

13    remarkably, Tesla claims it does not have an autonomous driving system.  *Forbes* explained the

14    mental gymnastics needed to justify Tesla's position in the following excerpt of a February 9, 2022,

15    article:

16    Everybody notes the absence of Tesla. Tesla claims they don't test self-driving
vehicles in California. Of course, they promote a product they call "Full Self Driving
17    Beta" and I have it on my Tesla. But in the fine print, and to the government, they call
it a driver assist system. That's true, to a point.

18

19    Tesla FSD Beta (really prototype) does indeed need full time supervision. But so do
almost all the other teams, which is why they have their safety drivers. The law
20    exempted driver assist systems from the report requirements and permit requirements,
but it was not intended to be a loophole anybody could drive any vehicle through. In
21    fact, the DMV forced Uber to relent when it tried to use the same loophole. The
difference is not whether you have supervision, but what you are trying to build, the
22    DMV said. There are rumblings they may apply the same to Tesla, though the likely
result is simply that the prototype testing by customers would be shut off in California.

23    Based on evaluation of many videos of Tesla FSD in operation, as well as my own
use, a rough estimate would suggest their miles per intervention number would be
24    among the poorer ones on the chart, but at present there is no way to tell which
interventions customers are doing are needed and which are cautionary.

25

26    212.    In the absence of Tesla reporting data, the only quantitative measurement of

27    disengagements comes from self-reported data by Tesla users.  A crowd-sourced database of such

28    self-reported numbers called Tesla FSD Tracker has logged over 100,000 miles.  That log shows that

59

there is a disengagement of Tesla's autonomous driving technology an average of once every 16 miles.[5]  In comparison, Tesla-competitors Cruise and Waymo reported data to the State of California for 2022 clocking 95,901 miles per intervention and 17,060 miles per intervention respectively.  Using the worse figure (from Waymo), Tesla was **1,000 times** worse; using the Cruise data, Tesla is over **5,800 times** worse.

213.    Qualitative accounts of the rates of disengagement are also illustrative.  The previously cited February 2023 article from the journal *Frontiers in Psychology* recounted interviews with users of Tesla's FSD software.  Many of those interviews provided accounts of the FSD software requiring near constant disengagement.  For example:

> FSD Beta, my disengagement rate is probably four or five disengagements per mile. Yesterday, I went to work and back and for 11-mile round trip, it was 43 disengagements. There's barely 43 intersections in my drive. As Autopilot tries to take over more tasks, it can actually be more work for me. It was just a straight road."

> I described the FSD as a 5-year-old learning to drive right and then inflicting that on you as a passenger.

> I use FSD Beta where I know I don't really need to give it a lot of energy. FSD Beta takes a lot of energy. Imagine having a 12 year-old on your lap. 'Get off my lap. I don't have the energy for you right now.' It's doing certain turns, and then it gets confused or stuck. 'Yes, it's OK to go ahead here, little child."

> With FSD Beta, I see a lot of disengagement on the trip, I just disengage it and drive away, because at some point it becomes dangerous, I think, and it's easier for me.

214.    Indeed, in a recent (August 25, 2023) live stream of Defendant Musk using the FSD software, he was forced to intervene after only twenty minutes, as his car lurched into an intersection in an attempt to run a red light.

215.    Recently leaked files show that Tesla was inundated with customer complaints reporting serious issues and crashes.  A series of articles in *Handelsblatt*, one of Europe's leading financial newspapers, details information from a data leak — dubbed "the Tesla Files" — of more than 23,398 files spanning over 100 gigabytes of data.  The first of which was titled "My Autopilot Almost Killed Me" (translated) and was published on May 25, 2023.

---

[5] This average figure is roughly the same regardless of whether one looks just at the Class Period or all data through August 2023.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

216.     *Handelsblatt* had a team of twelve people review the data for six months, and extensively verified its legitimacy by contacting current and former employees and customers who confirmed the information, *e.g.*, by verifying salary data (that could not plausibly have been fabricated) was accurate, or by verifying the details of accidents recorded in the data.  The paper also had the data forensically reviewed by the Fraunhofer Institute for Secure Information Technology, which found no reason to doubt its authenticity.  Additionally, in correspondence with the paper, Tesla confirmed the documents authenticity, by stating that Tesla identified an "aggrieved former employee," whom Tesla indicated was the source of the leak.  Most recently, Tesla further confirmed the data's legitimacy by stating that its own investigation determined that "two former Tesla employees misappropriated the information in violation of Tesla's IT security and data protection policies and shared it with the media outlet."  Tesla is suing the two employees that leaked the data.

217.     *Handelsblatt* reported that "The Tesla Files contain thousands of reports about complications with the driving assistance systems."  For example, one table within the Tesla Files show that Tesla logged about 3,000 entries corresponding to safety problems with autopilot.  The issues were so prevalent that Tesla had internal coding systems to keep track of reoccurring safety problems — *e.g.*, "27973" is the code for "Customer claims there was unwanted acceleration," and "55538" is the code for "Automatic emergency braking triggered without any apparent reason."  Astoundingly, Tesla logged at least 2,400 complaints about unintended acceleration, 1,500 complaints about break function, and over 1,000 crashes.

218.     The paper reported that customer interactions concerning safety issues were logged using a software tool called Jira.  Consistent with Tesla's general efforts at keeping safety issues with its autonomous driving software under wraps, Tesla had written policies intended to avoid leaving a public paper trail concerning these issues.  The paper reported that there were precise instructions to Tesla employees for communications with customers, which stated that information may only be relayed "VERBALLY to the customer," and which instructed employees: "Do not copy the following report into an email or text message or leave it in a voicemail for the customer."

219.     The Tesla Files also contained internal company presentations concerning the safety issues.  For example, the paper described a presentation in which a Tesla engineer listed ten categories

of issues from "fault analysis," including "unintentional braking and acceleration of vehicles." That presentation stated: "This impairs the safe operation of the vehicle," with an adjacent note stating "Dangerous - Direct risk to customer safety without warning."

**D.     Tesla Was Nowhere Near Release of Level 4-5 Autonomous Driving Systems**

220.    During the Class Period, Tesla continuously assured investors that it was on the cusp of releasing full self-driving technology at Level 4-5 autonomy. Most astoundingly, on April 22, 2019, Defendant Musk stated that Tesla would "for sure" release technology wherein it would be safe for drivers to "go to sleep" while their car drives by the end of 2020, such that it would also have a money-making fleet of one million robotaxis by that time. Throughout the time period, as these deadlines approached, Defendants doubled down with new assurances that the technology would be released by another upcoming date.

221.    At the time of this filing, the end of the 2020 deadline is now over 3 years and 8 months past, and Tesla has still not released even a Level 3 autonomous driving system. As a threshold matter, the magnitude of the discrepancy between the stated release dates and what has occurred strongly indicates that Defendants were nowhere near releasing a Level 4-5 system within the stated time periods. Indeed, Tesla has never provided any explanation of unanticipated events that delayed the release of these systems, which strengthens the obvious conclusion that the Company was simply nowhere near releasing the stated feature within the timeline provided.

222.    The safety issues detailed in the prior Section further demonstrate that Tesla was nowhere near releasing the promised features, as it could not receive regulatory approval to release Level 4-5 autonomy, while plagued with such safety issues.

223.    Additionally, (1) Tesla's disclosures to regulators, (2) former Tesla employees' statements, and (3) expert analyses further demonstrate that Tesla was nowhere near releasing Level 4-5 systems within the shared time periods.

**1.     Disclosures to Regulators**

224.    While requiring careful analysis to unravel, Defendants have both demonstrated and admitted that the release of a Level 4-5 system within the stated period was unattainable.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

225.    California law requires certain permitting and reporting of any autonomous driving technology.  Tesla has taken the position that, because the software it had released thus far requires driver supervision, it does not meet the statutory definitions implicating these regulations.  This argument is complicated, because many other companies testing autonomous driving technology supervise their products with human occupants, but nevertheless admit that they fall into the law — acknowledging that the law applies to them because they *are* trying to develop autonomous driving.  The previously cited February 9, 2021 *Forbes* article states: "The difference is not whether you have supervision, but what you are trying to build."

226.    Tesla's position that it falls outside of these regulations is grounded in the **reality** that Tesla is, and was throughout the Class Period, **so far** from releasing a Level 3, 4 or 5 autonomous driving system, that its FSD release could not even be considered a direct precursor to the development of Level 3, 4, or 5 autonomy.  Documents obtained from the California DMV through freedom of information laws demonstrate this point.

227.    In a letter dated November 10, 2020, Miguel Acosta, the California DMV's Autonomous Vehicle Chief, wrote the following to Eric Williams, Associate General Counsel at Tesla:

> On September 24, 2020, Tesla representatives notified the California Department of Motor Vehicles that the release of Navigate on Autopilot on City Streets[6] would occur the week of October 23, 2020. The Department appreciates the continued communications with Tesla since this initial notification regarding the release of new software.

> Pursuant to California Code of Regulations, Title 13, Articles 3.7 and 3.8, Testing and Deployment of Autonomous Vehicles, the Department needs to understand the capabilities of the new software, as well as how those capabilities are being communicated to both Tesla owners and the public.

228.    On November 20, 2020, Mr. Williams (Tesla) wrote a letter responding to Mr. Acosta (DMV) with the following response (emphasis added):

> **City Streets continues to firmly root the vehicle in SAE Level 2 capability and does not make it autonomous under the DMV's definition.** City Streets' capabilities with respect to the object and event detection and response (OEDR) sub-

---

[6] "City Streets" is another term for the "FSD" software functionality wherein the car's supposed ability to drive itself is purportedly expanded from "self-driving" on highways to "self-driving" on non-highest roads as well.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

task are limited, as there are circumstances and events to which the system is not capable of recognizing or responding. These include static objects and road debris, emergency vehicles, construction zones, large uncontrolled intersections with multiple incoming ways, occlusions, adverse weather, complicated or adversarial vehicles in the driving path, unmapped roads. As a result, the driver maintains responsibility for this part of the dynamic driving task (DDT). In addition, the driver must supervise the system, monitoring both the driving environment and the functioning of City Streets, and he is responsible for responding to inappropriate actions taken by the system. The feature is not designed such that a driver can rely on an alert to draw his attention to a situation requiring response. There are scenarios or situations where an intervention from the driver is required but the system will not alert the driver. In the case of City Streets (and all other existing FSD features), because the vehicle is not capable of performing the entire DDT, a human driver must participate, as evidenced in part through torque-based steering wheel monitoring, or else the system will deactivate.

229.    On December 7, 2020, Mr. Acosta (DMV) responded to Mr. Williams (Tesla) in another letter that included the following request (emphasis added):

> Please describe and provide any relevant documentation reflecting Tesla's intended functionality for the **final release** of FSD City Streets to the general public. Specifically, which of the limitations associated with the OEDR[7] described in the letter dated November 20, 2020 will continue to be part of the final release of FSD City Streets to the general public?

230.    On December 14, 2020, Mr. Williams (Tesla) responded to Mr. Acosta (DMV) in another letter containing the following response to Mr. Acosta's request (emphasis added):

> While the current pilot version of City Streets is still in a validation and review stage, <u>**we expect the functionality to remain largely unchanged in a future, full release to the customer fleet.**</u> We are analyzing the data obtained in the pilot and using it to refine the feature's operation and customer experience. We will continue to make refinements as necessary, and only after we are fully satisfied with performance, integrity, and safety will we release the feature to the customer fleet. That said, <u>**we do not expect significant enhancements in OEDR or other changes to the feature that would shift the responsibility for the entire DDT to the system. As such, a final release of City Streets will continue to be an SAE Level 2, advanced driver-assistance feature.**</u>
>
> Please note that Tesla's development of true autonomous features (SAE Levels 3+) will follow our iterative process (development, validation, early release, etc.) and any such features will not be released to the general public until we have fully validated them and received any required regulatory permits or approvals.

231.    In this letter, Tesla admitted that the FSD software it released on a limited basis in September 2020, and which it subsequently updated throughout the Class Period, was ***never*** intended to provide Level 3, 4, or 5 functionality.  The letter even states that Tesla is not expecting any "significant enhancements" to its core object detection and response functionality, or "any other

---

[7] The term OEDR refers to "object and event detection and response."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

changes" to the FSD software, that would render it a Level 3, 4, or 5 system. The final paragraph explains that sometime in the future Tesla may "develop[]" a separate system with "true autonomous features SAE Levels 3+" and in so doing, essentially reconfirms that Tesla's FSD software is itself not intended to ever be a Level 3+ system.

232. A separate "memo to file" by Mr. Acosta (DMV) dated March 9, 2021, provides equally compelling evidence that Tesla was nowhere near releasing a Level 4-5 autonomous driving system during the Class Period, especially when combined with data discussed herein and the letter exchange discussed in the prior paragraphs. The memo documents a conference call (via Microsoft Teams) between DMV representatives, Mr. Acosta, Nathan Gargiulo, Jennifer Berry and Emily Bisnett, and Tesla representatives Mr. Williams, CJ Moore (then Director of Autopilot Software), Alex Cobern (then Senior Director of Sales and Delivery Operations), and Beth Mykytiuk (then Managing Counsel, Regulatory). The memo included the following statement:

> DMV asked CJ to address, from an engineering perspective, Elon's messaging about L5 capability by the end of the year. Elon's tweet does not match engineering reality per CJ. Tesla is at Level 2 currently. The ratio of driver interaction would need to be in the magnitude of 1 or 2 million miles per driver interaction to move into higher levels of automation. Tesla indicated that Elon is extrapolating on the rates of improvement when speaking about L5 capabilities. Tesla couldn't say if the rate of improvement would make it to L5 by end of calendar year.

233. As an initial matter, that Tesla's Director of Autopilot Software responded to a question about Defendant Musk's "messaging" about Level 5 autonomy by stating that Defendant Musk's communications did not reflect the "engineering reality" strongly supports the conclusion that Tesla was nowhere near releasing Level 4-5 autonomy within the times claimed by Defendant Musk publicly. Additionally, the following sentence — which is most reasonably interpreted as an explanation of those "engineering realities" — further demonstrates that Tesla was nowhere near releasing Level 4-5 autonomy. That Tesla "couldn't say" that it would release level 5 software, demonstrates that Defendant Musk's public assurances otherwise were misleadingly unfounded. Additionally, the statement conveying Tesla's view that "higher" levels of autonomy beyond Tesla's Level 2 FSD system would require driver interventions to reduce to a level in the magnitude of one intervention per 1-2 million miles, is highly illuminating when compared to Tesla's intervention rates.

234.    Tesla does not publicly report human intervention rates, but the available crowdsourced data shows one intervention every 16 miles throughout the Class Period.  Even when using the lower end of Tesla's required range of one intervention per million miles, that would mean that Tesla still (as of this filing) needs to become about 62,000 times better before it could consider moving to Level 3, 4, or 5 autonomy.  This figure is even more astonishing if one considers that Defendant Musk said that Tesla would have a million robotaxi's on the road "for sure" by 2020, which passed more than 3 and a half years ago.

## 2.    Confidential Witnesses

235.    Confidential witnesses further confirm that Tesla's software was nowhere near a release or Level 4-5 autonomy within the claimed time periods.[8]

236.    **CW-1**.    CW-1 was formerly employed by Tesla from approximately May 2021 through November 2021 as an FSD (Full Self-Driving) Analyst and Quality Assurance (QA) analyst. He worked at Tesla's Buffalo, New York facility.

237.    CW-1 explained that his role as an FSD analyst involved helping to create the FSD program by providing data.  CW-1 advised that he understood that all accident and safety data was reviewed by Tesla.  CW-1 explained that Tesla's vehicles recorded everything, including all safety data and related issues such as phantom braking and SUA incidents.  CW-1 noted that the data was collected and reviewed in real time.

238.    CW-1 explained that the data analysts were separated into teams based on the specific details that the analysts were responsible for labeling on images to be fed into the autopilot neural network.  CW-1 articulated that the specific details were based on the features of the road that the analysts were labeling, such as whether the traffic line was single-lined, double-lined, or solid lined; whether there were medians; and other road features.  CW-1 added that road details were flagged and color-coded by the data analysts, and then fed into the neural network.  CW-1 also explained that the data analysts had access to digital map data while making these annotations.

---

[8] Confidential witnesses are identified as "CW-[#]."  Each CW was interviewed by Lead Counsel. To protect their anonymity, CW's are all described using male pronouns regardless of the individual's gender.

239.   CW-1 noted that he worked as a Quality Assurance (QA) analyst near the end of his tenure at Tesla.  CW-1 explained that one role of the QA analysts was to check the features or details that the neural network "autopopulated."  The QA analysts could then make corrections, which were fed into the neural network, so that the network could learn over time.

240.   When asked how accurate the "autopopulated" data was, CW-1 explained that it varied based on the terrain and estimated that approximately 30-40% of the autopopulated images he reviewed included errors.  CW-1 explained that errors were to be expected, because the neural network was trained on input provided by human analysts, and errors made by humans could be replicated in the neural network.  CW-1 described the neural network as being "like a baby learning how to drive."

241.   When asked how far along the system was progressing toward full-self driving, CW-1 emphasized that the project was still in beta.  He added that Tesla employees were given the option to take a Tesla vehicle home for a weekend, drive it, and experiment with autopilot.  CW-1 noted that most employees opted to wait for the technology to develop further before using autopilot, because they did not want to be "test dummies."  CW-1 indicated that some employees had a greater willingness to take those risks and chose to test autopilot even though it was in beta, but most employees did not.

242.   The information provided by CW-1 shows that in 2021 issues concerning phantom braking and SUA incidents were known by Tesla.  The information also shows that in late 2021, Tesla's perception system was staggeringly far from being reliable enough to support Level 4-5 automation, as the system's "autopopulated" labels frequently contained errors – in CW-1's experience 30-40% of the time.  This requires a bit of explanation.  The vision-based automation technology by Tesla was built on the foundation of Tesla's neural network being able to accurately identify road features and events and react accordingly.  The system was fed data, from which it would hopefully improve in identifying objects (*i.e.*, perceiving the world).  The frequently erroneous autopopulation of labels shows that the trained model Tesla had at the time was deeply unreliable, as it would produce incorrect labels frequently.  If that same model were deployed in operating vehicles, it would mean that the software would attempt to "self-drive" based on a frequently erroneous

1  perception of the world.  While this system could improve with time, the fact that this foundational

2  element of Tesla's technology was subject to error with such frequency in late 2019, highlights the

3  enormity of the gap between the actual status of Tesla's technology and its claims of releasing Level

4  4-5 autonomy.

5  243.  **CW-2**.  CW-2 was formerly employed by Tesla from before 2019 until mid-2022 and

6  worked as a Mobile Service Technician and Autopilot Test Operator.  As a Mobile Service

7  Technician, CW-2 was involved in fielding Tesla customer complaints, and that as an Autopilot Test

8  Operator, CW-2's responsibility was to drive Tesla test vehicles around in different and specific areas

9  of the U.S. to help increase the fleet's ability to perform when autopilot is engaged by a customer.

10  244.  CW-2 explained that it was "absolutely" known within Tesla's "autopilot department"

11  that Defendant Musk's pronouncements to the market throughout the period from April 2019 through

12  CW-2's tenure about the viability of Tesla's autopilot and FSD technologies were "exaggerations" of

13  what those capabilities actually were at any given time.  According to CW-2, everyone in the

14  department "from top to bottom" knew that Tesla's vehicles were nowhere near being full self-driving

15  as presented to the market and were not going to be in the foreseeable future and advised that this was

16  discussed openly by the Head of the department and many others on department-wide conference

17  calls.  CW-2 reiterated that "everyone" in the autopilot department was aware.

18  245.  According to CW-2, it was well known in Tesla's autopilot department that Tesla's

19  ADAS continued to have difficulties in making determinations at the more confusing areas of a

20  highway, such as multiple exits very close to each other, as just one example.  CW-2 further recalled

21  that these ADAS issues persisted throughout his entire tenure at Tesla.

22  246.  CW-2 went on to explain that as an Autopilot Test Operator, Tesla flew him to Austin,

23  Fremont, and San Francisco, in order to drive Tesla test cars in these areas so that they could gather

24  information from the test vehicles' various sensors that would in turn be used to help the Company's

25  fleet of cars to learn the roads and obstacles for when driving on autopilot and ADAS was engaged.

26  According to CW-2, each time CW-2 was flown out to these locations, CW-2 was tasked with driving

27  the vehicles around those geographic areas, and each time CW-2 was specifically directed to focus

28  on routes that were the most driven by Defendant Musk.  CW-2 added that these were areas where

1    Musk had major facilities for his various companies, including Tesla and SpaceX, and that CW-2 had

2    routes in that area that Defendant Musk normally took when visiting those facilities and testing FSD

3    himself.  CW-2 further described the testing routes as "heavily manipulated" with easier instances to

4    deal with because those were the routes that Defendant Musk test drove FSD himself.

5        247.    The information provided by CW-2 shows that it was known within Tesla that

6    Defendant Musk's public statements that Tesla was on the cusp of releasing Level 4-5 automation

7    were misleading, and that this view was shared by the head of the autopilot department.  The

8    information provided by CW-2 also shows that Defendant Musk's public statements touting the fact

9    that his drives involved few, if any, interventions, were deeply misleading, because they reflected

10   routes that the technology was especially likely to outperform on, given Tesla's efforts to collect data

11   and train its models specifically to perform well on those routes.

12       248.    **CW-3**. CW-3 was a Senior Software Engineer at Tesla during the development of the

13   autopilot software.  CW-3 worked at Tesla from before 2020 and through at least the end of that year.

14       249.    CW-3 advised that Musk personally used Tesla's autopilot on his daily commute to

15   and from his home and the SpaceX facility in Los Angeles.  As a result, CW-3 added, Musk's route

16   was carefully monitored, mapped, and planned, to make sure that any problems involving Musk's use

17   of autopilot were caught and resolved quickly.  CW-3 further noted that Musk communicated any

18   issues he experienced with autopilot to the team regularly, including in emails to the autopilot

19   engineering team.  CW-3 added that most of the problems identified by Musk were Perception team

20   issues.  CW-3 indicated that he received the emails, but the problems identified were not under CW-

21   3's responsibility.

22       250.    CW-3 indicated that Musk had regular meetings with both "the top brass," meaning

23   the leaders of the autopilot software program, as well as the autopilot engineers.  CW-3 explained

24   that if Musk observed a problem or an issue in his use of the FSD features in his car, he would

25   communicate directly to Milan Kovac, Tesla's Director of Engineering.  Kovac would then

26   communicate to the Engineering team that they needed to attempt to fix the issue.

27       251.    CW-3 advised that CW-3 was aware of issues such as phantom braking, sudden

28   unanticipated acceleration (SUA), and related FSD problems.  CW-3 explained that CW-3 learned of

these issues through emails to the Engineering group which detailed the problems, or "regressions," and that those emails included details regarding when and where the regression occurred, and the test driver involved. CW-3 added that when issues were discovered in the code or "build," those issues were logged and filed in several places, and that CW and others could see where changes were made. CW-3 described that CW-3 also heard about many of these issues through informal conversations or "shop talk."

252.    CW-3 confirmed that Musk received reports and updates during regular meetings regarding the team's work and that Musk met with the Engineering team's leaders regularly to discuss the autopilot stack; these meetings usually occurred on Mondays, and the Directors and Musk would discuss "regressions" with the code and any other issues with autopilot. CW-3 recalled occasions in which Musk came in to interact directly with the engineers as they worked, including looking over their shoulders as the engineers coded.

253.    CW-3 confirmed that Tesla did have access to video clips and video feeds from Tesla vehicles, with limits to protect customer privacy, and that the company used those video feeds to review and tag problems with the vehicle operations, including collisions, FSD "takeovers," where the autopilot system takes actions which override the driver's control, as well as issues affecting driver comfort or other system issues. CW-3 elaborated that any issue or bug identified in the video clips was tagged for review with time stamps; the tags and video clips could be used to determine what the car's computer system "thought," which was the starting point for debugging any problems.

254.    CW-3 confirmed that Tesla used a software program called Jira to track bugs, customer complaints, and set up response tickets for those issues. CW-3 added that these tickets and complaints were closely tracked at the company.

255.    CW-3 further added that if there was a major regression regarding safety, operations, or driver comfort, then Moore and Elluswamy would have been the first to know. CW-3 confirmed that Milan Kovac, Ashok Elluswamy, and CJ Moore all reported directly to Musk and frequently met with Musk.

256.    The information provided by CW-3 shows that Defendant Musk was regularly updated on issues concerning Tesla's autonomous driving technology and that issues concerning such as

70

phantom braking, sudden unanticipated acceleration, FSD takeovers and related FSD problems were known, tracked, and discussed within Tesla. The information provided by CW-3 also confirms that Defendant Musk's driving routes were the subject of special attention, which indicates Musk's public statements concerning the lack of interventions on his drives were misleading in that they were not representative of the system's capabilities. CW-3 confirms that Defendant Musk was aware of this because he specifically provided feedback on issues concerning his route with an expectation that they would be fixed.

257.    **CW-4**.    CW-4 purchased a 2019 Tesla Model 3 in 2019 from the company and purchased the autopilot / FSD system shortly thereafter. CW-4 was involved in a serious accident due to autopilot on October 29, 2020

258.    CW-4 explained that on the date of his vehicle collision, he was driving his Tesla with autopilot engaged. He went on to describe how his vehicle approached a green traffic light at an intersection where there were no traffic lines. CW-4 continued that, at the intersection, the vehicle pulled hard to the right instead of proceeding straight as intended and collided with the curb. CW-4 added that his hands were on the steering wheel at the time, as per the company's directions, and he attempted to steer the car away from the curb but was unable to do so, as the FSD was too strong. CW-4 noted that he had been able to take some limited control over the car, but only enough to prevent the crash from being worse. CW-4 added that the car was seriously damaged as a result and he suffered personal injuries. CW-4 stated that the vehicle's airbags were not deployed in this crash.

259.    The information provided by CW-4 shows that Tesla's autonomous driving software could cause severe accidents even when closely monitored by a human and that these accidents could be caused by the vehicle taking unsafe actions contrary to the ways any human would reasonably drive the vehicle. It also demonstrates the software's dangerous activity around intersections – a topic of the eventual recall of Tesla vehicles imposed by NHTSA. Finally, it serves as an example of how the software could cause dangerous accidents that would not result in airbag deployment, and thus not be counted in Tesla's publicly disclosed safety data.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

### 3.    Expert Analysis of Challenges Tesla Faced

260.    To release a full self-driving vehicle at Level 4-5 automation, using Tesla's vision-only neural network-based approach, would require Tesla to overcome incredible challenges.  The following analysis of those challenges was prepared in consultation with an expert on Vehicle Driving Automation.[9]

261.    When analyzing technologies like Tesla's autonomous driving hardware and software, it is accepted in scientific and engineering communities that such technologies can be productively analyzed by considering their Functionality, Operability, Dependability, and Performance, which terms have well understood meanings within those communities.   Within the analysis of "dependability" are subcategories of safety, security, reliability, and availability.

262.    Here, functionality is about what functions the vehicle performs at a particular level of driving automation, *e.g.*, highway intelligent cruise control at automation Level 2, or complete independent operation on all roadways at automation Level 5.  Additional examples of functionality include lane keeping, lane change, intersection driving, unprotected left turns, parking, etc.

263.    Here, operability is about the functioning of the vehicle as a component of a complex system made up of other vehicles, pedestrians, bicyclists and belonging to a wide range of stakeholders, *e.g.*, the vehicle must be able to operate in construction zones, the vehicle must co-exist with first responders such as fire trucks, emergency vehicles, police, etc.

264.    Dependability is the overall reliance that is placed on the vehicle to provide such functionality and operability. There are four attributes of dependability: safety, security, reliability, and availability.

---

[9] Specifically, Lead Plaintiff consulted with Professor Juan Pimentel.  Professor Pimentel has a Ph.D. in electric engineering from the University of Virginia.  He has over a decade of experience performing research and development activities regarding the safety and efficiency of automated vehicle features having edited four books on the subject for SAE International. Prior to automated vehicles, he performed extensive research on automotive safety critical systems having written a book on the subject for SAE International.  He has assisted and performed consulting projects for many automotive suppliers and OEMs on topics related to Automated Driving.  He was a professor of Electrical and Computer Engineering at Kettering University from 1979-2019.  Dr. Pimentel has reviewed this Section of the complaint and believes it is an accurate explanation of the topics discussed.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

265. Performance involves the manner, quality, and efficiency of functional and operational aspects of driving.

266. Throughout the Class Period, there were important functionality, operability, dependability, and performance aspects that needed to be addressed by Tesla before Level 4-5 autonomy could be released. This analysis primarily focuses on the functionality and dependability (especially the safety) of the development of Level 4-5 automation. However, for automated vehicles, functionality and dependability are intertwined, *e.g.*, offering functionality without a sufficient level of safety is not acceptable. Adding required dependability, *e.g.*, safety to an automated driving system with existing functionality is challenging. Thus, developing a degree of functionality is much easier than offering such functionality at an acceptable level of dependability and safety.

a. **Challenges with Establishing Suitable Functionality for Level 4-5 Functionality and Autonomous Robotaxis**

267. Throughout the Class Period, Tesla had enormous functionality challenges to complete before Tesla could release a vehicle (or software) with Level 4-5 automation suitable for full self-driving – including a robotaxi service. Some of those functionality challenges are discussed below:

268. **Parking functionality.** This functionality refers to a vehicle locating an empty parking space, either in a parking lot or other acceptable location, and actually performing the parking function in an available space. Tesla introduced the "Autopark" feature as part of its autopilot suite. Tesla attempted to offer this functionality as early as 2016, but it was subject to many performance issues. As *Forbes* reported on October 17, 2022, Tesla then discontinued providing autopark features as its shift to a vision-only approach rendered the autopark feature ineffective. On March 24, 2023 (after the Class Period), *Electrek* reported that Tesla was releasing new features that supposedly can park the car, but that the system still needs "some work" as it performs inconsistently. Indeed, Tesla's Model 3 owner manual warns that even with the current feature, owners should: "Never depend on Autopark to find a parking space that is legal, suitable, and safe;" "Be prepared to apply the brakes to avoid vehicles, pedestrians, or objects." The manual also warns the auto park feature is "particularly unlikely to operate as intended," in a variety of scenarios. For example, it is "only designed to operate on flat roads," not roads with any slope.

269.    The continued limitations highlight the extreme improvements that would be needed, even today, before Tesla could offer real full self-driving or a self-driving taxi.  This capability would require the parking functionality to work in all scenarios and would require it to respond to numerous complex environments, such as finding suitable parking locations in busy urban environments and locations with extremely specific parking guidance such as an airport.

270.    **Summon functionality**.  This functionality refers to having the vehicle go to the specific location where a person is located.  In the robotaxi context, the summon functionality applies to meeting a taxi customer to begin services.  Tesla expanded on the Autopark feature with "Summon," which enabled certain summoning capabilities in narrow situations in 2016.  That feature could only operate within 39 feet of the person summoning the vehicle.  In September 2019, Tesla released Smart Summon, which was limited to operating within 213 feet of the person summoning the vehicle.  In 2022, both summon features were disabled for new vehicles, as they could not operate with Tesla's vision-only equipment.  However, even today, Tesla's owner manual still describes common scenarios in which this feature is extremely limited.  For example, it can only operate if you have a "clear line of sight" to the vehicle, it will not work if the vehicle is plugged into a charger, it "cannot detect obstacles that are located lower than the bumper, are very narrow, or are hanging from a ceiling," "may not react to all traffic," "does not recognize the direction of traffic, does not navigate around empty parking spaces, and may not anticipate crossing traffic," "will not work on sloped roads or in a variety of weather conditions."

271.    The continued limitations highlight the extreme improvements that would be needed, even today, before Tesla could offer a self-driving taxi that could autonomously locate and pick up customers.  This capability would require the summon functionality to work in all scenarios, and would require it to respond to numerous complex additional environments, such as navigating unusual roadways to find passengers in residential areas, navigating hotel or airport facilities, complying with acceptable rules about where vehicles can pick up passengers, and finding passengers who are not entirely stationary.

272.    **Idling and waiting in an appropriate place**.  This functionality refers to having the vehicle wait at appropriate locations, other than designated parking lots.  Taxi drivers need to

determine what to do with their vehicle between passengers.  For example, will the vehicle have some means to pay for parking or an ability to locate a safe and legal place to wait other than a paid parking spot?  Tesla has not disclosed any technology that would enable it to perform this functionality or otherwise explained how its vehicles would handle this challenge when operating as autonomous robotaxis.

273.    **Choosing the correct lane**.  On a city or highway with multiple lanes, an autonomous vehicle must select an appropriate lane to drive in given the destination, traffic rules and customs, and flow of traffic.  Tesla's software had some capability to select lanes on highway driving and introduced some functionality for selecting lanes when it released FSD Beta.  However, users have complained that the functionality remains highly incapable.  For example, in a *CleanTechnica* article on September 11, 2022, titled, "Can Someone Explain To Me Why Tesla FSD Can't Choose The Correct Lane?"  The article stated:

> Time after time, the car, which is following the navigation route it decided was best to drive, just stays in the lane it's in and doesn't get into the turn lane it needs to get into. This happens when the street is empty and it's not at all hard to change lanes. It happens for right turns and left turns. It happens on slow streets and fast streets.

274.    Deficiencies in this functionality go beyond picking inconvenient lanes and can pose serious safety issues.  On November 23, 2021, *CNN* reported that NHTSA was investigating a crash resulting in severe damage to a Tesla Model Y.  According to the driver's account of the crash to NHTSA:

> The Vehicle was in FSD Beta mode and while taking a left turn the car went into the wrong lane and I was hit by another driver in the lane next to my lane. the car gave an alert 1/2 way through the turn so I tried to turn the wheel to avoid it from going into the wrong lane but the car by itself took control and forced itself into the incorrect lane creating an unsafe maneuver putting everyone involved at risk. car is severely damaged on the driver side.

275.    Tesla's owner manual describes several of the deficiencies that remain with lane selection today.  Tesla still requires the driver to always check blind spots, lane markings, and the surrounding roadway to confirm it is safe and appropriate to move into the target lane.  Tesla cannot perform lane changes on roads where traffic conditions are constantly changing and where bicycles and pedestrians are present.  Like other functionality, auto lane changing cannot occur on winding

1  roads with sharp curves, on icy or slippery roads, or when weather conditions (such as heavy rain,

2  snow, fog, etc.) may be obstructing the view from the camera(s) or sensors (if equipped).

3        276.    One scenario this functionality must appropriately handle is negotiating lane changes

4  when the vehicle finds itself in a turn-only lane and needs to continue driving straight.  The vehicle

5  then needs to negotiate a lane change out of the turn-only lane and back into the correct lane to

6  continue traveling straight.  In February 2023, the NHTSA issued a warning to Tesla to fix this issue.

7  Supposedly, Tesla fixed this issue on March 6, 2023 with an OTA software update.

8        277.    **Managing the duration of the vehicle's static position at certain intersections**.  The

9  vehicle needs to manage the time spent at an intersection with a stop sign, particularly when the

10  intersection is clear of any other road users.  In February 2023, the NHTSA issued a warning to Tesla

11  to fix this issue.  Supposedly, Tesla fixed this issue March 6, 2023 with an OTA software update.

12        278.    **Adjusting vehicle speed while traveling through certain variable speed zones**.  A

13  vehicle's speed can be based on detected speed limit signage and/or the vehicle's speed offset setting

14  that is adjusted by the driver. The vehicle speed needs to be adjusted according to the maximum

15  vehicle speed at the various zones. In February 2023, the NHTSA issued a warning to Tesla to fix

16  this issue. Supposedly, Tesla fixed this issue on March 6, 2023 with an OTA software update.

17        279.    **Handling unprotected left turns**.  This functionality refers to making a left turn in

18  an intersection with two-way streets when there is no traffic lights or traffic lights without left-turn

19  signals or arrows.  Tesla first offered this functionality with its FSD Beta release, though it was

20  reported that the product was deficient in several ways.  For example, on March 21, 2021, the car-

21  focused website, *Jalopnik*, reported in a video in an article titled, "Drone Footage Of Tesla Making

22  Unprotected Left Turns Is Seriously Terrifying," it stated:

> The left turn isn't a difficult one for most drivers. If a human were in charge, we'd
> likely put the pedal to the metal as soon as there was a break in traffic. But Tesla's
> Level 2 driver-assist technology isn't designed to do that.  Instead, the car just kind of
> waits in limbo until it deems the moment is right, which it will only do if it decides
> crossing is safe. So that means it just kind of... *takes off*. It doesn't give Cook a
> warning. It just *goes*. And as you can see in the clip above, Cook doesn't always deem
> it safe to do so, which means he needs to be on high alert to grab the wheel or hit the
> brakes. It kind of negates the whole purpose of it being a driver assistance program
> when the driver has to be *more* alert than normal.

280. **Traffic Light and Stop Sign Control**. A basic requirement to driving on roads with other cars and pedestrians is to be able to navigate through stop signs and traffic lights. Tesla's Traffic Light and Stop Sign Control is the functionality that is aimed at having Tesla's FSD navigate through these common vehicle maneuvers. However, before a Tesla will be able to achieve Level 4 or 5 autonomy, there are numerous issues that Tesla will have to solve in order for a Tesla to perform these basic driving functions. As it stands now, a Tesla attempts to stop at all traffic lights but may also stop at green lights – creating a risk that a car driving behind it will rear-end the Tesla and maybe others, causing a collision. Another challenge that this functionality faces is when a Tesla is driving on a hill or on a road that has sharp curves. In these driving situations, the cameras are unable to see upcoming traffic lights or stop signs. Another circumstance that the Tesla needs to solve is when a traffic light, stop sign, or road marking is obstructed (for example, a tree, a large vehicle, etc.). Also, a Tesla cannot turn through an intersection even after stopping at a red light or stop sign, and a car must be manually steered in these circumstances.

281. Finally, a Tesla may or may not stop at railroad crossings, keep-out zones, toll booths, crosswalk systems, yield signs, or temporary traffic lights and stop signs (such as at construction areas, miscellaneous traffic U-turn lights, bicycle and pedestrian crossing lights, lane availability lights, etc.) Like other functionality described herein, stopping at a stop sign or red light may not happen if visibility is poor (heavy rain, snow, fog, etc.) or when weather conditions are interfering with the camera or sensor operation, or bright light (such as direct sunlight) is interfering with the view of the cameras, or a camera is obstructed, covered, damaged, or not properly calibrated.

282. **Navigate driving at speed in interaction with other vehicles**. In order to reach Level 4-5 functionality, a Tesla needs to be able to safely navigate while driving on roads with other vehicles. This requires the Tesla to be able to adjust its speed to meet the speed of cars driving in close proximity to the Tesla, including maintaining an appropriate following distance to the car in front of it. This requires a Tesla to be able to accurately determine the distance from a vehicle ahead of it (which at this time it may not be able to accurately do). A Tesla must also be able to adapt to conditions of the road while taking account of other vehicles and pedestrians. Currently, Tesla does not adapt driving speed based on road and driving conditions. Like Tesla's Traffic Light and Stop

Sign Control, this functionality is limited and cannot be used on winding roads with sharp curves, on icy or slippery road surfaces, or when weather conditions (such as heavy rain, snow, fog, etc.).

283.    Other issues a Tesla currently faces in this regard is that a Tesla may brake when not required or when the driver is not expecting it. This can be caused by closely following a vehicle ahead, or when detecting vehicles or objects in adjacent lanes (especially on curves), etc.  Also, due to limitations inherent in the onboard GPS (Global Positioning System), a driver may experience situations in which the Tesla slows down, especially near exits or off-ramps where a curve is detected. In some cases (such as having insufficient data), a Tesla may not automatically reduce the set speed on the highway interchange or off-ramp.  The Tesla may not detect all objects and, especially when cruising over 50 mph, may not brake/decelerate when a vehicle or object is only partially in the driving lane or when a vehicle a Tesla is following moves out of the driving path and a stationary or slow-moving vehicle or object is in front of it. A Tesla may react to vehicles or objects that either do not exist, or are not in the driver's lane of travel, causing the Tesla to slow down unnecessarily or inappropriately. Like other functionality described herein, navigating on a road with other traffic is particularly unlikely to operate if visibility is poor (heavy rain, snow, fog, etc.) or when weather conditions are interfering with the camera or sensor operation, or when bright light (such as direct sunlight) is interfering with the view of the cameras, or a camera is obstructed, covered, damaged, or not properly calibrated.

284.    **Additional Operability Challenges**.  Releasing functional robotaxis would require additional functionality, operability, and infrastructure challenges beyond the challenges posed directly by achieving Level 4-5 autonomy.  For example, Tesla would need systems to manage complex and varying traffic laws as its vehicles move through a variety of locations; Tesla would need to determine a mechanism for charging their vehicles and removing them from charging stations without human assistance; Tesla would need to design and implement supervisory controls to handle all sorts of contingencies such as blocked roadways, as well as a nearly limitless number of unique and unusual scenarios (*i.e.*, edge cases) that would need to be resolved while vehicles are operating autonomously.

1

2

    **b.**  **Tesla's Challenge in Achieving This Functionality Was Heightened**
       **by The Company's Decisions**

3

  285.  Tesla has made a number of design decisions that make achieving the necessary

4

functionality and dependability for Level 4-5 automation especially difficult.  In essence, it has tied

one hand behind its back, while trying to achieve unprecedented results.

5

6

  286.  As of Tesla's 2019 Autonomy Investor Day, the Company has publicly stated that it

7

will develop its autonomous driving system without the use of LIDAR.  LIDAR is a technology, used

8

by other companies attempting to develop high levels of vehicle autonomy, that can detect distance

by measuring the time it takes beams of light to be transmitted and then returned to a sensor.  While

9

Tesla contends that it can determine distance entirely through ordinary passive optical data, and while

10

this may be technically possible, the decision to reject this technology increases the challenge of

11

developing a safe and reliable system.  Importantly, it reduces the availability of multiple and

12

independent sources of data that can be used to ensure redundancy and reliability.  Many experts in

13

the vehicle autonomy space do not believe a car could reach the requisite degree of dependability

14

without the use of LIDAR in the foreseeable future.  One major motivation for this change is likely

15

the relatively high price of LIDAR sensors.

16

  287.  In April 2021, Tesla announced that it would also be discontinuing its use of radar

17

sensors, another device that provides autonomous vehicle systems with information about the distance

18

and relative speed of objects.  Radar sensors are used by all other major developers working on high

19

levels of vehicle autonomy.  The *Washington Post* reported on March 19, 2023 that engineers at Tesla

20

were "aghast" at Defendant Musk's decision to remove radar sensors and that he had "overruled"

21

engineers who had raised issues with his decision.  That same article reported, based on "interviews

22

with nearly a dozen former employees and test drivers, safety officials and other experts," that the

23

decision to remove radar sensors prompted "an uptick in crashes, near misses and other embarrassing

24

mistakes by Tesla vehicles suddenly deprived of a critical sensor."

25

  288.  In addition to rejecting these specific sensors, Tesla has also rejected other

26

technologies commonly used in the industry – such as HD maps – which further the challenge of

27

developing a working autonomous system.  Tesla appears to be alone in the industry in its decision

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

1   to develop a system entirely based on vision and artificial intelligence, using data collected by eight

2   cameras connected to the vehicle.  The logic of Tesla's approach is to collect data from its fleet of

3   vehicles, feed that data to an off-line system to train its neural network, then deploy the trained neural

4   network on the vehicle, and then iteratively improve the system based on the feedback loop between

5   the collected data and vehicle performance.  This approach may yield results, but is slow moving

6   because improvements rely on the process of slowly collecting data about perceived issues and then

7   iteratively making changes to hopefully improve performance.  Furthermore, it is not guaranteed that

8   this approach will address all of the detected issues.

9          289.    This iterative machine learning based approach makes it exceptionally difficult to

10   reliably predict progress.  A system may make improvements for a time, before reaching a point

11   where progress stalls.  This phenomenon is well-illustrated by Tesla's rate of progress in developing

12   improvements in its technology.  For example, in Tesla's September 22, 2020 annual meeting,

13   Defendant Musk disclosed that Tesla was substantially changing its approach to providing data to its

14   neural network system – moving from labeling individual images to video segments – because "a

15   couple years ago" the company had become "kind of stuck in a local maximum," meaning that the

16   system was "improving, but like the improvements kind of started tailing off and just not getting

17   where they needed to be . . . so we had to do a fundamental rewrite of the entire Autopilot software

18   stack and all of the labeling software as well."  The prospect of reaching "local maximum[s]" is

19   heightened by an approach that relies heavily on feeding data to machine learning algorithms and

20   waiting for improvements. To date, it has not been proven in the research and development

21   community that an automated driving system based entirely on neural networks has the sufficient

22   level of functional safety to be deployed in actual systems.

23          290.    Indeed, over the course of developing its technology, Tesla has repeatedly made

24   dramatic design changes to its system architecture — suggesting that (a) it has never been close to

25   releasing higher levels of autonomy, *i.e.*, that it was not merely polishing the final bits of performance

26   for Level 4-5 autonomy (in Defendant Musk's terms walking the "march of nines"); and (b)

27   demonstrating that it has run into multiple "local maximums," in terms of improvements.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

291.    Initially, Tesla used neural networks primarily for the perception system involving the detection of vehicles, traffic signs, pedestrians, lane lines, and other objects.  For planning and control, Tesla used traditional procedural programming that resulted in planning and control software having around 300,000 lines of code.  Around January 20, 2023, Tesla moved to a mostly neural network approach to use neural networks for planning and control. On August 1, 2023, Defendant Musk tweeted that this decision resulted in Tesla reducing the procedural code from 300,000 lines of code to about 3,000 lines of code, a reduction of 100 times smaller.  In other words, its current system is essentially entirely dependent on the neural network trained system to produce accurate results in terms of perception, planning, and actual driving decision making, and not on "hard coded" procedural rules (*e.g.*, when red light detected, slow to a stop).

292.    A final major way that Tesla's decisions have made development of advanced autonomy especially difficult for itself, is its decision to pursue non "geo-fenced" autonomy – *i.e.*, true Level 5 autonomy – before first developing a more limited Level 4 system.  This means that Tesla needs to simultaneously develop solutions catered for highways, cities, rural areas, including all road conditions and environments.  In contrast, Tesla's competitors Cruise and Waymo have pursued an approach of developing Level 4 autonomy, *i.e.*, they have attempted to develop systems that can safely operate within a restricted geography.  This approach enables them to focus on specific issues unique to that geography — and rely on HD map data for the selected geography – to reach Level 4 autonomy at a faster pace.  The wisdom of this approach is so-well accepted that international standards, *e.g.*, ISO 34503, have even been developed around the use of "operational design domain" ("ODD") — *e.g.*, geo-fences — for autonomous vehicles, reflecting the industry's view that imposing limits on the ODD will be an important step in developing autonomous systems that can operate above Level 2.

          **c.**      **Challenges with Establishing Sufficient Dependability and Safety for Level 4-5 Autonomy**

293.    There are accepted industry standards and government regulations — including those set by SAE, ISO, and various legal regimes — that inform analysis of the requisite dependability and

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

1    safety of Level 4-5 autonomy.[10]  Several of these standards establish industry expectations regarding

2    the degree of dependability a particular system must have to be deemed safe at a satisfactory level.

3        294.    The enormity of Tesla's challenge in developing a sufficiently dependable Level 4-5

4    autonomous driving system can be illustrated by looking narrowly at just one safety consideration,

5    representative of the countless similar safety considerations.  Therefore, the balance of this subsection

6    focuses on standards and regulations for autonomous emergency breaking ("AEB").

7        295.    AEB is a critical component of any Level 4-5 autonomous driving system, as it handles

8    urgent breaking in the event an object comes too close to the vehicle to avert a crash.  While AEB is

9    a useful function even in human operated vehicles, it would not be possible to have a self-driving car,

10    without an acceptably safe AEB system, since without a human driver, the AEB system is the

11    vehicle's crucial line of defense against many collisions.

12        296.    While AEB is a critically important component, like many technologies, it can also

13    cause harm if it malfunctions.  One form of harm would be failing to activate when needed, and thus

14    failing to avert a collision.  However, an AEB system can only malfunction if it causes the vehicle to

15    unnecessarily apply emergency braking, and doing so can itself cause crashes.

16        297.    For example, on November 24, 2022, a Tesla vehicle operating with the "full self-

17    driving" system engaged, suddenly stopped in a tunnel, causing an 8-car pileup, which injured nine

18    people, including a 2-year-old.  The driver explained that the sudden stop was due to the full self-

19    driving system malfunctioning.  It is very likely that this accident was caused by an event called "false

20    positive" detection. *i.e.*, the vehicle concluded that there was a vehicle in front when in fact there was

21    none and thus applied maximum braking.  These type of events are the focus of "functional safety."

22    Functional safety concerns are often evaluated using a methodology referred to as a risk assessment.

23

24    ─────────────────────────

[10] Standards for regulation of automated vehicles include: SAE J3016 (Describes SAE levels of

25    driving automation, L1 to L5); ISO 34502 (Includes test scenarios for automated driving); UNECE
R-157 (Provisions for approval of vehicles with LKAS – Lane Keeping Assist System); and UNECE

26    R-152 (Provisions for approval of vehicles with AEB – Autonomous Emergency Braking).  Standards
specifically related to the safety of autonomous vehicle include: ISO 26262 (Automotive Functional

27    Safety (FuSa)); UL 4600 (Safety for the Evaluation of Autonomous Products); ISO 21448 (Safety of
the Intended Function (SOTIF)); ISO/TS 5983 (Safety for automated driving systems); EU 2019/2144

28    (General safety and the protection of vehicle occupants and vulnerable road users); and EU 2022/1426
(Specifications for the type-approval of automated driving system (ADS)).

298.    ISO 26262, which is set by the International Organization for Standardization, governs functional safety for road vehicles.  It establishes values of acceptable risk for evaluation of the functional safety of a system.  There is a standardized specification of functional safety risk tolerance articulated as "ASIL (Automotive Safety Integrity Level)" levels based on the safety concerns relevant to the system.  When designing for functional safety, the following safety goal can be associated to the vehicle sub-system involving AEB: "assuring AEB intervention when needed." Further, application of the ISO 26262 standard typically yields that this safety goal is subject to ASIL, requiring a rate of random hardware failure no more frequently than $10^{-8}$ failures per hour.  Satisfying this risk tolerance level for AEB is one aspect, of one of many types of safety considerations, for one of many systems necessary for autonomous driving.  Additionally, the proper functioning of AEB itself depends upon multiple sub-systems, including the perception system and the Brake Controller. The perception sub-system is needed by the AEB to detect objects and determine if they are close enough to the vehicle to warrant an AEB intervention.

299.    ISO 21448, set by the International Organization for Standardization, is a complementary standard to ISO 26262 (standard for functional safety) and governs SOTIF, for systems in road vehicles, and in particular, automated vehicles.  This standard requires systems to meet an acceptable level of unintended hazardous activity.  An appropriate analysis of the acceptable risks in analysis of SOTIF, pursuant to an appropriate analysis, would match the requirements set by ISO 26262 for the perceptual sub-system (object detection) used in the AEB system, *i.e.,* a failure rate of $10^{-8}$ per hour.  There are many sources of potential unintended hazardous activity relevant to the perception system relied upon in the AEB system, but one such risk arises due to the performance limitations of the sensors in the perception system (*e.g.*, LIDAR, radar, and cameras).

300.    Within these standards, an acceptable failure rate for a perception system relying on redundant data from LIDAR, radar, and cameras, could be achieved if each of these sensors failed to properly detect depth or distance to objects once every 41.6 days, as each sensor can have a failure rate of $10^{-3}$ per hour while the entire perception system itself maintains a failure rate of less than $10^{-8}$ per hour.  However, Tesla's system depends on a single sensor type — cameras — and thus this sensor must itself have a failure rate of no more than $10^{-8}$ per hour.  In other words, to comply with

the widely accepted international industry standards, Tesla's vision system must not err in detecting the depth of objects more frequently than $10^{-8}$ per hour. This highlights that Tesla's tact of developing an autonomous driving system that complies with industry standards and is dependent on one sensor system (without redundancy) from other sensor systems poses an astounding challenge. Therefore, to represent that its systems are safe for autonomous, unsupervised driving, Tesla would need confidence that this component of its system would not fail any more frequently than once every per 114,155 years of miles driven.

301.    Reaching this degree of confidence, based on an automated driving system that is based on an unproven inductive machine learning process would be exceptionally difficult. As of 2020, Tesla has logged about 71 million hours (*i.e.*, 8,105 years) with autopilot engaged.[11]  Thus, to test the reliability of their AEB system, even once, at the specified level of safety to comply with applicable standards, Tesla would need to log 14 times more hours of driving than it had at the start of 2020. This difficulty is greatly enhanced by the fact that Tesla routinely pushes out updates that essentially result in the car operating on a new machine-learning trained model. While this iteration is intended to result in improved performance, it also means that each over-the-air update essentially restarts the clock on hours of testing, since each new model is distinct and may introduce safety risks.

302.    Of course, there may be other methods of reaching a conclusion that the rate of failure was acceptable, but this gives a reasonable sense of the magnitude of the challenge in releasing a suitably safe system, pursuant to accepted industry standards, using Tesla's vision-only approach and a machine learning trained system.

**E.      Tesla Faces Legal Action and Investigations Related to Its Autonomous Driving Technology**

303.    Defendant Musk's statements with respect to Tesla's full self-driving technology have attracted scrutiny in the form of several legal actions.

---

[11] Estimated based on (1) Tesla's reporting on February 26, 2020 that its autopilot software had been active during 3 billion miles driven; (2) drivers in the U.S. driving an aggregate of about 3 trillion miles in 2020 per NHTSA data; and (3) AAA estimating that Americans drive approximately 70 billion hours annually. So, roughly, 3 trillion miles / 70 billion hours = 42 miles per hour, and 3 billion miles / 42 per hour = 71 million hours driven with autopilot.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

304.    First, on January 27, 2023, *Bloomberg* reported in an article, titled, "Musk Faces SEC Probe for Role in Tesla Self-Driving Claims" that "US regulators are investigating Elon Musk's role in shaping Tesla Inc.'s self-driving car claims."  Citing "a person with knowledge of the matter who asked not to be identified discussing aspects of the investigation that haven't been disclosed," the *Bloomberg* article reported that "SEC officials are weighing whether Musk may have inappropriately made forward-looking statements;" however, according to *Bloomberg*, "[i]t couldn't be determined specifically which of Musk's statements or activities about Autopilot have garnered the attention of the SEC."

305.    Second, on January 31, 2023 (only four days after the *Bloomberg* report revealing the SEC investigation into Defendant Musk's FSD statements), Tesla revealed in its Form 10-K, filed with the SEC in connection with its 2022 annual financial disclosure, that it had received document requests from the DOJ concerning its full self-driving technology.  Specifically, the 2022 Form 10-K stated that Tesla had "received requests from the DOJ for documents related to Tesla's Autopilot and FSD features," referring to the matter as an "ongoing investigation," warning that they "cannot predict the outcome," and that "there exists the possibility of a material adverse impact on our business." The 2022 Form 10-K did not provide any further information about the DOJ inquiry.

306.    The Company provided the same vague high-level description of the DOJ document requests in its Form 10-Q for 1Q23, filed with the SEC on April 24, 2023, as well as in its most recent Form 10-Q for 2Q23, filed with the SEC on July 24, 2023.

307.    Earlier reporting from *Reuters* on October 27, 2022, titled, "Exclusive: Tesla faces U.S. criminal probe over self-driving claims," indicated that, according to "three people familiar with the matter," the "U.S. Department of Justice launched the previously undisclosed probe [in 2021] following more than a dozen crashes, some of them fatal, involving Tesla's driver assistance system Autopilot, which was activated during the accidents."  According to the *Reuters* article, "[a]s part of the latest probe, Justice Department prosecutors in Washington and San Francisco are examining whether Tesla misled consumers, investors and regulators by making unsupported claims about its driver assistance technology's capabilities, the sources said."

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

308.    Tesla vehicles have been subject to multiple recalls, including those discussed in Section V(B) arising from the NHTSA's investigation of Tesla's autonomous driving technology.  An April 18, 2023 article in *Autoweek*, titled, "Tesla Is The Most-Recalled Car Brand—By Far—Of All Cars, Trucks, And SUVs," explained that "Teslas are far more likely to be the subjects of a recall than any other carmaker."  The article cited research by *iSeeCars* analyst Karl Brauer, who noted: "Most vehicles behave like the Toyota Camry—most of their recalls are issued when they are first introduced, with a rapid decline after 1-3 years. But some cars, like the Tesla Model S, see a pattern of ongoing recalls—or even an increasing number of recalls—as time passes."

309.    Additionally, Tesla has been subject to numerous consumer lawsuits, including a Class Action filed on September 14, 2022, and captioned, *Matsko v Tesla Inc.*, No. 22-cv-05240 (N.D. Cal.).  Tesla has routinely moved to remove these cases from federal court, citing arbitration clauses.

## V.    SUBSTANTIVE ALLEGATIONS BY ELEMENT

310.    The allegations in this Section should be read in conjunction with Section IV, which provides additional context and explanations relevant to these allegations.

311.    The allegations in this Section allege the specific misleading statements and omissions alleged to be fraudulent, the specific events alleged to reveal truthful corrective information to the market, Lead Plaintiff's basis for alleging reliance, scienter, loss causation, and additional allegations concerning the inapplicability of the "safe harbor" for forward-looking statements.

### A.    Defendants' False and Misleading Statements and Omissions

312.    Lead Plaintiff alleges that the statements highlighted in ***bold and italics*** within this Section were materially false, misleading, and omitted to disclose material information.  Each statement attributed to Defendant Musk during the Class Period was also made by Defendant Tesla because in each such statement Defendant Musk was speaking on behalf of Defendant Tesla as its CEO.  The reference to a statement being "misleading" includes statements that are misleading due to the omission of truthful information.

#### 1.    False and Misleading Statements Made in 2019

313.    On February 19, 2019, Defendant Musk participated in a podcast interview with an analyst from ARK Invest and the founder of ARK Invest, Cathie Wood, that was recorded in Fremont

California, and released publicly on ARK Invest's website on February 19, 2019. During the interview, Defendant Musk stated:

> *I think we will be feature complete full self driving this year. Meaning, the car will be able to find you in a parking lot, pick you up, take you all the way to your destination without an intervention this year. I would say that I'm certain of that. That is not a question mark.*

314.    The statements in the prior paragraph conveyed Tesla's progress in developing autonomous driving technology was sufficiently far along that Defendants could make an honest assurance — including by asserting "I'm certain of that. That is not a question mark" — that Tesla would have cars on the road that could drive themselves without intervention by the end of 2019. These representations were false and misleading because they misrepresented the status of Tesla's development of autonomous driving systems, as Tesla was not in a position to release a system that could safely drive a car without intervention by the end of 2019.

315.    During the February 19, 2019, Podcast hosted by ARK Invest, Defendant Musk stated:

> Once it is feature complete, then you're sort of kind of the march of nines. Like how many nines of reliability do you want it to be? And then when do regulators agree that it is that that is that reliable? *So there's feature complete for full self-driving this year with certainty. This is something that we control and I manage autopilot engineering directly every week in detail. So I'm certain of this*. Then when will regulators allow us even to have these features turned on with human oversight? That's a variable which we have limited control over. Then when will regulators agree that that these things can be done without human oversight? That is another level beyond that. So these are externalities we don't quite control. And the conservatism of regulators varies a lot from one jurisdiction to another. *My guess as to when we would think it's safe for somebody to essentially fall asleep and wake up the destination probably towards the end of next year*. That's that's when I would think it's most likely it will be safe enough for that. I don't know when regulators will agree.

316.    The statements in the prior paragraph conveyed Tesla's progress in developing Level 4-5 autonomous driving was sufficiently far along that Defendants could make an honest assurance that Tesla would be "feature complete for full self-driving" in 2019 and safe enough to sleep in while the car drives by 2020. These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of Level 4-5 autonomous driving systems, as Tesla was not in a position to release a feature complete full self-driving car by the end of 2019, or a Level 4-5 car you could sleep in by the end of 2020, and was many years away from a realistic release date.

317.    On April 22, 2019, Tesla hosted an event titled "Tesla Autonomy Investor Day," hosted at Tesla's (then) headquarters in Palo Alto and livestreamed over the internet. The event began at 4:00pm ET.[12] During the event, Defendant Musk stated:

> **By the middle of next year, we'll have over 1 million Tesla cars on the road with full Self-Driving hardware, feature complete at a reliability level that we would consider that no one needs to pay attention. Meaning you could go to sleep in your -- from our standpoint, if you fast-forward a year, maybe a year, maybe a year and 3 months, but next year, for sure, we'll have over one million robo taxis on the road. The fleet wakes up with an over-the-air update. That's all it takes.** You say what is the net present value of the robo taxi? Probably on the order of a couple of hundred thousand dollars. So buying a Model 3 is a good deal. Any questions?

318.    The statements in the prior paragraph conveyed Tesla's progress in developing Level 4-5 autonomous driving, as would be necessary for robotaxis, was sufficiently far along that Defendants could make an honest assurance that one million robotaxis would be on the road by 2020 and that it would be safe to "go to sleep" in the car and "not pay attention" by the end of 2020, such that regardless of whether that specific deadline was met, investors would expect that Tesla was on the cusp of achieving Level 4-5 autonomous driving. Because Level 4-5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statements necessarily also represented that Tesla had or was on the cusp of having a system that was sufficiently safe to satisfy regulators. These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of Level 4-5 autonomous driving systems, as Tesla was not in a position to release Level 4-5 autonomy by the end of 2020, and was many years away from a realistic release date; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Defendants could make such assertions, which depended upon the systems satisfying regulators.

319.    During the April 22, 2019 Tesla Autonomy Investor Day event, Defendant Musk had the following exchange with an analyst:

> [Question]: What data can you share with us today on how safe this technology is which would obviously be important in a regulatory or insurance discussion?

---

[12] Times are listed in Eastern Time because the NASDAQ trading hours are usually described in terms of Eastern Time.

88

[Defendant Musk]: Well, we publish the accidents per mile every quarter, and *what we see right now is that autopilot is about twice as safe as a normal driver on average*. And we expect that to increase quite a bit over time. Like I said, in the future, it will be -- consumers will want to outlaw – I'm not saying they will succeed nor am I saying I agree with this position, but in the future, consumers will want to outlaw people driving their own cars because it's unsafe.

320.    The statements in the prior paragraph conveyed that at the time of this statement, Tesla already had autonomous driving technology that was able to safely drive itself and able to do so at a safety level greater than—and in fact, at a level twice as safe—as humans.  These representations were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself and was not able to drive itself at a safety level greater than—or twice as great as—humans.

321.    On April 24, 2019, Tesla published its 1Q19 results, and hosted a corresponding earnings call at 5:30pm ET, which was livestreamed over the internet.  During the event, Defendant Musk stated:

All Tesla cars being built today have all the hardware necessary for full self-driving and over the year updates will enable our customers to use the Tesla ride-hailing network fleet and generate income which, as we said on Autonomy Day a few days ago, we think is somewhere between $10,000 and $30,000 a year. In some cases, perhaps more. We're the only company in the world producing our own vehicles and batteries as well as our own in-house chip for full self-driving. We're in a position unlike anyone else in the industry. *And in 2020, we expect to have 1 million robo taxis on the road* with the hardware necessary for full self-driving. We believe we'll have the most profitable autonomous taxi on the market and perhaps -- yes.

322.    The statements in the prior paragraph conveyed Tesla's progress in developing Level 4-5 autonomous driving, as would be necessary for robotaxis, was sufficiently far along that Defendants could make an honest assertion that one million robotaxis would be on the road by 2020. Because Level 4-5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statements necessarily also represented that Tesla would have a system that was sufficiently safe to satisfy regulators within the time period conveyed.  These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of Level 4-5 autonomous driving systems, as such systems were not in a condition where Defendants could honestly assert that these systems would be released by the end of 2020; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not

sufficiently safe such that Defendants could make such assertions, which depended upon the systems satisfying regulators.

323.    On May 9, 2019, Defendant Musk posted a tweet to Twitter at 1:46pm ET, which stated:

> *We could have gamed an LA/NY Autopilot journey last year, but when we do it this year, everyone with Tesla Full Self-Driving will be able to do it too[.]*

324.    This statement in the prior paragraph was a reference to a prior statement by Defendant Musk, on October 19, 2016, that Teslas would be able to drive from Los Angeles to New York "without the need for a single touch," and thus further conveyed that Tesla would publicly release that functionality by the end of 2019.  The statement in the prior paragraph conveyed that Tesla's progress in developing Level 4-5 autonomous driving, was sufficiently far along that Defendants could make an honest assertion that Tesla would release software by the end of 2019 enabling cross-country autonomous driving trips.  Because Level 4-5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statement necessarily also represented that Tesla would have a system that was sufficiently safe to satisfy regulators within the time period conveyed.  These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of Level 4-5 autonomous driving systems, as such systems were not in a condition where Defendants could honestly assert that these systems would be released by the end of 2019 and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Defendants could make such assertions, which depended upon the systems satisfying regulators.

325.    On June 11, 2019, Tesla hosted its annual meeting at 6:30pm ET and livestreamed the event over the internet.  During the event, Defendant Musk stated:

> Yes. *I think safety especially, I think we -- it is paramount for us -- it's like the absolute primary thing is to maximize the safety of the car. So it's like -- and this bears out in the statistics. So it's really hard to have a serious injury in a Tesla, like it's not – it's quite rare.* And when you do look at objective numbers like the NHTSA probability of injury, which is you could get on the Internet, the Teslas have the lowest probability of injury of any car tested. So like if it was possible to have a sixth star, we would have a sixth star. *It's like -- literally it's absurdly safe.* And yes, it's -- there's just a lot of forces that are kind of arrayed against Tesla. It's a lot of forces.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

326. The statements in the prior paragraph conveyed that Tesla prioritized safety above any other objectives. This was misleading because Tesla released autonomous driving systems that were prone to safety issues and because Defendants did not prioritize safety above releasing technology they could promote to the public as "full self-driving."

327. During the June 11, 2019 annual meeting, Defendant Musk stated:

> The Autonomy Investor Day, that I think was well received. The Tesla full self-driving computer is literally 20x faster -- 21x faster than the NVIDIA system that it replaces, and *we expect to be feature complete with autonomy by the end of this year. So you'll still need to supervise the autonomy, but it should be able to go from your garage to your parking space at work without intervention. So then we'll actually put on billions of miles of testing. And then I think probably sometime next year, you'll be able to have the car be autonomous without supervision, and then sometime thereafter, we'll be able to convince the regulators that the autonomy is safe enough that the car could actually go around with no one in it.*

328. The statements in the prior paragraph conveyed Tesla's progress in developing autonomous driving was sufficiently far along that Defendants could represent that Tesla would release a car that could drive itself without human intervention by the end of 2019 and would release a Level 4-5 autonomy system that could drive itself without human supervision by the end of 2020. Because Level 4-5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statement necessarily also represented that Tesla's full self-driving technology was safe. These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of autonomous driving systems, as Tesla was not in a position to release a car that could drive without interventions by the end of 2019, or a car that could drive without supervision by the end of 2020; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Defendants could honestly state they would release a system that did not require human supervision by the end of 2020.

329. On July 24, 2019, Tesla published its 2Q19 results, and hosted a corresponding earnings call at 6:30pm ET and livestreamed over the internet. During the event, Defendant Musk stated:

> *Well, if you factor in the full self-driving option, I think it is in play for the year. We just need to get the features done, make sure they're great, roll them out and recognize revenue and increase the take rate on full self-driving.* But also for the existing fleet, there's a very significant opportunity to upgrade the existing fleet to full self-driving. So most of the fleet has not purchased those options yet. So there's a

91

significant margin potential for the existing fleet to upgrade to full self-driving, which most of the fleet can. So yes, absolutely, I think that like long term, we are talking 25%, 30%. Not long term meaning like a year. Long term like in Tesla vernacular. That 30% gross margin is, I think, quite likely.

330.    The statements in the prior paragraph conveyed that Tesla would be releasing full self-driving technology in 2019, as Defendant Musk's statements that the Company would be able to recognize additional revenue by selling the FSD software as they got the "features done," indicated the service would be released that year. These statements conveyed that Tesla's progress in developing full-self-driving technology was sufficiently far along that Defendants could make an honest assertion that it would release those features in 2019. Because full self-driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statements necessarily also represented that Tesla would have a system that was sufficiently safe to satisfy regulators within the time period conveyed. These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of self-driving systems, as such systems were not in a condition where Defendants could honestly assert that these systems would be released by the end of 2019; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Defendants could make such assertions, which depended upon the systems satisfying regulators.

331.    On October 23, 2019, Tesla published its 3Q19 results and hosted a corresponding earnings call at 6:30pm ET, which was livestreamed over the internet. During the event, Defendant Musk stated:

I do -- while it's going to be tight, *it still does appear that we will be at least in limited -- in early access release of a feature-complete Full Self-Driving feature this year. So it's not for sure, but it appears to be on track for at least the early access release of a fully functional Full Self-Driving by the end of this year.*

332.    The statement in the prior paragraph conveyed that Tesla's progress in developing Level 4-5 autonomous driving — *i.e.*, "feature-complete Full Self-Driving" — was sufficiently far along that Defendants could make an honest assertion that it would release such a system by the end of 2019 (*i.e.*, in less than 10 weeks from this statement). Because Level 4-5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statement necessarily also represented that Tesla would have a system that was

sufficiently safe to satisfy regulators within the time period conveyed.  These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of Level 4-5 autonomous driving systems, as such systems were not in a condition where Defendants could honestly assert that these systems would be released by the end of 2019; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Defendants could make such assertions, which depended upon the systems satisfying regulators.

333.    During Tesla's October 23, 2019 3Q19 earnings call, Defendant Musk stated:

> *And as I said before, the point at which we're able to upload the software enabling a Tesla to become a robotaxi, expect to have that from a functionality standpoint by the end of next year. But in terms of the functionality -- so basic functionality is aspirationally end of this year, but reliable enough that you do not need to pay attention, in our opinion, by the end of next year. And we would need -- the acceptance by regulatory authorities will vary by jurisdiction.* That transition, that sort of flipping of the switch from a car that is from not robotaxi to robotaxi, I think will probably be the biggest step-change increase in asset value in history by far.

334.    The statements in the prior paragraph conveyed that Tesla's progress in developing autonomous driving was sufficiently far along that Defendants could represent that Tesla would release a car that could drive itself without human intervention by the end of 2019 and would release a Level 4-5 autonomy system that could drive itself without human supervision by the end of 2020. Because Level 4-5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statements necessarily also represented that Tesla's full self-driving technology was safe.  These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of autonomous driving systems, as Tesla was not in a position to release a car that could drive without human interventions by the end of 2019, or a car that could drive without supervision by the end of 2020; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Defendants could honestly state they would release a system that did not require human supervision by the end of 2020.

### 2.    False and Misleading Statements Made in 2020

335.    On April 29, 2020, Tesla published its 1Q20 results and hosted a corresponding earnings call at 6:30pm ET, which was livestreamed over the internet.  During the event, Defendant Musk stated:

93

[W]e really feel we're -- *I feel extremely confident that it will be possible to do a drive from your home to your office most of the time with no interventions by the end of the year.  So this is -- we can almost do this already with the leading-edge alpha builds driving in the car.*

336.    The statements in the prior paragraph conveyed that Tesla's progress in developing Level 4-5 autonomous driving was sufficiently far along that Defendants could make an honest assertion that Tesla would release a car capable of doing drives "most of the time" with no human "interventions" by the end of 2020.  These representations were false and misleading because Tesla's systems were not in a condition where Defendants could honestly assert that these systems would be released by the end of 2020.  The statements in the prior paragraph also conveyed that Tesla's progress in developing Level 4-5 autonomous driving was sufficiently far along, such that Tesla's "alpha builds" were "almost" capable of doing drives "most of the time" with no human "interventions." These representations were false and misleading because Tesla did not have technology at that time that was "almost" capable of enabling a car to drive itself with no human "interventions."  Because the ability for the car to drive itself with no human intervention is directly predicated on and tied to the safety of the autonomous driving system, these statements also misleadingly conveyed that Tesla was on the cusp of releasing, and internally already had, technology that could safely drive a car without human intervention most of the time, when in reality Tesla did not have a car with such capabilities and was not on the cusp of releasing software to enable this.

337.    On June 8, 2020, Defendant Musk posted a tweet to Twitter at 1:46pm ET, which stated:

*Autopilot prime directive is: don't crash.* What seems fast to humans is slow to a computer. *360 degree low light vision & sonar, plus forward radar enable to be superhuman*. Upcoming software upgrades will increasingly show the potential.

338.    The statements in the prior paragraph conveyed that, "enable[d]" by the combination of sensors and the computational speed of computers installed in Tesla vehicles, Tesla had cars that could drive themselves with superior safety to humans (*i.e.*, cars that could drive at "superhuman" safety levels).  The interpretation of Defendant Musk's reference to "superhuman" as conveying greater-than-human safety is bolstered by the context of this statement, as it followed an assurance that autopilot's "prime directive" is focused on safety (*i.e.*, "don't crash").  These representations

were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself, and was not able to drive itself at a safety level greater than — or twice as great as — humans.  The statements in the prior paragraph also conveyed that safety was Tesla's top concern — as indicated by asserting that the "prime directive" of its autonomous driving technology was "don't crash."  This was misleading because Tesla released autonomous driving systems that were prone to safety issues, and because Defendants did not prioritize safety above releasing technology they could promote to the public as "full self-driving."

339.    On July 9, 2020, Defendant Musk virtually "attended" the World Artificial Intelligence Conference, and a video of his remarks was made publicly available on YouTube and reported by several news outlets.  During those remarks Defendant Musk stated:

> *I am extremely confident that level five or essentially complete autonomy will [] happen, and I think will happen very quickly. I think at Tesla, I feel like we are very close to level 5 autonomy.  I think – remain confident that we will have the functionality for – basic functionality for Level 5 autonomy complete this year.*

340.    The statements in the prior paragraph conveyed that Tesla was "very close to level 5 autonomy" and that Tesla's progress in developing autonomous driving was sufficiently far along that Defendants could represent that Tesla would have vehicles that could operate at Level 5 autonomy in 2020.  These representations were false and misleading because they misrepresented the status of Tesla's development of autonomous driving systems, as Tesla was not in a position to release a car that could drive without intervention by the end of 2020.

341.    On July 22, 2020, Tesla published its 2Q20 results and hosted a corresponding earnings call at 5:30pm ET, which was livestreamed over the internet.  During the event, Defendant Musk stated:

> So what we've been doing thus far has really just been with like 2D -- mostly 2D. And like I said, not well correlated in time. So it's just hard to convey just how much better a fully 4D system would work -- does work. It's capable of things that if you just look -- looking at things as individual pictures as opposed to video like -- basically, like you could go from like individual pictures to surround video. So it's fundamental. So the car will seem to have just like a giant improvement. *We'll probably roll it out later this year. But we'll be able to do traffic lights, stop, turns, troughs, everything pretty much. And then it will be a long march of 9s, essentially, how many 9s of reliability are okay. So it's definitely way better than human*, but how much better than human does it need to be. So that's actually going to be the real work. There's just a massive amount of work with each kind of order of magnitude of reliability. But you'll see it

95

happen. And if you plot the points on the curve, it would be kind of obvious where it's headed.

342. The statements in the prior paragraph conveyed that Tesla was on the cusp of rolling out a full self-driving system (*i.e.*, software that could do "everything pretty much") and that such system was extremely reliable (*i.e.*, several degrees better than 99% reliable). These representations were false and misleading because the status of Tesla's development of Level 4-5 autonomous driving systems was not at a point where Defendants could honestly assert that the Company was on the cusp of releasing a reliable Level 4-5 system. The statements in the prior paragraph also represented that Tesla already had an autonomous driving system that was safer than humans (*i.e.*, that it was "definitely way better than human[s]," and was continuing along the "long march of 9s" to improve safety even further). These representations were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself and was not able to drive itself at a safety level greater than humans.

343. On July 22, 2020, during Tesla's 2Q20 earnings call, Defendant Musk stated:

> I personally tested the latest alpha build of the Full Self-Driving software when I drive my car. And ***it is really, I think, profoundly better than people realize. Yes, really profoundly better. It's like amazing. So it's almost getting to a point where I can go from my house to work with no interventions, despite going through construction and widely varying situations. So this is why I'm very confident about Full Self-Driving functionality being complete by the end of this year. It's because I'm literally driving it.***

344. The statements in the prior paragraph conveyed that Tesla was on the cusp of rolling out a full self-driving system (*i.e.*, a system that could drive itself with no human "interventions") and that Tesla was expecting to release such a system by the end of 2020. These representations were false and misleading because the status of Tesla's development of Level 4-5 autonomous driving systems was not at a point where Defendants could honestly assert that the Company was on the cusp of releasing a Level 4-5 system or that it was likely to release such a system by the end of 2020. The statements also conveyed that Tesla already had a full self-driving system that could drive itself with almost no interventions, and specifically that Defendant Musk personally used that system to drive from his home to work with no or almost no interventions. These representations were false and misleading because (1) Tesla did not have a system that could drive itself with almost no interventions

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

1   at the time of this statement; and (2) they omitted to disclose that Defendant Musk's experience — as

2   invoked by his statement, "I'm literally driving it" — was not demonstrative of the state of Tesla's

3   self-driving technology because special effort had been made to ensure the system was trained to

4   specifically work on Defendant Musk's driving routes.

5        345.   On October 8, 2020, Defendant Musk posted a tweet to Twitter at 2:03pm ET, which

6   stated:

7         Waymo is impressive, but a highly specialized solution. ***The Tesla approach is a***

8   ***general solution. The latest build is capable of zero intervention drives.*** Will release
      limited beta in a few weeks.

9        346.   The statements in the prior paragraph conveyed that Tesla had autonomous driving

10  software that was at a stage where it could be honestly said Tesla had fully solved the challenge of

11  self-driving (*i.e.*, referring to the "Tesla approach" and immediately claiming Tesla had a "build" on

12  capable of driving itself with "zero intervention").   The statements also conveyed that Tesla had

13  software wherein the cars could drive themselves without human intervention.   The statements also

14  conveyed that Tesla would — with its next release in a few weeks — be updating its cars, so that they

15  could drive themselves without human intervention.   Because the release of Level 4-5 autonomous

16  driving systems would not be permitted on the road unless regulators were convinced of their safety,

17  Defendants' statement necessarily also represented that the forthcoming release of a system capable

18  of driving itself without human interventions, would be a release that was safe.   These statements

19  were false and misleading because Tesla was not on the cusp of releasing a system that could safely

20  drive itself.

21       347.   On October 21, 2020, Tesla published its 3Q20 results and hosted a corresponding

22  earnings call at 5:30pm ET, which was livestreamed over the internet.   During the event, Defendant

23  Musk stated:

24        And it's also important to emphasize that this is a generalized neural net-based
      approach. There is no need for high-definition maps or a cellphone connection. So the

25        car -- the system is designed such that even if you have no connectivity whatsoever
      and you're in a place that you have never been to before and no Tesla has ever been

26        there, ***the car should still be able to drive, just like a person. That is the system that***
      ***we are developing and aiming to release this year.***

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

348.     The statements in the prior paragraph conveyed that Tesla was on the cusp of rolling out a full self-driving system (*i.e.*, a system that could drive itself "just like a person") and that Tesla was expecting to release such a system by the end of 2020.  These representations were false and misleading because the status of Tesla's development of Level 4-5 autonomous driving systems was not at a point where Defendants could honestly assert that the Company was on the cusp of releasing a Level 4-5 system or that it was likely to release such a system by the end of 2020.  Because the release of Level 4-5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statements necessarily also represented that the forthcoming release of a system capable of driving itself would be a release that was safe.  These statements were false and misleading because Tesla was not on the cusp of releasing a system that could safely drive itself.

349.     On December 1, 2020, Defendant Musk spoke at an award ceremony hosted by Axel Springer, which was live-streamed over the internet.  Defendant Musk was asked when Tesla could be expected to deliver full autonomy, and he responded:

> [Musk] ***I'm extremely confident of achieving full autonomy and releasing it to the Tesla customer base next year.*** Now the there's an uncertain period of time for when regulatory approval will be will take. How long will it take? But I think if you are able to accumulate billions of kilometers of autonomous driving, then it's difficult to argue and look at the accident rate when the car is autonomous versus non autonomous. ***And in fact, our our statistics already show a massive difference when the car is on autopilot or not on autopilot, it's the safety is much greater even with the current autopilot software.***

> [Interviewer]: And we are discussing level five autonomy. So really full autonomy.

> [Musk]: ***Yes.***

350.     The statements in the prior paragraph conveyed that Tesla's progress in developing Level 4-5 autonomous driving was sufficiently far along that Defendants could make an honest assurance that Tesla would have cars on the road that could drive themselves without intervention, and which would be safe to sleep in, by the end of 2021.  Because Level 4-5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statement necessarily also represented that Tesla had or was on the cusp of having a system that was sufficiently safe to satisfy regulators.  These representations were false and

misleading because they: (1) misrepresented the status of Tesla's development of Level 4-5 autonomous driving systems, as Tesla was not in a position to release Level 4-5 autonomy by the end of 2021, and was many years away from a realistic release date; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Defendants could make such assertions, which depended upon the systems satisfying regulators. The statements in the prior paragraph also conveyed that at the time of this statement, Tesla already had autonomous driving technology that was able to safely drive itself and able to do so at a safety level "much greater" than humans. These representations were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself and was not able to drive itself at a safety level greater than humans.

351. On December 5, 2020, Business Insider published an interview of Defendant Musk by Mathias Döpfner, the CEO of Axel Springer. The following interaction occurred during that interview:

**Döpfner**: But any prediction about by when it will be the new normal?

**Musk**: *I'm extremely confident that Tesla will have level five next year, extremely confident, 100%.*

**Döpfner**: But Tesla could do it next year in theory?

**Musk**: *Absolutely. I drive the alpha build of the latest, fully self-driving software for Tesla, and many times I can go through a very complicated series of intersections and narrow roads, without ever touching any of the controls. All the way to work and back.*

**Döpfner**: And approval, any prediction for that in the US, in Europe, in China?

**Musk**: *In the US, it will be pretty quick to approve, particularly in certain states.* Some countries, like perhaps Norway, will be very quick to approve. They've said that. The EU is where we actually have the most difficulty. It's quite challenging. And the committee only meets every six months, and then the agenda is decided six months before that. So, it's very difficult. Our biggest challenges for regulatory approval are in the EU. This is a case of too many cooks in the kitchen, maybe.

352. The statements in the prior paragraph conveyed that Tesla's progress in developing Level 4-5 autonomous driving was sufficiently far along that Defendants could make an honest assurance that Tesla would have cars on the road that could drive themselves without intervention, and which would be safe to sleep in, by the end of 2021. Because Level 4-5 autonomous driving

systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statements necessarily also represented that Tesla had or was on the cusp of having a system that was sufficiently safe to satisfy regulators.   These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of Level 4-5 autonomous driving systems, as Tesla was not in a position to release Level 4-5 autonomy by the end of 2021, and was many years away from a realistic release date; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Defendants could make such assertions, which depended upon the systems satisfying regulators.

### 3. False and Misleading Statements Made in 2021

353.    On January 1, 2021, Defendant Musk posted a tweet to Twitter at 10:20pm ET, which stated:

> ***Tesla Full Self-Driving will work at a safety level well above that of the average driver this year, of that I am confident.*** Can't speak for regulators though.

354.    The statements in the prior paragraph conveyed that, at the time of this statement, Tesla already had full self-driving technology that was able to safely drive itself, and that by the end of 2021, the system would go from being safer than human drivers, to far safer than human drivers. These representations were false and misleading because, at that time, Tesla did not have an autonomous driving system that was safer than human drivers and Defendants had no realistic basis to state that the system would drive "at a safety level well above that of" typical human drivers by the end of 2021.

355.    On January 27, 2021, Tesla published its 4Q20 results, and hosted a corresponding earnings call at 6:30pm ET, which was livestreamed over the internet.  During the event, Defendant Musk stated:

> ***It's very common for me to have no interventions on drives that I do, including drives to a place that I've never been to. So these are not preplanned routes. The car has never been there before. And it's now actually more -- it's more common than not for the car to have no interventions, even on a complex drive.***

356.    The statements in the prior paragraph conveyed that Tesla already had self-driving technology that enabled cars to drive themselves with no human intervention most of the time.  These statements also conveyed that Tesla was on the cusp of rolling out a full self-driving system (*i.e.*, a

100

system that could drive itself with no human "intervention."  These statements also conveyed that Defendant Musk personally used that system to drive from his home to work with no or almost no interventions.  These representations were false and misleading because (1) Tesla did not have a system that could drive itself with almost no intervention at the time of this statement; and (2) they omitted disclosing that Defendant Musk's experience was not demonstrative of the state of Tesla's self-driving technology, because special effort had been made to ensure the system was trained to specifically work on Defendant Musk's driving routes.

357.    On January 27, 2021, during Tesla's 4Q20 earnings call, Defendant Musk received the following question and provided the following answer:

[Question]: The next question is, why are you confident in Tesla will achieve Level 5 autonomy in 2021? And why is Dojo not necessary to get there?

[Defendant Musk]: *I guess I'm confident based on my understanding of the technical road map and the progress that we're making between each beta iteration. Yes. As I'm saying, it's not remarkable at all for the car to completely drive you from one location to another through a series of complex intersections. It's now about just improving the corner case reliability and getting it to 99.9999% reliable with respect to an accident.*

358.    The statements in the prior paragraph conveyed that Tesla's progress in developing Level 5 autonomous driving was sufficiently far along that Defendants could make an honest prediction that Tesla would achieve Level 5 autonomy by the end of 2021, such that regardless of whether that specific deadline was met, investors would expect that Tesla was on the cusp of achieving Level 5 autonomous driving.  Because Level 5 autonomous driving systems would not be permitted on the road unless regulators were convinced of their safety, Defendants' statements necessarily also represented that Tesla had or was on the cusp of having a system that was sufficiently safe to satisfy regulators, especially because the statement explicitly referenced reliability in terms of accidents.  These representations were false and misleading because they: (1) misrepresented the status of Tesla's development of Level 5 autonomous driving systems, as Tesla was not in a position to release Level 5 autonomy by the end of 2021, and was many years away from a realistic release date; and (2) misrepresented the safety of Tesla's autonomous driving systems, as those systems were not sufficiently safe such that Tesla could give honest predictions of the stated timeline for release, which depended upon the systems satisfying regulators.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

359.   On April 17, 2021, Defendant Musk posted a tweet to Twitter at 6:39pm ET, which stated:

> Essentially, passive Autopilot (car intervenes only when crash probability is high) cuts crashes in half. ***Active Autopilot (car is driving itself) cuts crashes in half again.*** Doesn't mean there are no crashes, but, on balance, Autopilot is unequivocally safer.

360.   The statements in the prior paragraph conveyed that Tesla's autonomous driving technology (*i.e.*, "Active Autopilot") safely enabled cars to drive themselves, as Defendant Musk explicitly equated "Active Autopilot" with "car [] driving itself," in the context of statements about safety.  The statements in the prior paragraph also conveyed that Tesla had technology whereby cars could "drive [themselves]," and that the car driving itself is safer than a human driver (i.e., "cuts crashes in half").  These representations were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself and was not able to drive itself at a safety level greater than humans.

361.   On April 29, 2021, Defendant Musk posted a tweet to Twitter at 6:10pm ET, which stated:

> ***To be fair, investors are giving us significant credit for achieving self-driving***, given that Tesla's valuation/production is very high compared to other automakers.

362.   The statement in the prior paragraph conveyed that Tesla had achieved self-driving technology, and conveyed that Defendants' prior statements that Tesla had technology enabling cars to safely drive themselves were accurate.  These representations were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself and was not able to drive itself at a safety level greater than humans.

### 4.   False and Misleading Statements Made in 2022

363.   On January 26, 2022, Tesla published its 4Q21 results and hosted a corresponding earnings call at 6:30pm ET, which was livestreamed over the internet.  During the event, Defendant Musk stated:

> ***It's not just a question of like do you get to full self-driving but really kind of like the March of Nines of reliability, is it 99.999% reliable or 99.999999% reliable. It gets nutty. Obviously, we want to get to as close to perfection as possible. So frankly, being safer than a human is a low standard, not a high standard.*** People are very, very lossy, often distracted, tired, texting. Anyway, it's remarkable that we don't have more accidents, yes. ***So actually being better than a human, I think, is relatively***

102

***straightforward, frankly, how it'd be 1,000% better or 10,000% better. Yes, that's much, much harder.***

364.    The statements in the prior paragraph conveyed that, at the time of these statements, Tesla already had autonomous driving technology that was able to safely drive itself, and able to do so at a safety level greater than humans, as the statement claimed that achieving "full self-driving" was not challenging — and the challenge came from getting "as close to perfection as possible" — and that achieving "better than a human" self-driving was "straightforward" — and the challenge came from getting the system to be 10x ("1,000%") or 100x ("10,000%") safer than humans.  These representations were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself, and was not able to drive itself at a safety level greater than humans.

365.    On September 30, 2022, Tesla hosted an event titled, "Tesla Autonomy Investor Day," at Tesla's (then) headquarters in Palo Alto and livestreamed the event over the internet.  The event began at approximately 9:30pm ET.  During the event, Defendant Musk stated:

> And then with respect to autopilot, we do publish this, broadly speaking, the statistics on miles driven with cars that have no autonomy or Tesla cars with no autonomy with kind of hardware one, hardware two, hardware three, and then the ones that are in FSD beta. And we see steady improvements all along the way. And you know, sometimes there's this dichotomy of, you know, should you wait until the car is like, I don't know, three times safer than a person before deploying any technology. But I think that's that's actually morally wrong at the point at which we believe that that adding autonomy reduces injury and death, I think you have a moral obligation to deploy it, even though you're going to get sued and blamed by a lot of people, because the people whose lives you saved don't know that their lives are saved. And the people, [Musk laughs] the people who do occasionally die or get injured, they definitely know or their estate does, that it was, you know, whatever, there was a problem with autopilot. That's why you have to look at the at the numbers of total miles driven, how many accidents occurred, how many accidents were serious, how many fatalities. And you know, we've got well over 3 million cars on the road. So it's that's a lot of miles driven every day. And it's not going to be perfect. ***But what matters it is, is that it is very clearly safer than not deploying it. Yeah.***

366.    The statements in the prior paragraph conveyed that, at the time of these statements, Tesla already had autonomous driving technology that was able to safely drive itself, and able to do so at a safety level greater than humans.  These representations were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself, and was not able to drive itself at a safety level greater than humans.

103

367.    On October 19, 2022, Tesla released its 3Q22 results, and hosted a corresponding earnings call at 5:30pm ET.  During the earnings call, Defendant Musk stated:

> ***So the safety that we're seeing when the car is in FSD mode is actually significantly greater than the safety we're seeing when it is not***, which is a key threshold for going to a wide Beta.

368.    The statement in the prior paragraph conveyed that, at the time of this statement, Tesla already had autonomous driving technology that was able to safely drive itself, and able to do so (*i.e.*, drive in "FSD mode" or full self-driving mode) at a safety level greater than humans.  This representation was false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself, and was not able to drive itself at a safety level greater than humans.

369.    On October 19, 2022, during Tesla's 3Q22 earnings call, Defendant Musk stated:

> ***So like when I came to Giga Texas today from Brent's house, I never touched any of the controls right here. And then there is a longer process of like called the march of nines, of like how many nines reliability do you need before you could really be comfortable saying that the car could drive with no one in it. And there's some subjectivity as to how many nines you need. But I think we'll be pretty close to having enough nines that you're going to have no one in the car by the end of this year. And certainly, without a question, that's forever in my mind next year. I think we'll also have an update next year to be able to show regulators that the car is safer, much safer than the average human.***

370.    The statements in the prior paragraph conveyed that Tesla was on the cusp of rolling out a full self-driving system with enough safety capability that it would not need a human in the car, and that Tesla's progress in developing such a system was such that Defendants could make an honest assertion that it would release such a system by the end of 2022 (*i.e.*, in fewer than 10 weeks from this statement).  These representations were false and misleading because Tesla's systems were not in a condition where Defendants could honestly assert that these systems would be released by the end of 2022.  These statements also conveyed that the Company's self-driving technology was safer — and, in fact, much safer — than humans, and that Tesla expected to have sufficient data to convince regulators of this fact by the end of 2023.  These representations were false and misleading because Tesla's autonomous driving technology was not, at that time, able to safely drive itself and was not able to drive itself at a safety level greater than humans.

**5.    Actionable Omissions in Violation of Disclosure Obligations**

371.    In addition to barring false or misleading statements, the securities laws also require certain SEC filings to affirmatively provide certain information to investors.  As relevant here, there were two such affirmative duties to disclose that Defendants violated throughout the Class Period.

372.    Throughout the Class Period, Tesla issued Quarterly and Annual Reports with the SEC.  Tesla issued such reports on or about February 19, 2019 (FY18 10-K), April 29, 2019 (1Q19 10-Q), July 29, 2019 (2Q19 10-Q), October 29, 2019 (3Q19 10-Q), February 13, 2020 (FY19 10-K), April 28, 2020 (amended FY19 10-K), April 30, 2020 (1Q20 10-Q), July 28, 2020 (2Q20 10-Q), October 26, 2020 (3Q20 10-Q), February 8, 2021 (FY20 10-K), April 28, 2021(1Q21 10-Q), April 30, 2021 (amended FY20 10-K), July 27, 2021 (2Q21 10-Q), October 25, 2021(3Q20 10-Q), February 7, 2022 (FY21 10-K), April 25, 2022 (1Q22 10-Q), May 2, 2022 (amended FY21 10-K), July 25, 2022 (2Q22 10-Q), October 24, 2022 (3Q22 10-Q), January 31, 2023 (FY22 10-K).  Each report and/or each of the Company's accompanying Sarbanes Oxley certifications were signed by Defendant Musk.

373.    Defendants had a duty to include in those reports — under Item 7 of Form 10-K and Item 2 of Form 10-Q — the information called for under Regulation SK (17 C.F.R. § 229.303), Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").  Among other things, Item 105 of Regulation S-K requires that the MD&A section of the Forms 10-K and 10-Q filed by Tesla disclose "the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105.

374.    The MD&A disclosures in Tesla's Forms 10-K and 10-Q filed with the SEC throughout the Class Period omitted to disclose that Tesla faced heightened risk of adverse regulatory action — such as recalls — due to its release of autonomous driving technology that was unsafe.

375.    Additionally, the MD&A disclosures in Tesla's Forms 10-K and 10-Q filed with the SEC during the Class Period omitted to disclose the risk that Tesla's promotion of its autonomous driving technology as making cars self-driving — including as described in Sections IV(A)(2), IV(C)(1), and V(A) — heightened the dangers posed by Tesla's customers insufficiently monitoring the operation of the cars, which could lead to crashes and/or adverse regulatory action.  Both of these

risks were extraordinarily material to Tesla insofar as crashes and adverse regulatory action would damage Tesla's brand, especially its claims of being the "safest" car on the road, and would decrease the prospect of Tesla ultimately securing regulatory approval for Levels 4-5 autonomy.

376.    Tesla tacitly recognized the materiality of these risks by stating "any product recall with respect to our products may result in adverse publicity, damage to our brand and adversely affect our business, prospects, operating results and financial condition" and by stating that the failure to secure regulatory approvals could "delay products or restrict self-driving features and availability" and "adversely affect our business." Tesla's generic disclosures of the possible adverse *effects* of regulatory action or product liability claims were not meaningful disclosures of the specific facts or types of facts that put Tesla at heightened risk of such events occurring.

**B.     Revelations of Truthful Information — The Truth Begins to Emerge, While Defendants Continue to Mislead the Market**

377.    The truth behind Defendants' fraud emerged through a series of disclosures from August 16, 2021, through February 16, 2023. These disclosures partially revealed truthful information correcting and/or counteracting Defendants' misrepresentations, omissions, and fraudulent course or conduct and/or constituted materializations of risk that were concealed, understated, or misrepresented by Defendants, through their misrepresentations, omissions, and fraudulent course of conduct.

**1.     August 16, 2021: (First Partial Disclosure)**

378.    On August 16, 2021, the NHTSA announced it was investigating Tesla's assisted-driving technology/autopilot system, following its identification of eleven instances of Tesla's operating on Tesla's autonomous driving technology crashing into first responder scenes. NHTSA stated that in these crashes "[t]he involved subject vehicles [involved in the crashes] were all confirmed to have been engaged in either Autopilot or Traffic Aware Cruise Control during the approach to the crashes." NHTSA stated that the "investigation will assess the technologies and methods used to monitor, assist, and enforce the driver's engagement with the dynamic driving task during Autopilot operation[,]" will assess the "identification of obstacles in the roadway or adverse

maneuvers" when vehicles are "engaged in Autopilot," in addition to investigating "the contributing circumstances for the confirmed crashes listed below and other similar crashes."

379.    This disclosure provided investors with new information that one of Tesla's main regulators was investigating credible concerns with the safety of Tesla's autonomous driving technology, following its determination that the technology was involved in a pattern of dangerous crashes.  It was a partial materialization of the previously concealed, or understated, risk that the safety issues with Tesla's autonomous driving technology would prompt adverse regulatory action, and make future regulatory approval of Level 4-5 autonomy more difficult.  It also provided investors with new and compelling reasons to believe that Defendants' representations concerning the safety of the vehicles and Tesla's timeline to releasing Level 4-5 autonomy were misleading.  However, this revelation was far from a complete disclosure of the truth, as the public still did not know the extent of the safety issues relevant to Tesla's autonomous driving software or the extent to which Defendants' assertions regarding the forthcoming release of Level 4-5 autonomy were misleading.

380.    On August 16, 2021, the *New York Times* reported on this development, as follows:

The U.S. auto safety regulator said Monday that it had opened a broad investigation of the Autopilot system used in hundreds of thousands of Tesla's electric cars. The investigation was prompted by at least 11 accidents in which Teslas using Autopilot, an assisted-driving system that can steer, accelerate and brake on its own, drove into parked fire trucks, police cars and other emergency vehicles, the safety agency, the National Highway Traffic Safety Administration, disclosed. Those crashes killed one woman and injured 17 people.

Safety experts and regulators have been scrutinizing Autopilot since the first fatal accident involving the system was reported in 2016, in which the driver of a Tesla Model S was killed when his car struck a tractor-trailer in Florida. In that case, the safety agency concluded there were no defects — a position it stuck to for years even as the number of crashes and deaths involving Autopilot climbed.

On Monday, the agency appeared to change course. The investigation is the broadest look yet at Autopilot and at potential flaws that could make it and the Teslas that operate on it dangerous. Depending on its findings, the safety agency could force Tesla to recall cars and make changes to the system. It also has the authority to force automakers to add safety devices and features to their cars, such as when it required rearview cameras and airbags.

One critical issue that investigators will focus on is how Autopilot ensures that Tesla drivers are paying attention to the road and are prepared to retake control of their cars in case the system fails to recognize and brake for something. The company's owner's manuals instruct drivers to keep their hands on the steering wheel, but the system continues operating even if drivers only occasionally tap the wheel.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

"Driver monitoring has been a big deficiency in Autopilot," said Raj Rajkumar, an engineering professor at Carnegie Mellon University who focuses on autonomous vehicles. "I think this investigation should have been initiated some time ago, but it's better late than never."

Tesla, the world's most valuable automaker by far, and its charismatic and brash chief executive, Elon Musk, have said Autopilot is not flawed, insisting that it makes cars much safer than others on the road. They have dismissed warnings from safety experts and the National Transportation Safety Board that have been critical of how the company has designed Autopilot. The company and Mr. Musk, who comments frequently on Twitter, did not respond to messages seeking comment on Monday and issued no public statements about the new investigation.

Mr. Musk has previously been dismissive of the idea that Tesla's advanced driver-assistance system ought to monitor drivers, and he said in 2019 that human intervention could make such systems less safe.

His views stand in stark contrast to the approach General Motors and other automakers have taken. G.M., for example, offers a driver-assistance system known as Super Cruise on a few models. The system allows drivers to take their hands off the steering wheel but uses an infrared camera to monitor drivers' eyes to ensure that they are looking at the road.

\* \* \*

The safety agency said it would also examine how Autopilot identifies objects on the road and under what conditions Autopilot can be turned on. Tesla tells drivers to use the system only on divided highways, but it can be used on smaller roads and streets. G.M. uses GPS to restrict Super Cruise's use to major highways that do not have oncoming or cross traffic, intersections, pedestrians and cyclists.

Tesla's Autopilot system appears to have difficulty detecting and braking for parked cars generally, including private cars and trucks without flashing lights. In July, for example, a Tesla crashed into a parked sport utility vehicle. The driver had Autopilot on, had fallen asleep and later failed a sobriety test, the California Highway Patrol said.

The safety agency's investigation will look at all models of Teslas — Y, X, S and 3 — from the 2014 to 2021 model years, totaling 765,000 cars, a large majority of the vehicles the company has made in the United States.

The new investigation comes on top of reviews the safety agency is conducting of more than two dozen crashes involving Autopilot. The agency has said eight of those crashes resulted in a total of 10 deaths. Those investigations are meant to delve into the details of individual cases to provide data and insights that the agency and automakers can use to improve safety or identify problem areas.

Tesla has acknowledged that Autopilot can sometimes fail to recognize stopped emergency vehicles. And safety experts, videos posted on social media and Tesla drivers themselves have documented a variety of weaknesses of Autopilot.

\* \* \*

The National Transportation Safety Board, which investigates accidents but cannot force automakers to make changes, has called on the National Highway Traffic Safety

108

Administration to take stronger action on regulating Autopilot and other advanced driver-assistance systems. Last year, the transportation safety board said in a report that Tesla's "ineffective monitoring of driver engagement" contributed to a 2018 crash that killed Wei Huang, the driver of a Model X that hit a highway barrier in Mountain View, Calif. After that report came out, the transportation safety board's chairman at the time, Robert L. Sumwalt, called on the highway safety administration "to fulfill its oversight responsibility to ensure that corrective action is taken." "It's time to stop enabling drivers in any partially automated vehicle to pretend that they have driverless cars," he said.

381.    In response to the revelations of the NHTSA's investigation, which specifically addressed the safety of Tesla's autopilot features, Tesla's stock **dropped $10.33 per share, or approximately 4.3 percent**, to close at $228.72 per share on August 16, 2021.

## 2.    November 2, 2021: (Second Partial Disclosure)

382.    On November 2, 2021, Tesla announced that it was recalling nearly 12,000 vehicles equipped with its "FSD Beta" software because of the potential for false forward-collision warning or unexpected activation of the emergency brakes.  Tesla said the recall was necessitated by a software update (version 10.3) to its FSD technology on October 23, 2021.  NHTSA stated that the recall addressed "the AEB system unexpectedly activat[ing] while driving, the risk of rear-end collision from a following vehicle may increase."

383.    This disclosure provided investors with new information that Tesla's autonomous driving software had serious safety issues, which required a recall.  The magnitude of the admitted defect — wherein the system could unexpectedly apply the emergency breaks — partially apprised investors of the Company's distance from being able to offer a Level 4-5 autonomous car that drives more safely than humans.  If Tesla could not even be sure the car would not suddenly and unnecessarily apply the emergency breaks, it was significantly less likely than represented by Defendants that Tesla was actually nearing release of a vehicle with Level 4-5 autonomy, or that its technology was capable of safer-than-human driving.  However, Tesla continued misrepresenting the capabilities of its technology, and this specific issue was far from a complete disclosure of the safety issues with Tesla's technology.

384.    According to a November 2, 2021 article by *Reuters*:

NHTSA said Tesla "uninstalled FSD 10.3 after receiving reports of inadvertent activation of the automatic emergency braking system" and then "updated the software and released FSD version 10.3.1 to those vehicles affected." The agency said it "will

109

continue its conversations with Tesla to ensure that any safety defect is promptly acknowledged and addressed."

The recall comes after NHTSA last month asked Tesla why it had not issued a recall to address software updates made to its Autopilot driver-assistance system to improve the vehicles' ability to detect emergency vehicles.

Tesla said the issue was prompted by a software communication disconnect between two onboard chips that prompted an issue that could produce "negative object velocity detections when other vehicles are present."

If the automatic emergency braking system unexpectedly activates while driving, it could raise the risk of a rear-end collision, Tesla said, but added it was not aware of any crashes or injuries related to the issue.

After the Oct. 24 reports, Tesla said [it] canceled the FSD update on vehicles that had not installed it and disabled FCW and AEB on affected vehicles. The same day, Tesla Chief Executive Elon Musk tweeted of FSD: "Seeing some issues with 10.3, so rolling back to 10.2 temporarily. Please note, this is to be expected with beta software."

On Oct. 25, Tesla began deploying the over-the-air software update and re-enabled FCW and AEB features on vehicles with the update. Tesla said as of Oct. 29, more than 99.8% of the vehicles - all but for 17 - had installed an update and no further action is necessary.

NHTSA in August opened a formal safety probe into Tesla's Autopilot system in 765,000 U.S. vehicles after a series of crashes involving Tesla models and emergency vehicles.

The U.S. auto safety agency also asked Tesla in October about its "Autosteer on City Streets" which the company also refers to as FSD first leased in October 2020, and raised concerns about limits on disclosure by drivers of safety issues.

385.    In response to the news of the recall — which directly addressed the safety of Tesla's autopilot features — Tesla's stock *dropped $12.20 per share, or more than 3 percent*, to close at $390.67 per share on November 2, 2021.

### 3.    January 26, 2022: (Third Partial Disclosure)

386.    On January 26, 2022, during Tesla's 4Q21 earnings call, which took place after market close, Defendant Musk admitted that Tesla had not achieved full self-driving yet and that, contrary to countless representations before, Tesla's version of FSD was not yet "safer than a human." Specifically, Defendant Musk disclosed: "Yes, I would be shocked if we do not achieve full self-driving safer than a human this year. I would be shocked."

387.    This admission revealed to investors that Tesla's autonomous driving technology was not safer than humans, contrary to Defendant Musk's many prior assertions.  While Defendant Musk

had previously made statements claiming the software *was* safer than humans and *would be* **far** safer than humans in the near future, this statement admitted that the technology was, in fact, not yet safer than humans.  This statement also partially revealed Tesla's distance from releasing Level 4-5 autonomy, because developing safer-than-human driving was a precursor to the release of that technology.  Thus, this revealed that Tesla's technology was not capable of safer-than-human driving at that time, it also did not reveal the myriad safety problems with the technology and did not fully apprise investors of the scope of the safety issues or how far Tesla truly was from releasing Level 4-5 autonomy.

388.    On January 27, 2022, Credit Suisse issued an analyst report following the Tesla 4Q21 results, quoting Defendant Musk's statement that he hoped the autonomous driving technology would be safer than humans within a year.  In reaction to Defendant Musk's revelation, the report expressed skepticism with Tesla, criticizing its "mixed" results in delivering autonomous driving technology, despite it being a "key priority for Tesla."  The following day, Deutsche Bank issued an analyst report noting the "FSD Goal" of being "safer than human driving by year end," and commented on the "color" provided by Defendant Musk on FSD.  Guggenheim Capital issued an analyst report that same day also reciting Defendant Musk's statements that Tesla was still working to achieve "full-self driving safer than a human," and commenting on how this was a "low bar," implicitly recognizing that Defendants had previously touted being much better than that already.  Guggenheim expressed considerable "skepticism" with Tesla over Defendant Musk's statements.

389.    In response to this admission from Defendant Musk — which directly addressed the safety of Tesla's purported FSD features — ***Tesla's stock plunged $36.10 per share, or almost 12 percent***, to close at $276.37 per share on January 27, 2022, the next trading day.

### 4.    June 3, 2022: (Fourth Partial Disclosure)

390.    On June 3, 2022, NHTSA published a letter it had sent to Tesla on May 4, 2022 relating to more than 750 complaints NHTSA received from Tesla drivers whose Tesla vehicles outfitted with automated driving systems had stopped suddenly while on the road for no apparent reason.  Specifically, the NHTSA letter informed Tesla of the following:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

This letter is to inform you that the Office of Defects Investigation (ODI) of the National Highway Traffic Safety Administration (NHTSA) has opened a Preliminary Evaluation (PE22-002) to investigate allegations of unexpected brake activation in certain model year (MY) 2021-2022 Model 3 & Y vehicles manufactured by Tesla, Inc. (Tesla), and to request certain Information.

391.    NHTSA then included over 11 document and information requests (each with multiple subparts) requesting detailed information on consumer complaints, field reports, reports involving a crash, injury or fatality; all assessments, analyses, tests, test results, studies, surveys, simulations, investigations, inquiries and/or evaluations conducted by Tesla; software and hardware modifications, system design, emergency braking system functions; Tesla's testing of its autonomous driving software and any risk assessment relating thereto, among other things.

392.    NHTSA gave Tesla a deadline of June 20, 2022 to respond to the letter and information request.  NHTSA also reminded Tesla that Tesla's failure to respond promptly and fully to NHTSA's letter could subject Tesla to civil penalties, under The Vehicle Safety Act, 49 U.S.C. § 30165(a)(3), which provides for civil penalties of up to $24,423 per violation per day, with a maximum of $114,954,525 for a related series of daily violations, for failing or refusing to perform an act required under that provision of The Vehicle Safety Act. This would include failing to respond completely, accurately, or in a timely manner to the NHTSA information requests.

393.    On that same day, June 3, 2022, media reports revealed that the NHTSA had received 758 reports of Tesla vehicles experiencing "phantom braking."  The phantom braking issue, which was the subject of Tesla's recall rolling back version 10.3 of its full self-driving (FSD) beta software, was reportedly getting worse after the software rollback.

394.    This disclosure provided investors with new information that Tesla's autonomous driving software had serious safety issues, indeed such serious issues that the previous attempt to fix the emergency breaking issue had not resolved the issue.  That Tesla could not fix even the issues it identified and claimed to fix partially apprised investors of the fact that Tesla was far from offering Level 4-5 automation.  Additionally, this disclosure revealed the phantom breaking problems were not merely limited to a bug introduced in FSD software version 10.3, as rolling back that software had not fixed the issue, which significantly provided new information to investors concerning the scope and extent of the challenges Tesla faced, including the challenges it would face in resolving

1  even those issues that it acknowledged needed resolution.  Additionally, this disclosure was a

2  materialization of the risk that by releasing Tesla's unsafe autonomous driving technology the

3  Company would face regulatory scrutiny, causing it reputational harm and heightening the prospect

4  of future regulatory action delaying its ability to release Level 4-5 automation.  However, Tesla

5  continued misrepresenting the capabilities of its technology and this specific issue was far from a

6  complete disclosure of the safety issues with Tesla's technology.

7       395.    According to a June 3, 2022 article published by *The Verge*:

When last we checked in with Tesla's "phantom braking" problem, the National Highway Traffic Safety Administration said it had received 350 complaints from owners who said their vehicles were braking for no reason. Now that number stands at 758, and the US government has some questions.

On May 4th, NHTSA fired off a 14-page "request for information" letter to Tesla about these incidents, including a request for all consumer and field reports it has received about false braking, as well as reports of crashes, injuries, deaths, and property damage claims.

NHTSA also wants to know whether Tesla's Full Self-Driving system was active during any of these incidents. Tesla has until June 20, 2022, to comply with the request, though it can seek an extension if it wants. (The letter was first reported by the Associated Press.)

Reports of "phantom braking" first surfaced last fall, when Tesla was forced to roll back version 10.3 of its Full Self-Driving (FSD) beta software, the company's advanced driver assist system, because of issues with forward collision warnings and unexpected braking. But after the rollback, the number of complaints actually increased substantially, with NHTSA receiving at least 107 from November to January, compared with only 34 in the preceding 22 months, according to The Washington Post.

In February, NHTSA began investigating incidents involving Tesla Model 3 and Model Y vehicles after receiving 354 complaints.

NHTSA's Office of Defects Investigation opened a "preliminary evaluation," which is the stage before the agency could issue a formal recall and covers approximately 416,000 vehicles. To date, there have been no reports of crashes, injuries, or fatalities as a result of this issue.

The problem may be traced to the decision last year by Tesla to remove radar sensors from new Model 3 and Model Y vehicles. The decision came after Musk publicly expressed a desire to rely exclusively on cameras to power the company's advanced driver assistance system.

Tesla has drawn scrutiny from safety advocates and regulators for its willingness to allow its customers to test what is essentially an unfinished version of a software product that Musk has long promised will lead to fully autonomous vehicles on the road. Earlier this year, the company was forced to issue a software update to remove an FSD feature that allows cars to perform a "rolling stop" — a maneuver in which

the vehicle moves slowly through a stop sign without coming to a full stop. (A rolling stop is a common driving maneuver despite being illegal in all 50 states in the US.)

396.    In response to this news, which directly addressed the safety of Tesla's purported FSD features, ***Tesla's stock plunged $23.81 per share, or more than 9.2 percent***, to close at $234.52 per share on June 3, 2022.

### 5.    February 16, 2023: (Fifth Disclosure)

397.    In a letter to Tesla on February 16, 2023, NHTSA confirmed the recall of Tesla models spanning 2016 to 2023 which were equipped with FSD.  Specifically, Tesla identified the "Problem Description" as follows:

> Tesla, Inc. (Tesla) is recalling certain 2016-2023 Model S, Model X, 2017-2023 Model 3, and 2020-2023 Model Y vehicles equipped with Full Self-Driving (FSD Beta) software or pending installation. The FSD Beta system may allow the vehicle to act unsafe around intersections, such as traveling straight through an intersection while in a turn-only lane, entering a stop sign-controlled intersection without coming to a complete stop, or proceeding into an intersection during a steady yellow traffic signal without due caution. In addition, the system may respond insufficiently to changes in posted speed limits or not adequately account for the driver's adjustment of the vehicle's speed to exceed posted speed limits.

398.    NHTSA also stated in the letter that a consequence of "FSD Beta software that allows a vehicle to exceed speed limits or travel through intersections in an unlawful or unpredictable manner increases the risk of a crash."  On that same day, Tesla reported that it was recalling more than 362,000 U.S. vehicles to update its FSD beta software after U.S. regulators said Tesla's driver assistance system did not adequately adhere to traffic safety laws and could cause crashes.

399.    This disclosure provided investors with new information that Tesla's autonomous driving software had such serious safety issues that Tesla needed recall every single vehicle on the road with its FSD software.  This major setback indicated to investors that Tesla was not nearly as close to the release of Level 4-5 automation as it had claimed throughout the Class Period. Additionally, this massive recall, prompted by pressure from NHTSA, was a materialization of the risk that by releasing Tesla's unsafe self-driving technology, including by overstating the real capabilities of its autonomous driving technology, Tesla would face regulatory scrutiny causing it reputational harm and heightening the prospect of future regulatory action delaying its ability to release Level 4-5 automation.  Indeed, NHTSA made clear that notwithstanding Tesla's recall of all

1    vehicles with this technology and representation that it would fix the technology with improved

2    software, the agency would continue its investigation into Tesla.

3        400.    According to a February 16, 2023 article by *Reuters*:

4        The National Highway Traffic Safety Administration (NHTSA) said the Tesla
         software allows a vehicle to "exceed speed limits or travel through intersections in an
5        unlawful or unpredictable manner [which] increases the risk of a crash."

6        Tesla said it disagreed with NHTSA's analysis but ultimately acquiesced to the safety
         agency's January request. The electric vehicle manufacturer has previously clashed
7        with NHTSA, which has a number of pending Tesla probes, over other safety issues
         and recall demands.

8
         Tesla, whose shares closed down 5.7% at $202.04, will release an over-the-air (OTA)
9        software update free of charge. The EV maker said it is not aware of any injuries or
         deaths that may be related to the recall issue. The automaker said it had 18 warranty
10       claims.

11       The recall covers 2016-2023 Model S and Model X vehicles, 2017-2023 Model 3, and
         2020-2023 Model Y vehicles equipped with FSD Beta software or pending
12       installation.

13       U.S. senators Ed Markey and Richard Blumenthal, both Democrats, said the recall was
         "long overdue," adding, "Tesla must finally stop overstating the real capabilities of its
14       vehicles."

15       This is a fresh setback for Tesla's driver assistance system. Chief Executive Elon Musk
         has repeatedly missed his own targets to achieve self-driving capability, which he has
16       touted as a potential cash cow.

17       The move is a rare intervention by federal regulators in a real-world testing program
         that the company sees as crucial to the development of cars that can drive themselves.

18
                                            *    *    *
19
         While Tesla's Autopilot feature assists with steering, accelerating, and braking for
20       other vehicles and pedestrians within its lane, the company says FSD is a more
         advanced system "designed to provide more active guidance and assisted driving"
21       under active supervision of the driver.

22       Tesla reported having $2.9 billion in deferred revenue at the end of 2022 related to
         "access to our FSD features, internet connectivity, free Supercharging programs and
23       over-the-air software updates primarily on automotive sales."

24       Tesla could not be reached for comment, but Musk tweeted on Thursday that the word
         "recall" for an over-the-air software update is "anachronistic and just flat wrong!"
25
         Tesla released FSD Beta to nearly all of its 400,000 FSD customers in the United
26       States and Canada in the fourth quarter, when it recognized FSD revenue of $324
         million. It said it expects to recognize nearly $1 billion of deferred revenue that
27       remains over time as software updates are delivered.

28       ONGOING PROBES

Musk has positioned FSD technology as one of several artificial intelligence initiatives at Tesla.

Last May, in an interview with members of a Tesla owners club, Musk called full self-driving "essential" for the company. "It's really the difference between Tesla being worth a lot of money or worth basically zero."

NHTSA has an ongoing investigation it opened in 2021 into 830,000 Tesla vehicles with driver assistance system Autopilot over a string of crashes with parked emergency vehicles. NHTSA is reviewing whether Tesla vehicles adequately ensure drivers are paying attention. NHTSA said on Thursday despite the FSD recall its "investigation into Tesla's Autopilot and associated vehicle systems remains open and active."

\* \* \*

Last year, Tesla recalled nearly 54,000 U.S. vehicles with FSD Beta software that may allow some models to conduct "rolling stops" and not come to a complete stop at some intersections, posing a safety risk, NHTSA said. Tesla and NHTSA say FSD's advanced driving features do not make the cars autonomous and require drivers to pay attention.

In December, NHTSA opened two new special investigations into crashes involving Tesla vehicles, including an eight-vehicle crash in San Francisco on the Bay Bridge in which a driver reported the FSD feature had malfunctioned.

Since 2016, NHTSA has opened more than three dozen investigations involving Tesla crashes where advanced driver assistance systems were suspected of use and 19 deaths were reported.

401. Analysts appeared surprised by the recall news. Wells Fargo issued an analyst reported the next day, on February 17, 2023, stating, in part:

**Initial Thoughts**

NHTSA announced a recall of 363K full-self driving (FSD) models indicating that FSD Beta may cause a crash. NHTSA said in certain rare circumstances FSD features may violate four different traffic laws. TSLA identified 18 warranty claims related to the issues but isn't aware of any injuries/deaths. TSLA will deliver an over-the-air (OTA) software update in several weeks to fix the issue, implying little or no recall cost. Musk claims it's a mere OTA update & terming it a recall is "flat wrong."

**Numerous Investigations Ongoing**

Since 2016, NHTSA has reportedly opened more than three dozen Autopilot crash investigations. In our initiation, we highlighted increased regulatory scrutiny after a letter from the NTSB raised concerns on the need to restrict L2 operational domains & for driver monitoring. In November, media reported that the DOJ had opened a criminal probe on Autopilot; TSLA noted DOJ requests for info in its 10K. And most recently there was news the SEC is investigating TSLA again.

**Is this Just the Beginning?**

Importantly, in the WSJ NHTSA said the recall does not address the full scope of the investigation which "remains open & active." Therefore, more actions could be

116

announced in the mid-term. As mentioned in our previous note, TSLA is reportedly on the DOJ's radar for FSD-related crashes. The penalties from precedent cases vary from $5B-$0.9B, small for TLSA. The largest risk from regulatory actions would be to TSLA's credibility, as Autopilot is a key selling point.

402.    The first article reporting this news captured on the Bloomberg news feed, was published around 12:30pm ET.  After the publication of that news, Tesla's stock price fell by ***$12.20 per share, or approximately 6% percent***, to close at $202.04 per share on February 16, 2023.  The stock price continued falling in after hours trading, opening the next day (February 17, 2023) at a price of ***$199.96 per share, for a decline of $14.25 per share, or approximately 6.6%.***

## C.    Defendants Acted with Scienter

403.    At all relevant times, Defendants acted with scienter.  Numerous facts support that Defendants had actual knowledge of the truth that they omitted to disclose, and which contradicted their false or misleading statements.  Additionally, numerous facts support that Defendants acted with deliberate recklessness as to whether their statements and omissions were false or misleading.  The conclusion that Defendants acted with scienter is substantially bolstered due to Defendant Musk's motive and opportunity to defraud in order to sell Tesla shares at a high price and by the core importance of "self-driving" to Tesla's business.  Tesla has the scienter of its management level employees, which includes Defendant Musk.

### 1.    Knowledge and Deliberate Recklessness

404.    **Tesla's Autonomous Driving Technology was Core to Its Business**.  As detailed in Section IV(A)(1)/(3), Defendants made many statements unambiguously touting the development of self-driving cars as the most important aspect of Tesla's business.  For example, Defendant Musk stated: self-driving is **"essential"** and **"really the difference between Tesla being worth a lot of money or worth basically zero."** (Musk, 6/14/2022).  Given the importance of the autonomous driving technology and given Defendant Musk's role as CEO and constant public discussion of Tesla's vehicle autonomy technology, and use of that technology himself, it is reasonable to conclude that Musk had a thorough knowledge of the Company's autonomous driving software, and related safety issues.

405.    **Defendant Musk's Own Words Demonstrate an Intimate Knowledge of Tesla's Autonomous Driving Technology**.  Throughout the Class Period, Defendant Musk spoke numerous times about Tesla's autonomous driving technology, including in investor presentations, podcasts, interviews, and through his own Twitter account.  For example, Musk was on stage throughout Tesla's 2019 Autonomy Investor Day event, for over 2 and a half hours providing technical explanations concerning Tesla's autonomous driving technology.  In addition to the myriad examples of statements herein in which Musk demonstrated his knowledge of the technology, a few notable examples are as follows:

[Defendant Musk speaking at Tesla's April 29, 2020, 1Q20 earnings call]

So it just got to go through a very rigorous safety process. So essentially, we need to figure out -- get very good at complex intersections, get very good at complex turns and intersections and things like busy malls, in a parking lot or office park or special events and sporting events, that kind of thing, when those eventually come back. Those are extra hard cases. **But it's all tracking very well, if you like. The Autopilot's engineering team is -- we just have an extremely talented group, and I'm deeply involved with the team. So we talk every week and meet every week when we can because now physical meeting is difficult. So I have quite a deep understanding where we are and where we're heading.** And I feel like we have a tremendous amount of momentum, and we'll have the functionality, that's the Full Self-Driving, by the end of the year.

[Defendant Musk speaking at Tesla's July 20, 2022, 2Q22 earnings call]

Okay. **This answer will be understood by 0.01% of the audience**, I think. I suppose people want to find out what a unified factory space would actually mean. It essentially would be if you can take -- if instead of netting together static and dynamic objects in C++, if they could be net together at the neural net level, then you don't need to reconcile them within C++ heuristics. That is an architecturally better way to -- that's the most desirable outcome. It's -- I think it's probably not necessary to achieve full self-driving, but it would be a slight improvement in the efficiency of the self-driving. And it's certainly something we want to get to. Yes. The sort of nirvana situation is you have surround video/auto labeling of all static and dynamic objects. And you have then surround video inference with spatial memory as well. Then that's -- I mean, I think we're almost certainly there before the end of the year. Yes, I'm not sure how many you would understand that. But I should say also, we are also confident of improving the frame rate and as we some of the legacy neural nets, we think we might be able to get to the frame rate of what the -- only cameras is maybe up to 36 fps, which is actually a lot of frames, considering it cameras. It's certainly comfortably above 24 frames, which is basically the movie -- frame rate of movies.

[Defendant Musk speaking at Tesla's January 27, 2021 4Q20 earnings call]

Yes. So it really goes back to what I was saying a moment ago, which is we need to transition over the neural nets in the car to video. And in order to do that, the whole stack has to be -- the whole stack has to be changed to video. That means gathering video clips than using -- and this is actually surround video. So you've got 8 cameras

118

operating simultaneously with synchronized frame rates. So you've got basically 8-frame surround video -- 8-camera surround video. And then you've got to label basically everything in that video snippet and then train against that and have those neural nets operate the car. So -- and this is coming from the past where we would label, the neural nets would be a single camera, single frame. So no video and not combining the cameras. And then we went from single frame, single frame, one frame at a time, one camera at a time, neural nets to surround camera, neural nets would look at all -- all 8 cameras but only one frame at a time and now to where we include the time dimension. And that's video. So I really do see this as a question of getting work done. We're getting it done. And you can see the results in the rapidly improving FSD betas that are leased.

406.    The Conclusion That Musk Had an Intimate Understanding of the True Condition of Tesla's Autonomous Driving Technology Is Supported By His Technological Sophistication and Hands-On Approach.  In addition to holding the position of CEO, Defendant Musk also held the title of Tesla's "Product Architect."  In March of 2021, Defendant Musk adopted the title "Technoking," in a tongue and cheek attempt to emphasize his role overseeing Tesla's technology.  Additionally, Defendant Musk is the CEO and Chief Technology Officer of SpaceX, a company involved in spacecraft manufacturing and operation.  Defendant Musk expressly stated that he directly managed autopilot engineering, stating on February 19, 2019, that Tesla would be feature complete for full self-driving in 2019, and then commenting: "*I manage autopilot engineering directly every week in detail*."

407.    Defendant Musk's own statements concerning his use of time, emphasize his hands on approach to running Tesla, which would ensure his intimate knowledge of the capabilities of Tesla's autonomous driving technology.  For example, in a pre-Class Period interview with publication *YCombinator,* Defendant Musk stated: "I think a lot of people think I must spend a lot of time with media or on business things. But actually almost all my time, like 80% of it is spent on engineering and design, so it's developing next-generation product, that's 80% of it."  Similarly, in a 2017 earnings call, Musk stated: "I really believe that one should lead from the front lines."

408.    Many of the False and Misleading Statements Themselves Were Delivered With a Degree of Specificity That Demonstrates Defendant Musk's Knowledge or Deliberate Recklessness. For example, at Tesla's 2019 Autonomy Investor Day, Defendant Musk stated: "[I]f you fast-forward a year, *maybe a year, maybe a year and three months*, but next year, for sure, we'll have over one million robo taxis on the road."  The equivocation between one year and one year and three-month

release, is irrelevant to the misleading nature of this statement, but significant in that the equivocation would have been absurd if Defendant Musk did not have a sufficient understanding of the autonomous driving technology to parse the timeline in such fine terms. Similarly, when asked about his assertions concerning the release of full self-driving in Tesla's 4Q20 earnings call, Musk explained: "I'm confident based on my understanding of the technical road map and the progress that we're making between each beta iteration." To the extent that Defendant Musk did not have a thorough knowledge of these topics, given their importance to the Company, his decision to make statements on these topics, especially such specific assurances, could only be understood to constitute deliberate recklessness.

409. **Tesla's Autonomous Driving Technology Was Meticulously Tracked by Defendants.** Tesla routinely boasts about its data collection and monitoring of Tesla vehicles through its software. For example, in Tesla's April 29, 2020, 1Q20 earnings call, Defendant Musk stated: "We are collecting data from over 1 million intersections every month at this point. This number will grow exponentially as more people get the update and as more people start driving again. Soon, we will be collecting data from over 1 billion intersections per month." An article in *IEEE Spectrum*, a magazine published by the Institute of Electrical and Electronics Engineers, titled, "The Radical Scope of Tesla's Data Hoard," describes expert analysis of the volume and type of data that Tesla collects about its vehicles in operation. In that article, says Francis Hoogendijk, a researcher at the Netherlands Forensic Institute, was quoted as saying, "[a]s far as we know, Tesla vehicles collect the most amount of data." The article noted that Tesla uses black box recorders, which collect data on crash events, but that Tesla also collects time-stamped gateway logs tracking information concerning autopilot usage and whether drivers have their hands on the steering wheel, and that Tesla ultimately has "billions of miles of real-world driving data and GPS tracks, and many millions of photos and videos."

410. On July 3, 2019, Defendant Musk tweeted explaining that "Active safety will continue to improve via over-the-air software updates. **Since all Tesla cars are connected, *we analyze each accident* & do our best to minimize probability of recurrence.**" According to a January 20, 2020 blog post by the Company, which falsely denied the Company faced issues with unintended acceleration,

Tesla explained that it "investigate[s] every single incident where the driver alleges to us that their vehicle accelerated contrary to their input," and further explained that the Company had data, including from the autopilot sensor suite, and that "[e]ach system is independent and records data, so we can examine exactly what happened."

411.    The Tesla Files leak shows that Tesla documented thousands of safety issues organized into tables and tracked safety issues using a program called Jira, as well as internal presentations on safety issues with the autonomous driving technology.  CW-3 confirmed that that Tesla used Jira to track bugs, customer complaints, and set up response tickets for those issues, and added that these tickets and complaints were closely tracked at the company.

412.    Tesla was directly apprised of the risks that it's autonomous driving technology would be dangerously misused due to its misleading public descriptions of the product by regulators such as the NTSB, and Defendant Musk's knowledge of these critical communications with one of Tesla's chief regulators about its most important technology, is a certainty.

413.    Confidential witnesses confirm that the issues with Tesla's autonomous driving technology were well known within the Company.

414.    CW-1 explained that Tesla employees were given an opportunity to test the technology by borrowing a car over weekends, but that most declined to do so because they did not want to be "test dummies."

415.    CW-2 explained that it was "absolutely" known within Tesla's "autopilot department" that Defendant Musk's pronouncements to the market throughout the period from April 2019 through CW-2's tenure about the viability of Tesla's autopilot and FSD technologies were "exaggerations" of what those capabilities actually were at any given time.  According to CW-2, everyone in the autopilot department "from top to bottom" knew that Tesla's vehicles were nowhere near being full self-driving as presented to the market and were not going to be in the foreseeable future and advised that this was discussed openly by the Head of the department and many others on department-wide conference calls.  CW-2 reiterated that "everyone" in the autopilot department was aware.  Specifically, giving one example, CW-2 stated it was well known that Tesla's technology continued to have difficulties

1    in making determinations in more confusing areas of a highway and that issues persisted throughout

2    his tenure at Tesla.

3       416.    In addition to the statements discussed above, CW-3 confirmed that Tesla did have

4    access to video clips and video feeds from Tesla vehicles, and that the Company used those video

5    feeds to review and tag problems with the vehicle operations, including collisions, FSD "takeovers,"

6    where the autopilot system takes actions which override the driver's control, as well as issues

7    affecting driver comfort or other system issues. CW-3 elaborated that any issue or bug identified in

8    the video clips was tagged for review with time stamps; the tags and video clips could be used to

9    determine what the car's computer system "thought," which was the starting point for de-bugging

10   any problems.

11       417.    The safety deficiencies in Tesla's systems were such that they would have been readily

12   apparent based on Tesla's internal logs showing the real and complete number of crashes related to

13   autopilot usage and autopilot/FSD disengagements.

14       418.    Defendant Musk's own admissions that the Company's system was still not as good

15   as human drivers – but that he hoped it would be soon (*see* ¶¶188, 386-89), further demonstrate that

16   he understood that the technology was not safer than humans as he repeatedly claimed throughout the

17   Class Period. The way in which these admissions were conveyed belies any alternative interpretation

18   that Defendant Musk merely *learned* and then *disclosed* that the system was less safe than humans,

19   and instead is consistent with the conclusion that Musk understood this fact throughout the Class

20   Period while he made contrary assurances.

21       419.    **<u>Defendant Musk Was Regularly Updated on the Status of Tesla's Autonomous</u>**

22   **<u>Driving Technology</u>.** According to CW-3 — a Senior Software Engineer — Defendant Musk was

23   regularly updated about the autonomous driving technology. As more fully stated herein, CW-3

24   explained that (1) Defendant Musk personally used and provided feedback on the software, and

25   particularly provided feedback on his driving routes; (2) Defendant Musk regularly met with the "top

26   brass" and autopilot engineers; (3) Musk received reports and updates during regular meetings from

27   the autopilot team; (4) Musk met with the team's leaders regularly to discuss the autopilot stack; these

28   meeting usually occurred on Mondays, and the Directors and Musk would discuss "regressions" with

Amended Complaint for Violations of the Federal Securities Laws
Case No. 3:23-CV-00869-AMO

1  the code and any other issues with autopilot; (5) CJ Moore (Tesla's former Director of Autopilot

2  Software) and Ashok Elluswamy (Tesla's director of Autopilot Software) would have been the first

3  to know about major safety or operational issues, and they reported directly to, and frequently met

4  with, Defendant Musk.  CW-3 even recalled occasions in which Musk came in to interact directly

5  with the engineers as they worked, including looking over their shoulders as the engineers coded.

6      420.  **Defendant Musk Knew That Tesla Was Not Near Releasing Level 4-5 Autonomy**

7  **Throughout the Class Period.**  The same facts demonstrating Defendant Musk's knowledge of the

8  safety issues discussed in paragraph ¶¶404-19, also demonstrate that his knowledge that Tesla's

9  technology was nowhere near achieving Level 4-5 autonomy during the Class Period.  Tesla could

10  not release Level 4-5 autonomy without the system being safe enough to drive itself without human

11  intervention, and would not have necessary regulatory support for such a release before the Company

12  could prove to regulators that the technology was safe.

13      421.  Furthermore, formal Tesla letters to the California DMV prove that Tesla was nowhere

14  near releasing Level 4-5 autonomy at any point during the Class Period, and was in fact not even

15  working on a product that was intended to offer that functionality.  That Tesla's strategic intention

16  with the product was not for an imminent release of Level 4-5 Autonomy is a fact that Defendant

17  Musk necessarily must have been aware of, given his hands-on involvement with the autonomous

18  driving technology and his role as Tesla's CEO.

19      422.  Finally, Defendant Musk's previous role in staging a video misrepresenting the status

20  of Tesla's autonomous driving technology (*see* ¶69), provides strong additional support for the

21  conclusion that his misrepresentations throughout the Class Period were knowing and intentional.

22      423.  Similarly, while secondary, the allegations of scienter are strengthened by Defendant

23  Musk's known history of making misrepresentations to investors with scienter.  In a summary

24  judgment order, Judge Chen of this District, held that Musk's August 7, 2018, tweet stating "funding

25  [was] secured" for his proposed takeover of Tesla was misleading and made with scienter, granting

26  summary judgment on those issues in plaintiffs' favor.  *See In re Tesla, Inc., Sec. Litig.*, No. 3:18-cv-

27  04865-EMC, (N.D. Cal. Apr. 1, 2022), ECF No. 387.  Specifically, the court found that "no

28  reasonable jury could find 'Funding secured' accurate and not misleading even under a liberal

1   understanding of the term 'secured.'"  *Id.* at 25.  In granting summary judgment in plaintiff's favor

2   on the issue of scienter, the court wrote: "a reasonable jury could reach only one conclusion – *i.e.*,

3   that Mr. Musk recklessly tweeted to the public that funding was secured."  While Plaintiffs ultimately

4   did not prevail on the issue of materiality, these prior acts nevertheless demonstrate that Defendant

5   Musk has an aptitude to act with scienter when making misleading statements to the market.

### 2.    Motive and Opportunity

7        424.    Defendant Musk had an enormous motive to carry out the fraud alleged herein to

8   enable himself to sell massive quantities of Tesla stock at artificially inflated prices.

9        425.    During the Class Period, Defendant Musk[13] engaged in massive sales of Tesla stock,

10  selling a total 141,310,673 shares, and collecting insider trading proceeds of $39,363,581,588 (about

11  **$39.4 billion**).  The proceeds (and profits) of these stock sales were suspicious in both scope and

12  timing.  Defendant Musk's Class Period sales of Tesla stock are detailed in Exhibit A.

13       426.    Defendant Musk also generated outsized profit through the sales.  Using a highly

14  conservative calculation, which treats the cost basis of Defendant Musk's shares as if he purchased

15  each of the shares he sold at the **highest** closing price for Tesla stock before the Class Period ($25.67),

16  Defendant Musk gained about $35,736,136,612 (about $35.7 billion) in insider trading profits through

17  his Class Period sales.  In reality, Musk's profits were likely considerably higher.  For instance,

18  assuming Defendant Musk purchased all the shares he sold at the **average** closing price of Tesla stock

19  before the Class Period ($11.64), Defendant's Musk's insider trading profits were $37,719,149,286

20  (about $37.7 billion).

21       427.    These stock sales dwarfed Defendant Musk's open market or public offering share

22  purchases during the Class Period.  Compared to 141,310,673 shares sold for $39,363,581,588 in

23  proceeds, Defendant Musk purchased only 1,738,755 Tesla shares for $34,999,212.  Therefore,

24  **Defendant Musk sold over 81 times more shares than he purchased and made over 1,124 times**

25  **more proceeds** from selling Tesla shares than he spent purchasing shares on the open market.

---

[13] The descriptions herein of Defendant Musk's trading and share ownership include shares directly owned and traded by the Elon Musk Revocable Trust, of which Defendant Musk is the trustee, and whose shares are beneficially owned by Defendant Musk.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

428. According to a 2010 study by two Wharton professors, "the typical CEO sells only about 1.9% of his equity incentives each year."[14] But during the Class Period, Defendant Musk unloaded far more than that on unsuspecting investors. Over the course of the Class Period, Defendant Musk sold approximately 24.4% of his shares overall, including pre-Class Period holdings and shares he acquired during the Class Period.

429. Further, Defendant Musk sold 44.8% of the stock he had available for sale.[15] This figure accounts for the fact that, during the Class Period, Defendant Musk had pledged a significant amount of his Tesla shares as collateral to secure personal indebtedness. These shares, therefore, were not available for sale and thus excluded from this calculation.

430. Defendant Musk's stock sales are also suspicious when compared to his trading in the years prior to the Class Period. As set forth in the chart below, Defendant Musk sold many more shares of Tesla stock during the Class Period than in a comparably long period of time prior to the Class Period, running from February 18, 2015 to February 18, 2019. His proceeds from the sale of Tesla stock were also far larger during the Class Period. In fact, Defendant Musk sold **239%** more shares for **6,354%** more in proceeds during the Class Period.

| **Table Showing Increase in Musk's Stock Sales During Class Period** | | |
|---|---|---|
| **Period** | **Shares** | **Proceeds** |
| Class Period | 141,310,673 | $39,363,581,588 |
| Pre-Class Period | 41,740,050 | $593,322,289 |
| **% Increase in Sales During Class Period** | **239%** | **6,534%** |

431. Additionally, Defendant Musk's Class Period sales are suspicious when compared to his trading in the period after the Class Period. Since the close of the Class Period, Defendant Musk has sold zero Tesla shares, meaning his Class Period sales were clearly greater than his post-Class Period sales.

---

[14] John E. Core & Wayne R. Guay, Is CEO Pay Too High and Are Incentives Too Low? A Wealth-Based Contracting Framework, 24 ACAD. MGMT. PERSP. 1, 5 (Feb. 2010).

[15] Specifically, this figure accounts for the 264,993,375 shares of Tesla stock Defendant Musk had pledged as of June 30, 2021.

432.    The timing of Defendant Musk's stock sales is also suspicious.  The average price at which Defendant Musk sold his stock during the Class Period was $278.56 per share.  Meanwhile, the average closing price for Tesla stock during the Class Period was $163.73.  Thus, Musk sold his shares at an average price which was $114.83 or 70% higher than the Class Period average.

433.    In fact, many of Defendant Musk's sales were executed at near all-time highs for Tesla's stock price.  Tesla's all-time highest closing stock price was $409.97 on November 4, 2021.  Defendant Musk's Class Period sales began days later, on November 8, 2021, at an average trading price of $392.20.

434.    Defendant Musk benefitted enormously by selling Tesla stock before the Company's fraud was exposed.  Had Defendant Musk waited and sold his stock on February 21, 2023, after the truth about his fraudulent scheme was revealed, his sales proceeds would have been nearly $11.5 billion less than what he collected from his insider sales during the Class Period.[16]

435.    The timing of Defendant Musk's sales is also suspicious because of how they align with his 2022 purchase of the social media company, Twitter, Inc. ("Twitter").[17]  Defendant Musk was highly incentivized to maintain the inflation of Tesla's stock price because of his purchase of Twitter.

436.    Defendant Musk began selling Tesla shares on November 8, 2021.  On December 22, 2021, after selling about $14.5 billion in Tesla stock in less than two months, Defendant Musk tweeted that he was "almost done" selling Tesla stock.  Around this period of time, Defendant Musk began purchasing a large volume of Twitter stock, which was then a publicly held company.

437.    In March of 2022, Defendant Musk told high ranking Twitter executives that he was considering options, including joining Twitter's Board of Directors, or taking the company private.  In April of 2022, he disclosed a 9.2% stake in Twitter, worth about $2.9 billion the day it was disclosed, making him Twitter's largest shareholder.  Shortly thereafter, Twitter disclosed a deal to the SEC whereby Musk would be appointed to Twitter's Board of Directors until 2024 and agreed to

---

[16] Tesla's stock price closed at $208.31 on February 17, 2023, $70.25 or 25% lower than the average price at which Defendant Musk sold shares during the Class Period.

[17] In April of 2023, Twitter merged with Defendant Musk's X Holdings.  For consistency, this complaint refers to the company as Twitter throughout.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

not become the beneficial owner of more than 14.9% of Twitter's stock while on the board and for 90 days thereafter.  Mere days later, Twitter disclosed that Defendant Musk had informed Twitter he would not join its board.

438.    On April 14, 2022, Defendant Musk offered to buy Twitter.  On April 25, 2022, Twitter and Defendant Musk announced a deal where he would buy Twitter for about $44 billion and announced the execution of an "Agreement and Plan of Merger."  On April 26, 2022, Defendant Musk began once again selling large numbers of Tesla shares, selling over $8.5 billion in shares in April 2022, likely to prepare for his intended purchase of Twitter.

439.    However, Defendant Musk soon began to renege on his commitment to buy the social media company, tweeting on May 13, 2022 that the deal was "temporarily on hold," while he requested more information on Twitter's calculation of how many of its users were spam or fake accounts.  Defendant Musk paused his stock sales during this time.

440.    On July 8, 2022, Defendant Musk sent a notice to Twitter purporting to terminate his agreement to buy the company.  On July 12, 2022, Twitter filed a complaint in the Delaware Court of Chancery against Defendant Musk seeking an order forcing Musk to consummate the purchase of the company.  Shortly thereafter, in August of 2022, Defendant Musk continued his stock sales, generating nearly $7 billion in proceeds.  Defendant Musk likely engaged in these sales so that he would be ready to buy Twitter if he failed to get out of the deal.  On August 9, 2022, Defendant Musk tweeted, "Yes.", in response to a Twitter user asking if he was done selling Tesla stock, further stating: "In the (hopefully unlikely) event that Twitter forces this deal to close . . .  it is important to avoid an emergency sale of Tesla stock."

441.    Then, after Defendant Musk suffered several pre-trial defeats in the Delaware Court of Chancery, including failing to delay the trial, he agreed to complete the $44 billion deal on October 3, 2022.  The deal closed on October 27, 2022.  Musk pledged to provide $46.5 billion in equity and debt financing for the acquisition, which also covered closing costs.  Debt financing covered about $13 billion of the total, and based on concurrent reports, Defendant Musk had secured several billion dollars from outside equity investors.  The Twitter stake Musk had built up was also worth several

billion dollars, meaning Defendant Musk likely paid tens of billions in dollars to fund the remainder of the deal.

442.    Soon thereafter, Defendant Musk then made the last of his Class Period sales of Tesla stock in November and December of 2022, generating over $7.5 billion in proceeds, which likely also helped him fund the Twitter deal.  Thus, Defendant Musk's Class Period sales of Tesla stock were timed to allow him to complete the Twitter transaction.  Defendant Musk's original sales in late 2021 allowed him to build up a sizable stake in Twitter, then in April 2022, when he decided to purchase the company, he began to sell again.  Defendant Musk paused his sales while he attempted to avoid completing the Twitter deal.  Then, after it became more likely he would buy the company because of Twitter's lawsuit, he resumed his sales again in August 2022.  After Defendant Musk agreed to complete the deal, he made his last his Class Period sales of Tesla stock in November and December 2022.

443.    Defendant Musk was also personally incentivized to maintain Tesla's inflated stock price because of the large personal loan he had taken out collateralized by his shares of Tesla stock. According to filings with the SEC, during the Class Period, a large number of Tesla shares owned by Defendant Musk were pledged as collateral to secure personal indebtedness.  For instance, Tesla reported that Defendant Musk had pledged 276,993,375 shares as of December 31, 2019, and as of Tesla's April 6, 2023, Tesla reported that he has pledged 238,441,261 shares.

444.    Pledging shares creates several risks for company insiders.  Importantly, if the value of the pledged shares fall below a certain contractual minimum, the insider can be subject to a margin call, which can require the insider to sell the pledged shares, pledge more shares, or pay cash to make up for the shortfall.  A forced sale can further lower the price of the pledged securities, creating a vicious cycle whereby the insider is forced to continue to sell to meet contractual requirements.

445.    The terms of Defendant Musk's loans backed by pledged Tesla shares provided him an incentive to maintain Tesla's inflated stock price throughout the Class Period.  If Tesla's stock price dropped significantly, Musk may have been subject to a margin call, forcing him to put up more collateral, pay cash, or sell further shares, which could have driven Tesla's stock price further down. As discussed above, Defendant Musk already needed substantial cash to make his large purchases of

1    Twitter shares and subsequently to complete the acquisition of Twitter. Therefore, Defendant Musk

2    was incentivized to maintain Tesla's inflated stock price to avoid a potential margin call, which could

3    have increased his acute need to raise funds.

4        **D.    LOSS CAUSATION AND ECONOMIC LOSS**

5        446.    Throughout the Class Period, as detailed herein, Defendants made false and

6    misleading statements and omissions about Tesla that caused Tesla's stock to trade at artificially

7    inflated and artificially maintained levels. Defendants' misrepresentations concerning the status and

8    release of Tesla's autonomous driving technology and the safety of that technology, included: (1)

9    representing that Tesla would release "full self-driving" features within particular time periods; (2)

10   claiming Tesla would have a robotaxi business within certain time periods; (3) claiming Tesla's

11   autonomous driving technology was safe and safer than human drivers; (4) claiming Tesla's self-

12   driving system could drive without human intervention; and (5) omitting to disclose risks that were

13   required to be disclosed under regulatory duties.

14       447.    These misrepresentations and omissions both created a materially false positive

15   impression of the investment value of Tesla and created a materially false impression of the risks

16   Tesla faced concerning the prospect of future regulatory action and the Company's release of safe

17   autonomous driving technology. Due to Defendants' misrepresentations and omissions, Tesla's stock

18   reached a Class Period high closing stock price of $409.97 and throughout the Class Period Tesla's

19   stock traded at artificially inflated levels due to Defendants' misrepresentations and omissions.

20       448.    As truthful information was revealed to the market and as the risks of regulatory action

21   materialized, Tesla's stock price declined as the artificial inflation was removed from its share price.

22   Specifically truthful information that removed artificial inflation from Tesla's stock price was

23   revealed on August 16, 2021, November 2, 2021, January 26, 2022, June 3, 2022, and February 16,

24   2023, which respectively corresponded to stock price declines of at least $10.33 per share (more than

25   4.3%), $12.20 per share (more than 3%), $36.10 per share (almost 12%), $23.81 per share (more than

26   9.2%), and $14.25 per share (almost 6.6%).

27       449.    As a result of their purchases of Tesla common stock during the Class Period, Lead

28   Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal

1  securities laws.  Defendants' false or misleading statements and omissions caused Tesla's stock to

2  trade at artificially inflated and artificially maintained levels throughout the Class Period.  When

3  Tesla's stock price declined as the truth was revealed, investors suffered losses.  The timing and

4  magnitude of the price declines and analyst reactions to the news, individually and collectively, negate

5  any alternative inference that the losses suffered by Lead Plaintiff and the other Class members were

6  caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts

7  unrelated to Defendants' fraudulent conduct.

8       **E.**    **RELIANCE**

9      450.   Lead Plaintiff alleges omissions concerning Defendants' failures to disclose risks as

10  well as failure to disclose information necessary to make Defendants' statements not

11  misleading. Where claims, like these, involve primarily failures to disclose, the requirement of

12  proving reliance is relieved, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of*

13  *Utah v. United States*, 406 U.S. 128, 153-54 (1972) ("*Affiliated Ute*").

14      451.   Lead Plaintiff and Class members are entitled to a presumption of reliance on the

15  material misrepresentations and omissions alleged herein pursuant to the fraud-on-the-market theory

16  adopted by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*," the "*Basic*

17  presumption," or the "fraud on the market" presumption).  Throughout the Class Period, Tesla's stock

18  traded in an efficient market and under *Basic*, Lead Plaintiff is entitled to a presumption that (a) the

19  misrepresentations and omissions alleged herein affected the market price for Tesla's stock, and (b)

20  reasonable investors, including Lead Plaintiff and members of the Class, relied on Defendants'

21  misrepresentations and omissions when trading Tesla's stock at the market price or at prices informed

22  thereby.  The following allegations show that Tesla's stock traded in an efficient market throughout

23  the Class Period:

24        (a)    Throughout the Class Period, Tesla's stock met the requirements for listing on,

25  and was traded on the NASDAQ, and securities that trade on the NASDAQ overwhelmingly trade in

26  an informationally efficient market.

27        (b)    Throughout the Class Period, Tesla's stock traded at high volumes, with an

28  average daily trading volume during the Class Period of over 100 million shares.

(c)     Throughout the Class Period, Tesla's stock traded with a narrow bid-ask spread, with an average daily bid-ask spread of well under 0.1% of Tesla's trading price.

(d)     Throughout the Class Period, Tesla maintained a large market capitalization and Tesla's average market capitalization was approximately $500 billion.

(e)     Throughout the Class Period, Tesla's stock was registered with the SEC, and Tesla filed periodic reports with the SEC.

(f)     Throughout the Class Period, Tesla communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

(g)     Throughout the Class Period, the market reacted promptly to public information disseminated by and about Tesla.

(h)     Throughout the Class Period, Tesla was covered by numerous securities analysts employed by major brokerage firms. Bloomberg reported dozens of securities analysts covering Tesla during the Class Period. Tesla was also extensively covered by news media and investor publications.

452.    As a result of the foregoing, the market for Tesla's stock promptly digested current information regarding or relevant to Tesla from all publicly available sources and reflected such information in the stock prices.

453.    Defendants' material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Tesla's stock.

454.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased Tesla's stock between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period.

**F.     NO SAFE HARBOR**

455.    The Private Securities Litigation Reform Act of 1995 ("PSLRA") restricts liability for certain forward-looking statements. *See* 15 U.S.C. § 78u–5 (the "Safe Harbor"). The Safe Harbor does not apply to any of the materially false or misleading statements and omissions alleged in this

1    Complaint.  The statements at issue are not protected by the PSLRA's Safe Harbor or the common

2    law bespeaks caution doctrine for a variety of reasons, including the following.

3        456.    First, Defendants' statements and omissions alleged to be false or misleading relate to

4    historical facts or existing conditions and, therefore, are not protected by the Safe Harbor.  Second,

5    to the extent that any of the false or misleading statements alleged may be characterized as forward-

6    looking, they were not adequately identified as "forward-looking" at the time they were made.  Third,

7    any purported forward-looking statements were not accompanied by meaningful cautionary language

8    because risks that Defendants warned of had already come to pass, and any cautionary language was

9    not meaningful and/or because important factors of similar significance to those actually

10   realized.  Fourth, to the extent that there were any forward-looking statements that were identified as

11   such, Defendants are liable because, at the time each of those forward-looking statements was made,

12   the speaker knew the statement was false and/or misleading when made.

13       457.    Additionally, the Safe Harbor cannot apply to any of the materially false or misleading

14   statements and omissions alleged in this Complaint because Defendants are excluded from relying on

15   the Safe Harbor by the express terms of the statute.  The Safe Harbor does not apply to statements

16   concerning an issuer of securities (like Tesla), where, in the three years prior to the misstatement, that

17   issuer has been the subject of a governmental action from which an order barring violations of

18   antifraud provisions of the securities laws arose.

19       458.    On October 16, 2018, District Judge Alison J. Nathan entered an order, in an SEC

20   action against Defendant Musk that enjoined him from further violation of certain antifraud

21   provisions of the securities laws, including § 10(b) of the Exchange Act, in connection with a

22   settlement related to a lawsuit, the subject of which was Defendant Musk's alleged fraudulent

23   statements concerning his offer to take Tesla private.  *United States Securities & Exchange*

24   *Commission v. Musk*, 1:18-cv-08865-LJL (S.D.N.Y Oct. 16, 2018), ECF No. 14 (incorporated by

25   reference herein).  On April 30, 2019, Judge Nathan entered an order in the same action referenced

26   above in this paragraph, following allegations by the SEC that Defendant Musk had violated the prior

27   court order, which once again enjoined Defendant Musk from further violation of certain antifraud

28

1  provisions of the securities laws, including § 10(b) of the Exchange Act, by stating that the prior

2  injunction would remain in effect. *Id.*, ECF No. 47.

3       459.    Also on October 16, 2018 in a related matter, Judge Nathan entered an order, in an

4  SEC action against Tesla that enjoined it from further violation of antifraud provisions of the

5  securities laws, in connection with a settlement of a related case to the one described in the prior

6  paragraph, concerning Defendant Musk's alleged fraudulent statements concerning his offer to take

7  Tesla private. *See United States Securities & Exchange Commission v. Tesla, Inc*, 1:18-cv-8947-LJL

8  (S.D.N.Y Oct. 16, 2018), ECF No. 14 (incorporated by reference herein).  On April 30, 2019, Judge

9  Nathan entered an order in the same action referenced above in this paragraph, following allegations

10  by the SEC that Defendant Musk had violated the prior court order, which once again enjoined

11  Defendant Tesla from further violation of certain antifraud provisions of the securities laws, including

12  § 10(b) of the Exchange Act, by stating that the prior injunction would remain in effect. *Id.*, ECF No.

13  17.

14  **VI.    CLASS ACTION ALLEGATIONS**

15       460.    Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the

16  Federal Rules of Civil Procedure on behalf of itself and all persons and entities that purchased or

17  otherwise acquired Tesla publicly traded common stock during the period from February 19, 2019

18  through February 16, 2023, inclusive (the "Class Period"), and were damaged thereby, except as

19  excluded below (the "Class").

20       461.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of

21  Defendant Musk; (iii) any person who was an officer or director of Tesla during the Class Period; (iv)

22  any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest;

23  (v) subsidiaries or affiliates of Tesla, including its employee retirement and benefit plan(s) and their

24  participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal

25  representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-

26  (v) of this paragraph.

27       462.    The members of the Class are so numerous that joinder of all members is

28  impracticable.  According to its quarterly and annual reports filed with the SEC during the Class

Period, there were between approximately 180 million and 3.17 billion of Tesla stock outstanding during the Class Period,[18] and Tesla's stock was actively traded on the NASDAQ under the ticker symbol "TSLA."  While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically.  Record owners and other members of the Class may be identified from records maintained by Tesla and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

463.    Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' alleged wrongful conduct in violation of the Exchange Act as complained of herein.

464.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class action and securities litigation.

465.    Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, but are not limited to, the following:

(a)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)    Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    Whether, and to what extent, the market price of Tesla's stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)    Whether Defendant Musk was a controlling persons of Tesla; and

---

[18] This range uses figures outstanding without modifying any figures to account for the stock splits described in ¶42.  Thus, the size of this range is primarily a result of the stock splits.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

(f)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

466.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.    COUNTS

### A.    COUNT I: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Defendants Tesla and Musk

467.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

468.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC, on behalf of Lead Plaintiff and the Class, against Defendants Tesla and Musk.

469.    Throughout the Class Period, Defendants deceived the investing public, including Lead Plaintiff and the Class, and artificially inflated or artificially maintained the price of Tesla stock.

470.    Defendants made untrue statements of material facts and/or omitted material facts necessary to make their statements not misleading.  Defendants' false or misleading statements and omissions are described in Section V(A).

471.    Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as alleged herein.

472.    Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with deliberate reckless disregard for the truth. The facts demonstrating that Defendants acted with actual knowledge and/or deliberate recklessness are stated in Section V(C).

473.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

474.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and members of the Class suffered damages in connection with their respective purchases of Tesla stock during the Class Period.

**B.     COUNT II: Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)/(c) Promulgated Thereunder Against Defendants Tesla and Musk**

475.     Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

476.     This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(a) and Rule 10b-5(c) promulgated thereunder by the SEC, on behalf of Lead Plaintiff and the Class, against Defendants Tesla and Musk.

477.     Throughout the Class Period, Defendants engaged in a fraudulent scheme, practice or course of business which operated as a fraud and deceit upon investors.  Specifically, Defendants' course of business throughout the Class Period was to persuade investors that Tesla had and/or was on the cusp of releasing fully autonomous cars.  Defendant Musk repeatedly claimed that Tesla's value depended almost entirely on full self-driving and engaged in acts and practices intended to instill a false belief in investors regarding the Company's autonomous driving technology.  This false belief was perpetuated by both the totality of the false and misleading statements alleged herein taken collectively, and the totality of Defendants other acts collectively creating a false perception regarding the Company's technology including (1) Defendants' use of the term "full self-driving" and (2) Defendants' use of the term "autopilot."

478.     Throughout the Class Period, Defendants' fraudulent scheme involved publicly claiming to investors that Tesla's cars could drive themselves, and that Tesla was on the cusp of releasing Level 4-5 autonomy (and a lucrative robotaxi business), while Defendants privately told regulators that the Company's technology was "firmly" Level 2 driver assistance technology (not self-driving) and that it expected the functionality to remain largely unchanged in future releases.

479.    Defendants' scheme unraveled through a series of disclosures, which revealed to the market that Tesla did not have and was not on the cusp of releasing Level 4-5 autonomy, including because the technology was not sufficiently safe for such a release to be plausible.  The actions of regulators investigating Tesla brought awareness to investors of the true status of Tesla's technology and that the Company was not on the cusp of releasing Level 4-5 autonomy.

480.    Defendants directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to perpetrate this fraud.

481.    Defendants had actual knowledge of the deceptive conduct alleged herein, or acted with deliberately reckless disregard for the effect of their deceptive conduct.  The facts demonstrating that Defendants acted with actual knowledge and/or deliberate recklessness are stated in Section V(C).

482.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and Rule 10b-5(c) promulgated thereunder.

483.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and members of the Class suffered damages in connection with their respective purchases of Tesla stock during the Class Period.

C.    **COUNT III: Violation of Section 20(a) of the Exchange Act Against Defendant Musk**

484.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

485.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Lead Plaintiff and the Class, against Defendant Musk.

486.    As alleged in Counts I and II, Tesla violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by engaging in a fraudulent course of business and making materially false or misleading statements and omitting material information about Tesla, with scienter.  Thus, Tesla is primarily liable under Section 10(b) of the Exchange Act.

487.    Defendant Musk had control over Defendant Tesla's fraudulent statements, omissions, and conduct. By virtue of his executive position and his culpable participation, as alleged above, Defendant Musk had the power to influence and control and did, directly or indirectly, influence and control the decision making of Tesla, including the content and dissemination of the various statements that Lead Plaintiff contends were false or misleading. Defendant Musk was provided with or had unlimited access to Tesla's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause them to be corrected.

488.    In particular, Defendant Musk had direct involvement in and responsibility over the day-to-day operations of Tesla and, therefore, is presumed to have had the power to control or to influence the conduct giving rise to the securities violations as alleged herein.

489.    Defendant Musk also was a culpable participant in the conduct alleged herein, because he: (a) made materially false and misleading statements or omitted to disclose truthful information; (b) had knowledge of the wrongful conduct or was reckless in not having such knowledge and continued in the capacity of control persons of Tesla; (c) provided credibility to Tesla's public disclosures by appearing in public events on behalf of Tesla while he conduct alleged herein occurred; and/or (d) did not act to prevent the wrongful conduct alleged herein, despite an ability to do so.

490.    By reason of such wrongful conduct, Defendant Musk is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendant Musk's wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Tesla stock during the Class Period.

## VIII.    PRAYER FOR RELIEF

491.    WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

(a)    Declaring this action to be a class action properly maintained pursuant to Rule 23(a), (b)(3), and (g) of the Federal Rules of Civil Procedure and certifying Lead Plaintiff as Class Representative, and Labaton Sucharow LLP as Class Counsel;

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 3:23-CV-00869-AMO

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

(d)     Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

## IX.    JURY TRIAL DEMANDED

492.    Lead Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  September 5, 2023

Respectfully submitted,

**LABATON SUCHAROW LLP**

By: /s/ Carol C. Villegas
    Carol C. Villegas *(pro hac vice)*
    Jake Bissell-Linsk *(pro hac vice)*
    Guillaume Buell *(pro hac vice)*
    Lisa Strejlau *(pro hac vice)*
    Danielle Izzo *(pro hac vice)*
    **LABATON SUCHAROW LLP**
    140 Broadway
    New York, NY  10005
    Telephone:  212 907 0700
    Fax:  212 818 0477
    cvillegas@labaton.com
    jbissell-linsk@labaton.com
    gbuell@labaton.com
    lstrejlau@labaton.com
    dizzo@labaton.com

    *Counsel for Lead Plaintiff and*
    *Proposed Lead Counsel for the Class*

    **HAGENS BERMAN SOBOL SHAPIRO LLP**
    Lucas E. Gilmore (Bar. No. 250893)
    715 Hearst Avenue, Suite 300
    Berkeley, CA  94710
    Telephone: (510) 725-3000
    Fax: (510) 725-3001
    lucasg@hbsslaw.com

    *Liaison Counsel for the Class*

139

**VANOVERBEKE MICHAUD & TIMMONY P.C.**
Aaron L. Castle (*pro hac vice*)
79 Alfred Street
Detroit, MI 48201
Telephone: (313) 578-1200
Fax: (313) 578-1201
acastle@vmtlaw.com

*Additional Counsel for Proposed Lead Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2023, I authorized the electronic filing of the foregoing Amended Complaint for Violations of the Federal Securities Laws with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:          September 5, 2023
                New York, New York


                                    */s/ Carol C. Villegas*
                                    Carol C. Villegas