**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Michael T. Lifrak (Bar No. 210846)
865 S Figueroa St., 10th Floor
Los Angeles, CA  90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
michaellifrak@quinnemanuel.com

Alex Spiro
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
alexspiro@quinnemanuel.com

*Counsel for Defendants Tesla, Inc.
and Elon R. Musk*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| THOMAS LAMONTAGNE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TESLA, INC. and ELON R. MUSK,<br><br>Defendants. | Case No. 3:23-CV-00869-AMO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Judge:  Hon. Araceli Martínez-Olguín<br>Courtroom:  10, 19th Floor<br>Hearing Date:  February 22, 2024<br>Hearing Time:  2:00 p.m |

1

## <u>TABLE OF CONTENTS</u>

2

**Page**

3
NOTICE OF MOTION AND MOTION ...................................................................................................1

ISSUES TO BE DECIDED ...................................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .........................................................................1

FACTUAL BACKGROUND ................................................................................................................2

LEGAL STANDARD ..........................................................................................................................4

ARGUMENT ......................................................................................................................................4

I.      PLAINTIFFS FAIL TO PLEAD A MISREPRESENTATION OR OMISSION ..........................4

        A.      Defendants' Timeline Statements Were Not False or Misleading.......................5

        B.      Defendants' Safety Statements Were Not False or Misleading........................11

        C.      Defendants' Capability Statements Were Not False or Misleading .................13

        D.      Plaintiffs Fail to Plead A Duty to Disclose .....................................................15

II.     PLAINTIFFS FAIL TO PLEAD SCIENTER ...............................................................15

        A.      Plaintiffs Fail to Plead Knowledge of Falsity or Deliberate Recklessness. ......................16

        B.      Musk's Stock Sales Do Not Suggest a Strong Inference of Scienter ...............21

        C.      Plaintiffs' Other Motive Allegations Fail ........................................................22

        D.      Plaintiffs Fail to Account for More Compelling, Non-Culpable Inferences ...................23

III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION .............................................24

CONCLUSION..................................................................................................................................25

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' NOTICE OF MOTION  AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

1

# TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

5  *Applestein v. Medivation, Inc.*,
     561 Fed.Appx. 598 (9th Cir. 2014) ....................................................................................18

6  *In re Aratana Therapeutics Inc. Sec. Litig.*,
7     315 F. Supp. 3d 737 (S.D.N.Y. 2018) ..................................................................................8

8  *In re Autodesk, Inc. Sec. Litig.*,
     132 F. Supp. 2d 833 (N.D. Cal. 2000) ...............................................................................20

9  *In re Bank of Am. AIG Disclosure Sec. Litig.*,
10    566 F. App'x 93 (2d Cir. 2014) ..........................................................................................23

11 *Bao v. SolarCity Corp.*,
12    2015 WL 1906105 (N.D. Cal. Apr. 27, 2015) ....................................................................23

13 *Berg v. Velocity Fin., Inc.*,
     2021 WL 268250 (C.D. Cal. Jan. 25, 2021) .......................................................................15

14 *Bodri v. GoPro, Inc.*,
15    252 F. Supp. 3d 912 (N.D. Cal. 2017) .................................................................................6

16 *Carr v. Zosano Pharm. Corp.*,
17    2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) .....................................................................19

18 *Carvelli v. Ocwen Fin. Corp.*,
     934 F.3d 1307 (11th Cir. 2019) ............................................................................................7

19 *CheckOut Holdings, LLC v. Amplified Holdings, Inc.*,
20    64 Fed.Appx. 631 (9th Cir. 2003) ......................................................................................16

21 *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
22    856 F.3d 605 (9th Cir. 2017) ...................................................................................10, 16, 22

23 *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
     880 F. Supp. 2d 1045 (N.D. Cal. 2012) ........................................................................20, 24

24 *In re Copper Mountain Sec. Litig.*,
25    311 F. Supp. 2d 857 (N.D. Cal. 2004) .................................................................................9

26 *Curry v. Yelp Inc.*,
     875 F.3d 1219 (9th Cir. 2017) ............................................................................................25

27 *In re Ford Motor Co. Sec. Litig.*,
28    381 F.3d 563 (6th Cir. 2004) ..............................................................................................12

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ...........................................................................16

*Golubowski v. Robinhood Mkts.*,
  2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) ...............................................15

*Hampton v. Aqua Metals, Inc.*,
  2020 WL 6710096 (N.D. Cal. Nov. 16, 2020) ...............................................23

*In re Hansen Natural Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ...........................................................22

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
  189 F.3d 971 (9th Cir. 1999) ...............................................................................8

*Hong v. Extreme Networks, Inc.*,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ................................................14

*In re Impax Labs., Inc. Sec. Litig.*,
  2007 WL 5076983 (N.D. Cal. Jan. 3, 2007) ...................................................24

*In re Infonet Servs. Corp. Sec. Litig.*,
  310 F. Supp. 2d 1080 (C.D. Cal. 2003) .......................................................7, 8

*In re Intel Corp. Sec. Litig.*,
  2023 WL 2767779 (N.D. Cal. Mar. 31, 2023).................................6, 20, 24

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
  2020 WL 1244936 (N.D. Cal. March 16, 2020) .............................................20

*Johnson v. NYFIX, Inc.*,
  399 F. Supp. 2d 105 (D. Conn. 2005)...............................................................23

*Kang v. PayPal Holdings, Inc.*,
  620 F. Supp. 3d 884 (N.D. Cal. 2022) ...............................................................4

*Lapiner v. Camtek, Ltd.*,
  2011 WL 445849 (N.D. Cal. Feb. 2, 2011) ....................................................22

*In re Leapfrog Enter., Inc. Sec. Litig.*,
  200 F. Supp. 3d 987 (N.D. Cal. 2016)................................................................9

*In re LeapFrog Enterprises, Inc. Sec. Litig.*,
  527 F. Supp. 2d 1033 (N.D. Cal. 2007)............................................................22

*Lechner v. Infusystem Holdings, Inc.*,
  2017 WL 11593803 (C.D. Cal. Dec. 15, 2017) ..............................................17

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) .......................................................................4, 17

*Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010)...............................................................19

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) ............................................................................25

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ..............10, 18

*Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) ............................................................................4

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .................................................................15, 21, 25

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020)......................................................20

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ..............................................................................24

*In re Netflix, Inc., Sec. Litig.*,
   923 F. Supp. 2d 1214 (N.D. Cal. 2013) ..............................................................15

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) .............................................................................24

*In re Nimble Storage, Inc. Sec. Litig.*,
   252 F. Supp. 3d 848 (N.D. Cal. 2017)..................................................................8

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006)...................................................................9

*In re NVE Corp. Sec. Litig.*,
   551 F. Supp. 2d 871 (D. Minn. 2007)...................................................................9

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ........................................................................4, 19

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
   2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .....................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)............................................................................................9

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018)................................................................12

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ..........................................................................4, 8

DEFENDANTS' NOTICE OF MOTION  AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

*Palm Harbor Special Fire Control & Rescue District Firefighters Pension Plan v. First Solar Inc.*,
   2023 WL 4161355 (D. Ariz. June 23, 2023) ..................................................................19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ......................................................................8, 18, 19, 20

*S.E.C. v. McNulty*,
   1996 WL 422259 (S.D.N.Y. July 29, 1996) .....................................................................7

*Saraf v. Ebix, Inc.*,
   632 F. Supp. 3d 389 (S.D.N.Y. 2022).............................................................................21

*In re Silicon Storage Tech., Inc.*,
   2006 WL 648683 (N.D. Cal. Mar. 10, 2006)..................................................................18

*In re Silicon Storage Tech., Inc., Sec. Litig.*,
   2007 WL 760535 (N.D. Cal. Mar. 9, 2007).....................................................................21

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
   545 F. Supp. 3d 120 (S.D.N.Y. 2021).............................................................................25

*Sneed v. AcelRx Pharm., Inc.*,
   2022 WL 4544721 (N.D. Cal. Sept. 28, 2022) .................................................................4

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) .................................................................8

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)........................................................................................................16

*In re Toyota Motor Corp. Sec. Litig.*,
   2011 WL 2675395 (C.D. Cal. Jul 7, 2011)................................................................13, 19

*Webb v. Solarcity Corp.*,
   884 F.3d 844 (9th Cir. 2018) .........................................................................................23

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..........................................................................24

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ..........................................................................5, 6, 9, 16

*Xiaojiao Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ..........................................................................13

*Yaron v. Intersect ENT, Inc.*,
   2020 WL 6750568 (N.D. Cal. June 19, 2020) ................................................................25

*Yen Hoang, et al., v. Contextlogic, Inc., et al.*,
   2023 WL 6536162 (N.D. Cal. March 10, 2023)..............................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
    445 F. Supp. 2d 1201 (D. Or. 2006), *aff'd*, 552 F.3d 981 (9th Cir. 2009)..........................................18

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) *as amended* (Feb. 10, 2009)..........................................16, 18

### **Statutes and Rules**

15 U.S.C. § 78c(a)(8) ..........................................7

15 U.S.C. § 78u-5 ..........................................6, 7

17 C.F.R. § 229.105 ..........................................15

17 CFR § 229.303 ..........................................15

Federal Rule of Civil Procedure 9(b) ..........................................4

Federal Rule of Civil Procedure 12(b)(6) ..........................................1

Rule 10b-5..........................................4

Rule 12b-20 ..........................................7

Rule 13a-15 ..........................................7

DEFENDANTS' NOTICE OF MOTION  AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT on February 22, 2024 at 2 p.m. before the Honorable Araceli Martínez-Olguín in Courtroom 10, 450 Golden Gate Avenue, 19th Floor, Defendants Tesla, Inc. ("Tesla" or the "Company") and Elon R. Musk (together, "Defendants") will move this Court for an order dismissing the Amended Complaint for Violations of the Federal Securities Laws (ECF No. 57, the "Complaint") filed by Lead Plaintiffs ("Plaintiffs").  This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based upon the following Memorandum; Defendants' Request for Judicial Notice, filed concurrently herewith; the argument of counsel; and any additional material as may be submitted to the Court before decision.  Defendants seek an order dismissing the Complaint with prejudice for failure to state a claim.

## ISSUES TO BE DECIDED

1.      Have Plaintiffs failed to plead adequately that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") where the Complaint identifies no materially misleading statements or omissions, does not plead that the alleged misstatements or omissions were made with scienter, and does not plead that any alleged conduct caused Plaintiffs or the purported class losses?

2.      Have Plaintiffs failed to plead that Defendant Elon Musk violated Section 20(a) of the Exchange Act where the Complaint does not plead a primary violation?

## MEMORANDUM OF POINTS AND AUTHORITIES

At its core, the Complaint alleges that because Defendants' forward-looking predictions, puffery, and opinions regarding the development timeline of cutting-edge technology were "wrong," Defendants must have intended to defraud investors—and thus committed securities fraud.  Plaintiffs' attempt to manufacture a securities fraud claim out of the mere fact that the development of state-of-the art technology involves challenges and potential delays is contrary to common sense and the securities laws:   the Complaint should be dismissed.

***First***, the Complaint fails to plead ***any*** materially false statement.  Indeed, the Complaint does not challenge a single one of Tesla's representations in its SEC filings over the four-year Class Period.  Instead, the Complaint challenges forward-looking statements during conferences and earnings calls regarding the development of Tesla's self-driving technology, ignoring entirely the extensive SEC disclosures describing the risks associated with the development of the self-driving technology, which render the challenged

DEFENDANTS' NOTICE OF MOTION  AND MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

forward-looking statements inactionable under the PSLRA Safe Harbor and the Bespeaks Caution Doctrine.  The remainder of the statements Plaintiffs challenge are inactionable corporate puffery and truthful statements of opinion without allegations that Musk did not believe the statements.  And none of the allegedly "omitted" information—much of which was public—rendered any statement misleading.

*Second*, Plaintiffs' allegations fail to support a "strong inference of scienter," *i.e.*, one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent" as required by the PSLRA.  Plaintiffs offer no particularized facts establishing that Musk—or anyone else whose scienter could arguably be imputed to Tesla—had any knowledge that contradicted their statements, let alone that rendered their statements misleading.  Plaintiffs rely on routinely rejected, general allegations that Musk "would have" possessed information contrary to his alleged misstatements and non-specific allegations that he attended meetings and received reports with unspecified information.  Further, Plaintiffs ignore the extensive risk warnings about Tesla's development of self-driving technology, which undermine any inference that the Company or Musk intended to defraud investors.  And in a final attempt to manufacture scienter where none exists, Plaintiffs point to Musk's stock sales, which are not alleged to have begun until *after* the first two alleged corrective disclosures.

*Finally*, Plaintiffs do not demonstrate any causal connection between the alleged misrepresentations and their losses, *i.e.*, loss causation.  Instead, Plaintiffs rely on the announcement of investigations, "recalls," and information previously known to the market and disclosed in Tesla's risk factors, none of which constitute "corrective disclosures."

## FACTUAL BACKGROUND

Tesla is a cutting-edge, vertically integrated clean energy company that manufactures and sells several types of electric vehicles as well as energy storage devices and solar energy generation systems. *E.g.*, ¶ 45.[1]  For several years, Tesla has been developing and improving self-driving technology.  ¶ 50. Today, Tesla vehicles come equipped with "Autopilot," which includes a suite of advanced driver assistance features—Traffic-Aware Cruise Control and Autosteer.  ¶¶ 3, 50; Ex. A (Tesla Autopilot and FSDC Support Page).  Throughout the Class Period, Tesla offered additional upgrades and functionalities

---

[1]  References to "¶ __" are to the Amended Complaint, ECF No. 57.  All emphasis is added, and internal quotations and citations omitted unless otherwise noted.  Exhibits are to the Declaration of Michael Lifrak.

1    being developed and beta tested.  *See, e.g.*, ¶¶ 49–50.  A software upgrade package called "Full Self Driving

2    Capability" or "FSDC" offered additional driving assistance features, including Traffic Light and Stop

3    Sign Control (Beta) and Autosteer on City Streets (Beta).  ¶ 50; Ex. A.  These FSDC features are distinct

4    from the Autopilot features.  *See* ¶ 3; *see also* Ex. A.  However, for each of these "Autopilot and FSD

5    options" Tesla was explicit that "the driver is ultimately responsible for controlling the vehicle."  *E.g.*,

6    Ex. B (2019 Form 10-K) at 4; *see also id.* at 27 ("Autopilot and FSD features . . . currently require drivers

7    to remain engaged").  Tesla continuously developed software updates and functionalities, which enhanced

8    these features and could be downloaded when available.  *See, e.g.*, ¶ 49.  Autosteer on City Streets (Beta)

9    became available to a small number of drivers for beta testing in October of 2020.  *See, e.g.*, Ex. C

10   (Oct. 21, 2020 Earnings Call) at 3; ¶ 384.  Tesla repeatedly emphasized that Autosteer on City Streets

11   (Beta) did not make the vehicle autonomous and required active driver supervision.  *See supra*.

12          Musk and Tesla were optimistic regarding the development of Autopilot and FSDC features.  *See,*

13   *e.g.*, ¶ 327.  Nonetheless, they cautioned investors at the same time that ***"[t]here is no guarantee that we***

14   ***will be able to successfully and timely introduce and scale . . . new processes or features***" and that Tesla

15   may experience "delays or other complications in launching and/or ramping production of . . . ***future***

16   ***features and services such as new Autopilot or FSD features and the autonomous Tesla ride-hailing***

17   ***network***."  Ex. B at 15.  Musk and Tesla cautioned further that "***certain features of our vehicles such as***

18   ***new Autopilot or FSD features [may] take longer than expected to become enabled.***"  *Id.* at 21.  Tesla

19   also warned investors that its software was "inherently complex and may contain latent defects and errors"

20   and that efforts to remedy those issues "***may not be timely***, may hamper production or may not be to the

21   satisfaction of our customers."  *Id.* at 21.  And they warned further that Tesla may "***be compelled to***

22   ***undertake product recalls*** or take other similar actions" for its products.  *Id.* at 28.[2]

23          Although Tesla made significant progress on the development of FSDC features throughout the

24   Class Period, the development was—like virtually all new technologies—not without delay or challenges.

25   Indeed, Musk himself admitted that he had "never really seen more kind of false dawns, or where it seems

26

27   ────────────────────
     [2] Substantively similar disclosures were reflected in all of Tesla's Class Period Forms 10-K.  Ex. D (2018
28   Form 10-K) at 16, 20, 22, 31; Ex. E (2020 Form 10-K) at 14, 18, 21, 25; Ex. F (2021 Form 10-K) at 14–
     15, 18, 21, 25; Ex. G (2022 Form 10-K) at 14–15, 18, 22, 25.

1  like we're going to break through but we don't, as I've seen in full self-driving."  Ex. H (April 20, 2022

2  Earnings Call) at 4.  Nor was the development without the need to improve perceived issues.  On November

3  2, 2021, for example, Tesla—as it warned it may be required to do—announced it was "recalling" certain

4  Autosteer on City Streets (Beta) software features by conducting an over-the-air software update.  ¶ 382.

5  Despite these challenges, Tesla shareholders have benefited immensely from Tesla's self-driving

6  technologies:  the stock price increased by over 1,000 percent from the beginning to the end of the Class

7  Period.  *See* Ex. I (Tesla stock price history).

8  **LEGAL STANDARD**

9  To state a claim, Plaintiffs must allege particularized facts showing (1) a misrepresentation or

10  omission of a material fact; (2) made with scienter; (3) in connection with the purchase or sale of a security;

11  (4) reliance; (5) economic loss; and (6) loss causation.  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046,

12  1052 (9th Cir. 2014).  Claims under Section 10(b) are subject to the heightened pleading requirements of

13  Rule 9(b) and the PSLRA, which apply to all elements of a securities fraud action, including loss causation.

14  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604–05 (9th Cir. 2014).  These "heightened

15  pleading requirements . . . present no small hurdle for the securities fraud plaintiff."  *Macomb Cnty. Emps.*

16  *Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022).  Plaintiffs cannot clear this hurdle: they

17  fail to allege a material misrepresentation, scienter, and loss causation, each of which is dispositive.[3]

18  **ARGUMENT**

19  **I.    PLAINTIFFS FAIL TO PLEAD A MISREPRESENTATION OR OMISSION**

20  Plaintiffs allege that statements by Defendants during the Class Period, falling into three categories,

21  were false and misleading.  *First*, Plaintiffs allege that forward-looking statements regarding the expected

22  timeline of the development of FSDC, such as "we will be feature complete full self driving this year"

23  (¶ 313), and "I'm extremely confident of achieving full autonomy and releasing it to the Tesla customer

24  base next year" (¶ 349) ("Timeline Statements") were false and misleading because these statements

25
26  [3]    Plaintiffs do not "allege a violation of Section 10(b) or Rule 10b" and thus cannot be liable under Section 20(a).  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).  The Complaint's
27  claim that Defendants are liable under a scheme liability theory pursuant to Rules 10b-5(a) and (c) (¶¶ 475–83)  rests on the same alleged facts and purported misstatements as the 10b-5(b) misstatements claim and,
28  thus, fails for the same reasons.  *See, e.g.*, *Sneed v. AcelRx Pharm., Inc.*, 2022 WL 4544721, at *6 (N.D. Cal. Sept. 28, 2022); *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022).

misrepresented the expected timeline for the development and release of the FSDC technology.  *Second*, Plaintiffs allege statements about the safety of Autopilot and FSDC features, such as "what we see right now is that autopilot is about twice as safe as a normal driver on average" (¶ 319), and Tesla's commitment to safety, such as "I think safety . . . is paramount for us" (¶ 325) ("Safety Statements") were false and misleading because Tesla allegedly did not prioritize safety, and "Tesla's autonomous driving technology was allegedly "not able to drive itself at a safety level greater than . . . humans" (¶ 320).  *Third*, Plaintiffs allege that statements regarding the capabilities of the FSDC technology, such as "we could have gamed an LA/NY Autopilot journey last year" (¶ 323) and "[t]he latest build is capable of zero intervention drives" (¶ 345) ("Capability Statements") were false and misleading because, despite not mentioning the anticipated timeline for release or level of safety, those statements "falsely" conveyed that Tesla was closer to a full release of the FSDC technology than it really was.  The alleged misstatements are a combination of forward-looking statements protected by the PSLRA Safe Harbor, truthful statements of opinion and fact, and inactionable puffery.

### A.     Defendants' Timeline Statements Were Not False or Misleading

Defendants' Timeline Statements are (i) exclusively inactionable forward-looking statements protected by the PSLRA Safe Harbor and the bespeaks caution doctrine and (ii) truthful statements of opinion.  Plaintiffs nonetheless claim that these statements are false because they allegedly misrepresented the progress of FSDC technology.  To support this assertion, Plaintiffs rely on speculation from confidential witnesses ("CWs"), *ad hoc* "expert" analysis, and letters sent to the California DMV relating to Tesla's FSDC features.  As explained below, each of these allegations fails.[4]

*First*, the Timeline Statements are forward-looking statements that are inactionable under the PSLRA where they are "identified as [] forward-looking" and "accompanied by meaningful cautionary statements."  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189 (9th Cir. 2021).  The Timeline Statements

---

[4]  Plaintiffs also allege that Defendants' statements were false because FSD "would not be permitted on the road unless regulators were convinced of" its safety, and the statements "represented" that Tesla would have a system "sufficiently safe to satisfy regulators within the time period conveyed" (*e.g.*, ¶ 332), but Musk repeatedly disclosed that he "can't speak for regulators" (¶ 353) and that when regulators will approve the technology is "a variable which we have limited control over" (¶ 315).

1  (¶¶ 313–14, 317, 321, 323, 327, 329, 331, 333, 335, 339, 341, 343, 347, 349, 351, 357, 369)[5] all concern

2  Tesla's predictions for when Tesla's FSDC features would reach certain benchmarks.[6] By definition, such

3  statements are forward-looking as "plans or objectives relating to the products or services of" Tesla,

4  15 U.S.C. § 78u-5(i)(1)(B), and are insulated from liability, *see In re Intel Corp. Sec. Litig.*, 2023 WL

5  2767779, at *11 (N.D. Cal. Mar. 31, 2023) (statements setting forth "projected launch date" and

6  "development cadence" "are plainly forward-looking statements of plans and objectives"); *Wochos*, 985

7  F.3d at 1191–92 ("Because any announced 'objective' for 'future operations' *necessarily* reflects an

8  implicit assertion that the goal is achievable based on current circumstances, an unadorned statement that

9  a company is 'on track' to achieve an announced objective" is "merely [an] alternative way[] of declaring

10  or reaffirming the objective itself.") (emphasis in original).

11      All of the Timeline Statements made during Tesla earnings calls were accompanied by meaningful

12  cautionary language, rendering them inactionable.  ¶¶ 321, 329, 331, 333, 335, 341, 347, 357, 363, 369.[7]

13  Indeed, while cautionary language "does not need to warn of the 'exact risk' that transpires," *Bodri v.*

14  *GoPro, Inc.*, 252 F. Supp. 3d 912, 931 (N.D. Cal. 2017), **Tesla did just that**.  In particular, Tesla issued

15  several risk disclosures in its Class Period SEC filings specifically relating to the timing for the release of

16  its FSDC technology.  Tesla specifically warned that it may "***experience . . . delays in launching and/or***

17  ***ramping . . . future features and services such as new Autopilot or FSD features*** and the autonomous

18  Tesla ride-hailing network," Ex. E at 14, and further that if its "products contain design or manufacturing

19  defects that cause them not to perform as expected or that require repair, or ***certain features of our vehicles***

20  ***such as new Autopilot or FSD features take longer than expected to become enabled***, . . . our ability to

21  develop, market and sell our products and services may be harmed," *id*. at 18.[8]  Tesla also warned of risks

---

5  To aid the Court, Defendants have prepared Appendix A, which identifies the alleged misstatements in the Complaint and the arguments applicable to each statement.

6  Further, many of Defendants' statements were caveated with language such as "it's going to be tight" and "it's not for sure" (¶ 331), and "I think probably sometime next year" (¶ 327).

7  *See* Ex. J (Apr. 24, 2019 Earnings Call) at 2; Ex. K (July 24, 2019 Earnings Call) at 2; Ex. L (Oct. 23, 2019 Earnings Call) at 2; Ex. M (Apr. 29, 2020 Earnings Call) at 2; Ex. N (July 22, 2020 Earnings Call) at 2; Ex. C (Oct. 21, 2020 Earnings Call) at 2; Ex. O (Jan. 27, 2021 Earnings Call) at 2; Ex. P (Jan. 26, 2022 Earnings Call) at 2; Ex. Q (Oct. 19, 2022 Earnings Call) at 2.

8  *See also* Ex. F at 18 ("For example, we are developing self-driving and driver assist technologies to rely on vision-based sensors . . . ***There is no guarantee that any incremental changes in the specific equipment***

1    that its software was "inherently complex and may contain latent defects or errors" and that efforts to

2    remedy those issues "*may not be timely*." *Id.* Thus, dismissal is required. *See In re Infonet Servs. Corp.*

3    *Sec. Litig.*, 310 F. Supp. 2d 1080, 1091–92 (C.D. Cal. 2003) (dismissing claim where cautionary language

4    addressed risks at issue).

5         Musk further explicitly clarified during Tesla earnings calls that being "feature complete" with

6    FSDC features meant only that "it has some chance of going from your home to work, let's say, with no

7    interventions. . . . [I]t doesn't mean the features are working well, but it means it has above 0 chance,"

8    Ex. R (Jan. 29, 2020 Earnings Call) at 6, and that despite this possibility, all drives need to be "supervised."

9    Ex. L at 10. Musk also disclosed the difficulties with developing the FSDC technology, stating, for

10   example, that he has "never really seen more kind of false dawns, or where it seems like we're going to

11   break through but we don't, as I've seen in full self-driving," Ex. H at 4, and that working towards FSDC

12   technology is "one of the hardest technical problems that exists," Ex. S (Apr. 26, 2021 Earnings Call) at 2.

13        Recognizing that Tesla's detailed cautionary language unequivocally shields Defendants' forward-

14   looking statements, Plaintiffs assert that the Safe Harbor does not apply for statements made through

15   October 16, 2021 because two October 16, 2018 court orders enjoined Musk and Tesla from "violation of

16   certain antifraud provisions of the securities laws." ¶¶ 457–59. Plaintiffs misstate both the orders and the

17   law. The Safe Harbor exclusion on which Plaintiffs rely only applies if the *issuer* has been the subject of

18   a governmental action from which an order barring violations of *antifraud provisions* of the securities laws

19   arose. *See* § 78u-5(b)(1)(A)(ii). Musk is not an issuer (*see* § 78c(a)(8)); any order against him is therefore

20   irrelevant to the applicability of the Safe Harbor. *Id.* And Judge Nathan's order (Ex. T) only enjoins

21   Tesla—the issuer—from violations of Rule 13a-15, which is *not* an antifraud provision, but rather a

22   controls and procedures provision. *See, e.g.*, *S.E.C. v. McNulty*, 1996 WL 422259, at *7 (S.D.N.Y. July

23   29, 1996) ("Section 13(a), like § 13(d)(1), is a reporting, and not an anti-fraud, provision"); *see also*

24   *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1325 (11th Cir. 2019) (Rule 12b-20 not an antifraud provision

25   because, like Rule 13a-15, it lacks scienter requirement).

26        Even were Plaintiffs correct that the Safe Harbor does not apply here (they are not), the Bespeaks

27

28   *we deploy in our vehicles over time will not result in initial functional disparities from prior iterations*
     *or will perform as expected in the timeframe we anticipate, or at all.*").

1   Caution Doctrine—which similarly provides protection for optimistic projections accompanied by

2   cautionary language—shields *all* of Defendants' forward-looking statements from liability, including

3   statements made in tweets and during interviews and industry conferences.  ¶¶ 313–14, 317, 321, 327, 329,

4   331, 333, 335, 339, 341, 343, 347, 349, 351, 353, 357, 369.  *See In re Splash Tech. Holdings, Inc. Sec.*

5   *Litig.*, 2000 WL 1727377, at *10 (N.D. Cal. Sept. 29, 2000) (Bespeaks Caution Doctrine protects oral

6   forward-looking statements when cautionary statements were in SEC filings).  Indeed, because Tesla's

7   SEC filings were "formal documents of considerable legal weight," any allegedly misleading forward-

8   looking statements made "in less formal press releases and interviews which were all closely proximate in

9   time to" those filings "may be fairly limited by cautionary statements contained in" Tesla's Class Period

10   SEC filings.  *Infonet*, 310 F. Supp. 2d at 1092–93.

11      ***Second***, Defendants' Timeline Statements that FSDC technology "appear[ed] to be on track"

12   (¶ 331), would be available "aspirationally end of this year" (¶ 333), and that Tesla was "***aiming to release***

13   this year" (¶ 347) are classic "[s]tatements of mere corporate puffery, vague statements of optimism,"

14   which are not actionable because "professional investors, and most amateur investors as well, know how

15   to devalue the optimism of corporate executives."  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical,*

16   *Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014); *see also In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d

17   848, 854 n.8 (N.D. Cal. 2017) ("[O]ptimistic statements indicating that a company is 'on track' to meet a

18   certain goal are, without more, inactionable puffery."); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F.

19   Supp. 3d 737, 757–58 (S.D.N.Y. 2018) (statements of confidence regarding FDA approval timeline puffery

20   because they "do no more than place a positive spin on developments in the" approval process).[9]  Further,

21   the Timeline Statements are *all* immaterial and inactionable in light of Defendants' extensive and specific

22   risk disclosures throughout the Class Period.  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 977

23   (9th Cir. 1999) (misstatements not actionable where truth disclosed as part of "total mix of information").

24      ***Third***, the Timeline Statements are opinion statements because they are not "subject to objective

25   verification."  *Or. Pub. Emps.*, 774 F.3d at 606; *Aratana*, 315 F. Supp. 3d at 758 ("Statements that express

26   expectations about the future rather than presently existing, objective facts are also statements of

27

28

---

[9]  *See also* ¶¶ 329, 343.

1    opinion."); *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004). Thus,

2    there are "substantial limits" to asserting securities claims for these "statement[s] of honest *opinion*."

3    *Wochos*, 985 F.3d at 1188–89 (emphasis in original) (citing *Omnicare, Inc. v. Laborers Dist. Council*

4    *Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)). Specifically, opinions "are actionable only if the

5    statement is not genuinely believed, there is no reasonable basis for that belief, or the speaker is aware of

6    undisclosed facts that seriously undermine the accuracy of the statement." *In re Leapfrog Enter., Inc. Sec.*

7    *Litig.*, 200 F. Supp. 3d 987, 1009 (N.D. Cal. 2016); *see also Wochos*, 985 F.3d at 1196 ("great progress" is

8    false "only if . . . Tesla had been 'making no progress at all'").

9         Here, Plaintiffs set forth no allegations establishing that Defendants' opinions in the Timeline

10   Statements were not subjectively held or that there was no reasonable basis for their beliefs as *Omnicare*

11   requires. Indeed, the Complaint contains no allegations of subjective falsity—Plaintiffs do not allege any

12   facts showing that Musk disbelieved the anticipated timeline for further FSDC capabilities. Instead,

13   Plaintiffs rely upon unnamed CWs—none of whom are alleged to have communicated with Musk or been

14   responsible for the engineering of FSDC software—to speculate that Defendants were aware of certain

15   alleged risks and hurdles to the development of FSDC. *Infra* at § II(A). Plaintiffs similarly allege that a

16   March 9, 2021 memo establishes falsity of the Timeline Statements (¶¶ 232–33) because it purportedly

17   demonstrates that certain Tesla employees could not guarantee that Tesla would reach "Level 5" autonomy

18   by the end of the year. Neither of these sets of allegations render Musk or Tesla's opinions misleading.

19        The CW allegations purport to identify certain "issues" supposedly undermining Defendants'

20   projected timeline, but Plaintiffs do not actually explain why these "issues" contradict Defendants'

21   projections. For example, Plaintiffs allege that CW-1 "estimated that approximately 30-40% of the

22   autopopulated images he reviewed included errors" (¶ 240) but do not allege that this issue—or any other

23   purported issue—was not actively being worked on such that Defendants could reasonably believe they

24   could meet their projected timeline. *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364,

25   405 (S.D.N.Y. 2006) (holding it "was well within reason to have an optimistic outlook about its new

26   products" when company was attempting to fix its technological problems); *see also In re NVE Corp. Sec.*

27   *Litig.*, 551 F. Supp. 2d 871, 894 (D. Minn. 2007) (statements regarding development of technology "must

28   be viewed in light of the fact that [FSDC] is an innovative and developing technology."). Indeed, the ***only***

CW allegation related to the FSDC timeline is CW-2's allegation that "it was known within Tesla that Defendant Musk's public statements that Tesla was on the cusp of releasing Level 4-5 automation were misleading" (¶ 247), but there is no allegation such information was shared with Musk. This is critical because "it is the facts known to, and the intent of, the maker of the statements which is ultimately relevant when the Court considers the falsity of statements of belief or opinion." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Further, far from supporting falsity, the DMV memo undermines it. The memo explains that "Elon's messaging about L5 capability by the end of the year" was based on "***extrapolating on the rates of improvement***" (¶ 232), which is precisely what Musk told investors was the basis for his confidence in the development timeline for FSDC, *see* ¶ 357 ("I'm confident based on my understanding of the technical road map and the ***progress that we're making between each beta iteration***"). Notably, the memo does ***not*** say that anyone at Tesla thought Musk's extrapolation was unreasonable, only that they "couldn't say" for sure whether the improvement would reach Level 5 by the end of the year. ¶ 232. In any event, even if the opinions of these CWs and Tesla employees were somehow relevant, they would constitute, at most, "fact[s] cutting the other way," which are insufficient to establish a false statement of opinion. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 615 (9th Cir. 2017).

***Fourth***, Plaintiffs do not establish the falsity of Defendants' Timeline Statements that Tesla would achieve "***feature complete***" status. ¶¶ 313, 314, 317, 327. Musk disclosed that "feature complete" "doesn't mean the features are working well, but it means it has above 0 chance" of a no-intervention drive. Ex. R at 6. Musk disclosed further that "you'll still need to supervise the autonomy," and that following reaching "feature complete" status, Tesla would execute "billions of miles of testing . . . and then sometime thereafter, we'll be able to convince the regulators that the autonomy is safe enough that the car could actually go around with no one in it." ¶ 327. Plaintiffs have not alleged that FSDC was not "feature complete" as Musk described it at any point during the Class Period.

***Fifth***, Plaintiffs allege that certain letters Tesla sent to the DMV in late 2020 establish falsity of the Timeline Statements because they state that Tesla's City Streets[10] feature of FSDC, which was in beta

---

[10]   As disclosed by Tesla, "City Streets" refers to Autosteer on City Streets (Beta), a feature of FSDC. *See* Ex. A.

testing, would not reach Level 3+ autonomy before being released to the entire Tesla fleet.  ¶¶ 28, 227–31, 421.  But Plaintiffs are conflating Tesla's intention to develop higher level autonomy in general and Tesla's statement that the City Streets feature specifically would not reach higher levels of autonomy before being released from beta testing to the general public.  That City Streets was not intended to reach Level 5 autonomy when released to the general public for the first time does not render false Defendants' statements about working toward full self-driving.  Musk disclosed that once Level 5 was achieved, extensive testing would still be required before a broad release.  *E.g.*, ¶ 327.  In any event, these letters were made public no later than March 2021, meaning the market was aware of City Streets' capabilities.[11]

     ***Finally***, Plaintiffs' "expert analysis" does not establish the contemporaneous falsity of the Timeline Statements.  Plaintiffs devote ***12 pages*** of their Complaint to vague and generalized analysis from an unnamed "expert" who purports to identify "functionality, operability, dependability, and performance aspects that needed to be addressed by Tesla before Level 4-5 autonomy could be released."  ¶ 266.  To start, Plaintiffs make no effort to tie these expert allegations to the alleged falsity of Defendants' statements.  And in any event, Plaintiffs' expert does not opine that it was impossible to meet Defendants' projected timeline for "Level 5" FSDC release, nor does the expert set forth a single allegation that any of the aspects of the FSDC feature he analyzed were not being worked on throughout the Class Period.  *See* ¶¶ 260–302.

## B.  Defendants' Safety Statements Were Not False or Misleading

     Plaintiffs allege that the Safety Statements (¶¶ 314, 319, 325, 337, 341, 353, 359, 363, 365, 367) were false because they conveyed that Tesla "already had full self-driving technology that was able to safely drive itself" while Tesla allegedly "did not have an autonomous driving system that was safer than human drivers."  ¶ 354.  Plaintiffs rely on Musk's "admission" that FSDC technology was not yet "safer than a human," hearsay from CWs, third-party research that post-dates the Class Period, and a scattered collection of accidents that purportedly occurred in Teslas with ***autopilot*** enabled.  These allegations fail.

     ***First***, Musk's statement on January 26, 2022 that he would "be shocked if we do not achieve full self-driving safer than a human this year" (¶ 386) does not contradict any Safety Statements.  To the contrary, Musk's "admission" is consistent with his statement on January 27, 2021 that Tesla was on a

---

[11]  For the same reasons, the DMV letters do not support an inference of scienter.

1    "*path* towards a vehicle that *will drive* 100% safer than a person." Ex. O at 8.  Further, the vast majority

2    of the Safety Statements do not even reference FSDC technology, they reference Tesla's Autopilot features.

3    *E.g.*, ¶ 319 ("what we see right now is that *autopilot* is about twice as safe as a normal driver on average");

4    *see also* ¶¶ 337, 359.  As Tesla disclosed in its SEC filings and on its website (*e.g.*, Exs. A, E), Autopilot

5    and FSDC are distinct features, and Plaintiffs do not explain how Musk's "admission" regarding FSDC—

6    which was consistent with prior statements—is relevant to statements about Autopilot.

7           *Second*, the *only* statements that even come close to addressing FSDC as compared to a human are

8    actually Timeline Statements that merely address the likely safety features of the FSDC technology *in the*

9    *future* and are thus forward-looking statements.  *E.g.*, ¶ 353 (FSDC "*will work* at a safety level well above

10    that of the average driver *this year*");[12] ¶ 341 ("We'll *probably roll it out later this year.*  But we'll be able

11    to do traffic lights . . . everything pretty much.  So it's definitely way better than human . . . .").  These

12    statements are inactionable under the PSLRA Safe Harbor and the Bespeaks Caution Doctrine because they

13    were surrounded by meaningful cautionary language, including that Tesla's software was "inherently

14    complex and may contain latent defects or errors" and that efforts to remedy those issues "may not be

15    timely" (*e.g.*, Ex. E at 18), and that Tesla's "vehicles have been involved and we expect in the future will

16    be involved in accidents resulting in death or personal injury, and such accidents where Autopilot or FSD

17    features are engaged are the subject of significant public attention" (*id.*).  *See also supra* at § I(A) (detailing

18    cautionary language specifically relating to timing for development of FSD).

19           *Third*, Defendants' statements that safety "is paramount" to Tesla (¶ 325), Teslas are "absurdly

20    safe" (*id.*), autopilot is "superhuman" (¶ 337), and "we want to get to as close to perfection as possible"

21    (¶ 363)—most of which do not mention FSDC—are inactionable puffery.  *See In re Ford Motor Co. Sec.*

22    *Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (safety statements are puffery because "[a]ll public companies

23    praise their products and their objectives"); *see also Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d

24    199, 231–32 (S.D.N.Y. 2018) (statements about prioritizing safety were inactionable puffery).  The Safety

25    Statements are also immaterial due to Defendants' extensive risk disclosures.  *Supra* at § I(A).

26

27    ───────────────────────

       [12]  Musk's statement that FSD "will work at a safety level well above that of the average driver this year,

28    of that I am confident" (¶ 353) is also an inactionable opinion because Plaintiffs fail to set forth allegations
       establishing that Defendants' beliefs were not subjectively held.  *Supra* at § I(A); *see also* ¶¶ 319, 325, 365.

**Finally**, instead of particularized allegations of fact establishing *why* the Safety Statements were false when made, Plaintiffs set forth a catalog of purported safety issues extracted from third-party research articles (most of which post-date the Class Period), none of which identify specific issues at specific times relative to the alleged false statements and thus do not suffice to establish falsity.  *See* ¶¶ 186–223; *see, e.g.*, *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019) (dismissing claims where plaintiff "fail[ed] to connect the statements with factual allegations that show how the statements were false or misleading when made").  Plaintiffs simply make no effort to explain *why* these articles render the Safety Statements false at the time, and even if they did, the articles would fall short.  The articles make general assertions divorced from the allegations in this case and reach conclusions that when utilizing *Autopilot*, "people looked away from the road 18% more often" (¶ 197); that the *Autopilot* features "caused" at least ten car accidents (¶¶ 204–05); and that during some unspecified period of time, Tesla received complaints about its driver assistance technology (¶¶ 215–19).  But these allegations—even if credited—merely show that driving with FSDC or Autopilot enabled did not render driving *riskless*.  They do not demonstrate that driving with FSDC or Autopilot enabled was not safe or less safe than driving without those features enabled.[13]  *See In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at *2 (C.D. Cal. Jul 7, 2011) ("[I]t is not necessarily inconsistent to assert that quality is stable or even increasing on the whole, while being aware of a potentially significant defect.").  Indeed, these anecdotal incidents demonstrate, at most, that certain drivers ignored Tesla's warnings that its FSDC and Autopilot features "require active driver supervision."  *Supra* at 3.

### C.    Defendants' Capability Statements Were Not False or Misleading

Plaintiffs allege as false Defendants' Capability Statements regarding the FSDC technology and Musk's experience with the technology (¶¶ 323, 343, 345, 347, 351, 355, 357, 361, 369) because the statements allegedly conveyed that Tesla's software was capable of no intervention drives when "Tesla was not on the cusp of releasing a system that could safely drive itself."  ¶ 346.  These allegations fail.

To start, Defendants' statements convey only that the current software, for which a "limited beta" version was being released during the Class Period (¶ 345) was *capable* of driving without human

---

[13]    This is particularly true given that the Safety Statements convey only that safety is enhanced when driving assistance is *enabled* alongside a driver, not without human oversight.  *E.g.*, ¶ 365.

intervention (itself a feat), not that it was yet safe to do so or that no interventions were required when the functionality was enabled. To the contrary, Defendants disclosed that the FSDC features "*require active driver supervision and do not make the vehicle autonomous*." Ex. A at 1–2 (Autopilot and FSDC features "are intended for use with a fully attentive driver, who has their hands on the wheel and is prepared to take over at any moment."); *see also* Ex. B at 4. Purported safety issues have nothing to do with whether FSDC was *capable* of an "LA/NY Autopilot journey" (¶ 323) or "zero intervention drives" (¶ 345), and Plaintiffs have not set forth any allegations establishing that the software was *not* capable of no intervention drives at the time these statements were made. *See also* ¶ 355 ("it's common for me to have no interventions on drives that I do"); ¶ 351 ("many times I can go through a very complicated series of intersections and narrow roads, without ever touching any of the controls"). Further, Musk's statements that FSDC was "capable" of zero intervention drives does not convey that it *always* completes zero intervention drives— indeed, Musk told investors only that it was "*common* for me to have no interventions on drives that I do . . . it's *more common than not* for the car to have no interventions[.]" ¶ 355. This statement conveys, at most, only that more than half the time, Musk completed zero intervention drives. There is nothing misleading about the "impression" that FSDC was capable of zero intervention drives.

Plaintiffs also assert in a conclusory fashion that these statements were false because they "misrepresented the status of Tesla's development of Level 4-5 autonomous driving systems" and "misrepresented the safety of Tesla's autonomous driving systems." ¶ 352. But "the reasons [p]laintiffs offer as to why the statements are false or misleading bear no connection to the substance of the statements themselves, and the Complaint does not contain any particularized allegations demonstrating that any of the statements was materially false or misleading." *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017). For example, Plaintiffs challenge Musk's tweet that "investors are giving us significant credit for achieving self-driving" because Tesla's self-driving "was not able to drive itself at a safety level greater than humans" (¶¶ 361–62), but Musk's tweet did not say anything about safety relative to humans or otherwise. In any event, Musk disclosed that Tesla was merely on a "*path* towards a vehicle that *will drive* 100% safer than a person" on January 27, 2021, before *any* corrective disclosure. Ex. O at 8.

#### D.    Plaintiffs Fail to Plead a Duty to Disclose

Plaintiffs allege that Tesla's Class Period SEC filings violated 17 CFR § 229.303 ("Item 303") and 17 CFR § 229.303 ("Item 105") because the MD&A section of those filings omitted to disclose "the risk that Tesla's promotion of its autonomous driving technology as making cars self-driving . . . heightened the dangers posed by Tesla's customers insufficiently monitoring the operation of the cars, which could lead to crashes and/or adverse regulatory action." ¶ 375.  This argument fails.

Item 303 requires issuers to "[d]escribe any known trends or uncertainties that have had or are reasonably expected to have a materially favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303.  Plaintiffs have not adequately alleged that the "promotion" of the FSDC technology constituted a "known trend or uncertainty" requiring disclosure under Item 303.  Indeed, it is unclear what "trend" Plaintiffs claim should have been disclosed, particularly given Tesla's robust risk disclosures about the risk of regulatory action throughout the Class Period (*e.g.*, Ex. E at 24–25) and the risks attendant with the development of new technology, including car crashes, as discussed above.  *See, e.g.*, *In re Netflix, Inc., Sec. Litig.*, 923 F. Supp. 2d 1214, 1221 (N.D. Cal. 2013) ("Plaintiffs' pleadings do not actually show that Defendants withheld information about a known trend or uncertainty in the streaming market, since Defendants repeatedly stated that success in the streaming market depended on multiple factors").[14]  Plaintiffs' Item 105 claim similarly fails.  Item 105 requires a "discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.  Plaintiffs' 105 claim fails for the same reason as Plaintiffs' Item 303 allegations.  *See Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *10 (C.D. Cal. Jan. 25, 2021) (dismissing Item 105 claims for same failures requiring dismissal of Item 303 claims); *Golubowski v. Robinhood Mkts.*, 2023 WL 1927616 at *8 (N.D. Cal. Feb. 10, 2023) (no Item 105 claim where risk expressly disclosed).

### II.    PLAINTIFFS FAIL TO PLEAD SCIENTER

To plead scienter under the PSLRA, Plaintiffs "must [allege] specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir.

---

[14]  Nor do Plaintiffs allege the risk of customers not paying sufficient attention were known to Defendants. *See infra* at § II(A).

1    2008); *see also Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (scienter requires

2    "specific facts indicating no less than a degree of recklessness that strongly suggests actual intent."); *City*

3    *of Dearborn Heights*, 856 F.3d at 619 ("mere recklessness" is insufficient to plead scienter).  It is not

4    enough to allege facts from which an inference of scienter "could be drawn"; Plaintiffs must "plead with

5    particularity facts that give rise to a 'strong'—i.e., a powerful or cogent—inference," *Tellabs, Inc. v. Makor*

6    *Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007), that "a reasonable person would deem . . . *cogent and at least*

7    *as compelling* as any opposing inference," *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th

8    Cir. 2009) *as amended* (Feb. 10, 2009) (emphasis in original).

9        **A.    Plaintiffs Fail to Plead Knowledge of Falsity or Deliberate Recklessness.**

10        Because the majority of statements alleged by Plaintiffs to be misleading are forward-looking (*see*

11    *supra* at § I(A)-(B), Plaintiffs must adequately plead that these statements were made with actual

12    knowledge that they were false; recklessness does not suffice.  *See, e.g.*, *CheckOut Holdings, LLC v.*

13    *Amplified Holdings, Inc.*, 64 Fed.Appx. 631, 632 (9th Cir. 2003).  But Plaintiffs do not allege with

14    specificity any actual knowledge by Musk (or anyone else whose scienter could be imputed to Tesla) of

15    information rendering any disclosure to investors false.  Absent is any allegation that Musk received a

16    report or attended a meeting where he was informed that his optimistic projections for FSDC were unlikely,

17    let alone impossible.

18        As described above, Plaintiffs rely on "expert analysis" (¶¶ 260–302) and the opinions of former

19    Tesla employees (¶¶ 235–59), none of which come anywhere close to establishing "that Defendants *knew*

20    their [] goal was *impossible* to achieve."  *Wochos*, 985 F.3d at 1194.  *Wochos* is instructive—there, the

21    plaintiffs cited statements by former Tesla employees who allegedly told Musk that they thought Tesla's

22    goal was unattainable because "there was zero chance that the plant would be able to produce 5,000 Model

23    3s per week by the end of 2017."  *Id.* at 1186.  The Ninth Circuit held that the plaintiffs "failed to plead

24    that Defendants *knew* their year's end goal was *impossible* to achieve" because no specific pleaded facts

25    showed that Tesla or Musk "shared," "adopted," or "accepted those employees' views that the goal was

26    impossible."  *Id.* at 1194.  Plaintiffs' allegations here are even more inadequate than those that failed in

27    *Wochos*, as they rely on generalizations and hearsay of what was known to "everyone" at the Company

28    and do not include any allegations of direct conversations with Musk.  Indeed, each category of scienter

1  allegation is insufficient to establish scienter under an actual knowledge or even a recklessness standard.

2  **Tracking and Data:**  Plaintiffs allege Tesla's "data collection and monitoring of Tesla vehicles

3  through its software" should have alerted Musk and the Company that their representations to the market

4  were misleading.  ¶¶ 409–19.  Specifically, Plaintiffs allege Tesla had access to data from a million

5  intersections (¶ 409), analyzed accidents that occurred (¶ 410), and documented safety issues with a

6  software program called Jira (¶ 411).

7  But Plaintiffs fail to make any specific allegation of what data was collected, what it showed that

8  was contrary to public statements or when, and how (if at all) Musk had access to such data.  *See, e.g.*,

9  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("Although plaintiffs refer to the

10  existence of the IMS data and make a general assertion about what they think the data shows, plaintiffs do

11  not allege with particularity any specific information showing" the internal data contradicted defendants'

12  public statements); *Zucco*, 552 F.3d at 1000 ("allegations that senior management . . . closely reviewed the

13  accounting number generated . . . each quarter, and that top executives had several meetings in which they

14  discussed quarterly inventory numbers" fall short of establishing a strong inference of scienter).  Tesla may

15  analyze its vehicles' performance, but Plaintiffs offer no explanation as to how that would have led Musk

16  to the conclusion that his statements to the market were false.  Nor could they, because "negative

17  characterizations of reports relied on by insiders, without specific reference to the contents of those reports,

18  are insufficient to meet the heightened pleading requirements of the PSLRA."  *Lipton*, 284 F.3d at 1036.

19  **Confidential Witnesses:**  Plaintiffs' confidential witnesses add no additional specificity sufficient

20  to plead that any statement was knowingly false when made.  CW-1 worked at Tesla for a short period

21  between May and November 2021 (¶ 263), and thus had no access to any information concerning the status

22  of the FSDC technology for the vast majority of the Class Period.  *Lechner v. Infusystem Holdings, Inc.*,

23  2017 WL 11593803, at *5 (C.D. Cal. Dec. 15, 2017) (rejecting allegations that "pre- or post-dated FE1's

24  three-month employment").  In any event, CW-1's allegations that "accident and safety data was reviewed

25  by Tesla" (¶ 237) and there were errors in Tesla's autopopulated images (¶ 240) does not articulate what

26  specific contrary information Musk or Tesla had at the time of any purported misstatement.

27  "CW-2," a Mobile Service Technician, asserts that it was widely known in the autopilot department

28  that there would not be full self-driving anytime in the near future.  ¶ 415.  Plaintiffs do not allege what

data led the unspecified members of that department to that conclusion nor that Musk shared such a view or was even aware of the opinions of those within the department doubting the timeline. CW-2 therefore lacks "reliable personal knowledge of the defendants' mental state." *Zucco*, 552 F.3d at 998; *see Intuitive Surgical*, 759 F.3d at 1062 (rejecting "impressions of witnesses who lacked direct access to the executives"); *Applestein v. Medivation, Inc.*, 561 Fed. Appx. 598, 601 (9th Cir. 2014) ("there is no allegation that any CW relayed this information to any defendant"). Hearsay allegations regarding what "everyone in the department" believed fall short. *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1207 (D. Or. 2006), *aff'd*, 552 F.3d 981 (9th Cir. 2009).

"CW-3," a software engineer who worked at Tesla for some unspecified period "before 2020 and through at least the end of that year" (¶ 248), similarly offers no allegations of specific data Musk had access to that contradicted his statements, instead making the unremarkable accusation that during his time at the Company, there were issues with the FSDC prototypes that needed to be worked out. *Lululemon*, 14 F. Supp. 3d at 581 (FEs "thoughts and opinions as to various quality issues . . . do not establish what specific contradictory information the makers of the statements had and the connection . . . between that information and the statements"). CW-3 alleges that Musk had meetings with the "top brass" (¶ 250), received "reports and updates during regular meetings regarding the team's work" (¶ 252), "met with the Engineering team's leaders regularly to discuss the autopilot stack" (*id.*), discussed "regressions" with directors (*id.*), and sometimes looked over engineers' shoulders as they coded (*id.*). These allegations offer no detail regarding what the reports reflected or when, who specifically attended the referenced meetings, or what was discussed at the meetings and when. *See, e.g.*, *In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *12 (N.D. Cal. Mar. 10, 2006) (allegations insufficient where plaintiffs "failed to cite to any specific report, [or] to mention any dates or contents of reports" and allegations of "defendants' attendance at meetings and their 'hands-on' managerial style" were insufficient); *Intuitive Surgical, Inc.*, 759 F.3d at 1063 (confidential witness failed to "detail the actual contents of the reports the executives purportedly referenced or had access to," and witnesses "lack[ed] first hand knowledge regarding what the individual defendants knew or did not know about Intuitive's financial health"). The Complaint lacks allegations that Musk attended meetings where he was informed that his projections for FSDC were impossible or inaccurate. Further, CW-3 is not alleged to have attended any meeting with Musk and therefore lacks the

1  "reliability and personal knowledge" required to credit CW assertions.  *Zucco*, 552 F.3d at 995–96.

2  CW-3 further alleges that "if there was a major regression regarding safety, operations, or driver

3  comfort, then Moore and Elluswamy would have been the first to know," and Moore and Elluswamy

4  "reported directly to Musk and frequently met with Musk," implying that information would have made its

5  way up the chain to Musk.  ¶ 255.  Missing, however, is any allegation that there was a "major regression"

6  or when that occurred, and alleging that information "would have" made its way up the chain cannot create

7  a strong inference of scienter.  *See Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp.*

8  *Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010) ("[B]land assertions that they 'would have received' such

9  information offer nothing concrete and are not allegations of fact."); *Palm Harbor Special Fire Control &*

10  *Rescue District Firefighters Pension Plan v. First Solar Inc.*, 2023 WL 4161355, at *4 (D. Ariz. June 23,

11  2023) (allegations that information "would have been reviewed" by defendants insufficient).  And even if

12  Musk received reports of regressions regarding safety or operations (which Plaintiffs do not allege), "it is

13  not necessarily inconsistent to assert that quality is stable or even increasing on the whole, while being

14  aware of a potentially significant defect."  *Toyota*, 2011 WL 2675395, at *2.

15  ***Core Operations:***  Plaintiffs attempt to rely on a core operations theory of scienter, alleging that

16  because alleged misstatements related to Tesla's "core" business, Defendants must have known of any

17  falsity.  ¶ 404.  Proceeding under such a theory is "not easy."  *Intuitive Surgical*, 759 F.3d at 1062.  Plaintiffs

18  "must produce either specific admissions by one or more corporate executives of detailed involvement in

19  the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that

20  executives had actual involvement in creating false reports."  *Id.*  Plaintiffs set forth neither.

21  *First*, Plaintiffs' allegation that self-driving was touted as "essential" (¶ 404) fails to plead the facts

22  necessary for a core operations theory.  *See, e.g., Carr v. Zosano Pharm. Corp.*, 2021 WL 3913509, at *12

23  (N.D. Cal. Sept. 1, 2021) (allegations that product "was the only product in [defendant]'s pipeline that

24  presented any opportunity for profitability," company "focused on a single product," and the company was

25  otherwise "in a dire financial position throughout the Class Period," insufficient); *NVIDIA*, 768 F.3d at

26  1064 (rejecting core operations theory even when "the problem concerned [NVIDIA's] flagship product

27  and was cause for concern to [NVIDIA's] two largest customers").  This is not one of the "exceedingly

28  rare" situations in which the staggering amount of a loss or some other comparable fact would have

indisputably been known to senior executives.[15] *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1068 (N.D. Cal. 2012). Rather, this is a highly complex state-of-the art technology being developed on a daily basis. *See Intel*, 2023 WL 2767779, at *24 (rejecting allegation that "Intel's 7nm development was of great importance to the company and to investors").

*Second*, Plaintiffs fail to allege Musk's involvement in the minutiae of the timeline for specific benchmarks in self-driving. Instead, Plaintiffs point to general statements from Musk that he speaks with the engineering team each week (¶ 405), has "a deep understanding of where [Tesla is] and where [it's] heading" (*id.*), and spends a significant amount of time on "next-generation products" (¶ 407).[16] None of these statements admits involvement in the minutiae of specific safety developments or operational difficulties. "Pointing to Defendants' statements . . . does not suffice under this theory" and cannot substitute for "specific admissions." *In re Nektar Therapeutics*, 2020 WL 3962004, at *12 (N.D. Cal. July 13, 2020); *see also Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 2020 WL 1244936 at *11 (N.D. Cal. March 16, 2020) (core operations requires admissions of "Individual Defendants' detailed involvement with this level of secondary data, as opposed to higher-level information").

*Third*, none of Plaintiffs' allegations attributed to the confidential witnesses establish that Musk had access to information or participated in preparing reports contrary to his public statements. *See supra* at 17-19. Without such allegations, Plaintiffs' theory of core operations fails. *Intuitive Surgical*, 759 F.3d at 1063 (core operations not pleaded where "witness statements [] lack foundation because they do not detail the actual contents of the reports the executives purportedly referenced or had access to.").

**Representations Regarding Musk's Involvement in FSDC:** Plaintiffs also allege that Musk's own representations about his involvement in FSDC indicate scienter. ¶¶ 405–08. But alleging an executive's "involvement" in the business is insufficient to establish scienter without alleging specific contrary data or information to which Musk had access. *See, e.g., In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) ("plaintiffs must do more than allege that these key officers had the requisite knowledge

---

[15]   Statements such as "Full Self-Driving will become the most important source of profitability for Tesla" (¶¶ 8, 52–58) similarly fail without more specific allegations of involvement in the minutia of the Company or in creating the false reports. *Intuitive Surgical*, 759 F.3d at 1062.

[16]   Even if Musk was aware of progress in FSDC development, that does not equate to knowledge of any information contradicting his statements, and Plaintiffs allege no such information. *See supra* at 17-19.

1    by virtue of their 'hands on' positions"); *Metzler*, 540 F.3d at 1068 ("[C]orporate management's general

2    awareness of the day-to-day workings of the company's business does not establish scienter—at least

3    absent some additional allegation of specific information conveyed to management and related to the

4    fraud."). Particularly absurd is Plaintiffs' argument that Musk's "[s]tatements [t]hemselves" suggest

5    scienter (¶ 408), which would effectively eliminate the scienter element from an Exchange Act claim.

6         ***2014 and 2016 Promotional Videos:*** Plaintiffs also point to Musk's participation in promotional

7    videos in 2014 and 2016 demonstrating certain autonomous driving features, alleging the staging of these

8    videos to eliminate problems before filming demonstrates Musk's awareness that his statements years later

9    were false. ¶¶ 69, 70, 422. Plaintiffs do not allege how the 2014 video supports an inference of scienter,

10   with the only allegation regarding that video being that Musk took his hands off the wheel and said "no

11   hands." ¶ 70. And any efforts to improve the technology behind the scenes prior to the 2016 video, which

12   pre-dates the Class Period by three years, says nothing about the capabilities of the rapidly evolving

13   technology years later or Musk's knowledge of the same. *In re Silicon Storage Tech., Inc., Sec. Litig.*,

14   2007 WL 760535, at *27 (N.D. Cal. Mar. 9, 2007) ("allegations relating to inventory management prior to

15   the class period do not show defendants' scienter with regard to statements made during the class period").

16        ***Previous Allegations of Securities Law Violations:*** Plaintiffs argue that Musk has been alleged to

17   have made misstatements to the market in other actions. Specifically, Plaintiffs point to another court's

18   summary judgment finding that Musk's "funding secured" tweet (related to an effort to take Tesla private)

19   was misleading. ¶ 423. But a prior finding about a tweet entirely unrelated to this case (that a jury did not

20   impose liability for) is irrelevant to whether any of these statements on a different subject were made with

21   scienter. *See. e.g.*, *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 400 (S.D.N.Y. 2022).

22        **B.    Musk's Stock Sales Do Not Suggest a Strong Inference of Scienter**

23        Plaintiffs allege that Musk's sales of Tesla stock during the Class Period suggest a motive to defraud

24   the market. ¶¶ 424–30. Not only are Musk's sales during the Class Period untethered from any of the

25   alleged misrepresentations, but Plaintiffs themselves offer an alternative, more plausible explanation for

26   the sales—Musk's purchase of Twitter.

27        ***First***, and critically, Plaintiffs have not made any effort to link the 41 pages of stock sales (ECF

28   No. 57-1) to any purported misstatement or corrective disclosure. Plaintiffs have not alleged that Musk

sold a significant amount of stock right after a purported misstatement or right before a corrective disclosure, and thus Plaintiffs' stock sale allegations add nothing to the scienter calculus.  *See, e.g.*, *In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1052 (N.D. Cal. 2007) (dismissing claim where "plaintiffs make no attempt to plead how the timing of any specific sale by any specific defendant is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions"); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("Because Plaintiff has failed to meet his burden of demonstrating that the stock sales are related to the alleged misstatements, he has failed to demonstrate a strong inference of scienter based upon" the sales).  In fact, all of the stock sales alleged by Plaintiffs occurred weeks or months before the soonest following corrective disclosure (*see* ECF No. 57-1), which adds nothing to the scienter calculus.  This is particularly true given the fact that Plaintiffs have alleged a ***four-year*** class period.  Stock sales over such a lengthy period of time must be specifically linked to the alleged fraud.  *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *35 (C.D. Cal. Apr. 14, 2015) (stock sales during long class period unrelated to misrepresentations do not contribute to scienter calculus).

    ***Second***, the timing of the alleged sales actually undermines any inference of scienter.  Plaintiffs do not allege a single stock sale by Musk for more than ***two years*** after the first alleged misstatement.  *See Lapiner v. Camtek, Ltd.*, 2011 WL 445849, at *7 (N.D. Cal. Feb. 2, 2011) (rejecting motive allegation where "all of the alleged sales occurred more than five months after the alleged misstatements began").  Further, the first stock sale alleged by Plaintiffs is ***after*** the first two alleged corrective disclosures.  *Yen Hoang, et al., v. Contextlogic, Inc., et al.*, 2023 WL 6536162, at *26 (N.D. Cal. March 10, 2023) ("[s]ales after corrective disclosures do not support an inference of scienter.").  Musk is also not alleged to have sold stock until 8 months after it became widely publicized that the City Streets FSDC feature would not exceed Level 2 autonomy before being released to the general public.  *See supra* at § I(A).

### C.    Plaintiffs' Other Motive Allegations Fail

    Plaintiffs' other motive allegations fare no better.[17]  ***First***, Plaintiffs allege Musk was incentivized to maintain Tesla's high stock price to fund his purchase of Twitter.  ¶¶ 435–42.  This allegation is no

---

[17]  In any event, allegations of motive and opportunity are not independently sufficient to establish scienter. *See City of Dearborn Heights*, 856 F.3d at 619.

1  different from general allegations that Musk had a motive to sell the shares at a high price to profit, which

2  are routinely rejected.  *See, e.g.*, *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096, at *16 n.8 (N.D. Cal.

3  Nov. 16, 2020) ("motives common to most corporate officers, such as the desire for the corporation to

4  appear profitable to keep stock prices high or a need for capital infusions, do not create a sufficient

5  inference of scienter"); *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (similar).  In fact, as

6  described below, this allegation supports an opposing, non-culpable inference.  *See infra* at § II(D).

7      ***Second***, Plaintiffs allege that the fact that Musk held loans collateralized by his shares of Tesla

8  stock supports motive.  ¶¶ 443–45.  Courts routinely reject this argument; indeed, this precise argument

9  has already been rejected when made against Musk himself in prior litigation.  *See Bao v. SolarCity Corp.*,

10  2015 WL 1906105, at *2 (N.D. Cal. Apr. 27, 2015) (scienter insufficiently pleaded even with allegations

11  that Musk had pledged the company's stock to secure a loan); *see also Johnson v. NYFIX, Inc.*, 399 F.

12  Supp. 2d 105, 114 (D. Conn. 2005) (CFO's pledge of company stock as collateral is insufficient to establish

13  motive because "loans secured with stock are analogous to stock ownership").

14      **D.    Plaintiffs Fail to Account for More Compelling, Non-Culpable Inferences**

15      Even if Plaintiffs' allegations warranted any inference of scienter, it would not be as compelling as

16  the non-culpable inference:  Tesla and Musk really were optimistic about the development of FSDC

17  features.  Indeed, Plaintiffs' own allegations demonstrate that Tesla employees were giving Musk a reason

18  to be optimistic.  For instance, the Complaint makes much of its allegations that Tesla "train[ed] its models

19  specifically to perform well" on routes often driven by Musk.  ¶ 247; *see also* ¶¶ 126, 127, 246.  But rather

20  than supporting scienter, the more plausible inference is that Musk—who is not alleged to have instructed

21  Tesla employees to focus on his routes—did personally have successful trips on his regular routes because

22  his employees were more focused on those routes, which in turn contributed to his optimism about FSDC.[18]

23      However, as often happens with the development of new technology, there were speed bumps in

24  the development of FSDC.  Musk and Tesla repeatedly disclosed these risks to investors (*see supra* at

25  § I(A)), and it is most plausible that they honestly believed they had sufficiently disclosed the risks

26  associated with the development of such cutting-edge technology.  *In re Bank of Am. AIG Disclosure Sec.*

27

28  ────────────────────
[18]  CW-2 claims he was instructed to "to focus on routes" "most driven by Defendant Musk."  ¶ 246.

1   *Litig.*, 566 F. App'x 93, 94 (2d Cir. 2014) (no scienter where more plausible inference was defendants "did

2   not think there was any need for public disclosure" in light of, among other things, existing disclosures).

3   "As the Ninth Circuit reasoned in an analogous circumstance, the 'detailed risk disclosure . . . negates an

4   inference of scienter.'"  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007).

5         Plaintiffs' inadequate allegations do not establish why Tesla or Musk would have sought to make

6   misrepresentations regarding issues with FSDC they purportedly knew would inevitably come to light

7   when FSDC did not meet the projected timelines.  *See Intel*, 2023 WL 2767779, at *25 (no scienter where

8   there was no motive for company to hide produce issues that would eventually come to light).  The far

9   more compelling inference is that they were truly optimistic about the projected timelines and features.

10        This inference is even more compelling when considering Musk's stock sales.  Plaintiffs' theory is

11  that Musk lied to investors starting in 2019 so that he could sell Tesla stock to purchase Twitter in 2022.

12  But Musk held his stock for two years while the alleged misstatements purportedly inflated Tesla's stock

13  price and only sold after Tesla had missed projected timelines and after multiple alleged corrective

14  disclosures.  Plaintiffs' "theory does not make a whole lot of sense."  *Nguyen v. Endologix, Inc.*, 962 F.3d

15  405, 415 (9th Cir. 2020) (scienter not adequately alleged where there was no motive for company to hide

16  issues that would eventually come to light).  Plaintiffs provide a more compelling inference:  Musk's sales

17  had no connection to any alleged effort to defraud, and many occurred because Musk was acquiring Twitter.

18  "This innocent, alternative explanation for the stock sales negates an inference of scienter."  *City of Royal*

19  *Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1069 (N.D. Cal. 2012).

20  **III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION**

21        To plead loss causation adequately, Plaintiffs must allege that "the misstatement or omission

22  concealed something from the market that, when disclosed, negatively affected the value of the security."

23  *In re Impax Labs., Inc. Sec. Litig.*, 2007 WL 5076983, at *3 (N.D. Cal. Jan. 3, 2007).  In an efficient market,

24  "a corrective disclosure must by definition reveal new information to the market that has not yet been

25  incorporated into the [stock] price."  *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir.

26  2022).  But Plaintiffs notably do not rely on, among other things, "the most compelling evidence that

27  Tesla's representations concerning the release of Level 4-5 autonomy were false"—Tesla's "admissions"

28  to the California DMV, *supra* at § I(A).  Instead, Plaintiffs rely on disclosures that do not reveal falsity,

1  including investigations and information already known to the market.

2      *First*, Plaintiffs rely on the NHTSA investigation (¶¶ 378–81), but "an investigation without more,

3  is insufficient to establish loss causation" because it "does not reveal fraudulent practices to the market."

4  *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014).

5      *Second*, Plaintiffs rely on over-the-air "recall" announcements (¶¶ 382–85, 397–402), which

6  Plaintiffs' Complaint makes clear are nothing more than software updates, but recalls are not corrective

7  disclosures because they do not reveal the falsity of any prior alleged misstatement, *Metzler Inv. GMBH v.*

8  *Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).  This is especially true here, where the

9  "recall" Plaintiffs claim was "corrective" was a voluntary recall via a software update addressing minor

10  aspects of the self-driving functionality—not a wholesale recall of the entire system.  And because Tesla

11  warned investors about the likelihood of recalls related to its software, such a disclosed risk cannot be a

12  corrective disclosure, *Yaron v. Intersect ENT, Inc*., 2020 WL 6750568, at *10 (N.D. Cal. June 19, 2020)

13  (failure to plead loss causation where loss stemmed from "known risks" rather than "hidden risk[s]"); *see*

14  *also Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021) (similar).

15      *Third*, Plaintiffs rely on Musk's January 26, 2022 statement that "I would be shocked if we do not

16  achieve full self-driving safer than human this year" (¶¶ 386–89), but that cannot serve as a corrective

17  disclosure because Defendants had ***never*** before stated that the FSDC technology was ***presently*** "safer than

18  a human."  *Supra* at § I(B).  Plaintiffs also fail to account for the other negative information that Tesla

19  released during the same earnings call, including that Tesla would not introduce new vehicle models that

20  year, and that Tesla continued to be constrained by supply chain issues.  *E.g.*, Ex. P at 3.  *See Metzler*, 540

21  F.3d at 1063, 1065 (no loss causation where earnings miss was "more plausible" cause for stock drop).

22      *Finally*, the June 3, 2022 letter from NHTSA sent to Tesla on May 4, 2022 relating to complaints

23  NHTSA received from Tesla drivers (¶¶ 390–96) is not a corrective disclosure because complaints alone do

24  not reveal the falsity of any prior alleged misstatement, *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017)

25  (plaintiffs cannot allege loss causation "merely by resting on a number of customer complaints and asserting

26  that where there is smoke, there must be fire.").

27                                    **CONCLUSION**

28      For the reasons discussed herein, Plaintiffs' Complaint should be dismissed with prejudice.

1
2  DATED:  November 6, 2023

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

3
4  */s/ Michael T. Lifrak*
Michael T. Lifrak (Bar No. 210846)
865 S Figueroa St., 10th Floor
5  Los Angeles, CA  90017
Telephone: (213) 443-3000
6  Fax: (213) 443-3100
michaellifrak@quinnemanuel.com
7
8  Alex Spiro (*pro hac vice*)
Jesse Bernstein (*pro hac vice*)
9  Brenna Nelinson (*pro hac vice*)
Leigha Empson (*pro hac vice*)
10  51 Madison Ave., 22nd Floor
New York, NY 10010
11  Telephone: (212) 849-7000
Fax: (212) 849-7100
12  alexspiro@quinnemanuel.com
jessebernstein@quinnemanuel.com
13  brennanelinson@quinnemanuel.com
leighaempson@quinnemanuel.com
14
15  *Counsel for Defendants*
16
17
18
19
20
21
22
23
24
25
26
27
28