United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS LAMONTAGNE, | Case No. 23-cv-00869-AMO |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION TO DISMISS** |
| TESLA, INC., et al., | Re: Dkt. No. 62 |
| Defendants. | |

This is a securities action case about Tesla's self-driving car technology. The matter is fully briefed and suitable for decision without oral argument. *See* Civil L.R. 7-1(b). Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the Court hereby **GRANTS** the motion to dismiss for the following reasons.

## BACKGROUND[1]

Lead Plaintiffs Oakland County Voluntary Employees' Beneficiary Association and Oakland County Employees' Retirement System (collectively, "Plaintiffs") bring a putative class action alleging Private Securities Litigation Act ("PSLRA") violations by Tesla, Inc., and Elon Musk (collectively, "Defendants"). ECF 57 (First Amended Complaint or "FAC"). They assert that Defendants made 29 false or misleading statements about the development timeline of its autonomous driving technology, the safety of the technology, and its capabilities.

By the start of the Class Period (February 19, 2019 to February 16, 2023), Tesla included a

---

[1] The Court accepts Plaintiffs' allegations in the complaint as true and construes the pleadings in the light most favorable to Plaintiffs. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

software package in its vehicles called "Autopilot," which it described as providing substantial self-driving capabilities, including providing "highway autonomy." FAC ¶ 63. Musk described Autopilot as being safer than human driving. FAC ¶ 63. Tesla also sold a software upgrade called "Full Self Driving" or "FSD" which enhanced the self-driving capabilities of the car. FAC ¶ 64. As part of the FSD software upgrade, Tesla offered a feature called "Smart Summon" which permitted users to direct the car to drive itself to them across very short distances. FAC ¶ 66. Tesla's software required drivers to occasionally touch the steering wheel, which Musk described as a mere technicality. FAC ¶ 67.

Defendants asserted that Tesla would run a network of "robotaxis" that would allow drivers to use a phone application (similar to Uber) to enable third parties to summon their car and drive them to a destination, allowing drivers to receive passive income while they were not personally using their car. FAC ¶ 75. Tesla equated robotaxis with Level 4-5 autonomy, describing them as "FSD without supervision." FAC ¶ 76.[2]

During the Class Period, Defendants represented that Tesla was very close to releasing safe and functional Level 4-5 self-driving technology that would drive safer than humans (e.g., Tesla will be "feature complete – full self-driving – this year"). FAC ¶¶ 82-83. However, Tesla's system is currently unsafe for use without human supervision, and its technology is not yet better than humans. FAC ¶¶ 186, 188. Further, the National Transportation Safety Board has criticized Tesla for its dangerous marketing which encourages drivers to not pay as close attention as is necessary for the technology. FAC ¶¶ 190-91. Reports have found that Tesla's autonomous driving technology has led to "far more" crashes than previously reported. FAC ¶¶ 204-05. The Full Self-Driving software has critical safety defects (e.g., it ignores "Do Not Enter" signs, speeds in school zones, runs over children crossing the road, swerves into oncoming traffic).

---

[2] The Society for Automotive Engineers has established five levels of vehicle autonomy. FAC ¶ 61. Levels 1-2 refer to systems where a human is driving the vehicle but technology can assist with certain aspects; Level 3 refers to systems where a human can sometimes hand over control of driving tasks but must always be ready to "intervene"; Levels 4-5 refer to systems where the human is not responsible for driving the car while systems are engaged, with Level 4 only providing the functionality in limited conditions (e.g., restricted geographical location or specific conditions such as not during rain). FAC ¶ 61.

FAC ¶¶ 208-09.  Tesla does not report the number of "disengagements" (i.e., human interventions) needed while its vehicles operate.  FAC ¶ 211.  The self-reported data from Tesla users shows that there is a disengagement of the Tesla's autonomous driving technology once every 16 miles, which is worse than its competitors in the autonomous driving market (1,000 times worse than Waymo and 5,800 times worse than Cruise).  FAC ¶ 212.

Throughout the Class Period, Tesla continuously assured investors that it was certain to release full self-driving technology at Level 4-5 autonomy very soon, including by the end of 2020.  FAC ¶ 220.  When suit was filed, over 3 years and 8 months had passed since the 2020 deadline and Tesla had not yet released even a Level 3 autonomous driving system.  FAC ¶ 221.

Plaintiffs bring three causes of action: (1) violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5(b) against Tesla and Musk; (2) violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5(a) and (c) against Tesla and Musk; and (3) Violation of Section 20(a) of the Securities and Exchange Act against Musk.  Defendants move to dismiss the First Amended Complaint in its entirety.  FAC ¶¶ 467-474, 475-483, 484-490.

### LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless,

1   Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of

2   fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

3   2008).

4       Securities fraud cases have heightened pleading requirements as the complaint must satisfy

5   both the pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *In re*

6   *VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Pursuant to Rule 9(b),

7   claims alleging fraud must "state with particularity the circumstances constituting fraud…" Fed.

8   R. Civ. P. 9(b). The PSLRA mandates that "the complaint shall specify each statement alleged to

9   have been misleading, [and] the reason or reasons why the statement is misleading. . . [.]" 15

10  U.S.C. § 78u–4(b)(1)(B). The PSLRA further requires that the complaint "state with particularity

11  facts giving rise to a strong inference that the defendant acted with the required state of

12  mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007) (quoting

13  15 U.S.C. § 78u–4(b)(2)(A)). This means a plaintiff must allege that "the defendant[] made false

14  or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone*

15  *Holdings*, 704 F.3d at 701 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991

16  (9th Cir. 2009)).

## DISCUSSION

### I.    REQUEST FOR JUDICIAL NOTICE

19      While the scope of review on a motion to dismiss is generally limited to the contents of the

20  complaint, courts may take judicial notice of facts that are "not subject to reasonable dispute."

21  Fed. R. Evid. 201(b). Courts may consider documents incorporated into the complaint by

22  reference, *Tellabs*, 551 U.S. at 322, and take judicial notice of matters of public record, *Lee v. City*

23  *of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001), and publicly available financial documents

24  such as SEC filings, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th

25  Cir. 2008). Courts may not assume the truth of an incorporated document "if such assumptions

26  only serve to dispute facts in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics, Inc.*,

27  899 F.3d 988, 1003 (9th Cir. 2018).

28      Defendants seek judicial notice of 20 exhibits (Exs. A-T). ECF 63 ("RJN"). Defendants

United States District Court
Northern District of California

4

1  assert that Exhibits A through H and J through T[3] are incorporated by reference.  *Id.* at 2; *see*

2  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  Plaintiffs' FAC is premised on earnings call

3  transcripts (Ex. C, H, J-S), s*ee* FAC ¶¶ 321, 329, 333, 347; and Tesla's Forms 10-K (Exs. B, D-G),

4  *see* FAC ¶¶ 372-75.  The FAC also relies on a Southern District of New York order (Ex. T) that

5  purportedly enjoins Tesla from invoking the PSLRA safe harbor, *see* FAC ¶ 459, and references

6  Tesla's website and its disclosures (Ex. A), *see* FAC ¶ 187.  Because the FAC alleges

7  misstatements based on Tesla's website and the Southern District of New York order, they are

8  incorporated by reference despite not being attached to the complaint.  *See U.S. v. Ritchie*, 342

9  F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be

10  incorporated by reference into a complaint if the plaintiff refers extensively to the document or the

11  document forms the basis of the plaintiff's claim.").

12      The Court also takes judicial notice of the contents of Exhibits B and D through G as they

13  are Forms 10-K filed with the SEC.  *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017

14  WL 3727318, at *10 (N.D. Cal. Aug. 30, 2017) (holding that SEC filings referenced in the

15  complaint "are proper subjects of judicial notice").  The Court takes judicial notice of Exhibits C,

16  H, and J through S as they are earnings call transcripts.  *See Sneed v. AcelRx Pharm., Inc.*, 2022

17  WL 4544721, at *3 (N.D. Cal. Sept. 28, 2022) (finding "transcripts of earnings calls . . . are proper

18  subjects of judicial notice").  The Court further takes judicial notice of Exhibit I, which reflects

19  Tesla's stock price on the first and last days of the Class Period.  *See, e.g.*, *Metzler*, 540 F.3d at

20  1064 n.7 (holding that district court properly took notice of stock price).  Exhibit A, which is an

21  excerpt of content from Tesla's website as displayed during the Class Period, is the proper subject

22  of judicial notice.  *See Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139,

23

24  ---

[3] Ex. A (Tesla Autopilot Support Page); Ex. B (Tesla 2019 Form 10-K); Ex. C (Oct. 21, 2020

25  Earnings Call Transcript); Ex. D (Tesla 2018 Form 10-K); Ex. E (Tesla 2020 Form 10-K); Ex. F
(Tesla 2021 Form 10-K); Ex. G (Tesla 2022 Form 10-K); Ex H (Apr. 20, 2022 Earnings Call

26  Transcript); Ex. J (Apr. 24, 2019 Earnings Call Transcript); Ex. K (Jul. 24, 2019 Earnings Call
Transcript); Ex. L (Oct. 23, 2019 Earnings Call Transcript); Ex. M (Apr. 29, 2020 Earnings Call

27  Transcript); Ex. N (Jul. 22, 2020 Earnings Call Transcript); Ex. O (Jan. 27, 2021 Earnings Call
Transcript); Ex. P (Jan. 26, 2022 Earnings Call Transcript); Ex. Q (Oct. 19, 2022 Earnings Call

28  Transcript); Ex. R (Jan 29, 2020 Earnings Call Transcript); Ex. S (Apr. 26, 2021 Earnings Call
Transcript); Ex. T (Oct. 16, 2018 Tesla Order).

United States District Court
Northern District of California

146 (N.D. Cal. 2020) (finding that "websites and their contents may be judicially noticed").

Finally, the Court takes judicial notice of Exhibit T, the Southern District of New York order, as

the Court may take judicial notice of court filings, *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,

442 F.3d 741, 746 n.6 (9th Cir. 2006).[4]

## II.   SECTION 10(B) CLAIM

Section 10(b) of the Securities Exchange Act makes it unlawful for any person to "use or

employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the Commission may

prescribe as necessary or appropriate in the public interest or for the protection of

investors."  15 U.S.C. § 78j(b).  To state a claim under section 10(b) and Rule 10b-5, a plaintiff

must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citations omitted); *see In

re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014).  "Rule 9(b) applies to all

elements of a securities fraud action, including loss causation."  *Oregon Pub. Emps. Ret. Fund v.

Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).  "Even where a plaintiff has properly pleaded

all six elements of a Section 10(b) violation, the allegedly false or misleading statement may still

be shielded from liability by the 'safe harbor' provision of the PSLRA."  *In re Quality Sys., Inc.

Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

Plaintiffs allege that Elon Musk and Tesla made 29 false and misleading statements in

violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).  Defendants move to dismiss

the FAC in its entirety.  They argue that the statements are not actionable because (1) they are

forward-looking statements protected by the PSLRA safe harbor; and (2) they are statements of

corporate puffery; and (3) Plaintiffs have not adequately pleaded facts to support the elements of a

---

[4] Plaintiffs do not object to the Court taking judicial notice of each of these documents.

United States District Court
Northern District of California

1   Section 10(b) claim.[5]  As statements protected under the safe harbor are nonactionable, the Court

2   considers that argument first.  *See, e.g.*, *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 873 (N.D.

3   Cal. 2023) ("*DocuSign*") (considering safe harbor before addressing whether statements are

4   otherwise actionable).  Similarly, the Court considers whether the statements are corporate puffery

5   before considering whether the claims are sufficiently pled.

6   **A.   PSLRA Safe Harbor**

7       The PSLRA "safe harbor" rule protects certain "forward-looking" statements from

8   liability.  15 U.S.C. § 78u-5(c).  The safe-harbor provision is "designed to protect companies and

9   their officials when they merely fall short of their optimistic projections."  *Wochos v. Tesla, Inc.*,

10  985 F.3d 1180, 1189 (9th Cir. 2021) (citation and quotations omitted).  Plaintiffs argue that Tesla

11  is statutorily prohibited from invoking the safe harbor doctrine.  The Court addresses this

12  argument before turning to the elements of the PSLRA safe harbor.

13  **1.   Statutory Exclusion from Safe Harbor**

14      The PSLRA Safe Harbor does not protect statements made by an issuer of securities within

15  three years after it has been the subject of an order barring future violations of an antifraud

16  provision of the securities laws.  15 U.S.C. § 78u-5(b).  Plaintiffs argue that this exclusion applies

17  to Tesla because a settlement in an SEC action bars Tesla from violating Rule 13a-15.  ECF 66

18  ("Opp.") at 21 (citing FAC ¶¶ 457, 459; *United States Securities & Exchange Commission v.

19  Tesla, Inc.*, 1:18-cv-8947-LJL (S.D.N.Y Oct. 16, 2018), ECF No. 14.[6]  Plaintiffs contend that Rule

20  13a-15 is an antifraud provision within the meaning of Section 15 U.S.C. § 78u-5(b), as it is aimed

21  at preventing fraud.  Opp. at 21.  Defendants dispute that Rule 13a-15 is an antifraud provision, as

22  it is a controls and procedures provision and does not contain a scienter requirement.  Mot. at 14

23  (citing *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1325 (11th Cir. 2019) (holding that Rule

24  12b-20 is not an "antifraud provision" because, among other reasons, it does not contain a scienter

---

[5] In the motion, Defendants categorize the statements into three types: Timeline, Safety, and
Capability.  Because Plaintiffs adopt this categorization in their response, the Court does as well.

[6] Plaintiffs do not dispute that the Musk can avail himself of safe harbor as he is not an "issuer" of
a security.  *See* Opp. at 21-22.

United States District Court
Northern District of California

1  requirement, and fraud provisions by their nature involve intentional wrongdoing).  Plaintiffs

2  provide no caselaw of any kind considering whether Rule 13a-15 is an antifraud provision.  The

3  Court therefore examines the rule and the conduct it regulates.

4      Rule 13a-15 dictates that issuers of securities must maintain "disclosure controls and

5  procedures" and evaluate their effectiveness every fiscal quarter.  17 C.F.R. § 240.13a-15(a)-(b).

6  The Rule defines "disclosure controls and procedures" to mean controls and procedures "designed

7  to ensure that information required to be disclosed by the issuer . . . is recorded, processed,

8  summarized and reported" in a timely manner.  *Id.* § 240.13a-15(e).  The issuer must also evaluate

9  "internal control over financial reporting" every fiscal year, which requires the issuer to provide

10  "reasonable assurance regarding the reliability of financial reporting and the preparation of

11  financial statements[.]"  *Id.* §§ 240.13a-15(c)-(d), (f).  The Court does not read this rule to be an

12  antifraud provision as fraud involves intentional wrongdoing.  *See* Prosser & Keeton on Torts 728

13  (5th ed. 1984) ("[Fraud] entail[s] [a]n intention to induce the [victim] to act or to refrain from

14  action in reliance on the misrepresentation.").  In promulgating Rule 13a-15, the SEC did not

15  discuss any fraud or state of mind requirements for the rule.  It explained that "[p]roposed Rule

16  13a-15 would require a company to maintain sufficient procedures to collect, process and disclose

17  the information required in its periodic and current reports filed with the Commission."  *In Re*

18  *Certification of Disclosure in Companies' Q. & Ann. Reps.*, SEC Release No. 46079 (June 14,

19  2002); *see also S.E.C. v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 462 (9th Cir. 1985)

20  (differentiating between "registration provisions of the Exchange Act," including Sections 12(g),

21  13(b)(2), and Rule 12b-20, recordkeeping provisions of the Securities Act, such as Section

22  13(b)(2) and "antifraud provisions of the Securities Act, § 17(a), § 10(b)").[7]  Rule 13a-15 does not

23  make any reference to the speaker's state of mind.  Therefore, the Court cannot find that Rule 13a-

24  15 is an antifraud provision and Plaintiffs have not shown that Tesla is prohibited from availing

25

26  _____

27  [7] Plaintiffs argue that Rule 13a-15 was implemented pursuant to "existing antifraud" rules such as Section 10(b).  Opp. at 19 (quoting SEC Release No. 46079, at *2).  However, this misquotes the SEC Release, which refers broadly to "existing antifraud and disclosure rules."  SEC Release No. 46079, at *2.

28

itself of the PSLRA safe harbor.  The Court thus turns to whether the safe harbor applies to the challenged statements.

### 2. Forward-Looking Statements

In determining whether the PSLRA safe harbor applies, the threshold question is whether any of the statements at issue are forward-looking.  Relevant here, the provision applies to (1) forward-looking statements that are identified as such and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially," or (2) forward-looking statements that were not made with "actual knowledge" by the speaker "that the statement was false or misleading."  15 U.S.C. § 78u-5(c); *see Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F. 4th 611, 620 (9th Cir. 2022).  The statute defines forward-looking statements as "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues."  *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)).  "Whether a statement is forward-looking and protected by the PSLRA's safe harbor 'turns on particular language' and therefore requires an individualized analysis of each statement."  *DocuSign*, 669 F. Supp. 3d at 874 (citation omitted).

Defendants argue that 18 Timeline Statements[8] expressing predictions for when Tesla's "Full Self Driving Capability" or "FSDC" would reach certain benchmarks are forward looking statements protected by the PSLRA safe harbor.  Mot. at 12-13; *see, e.g.*, FAC ¶¶ 313-14 (predicting "feature complete for full self-driving" this year); FAC ¶ 327 ("we expect to be feature complete with autonomy by the end of this year . . . I think probably sometime next year, you'll be able to have the car be autonomous without supervision"); FAC ¶ 331 (Tesla "appears to be on track" for fully functional FSD by the end of the year); FAC ¶¶ 343, 349, 351, 357 (expressing

---

[8] Statements 1-3, 5-6, 8-12, 14-16, 18-20, 23, 29.  *See* FAC ¶¶ 313, 315, 317, 321, 323, 327, 329, 331, 333, 335, 339, 341, 343, 347, 349, 351, 357, 369.  The Court refers to the statement numbers in Plaintiffs' Appendix A at ECF 66-1.

1    confidence that Tesla will achieve full autonomy the following year).

2    Plaintiffs contend that the Timeline Statements are not forward-looking because they omit

3    present facts rendering them misleading.  Opp. at 19.  For example, Plaintiffs argue that Musk's

4    statements that "I think we will be feature complete full self driving this year" and "I would say

5    that I'm certain of that. That is not a question mark" (FAC ¶ 314) are misleading "by omitting that

6    Tesla was nowhere near releasing Level 4-5 ADT and not even intending to develop that

7    technology over the near term."  *Id.*  However, Plaintiffs misunderstand the caselaw.  Statements

8    of the "assumptions underlying or relating to" the "plans and objectives of management for future

9    operations" are forward-looking statements.  *Wochos*, 985 F.3d at 1191-92 (holding that

10   statements that Tesla is "on track" to produce a certain number of vehicles per week were

11   "unquestionably" forward-looking statements).  To establish that a challenged statement contains

12   non-forward-looking assertions, a plaintiff must allege that the statement "goes beyond the

13   articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied

14   'concrete' assertion containing a specific 'current or past fact.' "  *Id.* at 1191 (quoting *Quality Sys.*,

15   865 F.3d at 1142, 1144).  Plaintiffs have failed to allege that these challenged statements contain

16   such "concrete" assertions of "current or past fact."  *See id.*[9]

17   The statements here set forth a projected timeline for achieving autonomous driving

18   technology, much like statements of a "projected launch date for [a company's] products" and thus

19   are plainly forward-looking statements of Tesla's plans and objectives.  *See In re Intel Corp. Sec.*

20   *Litig.*, 2023 WL 2767779, at *11 (N.D. Cal. Mar. 31, 2023), *aff'd*, 2024 WL 1693340 (9th Cir.

21   Apr. 19, 2024).

22   Defendants also argue that two Safety Statements are forward-looking:

23   - "We'll probably roll it out later this year.  But we'll be able to do traffic lights, stop, turns,
24     troughs, everything pretty much. And then it will be a long march of 9s, essentially, how
        many 9s of reliability are okay. So it's definitely way better than human . . ."  FAC ¶ 341

25

26   _____

27   [9] Plaintiffs also argue that because the statements were framed as guarantees rather than
     projections, they misrepresent the current condition of Tesla's business.  Opp. at 20.  They cite
28   only an out of circuit case from 25 years ago that is not persuasive.

United States District Court
Northern District of California

(Statement 15) (Jul. 22, 2020 Musk on Earnings Call).[10]

- "Tesla Full Self-Driving will work at a safety level well above that of the average driver this year, of that I am confident.  Can't speak for regulators though."  FAC ¶ 353 (Statement 21) (Jan. 1, 2021 Musk Tweet).

Plaintiffs argue that the statement "it's definitely way better than human" (Statement 15) is not forward-looking because it is a "mixed" statement that represents a present fact.  Opp. at 19. Where a defendant makes a mixed statement containing a non-forward-looking statement as well as a forward-looking statement, the non-forward-looking statement is not protected by the safe harbor.  *In re Quality Sys.*, 865 F.3d at 1141-42.  However, where the statement, "examined as a whole," challenges "future expectations and performance," the statement is properly classified as forward-looking.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1059 (9th Cir. 2014) ("*Intuitive Surgical*").  Here, the statement discusses rolling out "4D"[11] later in the year, what Tesla will "be able to do," and that reliability is "going to be the real work."  FAC ¶ 341. Thus, examined as a whole, the statement is best understood as discussing the "future expectations and performance" possible in the future roll-out.  *See Intuitive Surgical*, 759 F.3d at 1059 (statement that defendant was not "hear[ing] anything that causes us any significant concern . . . no change from last quarter, I guess . . ." was properly understood as "expectations of the future impact of the external economic environment on [defendant]").  Statement 15 (FAC ¶ 341) is thus forward-looking.  *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 936 (N.D. Cal. 2022) (citing *Wochos*, 985 F.3d at 1190) ("for a challenged statement to be deemed 'mixed,' the non-forward-looking aspects must be 'separable' from the forward-looking aspects").  Plaintiffs do not dispute that Statement 21 (FAC ¶ 353) is forward-looking.  As the Court has concluded that the above statements are forward-looking, the Court next considers whether Defendants have alleged that they were accompanied with meaningfully cautionary language or Plaintiffs have failed to allege knowledge of falsity.

---

[10] Defendants describe this statement as both a Timeline and a Safety Statement.

[11] The parties do not define "4D."

United States District Court
Northern District of California

### 3.     Prong One of the Safe Harbor: Meaningfully Cautionary Language

Defendants argue that the forward-looking statements are protected under the first prong of the PSLRA safe harbor because they provided meaningful cautionary language warning investors that predictions in their forward-looking statements were subject to certain risks.  Mot. at 13-14.  Forward-looking statements are protected under the first prong of the safe harbor if they were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially."  15 U.S.C. § 78u-5(c)(1)(A)(i).  "To be adequate under the cautionary-language prong, the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil.' "  *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)).  These factors must be "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances."  *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1052 (N.D. Cal. 2018) (citations omitted).  But the cautionary language "does not need to warn of the 'exact risk' that transpires."  *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 931 (N.D. Cal. 2017).

The forward-looking statements in Statements 5, 9-12, 15, 18, 23, 26, and 29 (FAC ¶¶ 321, 329, 331, 333, 335, 341, 347, 357, 363, and 369) were made during Tesla earnings calls.  At the beginning of each call, Defendants cautioned that "[d]uring this call, we will discuss our business outlook and make forward-looking statements.  These comments are based on our predictions and expectations as of today.  Actual events or results could differ materially due to a number of risks and uncertainties, including those mentioned in our most recent filings with the SEC."  ECF 62-13 (Ex. J) (Apr. 24, 2019 Earnings Call) at 2.[12]  The SEC filings discussed hardware for Autopilot and FSD features and stated that "[t]here is no guarantee that we will be able to successfully and timely introduce and scale any such new processes or features" and that Tesla may experience

---

[12] Ex. K (July 24, 2019 Earnings Call) at 2 (same); Ex. L (Oct. 23, 2019 Earnings Call) at 2 (same); Ex. M (Apr. 29, 2020 Earnings Call) at 2 (same); Ex. N (July 22, 2020 Earnings Call) at 2 (same); Ex. C (Oct. 21, 2020 Earnings Call) at 2 (same); Ex. O (Jan. 27, 2021 Earnings Call) (same); Ex. P (Jan. 26, 2022 Earnings Call) at 2 (same); Ex. Q (Oct. 19, 2022 Earnings Call) at 2 (same).

1    "delays or other complications in launching and/or ramping production of . . . future features and

2    services such as new Autopilot or FSD features and the autonomous Tesla ride-hailing network."

3    ECF 62-5 (Ex. B) (Dec. 31, 2019 Form 10-K) at 5.  Defendants also cautioned that "certain

4    features of our vehicles such as new Autopilot or FSD features [may] take longer than expected to

5    become enabled . . . [.]"  *Id.* at 11.

6            Plaintiffs contend that the cautionary language was inadequate as Defendants failed to

7    disclose risks known to them – namely, that Tesla was not close to developing FSDC.  Opp. at 20-

8    21.  "Risk disclosures that speak entirely of as-yet-unrealized risks and contingencies and do not

9    alert the reader that some of these risks may already have come to fruition can mislead reasonable

10   investors."  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (citation and quotation

11   marks omitted); *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th

12   Cir. 2023) (applying this to the context of the safe-harbor provision and finding that "cautionary

13   language is not 'meaningful' if it discusses as a mere possibility a risk that has already

14   materialized.").  In November and December of 2020, Tesla's Assistant General Counsel told that

15   California DMV that Tesla's City Streets software was ordinary "Level 2" driving assistance and

16   that Tesla was not expecting any "significant enhancements" or "changes" to the software to

17   render it Levels 3-5.  FAC ¶¶ 227-31.  The letter also stated that the development of Levels 3-5

18   will follow Tesla's "iterative process" and will not be released until the company has "fully

19   validated them."  FAC ¶ 230.  In 2021, Tesla's Director of Autopilot Software told the DMV that

20   Musk's tweet about reaching Level 5 capacity by the end of the year "does not match engineering

21   reality."  FAC ¶ 232.

22           Defendants argue that these allegations do not show that Tesla's statements were false or

23   misleading because the DMV letter refers to a specific technology – the City Streets software –

24   and does not indicate that Tesla's goals of completing FSD by the end of the year were not

25   plausible.  Mot. at 17-18.  Further, the 2021 DMV memo indicates that Tesla "couldn't say if the

26   rate of improvement would make it to L5 [Level 5] by the end of the year" and that Musk was

27   "extrapolating on the rates of improvement when speaking about L5 capabilities."  FAC ¶ 232.

28   The Court agrees with Defendants that Plaintiffs have failed to point to allegations showing that

the risk that the FSD technology could not be achieved by the projected timeline had "already come to fruition." *See In re Alphabet*, 1 F.4th at 703; *cf. Khoja*, 899 F.3d at 1016 (holding that a company's warning in its Form 10-Q that share prices "might" be affected by announcements of study results that "may" be inconsistent with interim study results was misleading because the company "allegedly knew already that the 'new data' revealed exactly that"); *DocuSign*, 669 F. Supp. 3d at 879 (finding that defendant's disclosures that risks related to the pandemic "could" or "may" impact the business were insufficient where defendant was aware that the "pandemic-generated demand was unsustainable" and knew of "plummeting usage rates . . . and disappointing sales as customers returned to in-person work and refused to renew" their contracts).

Moreover, courts have recognized that language similar to Defendants' is sufficiently cautionary. *See, e.g.*, *Intuitive Surgical*, 759 F.3d at 1059-60 (finding sufficient cautionary language in disclaimer that "[a]ctual results may differ materially from those expressed or implied, as a result of certain risks and uncertainties. These risks and uncertainties are described in detail in the company's [SEC] filings. Prospective investors are cautioned not to place undue reliance on such forward-looking statements"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010) (finding that the following language adequately cautioned investors: "these prepared remarks contain forward-looking statements concerning future financial performance and guidance . . . management may make additional forward-looking statements in response to questions, and . . . factors like Cutera's ability to continue increasing sales performance worldwide could cause variance in the results."). The cautionary language in the SEC filings mentions potential delays and complications in developing the technology and explains that certain features such as autopilot and FSD may take longer than expected. This precisely addresses the alleged misrepresentations. Indeed, "[t]he PSLRA safe harbor demands only that companies warn of risks that might cause actual results to differ from forward-looking predictions . . . [.]" *In re Intel Corp.*, 2023 WL 2767779, at *14 (citing 15 U.S.C. § 78u-5(c)(1)(A)). As Defendants have done that with respect to Statements 5, 9-12, 15, 18, 23, 26, and 29, the Court finds that those statements are protected under the PSLRA safe harbor.

### 4.      Prong Two of the Safe Harbor: Knowledge of Falsity

This leaves seven statements (Statements 1-3, 14, and 19-21 (FAC ¶¶ 313, 315, 317, 339, 349, 351, 353)), which Defendants contend are protected under the second prong of the PSLRA safe harbor because Plaintiffs have not alleged that the speaker knew that the statements were false or misleading.[13]  "Even if a forward-looking statement is not accompanied by adequate cautionary language, it is protected by PSLRA's safe harbor if the speaker did not have 'actual knowledge' that the statement was false or misleading."  *In re Quality Sys.*, 865 F.3d at 1149; *see Cutera*, 610 F.3d at 1112-13 (explaining that "actual knowledge" and "cautionary language" safe harbor prongs are disjunctive).  Plaintiffs argue that for the same reasons they have sufficiently alleged scienter, they have alleged knowledge of the statements' falsity.  Opp. at 20.  As discussed in the scienter section below, Plaintiffs have not alleged that Musk had knowledge that his statements were false.  Thus, the remaining forward-looking statements, Statements 1-3, 14, and 19-21, are protected under the second prong of the safe harbor.

### B.      Corporate Puffery

Defendants next argue that several Timeline and Safety Statements, Statements 7, 9-11, 13, 16, 18, and 26 (FAC ¶¶ 325, 329, 331, 333, 337, 343, 347, 363), are nonactionable statements of corporate puffery and optimism.  Mot. at 15, 19.  In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements.  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012) (citations omitted); *see In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017), *aff'd*, 756 F. App'x 779 (9th Cir. 2019) ("[A]lleged optimistic

---

[13] Defendants also contend that Statements 1-3, 14, and 19-21 (FAC ¶¶ 313, 315, 317, 339, 349, 351, 353), which were not identified as forward-looking or accompanied by forward-looking language, are protected under the "bespeaks caution" doctrine.  Mot. at 14-15.  The Court cannot agree, as dismissing the pleadings under the bespeaks caution doctrine requires showing that "reasonable minds could not disagree that the challenged statements were not misleading."  *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (citation omitted).  However, the Court need not address whether this doctrine applies, as that Plaintiffs have not adequately alleged knowledge of falsity.

1    statements indicating that a company is 'on track' to meet a certain goal are, without more,

2    inactionable puffery.").  This is because "[w]hen valuing corporations, . . . investors do not rely on

3    vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers."  *In re

4    Cutera*, 610 F.3d at 1111.  However, even "general statements of optimism, when taken in

5    context," may be misleading "when those statements address specific aspects of a company's

6    operation that the speaker knows to be performing poorly."  *In re Quality Sys.*, 865 F.3d at 1143

7    (citation omitted).

8            Defendants argue that the Timeline Statements that FSDC technology "appear[ed] to be on

9    track," would be available "aspirationally by the end of the year," and Tesla was "aiming to

10   release [it] this year," Statements 10, 11, and 18 (FAC ¶¶ 331, 333, 347), were nonactionable

11   statements of corporate puffery and optimism.  Mot. at 15.  Plaintiffs contend that the statements

12   provided a "concrete description" of the state of Tesla's technology in a way that misled investors.

13   Opp. at 18 (citing *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193, at *13 (N.D. Cal. Mar. 31,

14   2023)).  These statements about Tesla's aims and aspirations to develop Tesla's technology by the

15   end of the year and Musk's confidence in the development timeline are too vague for an investor

16   to rely on them.  *See Nimble Storage*, 252 F. Supp. 3d at 854 n.8.  Thus, in addition to being

17   protected under the PSLRA safe harbor, Statements 10, 11, and 18 are nonactionable puffery.[14]

18           Defendants also assert that several Safety Statements are corporate puffery.  For example,

19   statements that safety is "paramount" (FAC ¶ 325), Tesla cars are "absurdly safe" (*id.*), autopilot

20   is "superhuman" (FAC ¶ 337), and "we want to get to as close to perfection as possible"

21   (FAC ¶ 363).  Mot. at 19.  Plaintiffs respond that "super" in "superhuman" is not puffery because

22   it represents that ADT is safer than human and "absurdly safe" conveys greater-than-human

23   safety.  Opp. at 12.  However, these vague statements of corporate optimism are not objectively

24   verifiable.  *See In re Cutera*, 610 F.3d at 1111; *see, e.g.*, *Bodri*, 252 F. Supp. 3d at 924 (statement

25

26   _____

27   [14] Defendants also point to Statements 9 and 16 (FAC ¶¶ 329, 343) in a footnote.  Mot. at 15 n.9.
     The Court does not address arguments relegated to footnotes.  *See Est. of Saunders v. Comm'r*,
     745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes . . . are generally
28   deemed waived.").

United States District Court
Northern District of California

that the company was "enjoying terrific momentum" which was a "testament to the strength of the GoPro brand" was corporate optimism even though plaintiffs alleged that sales were weak and within days GoPro had cancelled orders). Accordingly, Statement 13 (FAC ¶ 337) is not actionable. Similarly, in Statement 26 (FAC ¶ 363), Tesla states that it wants to get "as close to perfection as possible" and that being safer than a human is a low standard. FAC ¶ 363. As Statement 26 is not objectively verifiable, it is mere puffery. However, Statement 7 (FAC ¶ 325) cannot be dismissed as mere puffery. While describing safety as "paramount" is not objectively verifiable, the rest of the statement explains that safety "bears out in the statistics," describes the "objective numbers" of the low probability of injury, and states "it's really hard to have a serious injury in a Tesla, . . . it's quite rare." FAC ¶ 325. Such a statement is more than simply corporate optimism and addresses a "specific aspect[] of [Tesla's] operation." *See In re Quality Sys.*, 865 F.3d at 1143. It thus cannot be dismissed on this basis. Similarly, Statement 27 (FAC ¶ 365) (that deploying the technology is "clearly safer than not deploying it") is not mere corporate optimism as it can be objectively verified.[15]

To recap, Statements 10, 11, 13, 18, and 26 (FAC ¶¶ 331, 333, 337, 347, and 363) constitute nonactionable puffery and the Court dismisses the claims based on those statements. However, the Court does not find that Statements 7, 9, 16, 21, and 27 (FAC ¶¶ 325, 329, 343, 353, 365) are corporate puffery.

**C.      Elements of Section 10(b) Claim**

Having assessed which statements are sheltered by the PSLRA safe harbor or are non-actionable statements of corporate puffery, the Court turns to Defendants' challenge of the sufficiency of Plaintiff's pleadings for each element of the Section 10(b) claim. The Court examines whether Plaintiffs have adequately the elements of Section 10(b) for the remaining 11 statements, Statements 4, 6, 7, 8, 16, 17, 22, 24, 25, 27, and 28.

---

[15] Defendants also argue in a footnote that the statement that Full-Self Driving "will work at a safety level well above that of the average driver this year" is a forward-looking statement. Mot. at 19 n.12 (quoting FAC ¶ 353). The Court does not address arguments made in footnotes. *See Est. of Saunders*, 745 F.3d at 962 n.8.

1    To state a claim under section 10(b) and Rule 10b-5, a plaintiff must show: "(1) a material

2    misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

3    misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

4    misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton*, 573 U.S.

5    at 267 (citations omitted).  "Rule 9(b) applies to all elements of a securities fraud action, including

6    loss causation." *Oregon Pub. Emps. Ret. Fund*, 774 F.3d at 605.

### 1.    False or Misleading

8    Defendants argue that the remaining 11 statements regarding the safety of autopilot and

9    FSDC features ("Safety Statements") and the capabilities of FSDC technology ("Capability

10   Statements") are not actionable because Plaintiffs have not alleged that they are false or

11   misleading.[16]  For a statement to be actionable under the PSLRA it must be false or misleading as

12   well as material.  "Under Rule 10b-5, . . . a fraudulent omission is a failure to 'state a material fact

13   necessary in order to make the statements made, in the light of the circumstances under which they

14   were made, not misleading.' " *Wochos*, 985 F.3d at 1188 (quoting 17 C.F.R. § 240.10b-5(b)).  A

15   statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs

16   that differs in a material way from the one that actually exists.' " *Berson v. Applied Signal Tech.,*

17   *Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d

18   997, 1006 (9th Cir. 2002)).  An omitted fact is material if there is a "substantial likelihood that the

19   disclosure of the omitted fact would have been viewed by the reasonable investor as having

20   significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway,*

21   *Inc.*, 426 U.S. 438, 449 (1976).  "The inquiry into materiality is 'fact-specific.' " *In re Alphabet*, 1

22   F. 4th at 700 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)).  As such,

23   "resolving materiality as a matter of law is generally appropriate 'only if the adequacy of the

24   disclosure or the materiality of the statement is so obvious that reasonable minds could not

25   differ.'" *Id.* (citation omitted).

26   The Court considers whether Plaintiffs have alleged that the statements are false or

27

---

28   [16] The Court does not address Defendants' arguments for dismissing the Timeline Statements here
as the Court has already dismissed the claims based on these statements.  *Supra* Section A.

United States District Court
Northern District of California

misleading, analyzing the Safety Statements and Capability Statements in turn.

### a.   Safety Statements

Defendants argue that several Safety Statements (Statements 4, 7, 13, 15, 21, 24, and 26-28, FAC ¶¶ 319, 325, 337, 341, 353, 359, 363, 365, 367)[17] were not false or misleading.  Mot. at 18-20.

- "[W]e publish accidents per mile every quarter, and ***what we see right now is that autopilot is about twice as safe as a normal driver on average.*** And we expect that to increase quite a bit over time."  Statement 4 (FAC ¶ 319) (Apr. 22, 2019 Musk at Tesla Autonomy Investor Day) (emphasis in original).

- "***I think safety especially, I think we -- it is paramount for us -- it's like the absolute primary thing is to maximize the safety of the car. So it's like -- and this bears out in the statistics. So it's really hard to have a serious injury in a Tesla, like it's not – it's quite rare***.  And when you do look at objective numbers like the NHTSA probability of injury, which is you could get on the Internet, the Teslas have the lowest probability of injury of any car tested. So like if it was possible to have a sixth star, we would have a sixth star. ***It's like -- literally it's absurdly safe***."  Statement 7 (FAC ¶ 325) (Jun. 11, 2019 Musk at Annual Meeting).

- "Essentially, passive Autopilot (car intervenes only when crash probability is high) cuts crashes in half. ***Active Autopilot (car is driving itself) cuts crashes in half again***.  Doesn't mean there are no crashes, but, on balance, Autopilot is unequivocally safer." Statement 24 (FAC ¶ 359) (Apr. 17, 2021 Musk Tweet); *see also* Statement 26 (FAC ¶ 363).

- "[W]ith respect to autopilot . . . we see steady improvements all along the way. And you know, sometimes there's this dichotomy of, you know, should you wait until the car is like, I don't know, three times safer than a person before deploying any technology. But I think that's that's [*sic*] actually morally wrong at the point at which we believe that that adding autonomy reduces injury and death, I think you have a moral obligation to deploy it, even though you're going to get sued and blamed by a lot of people, because the people whose lives you saved don't know that their lives are saved. . . . And it's not going to be perfect. ***But what matters it is, is that it is very clearly safer than not deploying it.***"  Statement 27 (FAC ¶ 365) (Sept. 30, 2020 Musk at Tesla Autonomy Investor Day).

- "***So the safety that we're seeing when the car is in FSD mode is actually significantly greater than the safety we're seeing when it is not***, which is a key threshold for going to a wide Beta."  Statement 28 (FAC ¶ 367) (Oct. 19, 2022 Musk on Earnings Call).

Plaintiffs allege that the high rate of driver interventions demonstrates that Tesla's ADT

---

[17] Defendants also raise this argument for Statements 13, 15, 21, and 26.  The Court does not engage the argument because it has already concluded the claims based on these statements should be dismissed.  *Supra* Sections II A(3) and B.

was not safer than humans, as humans had to take control to avoid crashes. Opp. at 11 (citing FAC ¶ 212). In addition, Plaintiffs reference research showing thousands of deficiencies in Tesla's ADT where it fails to safely complete basic driving tasks, FAC ¶ 210, and note that Tesla has more incidents, more severe crashes, and certain types of crashes (such as accelerating on an exit-ramp) than previously reported. FAC ¶¶ 204-05, 217-19.[18] Plaintiffs allege that Musk's recent statements indicate that ADT is not yet safer than humans (e.g., Musk would be "shocked if we do not achieve full self-driving safer than a human this year," and after the Class Period that "I think we'll be better than human by the end of this year," FAC ¶ 188). Plaintiffs allege that various articles show that Autopilot and self-driving technology led to crashes in Teslas. FAC ¶¶ 191-203. For example, a June 10, 2023, Washington Post article (from after the Class Period) indicates that Tesla's autopilot had "far more" crashes than previously reported and that a NHTSA Senior Safety Advisor commented that "Tesla is having more severe – and fatal – crashes than people in a normal data set." FAC ¶ 204.

Defendants argue that articles from after the Class Period about general safety issues do not show that the Safety Statements were false when made. Mot. at 20. In order to satisfy the PSLRA's "exacting requirements for pleading 'falsity," a plaintiff must plead "specific facts" indicating why a statement is false. *Metzler*, 540 F.3d at 1070. Plaintiffs allege that there were safety issues with the technology, "people looked away from the road 18% more often" with autopilot, FAC ¶ 197, and autopilot features caused at least ten car accidents during an unspecified period, FAC ¶¶ 204-05. However, Plaintiffs fail to provide "contemporaneous reports or data" showing that the statement was false or misleading when made. *Nursing Home Pension Fund Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). Even if this data existed at the time the statements were made, the fact that there were safety issues with the technology does not suggest that it was false or misleading to assert that the technology was safer than regular human driving. *See Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019)

---

[18] Plaintiffs also detail the large gap between Tesla's current autonomous driving technology and what is required to achieve a Level 4-5 system. FAC ¶¶ 260-302.

United States District Court
Northern District of California

1    (dismissing claims where plaintiff "fail[ed] to connect the statements with factual allegations that

2    show how the statements were false or misleading when made").  For example, Plaintiffs allege

3    that the NTSB found that Tesla's autopilot was a "probable cause" of a deadly March 2018 crash

4    and an August 2019 crash.  FAC ¶ 206.  However, such findings do not contradict statements that

5    Autopilot cut crashes in half or that using it was safer than not using it.[19]  Accordingly, Plaintiffs

6    have not alleged that the Safety Statements were false or misleading, and the Court dismisses with

7    leave to amend the claims based on Statements 4, 7, 13, 15, 21, 24, 26, 27, and 28 (FAC ¶¶ 319,

8    325, 337, 341, 353, 359, 363, 365, 367).

9                               **b.**     **Capability Statements**

10           Defendants next argue that Plaintiffs have not alleged that the Capability Statements about

11   the FSDC technology, Statements 6, 16, 17, 18, 20, 22, 23, 25, and 29 (FAC ¶¶ 323, 343, 345,

12   347, 351, 355, 357, 361, 369), were false or misleading.  Mot. at 20-21.  Musk stated that the Full

13   Self-Driving software is "almost getting to a point where I can go from my house to work with no

14   interventions" (FAC ¶ 343), "[t]he latest build is capable of zero intervention drives" (FAC ¶ 345),

15   the "car should still be able to drive, just like a person. That is the system that we are developing

16   and aiming to release this year" (FAC ¶ 347), Musk drives the alpha build of the latest fully self-

17   driving software and "many times I can go through a very complicated series of intersections and

18   narrow roads, without ever touching any of the controls" (FAC ¶ 351), it is "very common for me

19   to have no interventions on drives that I do, including drives to a place that I've never been to"

20   (FAC ¶ 355), and "I think we'll also have an update next year to be able to show regulators that

21   the car is safer, much safer than the average human" (FAC ¶ 369); *see also* FAC ¶¶ 323, 357, 361.

22   Plaintiffs allege that these statements are materially misleading because numerous safety issues

23   demonstrate that Tesla did not possess Level 4-5 autonomy, Tesla disclosed to regulators that it

24   remained "firmly" at Level 2, the confidential witness[20] allegations show that Tesla's ADT had

25

26   ──────────────────────

27   [19] Indeed, Statement 24 states that Autopilot "cuts crashes in half" but that "[d]oesn't mean there
     are no crashes . . . [.]" Statement 24 (FAC ¶ 359).

28   [20] Confidential witnesses are identified in the FAC as CW-1, CW-2, CW-3, and CW-4.
     FAC ¶ 235 n.8.

United States District Court
Northern District of California

1    not reached Level 4-5 autonomy, and Tesla faced functionality and dependability problems.  Opp

2    at 13 (citing FAC ¶¶ 222-34, 236-47, 260-84).  However, "the reasons Plaintiffs offer as to why

3    the statements are false or misleading bear no connection" to the substance of the Capability

4    Statements, and do not allege that the software was not capable of no intervention drives.  *See Jui-*

5    *Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *15 (N.D. Cal. Apr. 27, 2017).  The

6    only factual allegations that are connected to the Capability Statements are CW-2's statements that

7    it was "absolutely" known within the autopilot department that Musk's statements about the

8    viability of autopilot and FSD technologies were "exaggerations."  FAC ¶¶ 243-44.  However,

9    such allegations are too vague to show that Musk's statements were false or misleading.  *See*

10   *Intuitive Surgical*, 759 F.3d at 1063.  Accordingly, the Court dismisses the claims based on the

11   Capability Statements.

12                        **2.      Strong Inference of Scienter**

13          Defendants also challenge the sufficiency of Plaintiffs' allegations with respect to scienter.

14   Scienter is the intent to deceive, manipulate or defraud.  *Tellabs*, 551 U.S. at 319.  To establish

15   scienter, the complaint must "state with particularity facts giving rise to a strong inference that the

16   defendant acted with the required state of mind."  15 U.S.C. § 78u– 4(b)(2)(A).  The required state

17   of mind is "a mental state that not only covers 'intent to deceive, manipulate, or defraud,' but also

18   'deliberate recklessness.' "  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir.

19   2016) (internal citations omitted).  Deliberate recklessness is " 'an *extreme* departure from the

20   standards of ordinary care,' which 'presents a danger of misleading buyers or sellers that is either

21   known to the defendant or is so *obvious* that the actor must have been aware of it.' "  *In re*

22   *Alphabet*, 1 F. 4th at 701 (emphasis in original) (quoting *Nguyen v. Endologix, Inc.*, 962 F.3d 405,

23   414 (9th Cir. 2020)).

24          The "strong inference" required by the PSLRA "must be more than merely 'reasonable' or

25   'permissible'—it must be cogent and compelling, thus strong in light of other explanations."

26   *Tellabs*, 551 U.S. at 324.  "Facts showing mere recklessness or a motive to commit fraud and

27   opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish

28   a strong inference of deliberate recklessness."  *In re VeriFone Holdings*, 704 F.3d at 701.  "A

United States District Court
Northern District of California

court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco Partners*, 552 F.3d at 991 (9th Cir. 2009); *see Nguyen*, 962 F.3d at 415 (9th Cir. 2020). In evaluating whether a complaint satisfies the "strong inference" requirement, courts must consider the allegations and other relevant material "holistically," not "scrutinized in isolation." *In re VeriFone Holdings*, 704 F.3d at 701-02 (citing *Tellabs*, 551 U.S. at 323, 326). If no individual allegation is sufficient, the court "conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer*, 63 F.4th at 766 (citation omitted). Because scienter is a subjective inquiry, "the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1042 (9th Cir. 2010).

Plaintiffs allege scienter based on: (1) confidential witness accounts; (2) Musk's access to data about Tesla's Autonomous Driving Technology; (3) the core operations doctrine; (4) Musk's motives to inflate the stock price; and (5) Musk's history of fraud. The Court addresses each below. At their core, the allegations do not allege a strong inference of scienter because they fail to show that Defendants knew the statements were false, or indeed that there existed contemporaneous data about the capability and safety of the technology at the time the statements were made.

### a.       Confidential Witness Accounts

Plaintiffs allege that confidential witness statements raise a strong inference of scienter. "Where the plaintiff relies upon statements by confidential witnesses, the complaint must also pass two additional hurdles." *In re Quality Sys.*, 865 F.3d at 1144. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 552 F.3d at 995. "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* Defendants argue that none of the confidential witnesses offer sufficiently specific testimony to raise a strong

United States District Court
Northern District of California

inference of scienter.  Mot. at 24-26.  The Court addresses the confidential witness allegations, and whether they support an inference of scienter.

CW-1 only worked for Tesla for six months, and thus did not have "personal knowledge" about the FSDC technology for the majority of the Class Period.  FAC ¶ 236.  CW-1 alleges that "accident and safety data was reviewed by Tesla" and full-self driving was in beta and faced errors such as phantom braking.  FAC ¶¶ 237, 240-41.  While these allegations show that Tesla faced issues in its development of the technology, they are not "indicative of scienter," *see Zucco Partners*, 552 F.3d at 995, as they do not show that Defendants knew their statements about auto safety were false or misleading, *see Gebhart*, 595 F.3d at 1042.

CW-2 alleges that it was "absolutely" known within Tesla's "autopilot department" that Musk's statements about the viability of FSD and autopilot were "exaggerations," and "everyone" knew the vehicles were not close to being full self-driving.  FAC ¶ 244.  CW-2 does not explain how he knew such information.  Indeed, CW-2 does not explain how or why "everyone" knew that the technology was not close to full self-driving.  Such "unreliable hearsay and . . . conclusory assertions of scienter" are too lacking in factual allegations to support an inference of scienter. *See Zucco Partners*, 552 F.3d at 996.

CW-3 states that there were issues with the FSDC prototypes that needed to be worked out, and Musk received regular reports and updates regarding the engineering team's work. FAC ¶¶ 248-53.  Defendants argue that there is no detail about what the reports reflected, who attended the meetings, when they occurred, or what was said.  Mot. at 25.  The Court agrees that without more specificity, it cannot find that Musk's receipt of unspecified reports and updates from the engineering team are indicative of a strong inference of scienter.  *See In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *11-12 (N.D. Cal. Mar. 10, 2006) (no scienter where plaintiffs failed to cite specific report, mention date or contents of report, or allege sources of information on report); *Intuitive Surgical*, 759 F.3d at 1063 (witness statements lacked foundation where they did "not detail the actual contents of the reports the executives purportedly references or had access to").  CW-3 also stated that "if there was a major regression regarding safety, operations, or driver comfort," it would have been reported to certain individuals who reported to

Musk.  FAC ¶ 255.  However, CW-3 does not allege that any such regression occurred.  "[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA."  *Intuitive Surgical*, 759 F.3d at 1062-63 (rejecting "impressions of witnesses who lacked direct access to the executives") (quoting *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1036 (9th Cir. 2002)).  Accordingly, these vague allegations do not support scienter.

### b.  Musk's Access to Information

Plaintiffs next argue that Musk's access to information about Tesla's autonomous driving technology establishes a strong inference of scienter.  Opp. at 24-25; *see* FAC ¶¶ 252, 256, 405-06, 419.  While "detail-oriented management style" supports scienter, *Nursing Home Pension Fund*, 380 F.3d at 1234 (statements that "I love getting involved in every detail of the business" and that executive monitored portions of the global database supported scienter), Plaintiffs fail to connect Musk's hands-on management with any information that he allegedly learned rendering his statements false or misleading.  For example, Plaintiffs allege that Tesla employees declined to test the ADT because they did not want to be "test dummies" and that Tesla had access to video feeds from its vehicles which it used to track problems (FAC ¶¶ 241, 248-56, 414, 416).  However, there is no indication that Musk viewed these videos or that they rendered his statements false or misleading.

Plaintiffs also repeatedly reference the DMV letter that Tesla was not developing City Streets above a Level 2 autonomy and that Musk's Level 5 tweet did not match engineering reality (but that Tesla could not say whether it was possible by the end of the year).  These allegations are not enough to rise to the level of a strong inference of scienter because Plaintiffs have not alleged that statements about City Streets technology applied to all of Tesla's ADT, and Tesla was equivocal in whether it could achieve Level 5 autonomy by the end of the year.  FAC ¶¶ 28-29.  *See Wochos*, 985 F.3d at 1194 (statements from former Tesla employees who told Musk that they believed Tesla's goal of producing 5,000 Model 3s per week by the end of 2017 was impossible did not show that Tesla or Musk "shared," "adopted," or "accepted those employees' views that

the goal was impossible").[21]  In addition, as discussed above, allegations that "everyone" knew about problems with the technology and that its viability was an "exaggeration" (FAC ¶¶ 243-44, 415) are not "particularized allegations" showing that Musk knew that Tesla could not achieve its goals in the timeline it projected.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Syst. v. Align Tech.*, 856 F.3d 605, 620 (9th Cir. 2017).  Accordingly, Plaintiffs have not raised a strong inference of scienter.

### c.  Core Business

Plaintiffs also contend that Tesla's autonomous driving technology was core to its business, raising a strong inference of scienter.  The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers.  *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018).  "Proof under this theory is not easy.  A plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring . . . or witness accounts demonstrating that executives had actual involvement in creating false reports."  *Intuitive Surgical*, 759 F.3d at 1062.  "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."  *Metzler*, 540 F.3d at 1068.  Musk's admitted importance of the self-driving technology (describing self-driving technology as the "difference between Tesla being worth a lot of money or basically worth zero," FAC ¶ 56) coupled with Musk's involvement in the minutiae of Tesla's ADT supports an inference of Musk's awareness of relevant facts.  *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).  As with the previous scienter arguments, however, Plaintiffs do not show what information showed that Musk knew that his predictions about the timeline of FSD development, its capabilities, or its safety were false or misleading.

### d.  Motive Allegations from Stock Sales

---

[21] Plaintiffs also point to an expert analysis showing that Tesla still faces many obstacles to releasing Level 4-5 ADT.  Opp. at 9 (citing FAC ¶¶ 260-302).  However, Plaintiffs do not indicate that such information was learned by Tesla or Musk at the time the statements were made.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs also highlight Musk's financial motives to mislead investors.  Although

2    "evidence of a personal profit motive on the part of officers and directors . . . is insufficient to

3    raise a strong inference of scienter," *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 748 (9th

4    Cir. 2008), "personal financial gain may weigh heavily in favor of scienter." *Tellabs*, 551 U.S. at

5    325.  "[S]tock sales by corporate insiders [are] suspicious only when [they are] dramatically out of

6    line with prior trading practices at times calculated to maximize the personal benefit from

7    undisclosed inside information." *Dearborn Heights*, 856 F.3d at 621 (internal quotation marks

8    and citation omitted).  When analyzing insider trading, courts look to "(1) the amount and

9    percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were

10    consistent with the insider's prior trading history." *Id.* (citations omitted).

11    Here, Plaintiffs allege that during the Class Period, Musk sold over 141 million Tesla

12    shares, collecting nearly $34 billion in profit.  FAC ¶¶ 33, 425-26.  These sales were 239% greater

13    in volume, and 6,345% greater in value, than Musk's trading over the same timespan prior to the

14    Class Period.  FAC ¶¶ 430-31.  The average price of his sales was 70% higher than the Class

15    Period average, and Musk sold 44.8% of the stock he had available for sale.  FAC ¶¶ 429, 432-33.

16    The fact that Musk sold a substantial number (141 million) and percentage (44.8%) of shares, and

17    that the sales were not consistent with prior trading history, supports an inference of scienter.  *See*

18    *Dearborn Heights*, 856 F.3d at 621; *cf. Intuitive Surgical*, 759 F.3d 1063-64 (significant profits

19    did not raise inference of scienter because the complaint did not contain allegations regarding the

20    defendants' prior trading history).

21    However, as Defendants emphasize, the stock sales (over a four-year period) were not

22    linked to any purported misstatement or corrective disclosure, and the timing of sales undermines

23    any inference of scienter.  Mot. at 28-29.  For example, Plaintiffs do not allege that Musk sold any

24    stocks until more than two years after the first alleged misstatement, and he sold his first stocks

25    after the two alleged corrective disclosures.  *See* ECF 57-1, FAC ¶¶ 313, 315 (first alleged

26    misstatements in February of 2019 and first alleged stock sale in November of 2021).  This timing

27    does not support an inference of scienter.  *See Hoang, et al., v. Contextlogic, Inc., et al.*, 2023 WL

28    6536162, at *26 (N.D. Cal. March 10, 2023) ("[s]ales after corrective disclosures do not support

1   an inference of scienter.").  Plaintiffs do not respond to this argument apart from reiterating that

2   the sales were "suspiciously timed" because the average price of the sales over the four-year Class

3   Period was 70% higher than the Class Period average.  Opp. at 29 (citing FAC ¶¶ 432-33).  Given

4   the timing of the sales, any inference of scienter from the higher sale of stocks is not a strong

5   inference and Plaintiffs have failed to carry their burden.  *See In re Hansen Natural Corp. Sec.*

6   *Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007) ("Because Plaintiff has failed to meet his

7   burden of demonstrating that the stock sales are related to the alleged misstatements, he has failed

8   to demonstrate a strong inference of scienter based upon" the sales).

9                              **e.      History of Fraud**

10          Plaintiffs also allege that Musk has a history of making misrepresentations to investors

11  with scienter, and that staged videos from 2014 and 2016 support an inference of Musk's scienter.

12  A summary judgment order in a different case held that Musk's 2018 tweet about securing funding

13  for Tesla was misleading and made with scienter.  FAC ¶ 423 (citing *In re Tesla, Inc., Sec. Litig.*,

14  No. 3:18-cv-04865-EMC (N.D. Cal. Apr. 1, 2022), ECF No. 387).  A 2016 video shows a Tesla

15  driving itself while a driver sat with their hands on their lap and the video stated that the person in

16  the driver's seat "is only there for legal reasons. He is not doing anything. The car is driving

17  itself." FAC ¶ 69.  In January 2023, it came to light that Musk was directly involved in creating

18  the 2016 video, which was staged using 3D mapping on a predetermined route.  FAC ¶ 69.

19  Plaintiffs offer no authority to explain why such allegations are relevant here or why a video from

20  before the Class Period is relevant.  Thus, the summary judgment order and videos cannot support

21  a strong inference of scienter.

22                             **f.      Holistic Review**

23          Finally, the Court holistically reviews the scienter allegations, as required by *Tellabs*, 551

24  U.S. at 322-23.  Plaintiffs' allegations show that Tesla's vehicles face numerous limitations that

25  they need to overcome to achieve full self-driving and that Defendants were generally aware that

26  various issues existed.  FAC ¶¶ 260-84.  However, the FAC lacks allegations describing with

27  particularity the documents to which Musk had access or the documents he received indicating

28  that the software was not capable of no-intervention drives, that full self-driving was not possible

United States District Court
Northern District of California

within the projected timeframe, or that autopilot was not safer than humans.

In *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020), the Ninth Circuit held that plaintiffs' theory that defendants promised FDA approval that they knew would not be possible because of migration problems "does not make a whole lot of sense," and relies on the "supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout" when the migration problem was revealed. *Id.* at 415. The Court reasoned that if defendants had "sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs," but there were no such factual allegations. *Id.* Here, Plaintiffs' profit motive theory makes little sense given that there are no allegations that Musk sold significant amounts of stock right after a purported misstatement, and in fact the allegations show that he sold stock months after corrective disclosures. Moreover, like in *Nguyen*, Plaintiffs' theory that Defendants knew that the software was not safe, not capable of what they alleged, and would not be achieved in the projected timeframe would have inevitably been revealed when Defendants missed their development timeline. Accordingly, the Court finds that Plaintiffs have failed to allege a strong inference of scienter and the Court dismisses the Section 10(b) claim.[22]

### III.    SECTION 11 CLAIM UNDER ITEMS 105 AND 303

Plaintiffs also bring a claim under Section 11 for failure to comply with Items 303 and 105. Defendants moves to dismiss this claim. Item 303 requires disclosure of any known material "trends or uncertainties," 17 C.F.R. § 229.303 ("Item 303"). Item 105 requires affirmative disclosure of the "material factors" that made investment "risky," 17 C.F.R. § 229.105 ("Item 105"). *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296-97 (9th Cir. 1998) (an Item 303 violation automatically states a claim for a Section 11 violation); *Sundaram v. Freshworks Inc.*, 2023 WL 6390622, at *7 (N.D. Cal. Sept. 28, 2023) (citing cases) (treating violations of Items 105 and 303 as a violation of Section 11).

---

[22] Because the Court finds that the Section 10(b) claims fail for lack of scienter, it does not address the parties' arguments regarding loss causation.

United States District Court
Northern District of California

1    "To state a Section 11 claim for failing to adhere to Item 303, Plaintiffs must plausibly

2    allege: (1) the existence of a trend or uncertainty; (2) known to management; (3) that is reasonably

3    likely to have a material effect on the registrant's financial condition or results of operation."

4    *Sundaram*, 2023 WL 6390622, at *7 (citing *Steckman*, 143 F.3d at 1296-97); *see* 17 C.F.R. §

5    229.303(b)(2)(ii) (requiring disclosure of any "known trends or uncertainties that have had or that

6    are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues

7    or income from continuing operations").  Plaintiffs allege that a 2023 article claimed that Tesla's

8    Autopilot was involved in more crashes than previously reported and allege that Teslas were

9    involved in a handful of crashes over a four-year period.  FAC ¶¶ 204-05.  However, Plaintiffs fail

10   to allege that the safety issues represented a pattern or "trend" requiring disclosure as opposed to

11   isolated incidents.  *See In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1263

12   (N.D. Cal. 2019) ("A trend under Item 303 requires an 'observed pattern that accurately reflects

13   persistent conditions of the particular registrant's business environment.' ") (citation omitted).

14   Accordingly, Plaintiffs' Item 303 claim fails.

15         Defendants argue that Plaintiffs' Item 105 claim fails for the same reason the Item 303

16   claim fails – that Tesla adequately disclosed the risks it faced.  Mot. at 22.  Item 105 requires a

17   "discussion of the material factors that make an investment in the registrant or offering speculative

18   or risky." 17 C.F.R. § 229.105(a).  A company's risk disclosures may be misleading where the

19   "risk factors" reported have already materialized.  *See Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020

20   WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) (company's financial affairs were materially

21   different than what it represented in its Registration Statement).

22         Here, the Form 10-K disclosures explain that Tesla vehicles "have been involved and we

23   expect in the future will be involved in accidents resulting in death or personal injury, and such

24   accidents where Autopilot or FSD features are engaged are the subject of significant public

25   attention.  We have experienced and we expect to continue to face claims arising from or related to

26   misuse or claimed failures of such new technologies that we are pioneering."  ECF 62-8 (Ex. E) at

27   9.  Plaintiffs argue that the "boilerplate" risk disclosures about the possibility of crashes and

28   regulatory action did not apprise investors of risks.  Opp. at 22.  However, this language warned

United States District Court
Northern District of California

30

1    investors of the risks Tesla faced, and this type of language has been found in similar cases to

2    constitute sufficient disclosure. *See Golubowski v. Robinhood Mkts.*, 2023 WL 1927616 at *8

3    (N.D. Cal. Feb. 10, 2023); *see also Sundaram*, 2023 WL 6390622, at *9 (risk disclosures

4    sufficiently warned that the company may experience deterioration in revenue growth, listing

5    potential risks such as the COVID-19 pandemic, level of product demand, errors in forecasting

6    product demand, and a reduction in customer renewal rates). Plaintiffs have not alleged facts that

7    plausibly demonstrate that Tesla's car safety was materially different from what was represented

8    in its risk disclosures. Accordingly, Plaintiffs have not plausibly alleged an Item 105 violation.

9    **IV.    RULE 10B-5(A), (C) CLAIM AND SECTION 20(A)**

10    Plaintiffs also allege a scheme or course of conduct liability against Defendants under Ruel

11    10-5(a) and (c). FAC ¶¶ 475-83; *see* 17 C.F.R. § 240.10b-5(a), (c) (declaring it unlawful "[t]o

12    employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course

13    of business which operates or would operate as a fraud or deceit upon any person, in connection

14    with the purchase or sale of any security"). Defendants state that they are not liable for any such

15    violation as the theory rests on the same facts and purported misstatements as the Rule 10b-5(b)

16    claim and fails for the same reasons. Mot. at 11 n.3. A scheme liability claim can depend on

17    misstatements that also violate Rule 10b-5(b). *See Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71,

18    80 (2019) (explaining that subsection (b) and subsections (a) and (c) of Rule 10b-5 do not govern

19    "mutually exclusive[ ] spheres of conduct").

20    Here, Plaintiffs do not adequately allege a violation of subsections (a) and (c) under either

21    the *Lorenzo* dissemination of fraud theory or a scheme liability theory. Under *Lorenzo*, Plaintiffs

22    must allege that Defendants disseminated "false or misleading information to prospective

23    investors with the intent to defraud." 587 U.S. at 79. For the same reasons discussed above,

24    Plaintiffs have not adequately alleged any false or misleading statements or scienter, and thus may

25    not proceed under that theory. *See Sneed v. AcelRx Pharms., Inc.*, 2022 WL 4544721, at *6 (N.D.

26    Cal. Sept. 28, 2022). Under scheme liability, which Plaintiffs seem to be pursuing, *see* FAC ¶ 477

27    ("Defendants engaged in a fraudulent scheme, practice, or course of business . . ."), Plaintiffs

28    argue that they are focusing on Defendants' "course of business" in which they persuaded

United States District Court
Northern District of California

31

1   investors that Tesla was close to releasing fully autonomous cars based on the collective totality of

2   the false and misleading statements.  Opp. at 23; FAC ¶¶ 72-74.  However, Plaintiffs fail to allege

3   sufficient facts showing that Defendants engaged in such a fraudulent scheme to mislead investors.

4   *See Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022).  Accordingly, the

5   Court dismisses this claim with leave to amend.

6   **V.       SECTION 20(A) CLAIM**

7          Plaintiffs bring a claim for a violation of Section 20(a) of the Exchange Act against Musk.

8   FAC ¶¶ 484-490.  A Section 20(a) claim requires an underlying violation of securities law.  *In re*

9   *Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012).  Because Plaintiffs failed to

10  adequately plead a violation under Section 10(b), the Section 20(a) claim also fails.  *See id.*[23]

11                                      **CONCLUSION**

12         For the foregoing reasons, the Court **GRANTS** Defendants' motion to dismiss with leave

13  to amend.  Any amended complaint must be filed by **October 30, 2024**.  No additional parties or

14  claims may be added without leave of Court or stipulation of Defendants.

15

16         **IT IS SO ORDERED.**

17  Dated: September 30, 2024

18

19                                              _____
20                                              **ARACELI MARTÍNEZ-OLGUÍN**
                                                **United States District Judge**
21

22

23

24

25

26

27  ───────────────────────
[23] Defendants only raise the arguments about Section 20(a) in a footnote.  Mot. at 11 n.3.  The
28  Court does typically not address arguments relegated to footnotes.  *See Est. of Saunders*, 745 F.3d
    at 962 n.8.

United States District Court
Northern District of California